### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>KTRV LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 25-10601 (MFW)<br><br>(Joint Administration Requested) |

### DECLARATION OF BRIAN RYNIKER IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

Pursuant to 28 U.S.C. § 1764, I, Brian Ryniker, declare as follows under the penalty of perjury:

1.    KTRV LLC ("KTRV") and Heritage Coal & Natural Resources, LLC ("HCNR," and together with KTRV, the "Debtors" or the "Company") are the debtors and debtors-in-possession in the above-captioned cases. I am currently serving as the Chief Restructuring Officer of the Debtors.

2.    I am a founding member at RK Consultants LLC. Prior to forming RK Consultants, I provided bankruptcy consulting and forensic services with a top 10 accounting and advisory firm for more than 20 years,

3.    I am over 18 years of age. If called as a witness, I could and would competently testify with respect to the matters set forth in this declaration from my own personal knowledge or from knowledge gathered from others within the Debtors' organization and the Debtors' advisors, my review of relevant documents, or my opinion based upon my experience concerning the

---

[1] The Debtors in these chapter 11 cases, along with each the last four digits of each Debtors' tax identification number, are as follows: KTRV LLC (9993), Heritage Coal & Natural Resources, LLC (8326). The location of the Debtors' principal place of business and service address is 1521 Concord Pike, Suite 201, Wilmington, DE 19803.

Debtors' business and operations.[2]  References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel.

4.       I submit this declaration on behalf of the Debtors (a) in support of the Debtors' voluntary petitions for relief that were filed under chapter 11 of the Bankruptcy Code, (b) in support of the Debtors' request for relief in First Day Pleadings, as subsequently defined herein , being filed contemporaneously with this declaration, and (c) to assist this Court and other interested parties in understanding the circumstances giving rise to the commencement of the Debtors' chapter 11 cases (the "Chapter 11 Cases"). I have reviewed the Debtors' petitions and the First Day Pleadings, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' business and the maximization of the value of the Debtors' estates.

5.       To familiarize the Court with the Debtors and the relief that the Debtors seek early in these Chapter 11 Cases, this Declaration is organized in four parts. **Part I** provides an introduction to the Debtors and detailed information on their corporate history, and the events that led to the commencement of these Chapter 11 Cases. **Part II** describes the Debtors' business operations and finances as of the Petition Date, and **Part III** provides an overview of the First Day Pleadings.

### PART I – The Debtors' Business, Corporate History, and Events Leading to Bankruptcy

6.       KTRV is a Delaware holding company whose sole asset is the membership interest in HCNR, a Pennsylvania Limited Liability Company.

---

[2] The historical information contained in this Declaration is derived from information provided by the Debtors' management, board and/or advisors.

17228340/4

7.     HCNR currently owns and operates five producing coal mines and related operations in Pennsylvania and Maryland.   Specifically, HCNR owns the following: (i) the Carlos site (located in Frostburg, MD) which is shipping and mining coal with a substantially reduced work crew, (ii) the Cabin Run site (located in Frostburg, MD) which is currently shipping coal and mining coal with a substantially reduced work crew, (iii) Summit #2 site (located in Meyersdale, PA) which is not currently mining or shipping coal, (iv) the Fisher #3 site (located in Meyersdale, PA) which is not currently mining or shipping coal, and (v) the Saylor Hill #2 site (located in Meyersdale, PA) which is currently mining coal with a substantially reduced work crew. Additionally, HCNR owns an operating wash plant located in Meyersdale, PA. Additionally, HCNR owns a number of permits for other sites that are currently in cessation or reclamation. HCNR's main office is located in Meyersdale, PA.

A.     **Purchase and Financing of HCNR**

8.     Upon information and belief, at all relevant times prior to February 2024, Angela Svonavec ("Ms. Svonavec") owned all membership interests in Heritage Holding Co. ("Heritage Holding"), which, in turn, owned all equity interests in HCNR.

9.     On February 5, 2024, KTRV purchased all of the membership interests in HCNR from Heritage Holding pursuant to a membership interest purchase agreement (the "MIPA"). Bedrock Industries Investco 1 LLC ("Bedrock") provided financing for KTRV's purchase of the membership interests in HCNR.[3]

---

[3] One of Bedrock's principals is the father and father-in-law of certain members and/or managers of KTRV.  I understand that during all transactions in connection with the original loan agreement and related documents, the Amended Loan Agreement, Strict Foreclosure and related agreements, and the Settlement Agreement contemplated hereunder, each of the parties was separately represented and advised by their own respective counsel.  I further understand that these transactions were the product of extensive arms' length negotiation.   The boards of each of the Debtors have given me exclusive authority, as Chief Restructuring Officer, to consider and approve or disapprove any transactions in which the Managers have a personal interest, including any transaction with Bedrock.

10.    On February 2, 2024, (i) Bedrock extended $10 million in bridge financing to KTRV pursuant to a promissory note executed by KTRV (the "Bridge Note"); (ii) HCNR guaranteed the Bridge Note by signing a guaranty, and (iii) HCNR executed a Security Agreement (the "Security Agreement") pursuant to which HCNR granted Bedrock a security interest in substantially all of HCNR's personal property assets, including the company's equipment (the "Equipment").

11.    In conjunction with the MIPA, KTRV and Heritage Holding executed an earn out agreement dated February 5, 2024 (the "Earn Out Agreement"), which provides for certain payments by KTRV to Heritage Holding based on the gross profits generated by HCNR from the sale of coal and rock, subject to certain adjustments and conditions. Section 8.2 of the MIPA (the "Incremental Tax Liability Provision") additionally provides for reimbursement of certain tax liabilities by KTRV to Heritage Holding based on the tax structuring of the sale of HCNR to KTRV.  All earn-out payments and incremental tax liability reimbursements are subject to set-off against other amounts owing to KTRV from Heritage Holding, including indemnification obligations, at any time when such earn-out payments and incremental tax liability payments are due.  KTRV individually and solely (and not HCNR) is obligated for such earn-out payments and incremental tax liability payments.

12.    The MIPA and the Earn-Out Agreement (collectively, the "Sale Agreement Documents")[4] provide that HCNR will not allow the filing of any UCC-1 financing statements on the equipment listed in the MIPA (other than any preexisting filings) until the Debtors obtain permanent term and/or working capital financing; only if that financing is obtained by, and the

---

[4] HCNR is not a party to the Agreements and is therefore not bound by them.

UCC-1 financing statements are filed by, June 30, 2024; and only if the applicable creditor's debt secured by the equipment is not greater than $20 million.

13.     The Sale Agreement Documents also state that, after the Debtors obtained financing and the related UCC-1 financing statements have been filed, Heritage Holding "… may file a UCC-1 financing statement put a lien on the [equipment], provided that such UCC-1 financing statement shall be subordinate to the UCC-1 financing statement associated with the [permanent term and/or working capital financing obtained by the Borrowers]." Earn-Out Agreement, § 2.01(f) and MIPA, § 2.2.

14.     On June 27, 2024, Bedrock and the Debtors entered into an Amended and Restated Loan Agreement (the "Amended Loan Agreement"). The Amended Loan Agreement recasted and converted the Bridge Note to permanent and working capital financing.  Ultimately, the total amount available under the Revolving Credit Commitment was $20 million, from which $15 million was drawn after June 27, 2024.

15.     On June 27, 2024, Bedrock filed a UCC-1 financing statement in Delaware against KTRV and a UCC- 1 financing statement in Pennsylvania against HCNR, thereby perfecting its security interest in the Equipment and other collateral provided by the Borrowers) as authorized by each of KTRV and HCNR in the Agreements,  Bedrock's Delaware UCC-1 filing identified KTRV as debtor and described the collateral as KTRV's membership interest in HCNR and all proceeds of such interests in HCNR.  Bedrock's Pennsylvania UCC-1 filing identified HCNR as the debtor and described the collateral in substance as all of HCNR's personal property (which included the Equipment).

16.     Bedrock's UCC-1 financing statements were authorized by Section 9-509(a) of the Uniform Commercial Code. And the KTRV'S grant of security to Bedrock complied with

KTRV'S covenant under the MIPA and Earn Out Agreement because the debt secured by the Equipment did not exceed $20 million, the UCC-1 financing statement against HCNR was authorized by the Agreements and were only filed after the Borrowers obtained permanent term and/or working capital financing and in any event existed as of the closing. HCNR did not make such covenant and there was no agreement or covenant made by HCNR but in any event for the reasons stated about the financing complied with KTRV covenant.

**B.    Actions of Heritage Holdings and Ms. Svonavec**

17.    HCNR was not a party or signatory to the Sale Agreements and had no obligation or liability to pay or satisfy the Earn Outs. Despite never having received a grant of a security interest from HCNR with respect to any of its assets, on July 1, 2024, Heritage Holding filed a UCC-1 financing statement in Pennsylvania (the "Improper UCC Filing"). The Improper UCC Filing identified HCNR as the debtor and Heritage Holding and its owner, Ms. Svonavec and her husband and the former General Manager of HCNR, Jason Svonavec[5] ("Mr. Svonavec" and together with Ms. Svonavec, the "Svonavecs") as the secured parties and described the Foreclosed Equipment as their collateral.[6]

18.    HCNR never agreed or provided its consent enabling Heritage Holding to be named a secured party against HCNR or file a financing statement. The Sale Agreement Documents, drafted and executed by KTRV and Heritage Holding, contemplated that HCNR might grant Heritage Holding a security interest in the Equipment or other collateral, after securing a first-

---

[5] On or about August 14, 2024, Mr. Svonavec was convicted of tax evasion and filing false income tax returns. https://www.justice.gov/usao-wdpa/pr/rockwood-man-sentenced-tax-evasion-and-filing-false-income-tax-returns. Upon information and belief, Mr. Svonavec currently serves as an inmate at USP Hazelton.

[6] Caterpillar Financial Services Corporation ("Caterpillar"), and Cleveland Brothers Equipment Co., Inc. ("Cleveland Bros.") have senior security interests in certain of HCNR's equipment. Upon information and belief, Wells Fargo Bank, N.A. has a lien on a train engine, but the last payment due to Wells Fargo was recently paid in full, and the security interest has not yet been terminated.

priority lien in favor of a new permanent and/or working capital lender, who might require a lien on all of HCNR's assets. KTRV and HCNR failed to obtain new permanent or working capital financing after the closing, and Bedrock, their existing lender, expanded and converted loans to Bedrock and retained its first-priority lien on all of their assets, including any of HCNR's equipment.

19.     Heritage Holding's right to file a UCC-1 financing statement on the Equipment was contingent on HCNR executing a security agreement in its favor, as required by UCC §9-203(b)(3)(A) and §9-509(b). HCNR never executed such a security agreement, and none of the other conditions under §9-509(b) were met. Heritage Holding knew or should have known that it had no legal basis to file a UCC-1 financing statement on the Equipment.  Despite this, Heritage Holding and the Svonavecs filed a UCC-1 financing statement without the consent or authorization of HCNR, KTRV, or Bedrock, in violation of the sale agreements.  Heritage Holdings and Svonavecs filed unauthorized and impermissible UCC-1 financing statements.

20.     On or about February 22, 2025, Ms. Svonavec authorized at least two of her agents, and both former employees of HCNR, Timothy "Smiley" Hunt and Anthony "Tony" Boyer, to unlawfully enter multiple HCNR mining properties in Maryland and Pennsylvania in an attempt to seize, repossess or render unusable the equipment located at each respective HCNR facility and sabotage HCNR's mining operations at those facilities.  After being asked to leave the premises by authorities and the police, they returned the following night and broke into the property again and stole additional pieces of equipment out of multiple locations.

21.     At no time did Ms. Svonavec have authority to enter any of HCNR's premises either from HCNR (as lessee of certain of the properties and as the owner of others) or from the owner of any such properties leased by HCNR. Nor did Ms. Svonavec have a valid security interest in

7

any of the equipment she seized and/or attempted to seize.  Even so, Mr. Hunt and Mr. Boyer showed up at two of HCNR's Maryland sites, trespassed upon the sites, and removed electronic control modules (each, an "ECM") from two-wheel loaders and two bulldozers, rendering those pieces of equipment inoperable.

22.     After learning of Mr. Hunt's and Mr. Boyer's presence at those mining sites, the Carlos Mine, an HCNR foreman drove to each location to stop Mr. Hunt and Mr. Boyer from taking any equipment. The sheriff's department was also called. But when a deputy sheriff arrived on the scene, Mr. Hunt and Mr. Boyer presented a document signed by Ms. Svonavec in which she represented that her "agents" could "render unusable" the equipment and represented that Heritage Holding had obtained permission from the landowners to conduct these activities.  Ms. Svonavec's written statements are false, and she had no legal basis to direct any party to trespass and sabotage this equipment.

23.     Later that day, the same HCNR foreman visited a third HCNR Maryland mine site and found that the gate had been forced open by its top being cut with a welding blowtorch.  The foreman found that Mr. Hunt and Mr. Boyer were still inside the facility where they had already disabled primarily all of the equipment at that site. Without this equipment, HCNR has been forced to substantially cease all mining at that site. The foreman confronted Mr. Hunt and Mr. Boyer, and Mr. Hunt falsely claimed that Heritage Holding owned the equipment before the two drove away.

24.     Mr. Hunt and Mr. Boyer subsequently attempted to enter a fourth HCNR Maryland mining site, its Cabin Run mine.  This time, HCNR's employees prevented them from entering through the front gate. Mr. Hunt and Mr. Boyer assured those HCNR employees they would not return to that facility, but HCNR's employees spotted them driving by the facility repeatedly

throughout the rest of the day. Two days later HCNR employees discovered that units on this site were also vandalized.

25.      Two days later, at approximately 1:30 a.m. on Monday, February 24, 2025, a security contractor spotted two men on site at HCNR's mines in Pennsylvania. Upon seeing the security contractor, both men fled in a Ford F250 truck with several of the electronic control modules from different pieces of the equipment.  Multiple pieces of equipment were disabled at HCNR's Pennsylvania site, with written notice from Heritage Holding. The truck appeared to have been one driven by Mr. Hunt.

26.      HCNR's employees again called the police, and Pennsylvania state troopers arrived and collected information. Later that night, the same HCNR contractor checked on a different HCNR mine and discovered that multiple electronic control modules from other pieces of equipment had also been removed from certain of the location's bulldozers and 6020 excavator, and the keys to several rock trucks were missing. The same written notice from HHC was placed on those pieces of equipment.

27.      All told, Heritage Holding and its agents caused more than $200,000 of damage to the equipment, alone.   As a result of the sabotage, HCNR has not been able to effectively operate these two Pennsylvania mines beyond a very limited basis, and HCNR's operations at those locations have since substantially ceased.   As of the Petition Date, HCNR is still missing approximately 32 ECMs.   More than that, the absence of the ECMs significantly inhibits the Debtors' ability to market the equipment.

### C.      Default by KTRV and Strict Foreclosure by Bedrock

28.      On January 20, 2025, Bedrock sent the Debtors a Notice of Events of Default and Acceleration (the "Notice of Default") stating that, pursuant to the terms of the loan agreement

9

and related documents, Borrowers were in default, and the time to remedy the default had passed. Further, Bedrock declared the entire outstanding principal balance of the Bridge Note and all amounts owing under the loan agreement and other loan documents immediately due and payable, and imposing the default interest rate of 15% per annum on all outstanding balances and amounts due to Bedrock.  Further, Bedrock made demand for payment of all unpaid obligations and amounts now due and payable by them, including, but not limited to the amounts due under the loan agreement and note.

29.    Bedrock thereafter worked with the Borrowers in attempt to address and resolve liquidity challenge and enable the Borrowers to raise cash and reduce liabilities by selling certain assets of the Borrowers.  The Debtors need time to negotiate and effectuate any sales, and given the obstacles and overhand as a result of the Heritage Holdings and Svanovic's actions, options were limited, but nevertheless certain strategic sales of limited assets was possible.  As a result Bedrock informally forebeared from exercising remedial rights.  Effective January 31, 2025, the Debtors, Jordan Kestenbaum ("Mr. Kestenbaum") and David Tradburks ("Mr. Tradburks," and together with Mr. Kestenbaum, the "Managers"), and Bedrock entered into a forbearance agreement (the "Forbearance Agreement") in an effort to extend the Debtors' runway and allow the Debtors to implement certain transactions expected to provide value for the Debtors.  In exchange for forbearing from exercising remedies, the Debtors granted Bedrock a security interest on certain additional collateral as set forth in the Forbearance Agreement.  Unfortunately, the Debtors were unable to meet their obligations under the Forbearance Agreement and subsequently defaulted.

30.    On or about February 12, 2025, HCNR entered into an agreement with Bedrock (the "Strict Foreclosure") pursuant to UCC § 9-620, by and through which HCNR transferred to

Bedrock title and ownership of the portion of equipment that served as Bedrock's collateral (the "Foreclosed Equipment")[7] in satisfaction of $10,000,000.00 of the obligations due to Bedrock. As a result, the remaining monetary obligations of the Debtors due to Bedrock under the loan documents are at least $5,650,000 in principle, plus all accrued and accruing but unpaid interest, costs, and fees.

31.    Further, HCNR agreed that, upon Bedrock's request, HCNR would execute and deliver any bill(s) of sale or other typical conveyancing documents to provide furthers assurances to Bedrock and any transferees of any Foreclosed Equipment from Bedrock, in form and substance reasonably acceptable to Bedrock. The Debtors further agreed to waive any rights they might otherwise have to redeem the Foreclosed Equipment and confirmed that Bedrock would continue to have the right to foreclose on any of the collateral that is not included in the Foreclosed Equipment and other rights granted to them.

32.    Substantially contemporaneously with the Strict Foreclosure, Bedrock and HCNR entered into an agreement (the "Equipment Lease Agreement") by and through which Bedrock agreed to lease the Foreclosed Equipment to HCNR through March 14, 2025, with an option to renew the lease for up to ten one-week increments for a fixed weekly rent of $105,000.[8]  The Equipment Lease Agreement enabled HCNR to continue its ongoing revenue-producing mining operations and otherwise operate and maximize the value of the assets of HCNR.  At the same time, HCNR and Bedrock conferred with a third-party professional auction company with

---

[7] Certain equipment, most notably two 100-ton haul trucks (i.e., "triple sevens") were not the subject of the Strict Foreclosure, and were therefore not included in "Foreclosed Equipment."

[8] On or prior to March 14, 2025, the Debtors and Bedrock agreed to extend the term of the Equipment Lease Agreement for an additional four week period at a reduced rate of $50,000 per week.

17228340/4

experience selling equipment of this type, about selling the Foreclosed Equipment once the Equipment Lease Agreement terminated.

### D.    Litigation[9]

33.    In addition to the sabotage of the equipment and continual refusal to return the ECM's to the Debtors, the actions by Heritage Holding, Ms. Svonavec, and Mr. Svonavec (collectively, the "Heritage Defendants") have created a maelstrom of litigation in numerous venues, all of which has further depleted the Debtors' limited assets.

### i.    The Allegheny County Action

34.    On October 1, 2024, Heritage Holding commenced an action against KTRV (Civil Action GD-24-010899) in the Court of Common Pleas for Allegheny County, PA (the "Allegheny County Action" or the "First W.D. Pa. Action").  By and through the Allegheny County Action, Heritage sought damages arising from the MIPA and Earn-Out Agreement.  On October 17, 2024, KTRV filed a notice of removal to remove the action to the District Court for the Western District of Pennsylvania thereby initiating Civil Action 24-cv-1448.  On February 27, 2025, the District Court entered an Opinion that the greater weight of the evidence did not support a finding of complete diversity jurisdiction, the Court remanded the action back to Court of Common Pleas for Allegheny County, PA.  [The Allegheny County Action remains pending.]

---

[9] Prior to KTRV's purchase of the interest in HCNR, HCNR was party to the following litigation that remains ongoing for which the Heritage Holding and the Svonavecs are liable for indemnification: (i) Robindale Coal Sales, LLC, and Robindale Export, LLC v. Heritage Coal & Natural Resources, LLC (Case No. 2021-4158; CCP Westmoreland County, PA) and (ii) Appalachian Timber Products, Inc. and J.C.L. Logging, Inc. v. Heritage Coal & Natural Resources, LLC (Case No. 2022-708; CCP Somerset County, PA).

17228340/4

ii        The Banshee Action

35.        On February 5, 2024, substantially contemporaneously with the KTRV purchase of the membership interests of HCNR, Banshee Industries, LLC ("Banshee"), a company owned by Ms. Svonavec, and Mr. Svonavec, entered into a contract with HCNR.  By and through the agreement, HCNR agreed to sell 10,000 tons of "nut coal" to Banshee per year for ten years at a price of $75 per ton.  In or about September 2024, the Debtors determined that Banshee had been fraudulently manipulating the weight of the trucks picking up the nut coal at HCNR's facilities, thereby deliberately and deceitfully causing Banshee to receive tons of additional coal without payment to HCNR.  As a result, on September 26, 2024, HCNR sent a letter to Banshee detailing Banshee's fraud, terminating the agreement, and making demand for payment of the coal that Banshee received without payment.

36.        On October 1, 2024, Banshee commenced a civil action in the Court of Common Pleas of Somerset County Pennsylvania (630-Civil-2024) (the "Banshee Action").  By and through the Banshee Action, Banshee asserted counts for breach of contract, tortious interference with prospective relations, and injunctive relief. Banshee seeks money damages as well as an emergency motion for a preliminary injunction. HCNR denied any liability.

37.        On October 7, 2024, HCNR filed a notice of removal in the United States District Court for the Western District of Pennsylvania (Civil Action 3:24-cv-00233).  On February 27, 2025, the District Court entered an Opinion that the greater weight of the evidence did not support a finding of complete diversity jurisdiction, and an Order remanding the Banshee Action to the Somerset County Court of Common Pleas, where the Banshee Action remains pending.

17228340/4

iii    The Second W.D. Pa. Action

38.    On February 25, 2025, HCNR commenced a civil action in the United States District Court for the Western District of Pennsylvania (Case No. 3:25-cv-0059) against Heritage Holding Co., LLC, Angela Svonavec, Timothy Hunt, and Anthony Boyer (the "Second W.D. Pa. Action"). By and through the Second W.D. Pa. Action, HCNR asserted claims of trespass, conversion, and replevin. Further HCNR sought injunctive relief precluding Heritage Holding, Ms. Svonavec, Mr. Hunt and Mr. Boyer from entering any property owned or leased by HCNR without specific and prior written permission from HCNR. By Order of the District, the District Court relied upon the same Order dated February 27, 2025, in the First W.D.Pa. Action, and ordered briefing on the issue of subject matter jurisdiction. As a result, on February 28, 2025, HCNR filed a notice of voluntary dismissal of the Second W.D. Pa. Action. Such dismissal was expressly without prejudice.

iv.    The New York Action

39.    On February 28, 2025, Bedrock filed an action against Heritage Holding, Ms. Svonavec, Mr. Svonavec, HCNR and KTRV in the Supreme Court of the State of New York (Index No. 651177/2025) (the "New York Action"). By and through the New York Action, Bedrock seeks, among other things: (i) damages from Heritage Holdings, Ms. Svonavec, and Mr. Svonavec for slander of Bedrock's title to the equipment; (ii) damages from the Heritage Defendants for their tortious interference with Bedrock's business relations; (iii) damages from Heritage Holding and Angela Svonavec for the authorization and direction of the trespass to chattel by removing and disabling pieces of the Equipment; (iv) damages from Heritage Holding and Angela Svonavec for the conversion of portions of the Equipment; (v) a declaratory judgment that the Heritage Defendants had no basis to assert a security interest in the equipment and Bedrock maintained the

only valid security interest against the equipment; (vi) a declaratory judgment that that the Heritage Defendants UCC- 1 filings are void and of no effect, and that Bedrock's strict foreclosure agreement is valid and effective, and that Bedrock has acquired title to the collateral free and clear of any claims or liens, including any liens asserted by the Heritage Defendants. Further, by and through the New York Action, Bedrock seeks an order directing the immediate return of every piece of equipment removed from HCNR's mining sites by Heritage Holding, Angela Svonavec, or their agents, and directing the Heritage Defendants to terminate and withdraw their UCC-1 filings and to refrain from filing any further UCC-1 financing statements against HCNR's personal property.  The New York Action remains pending.

> v.    The Somerset Action

40.    On March 6, 2025, Heritage Holding commenced an action in the Court of Common Pleas of Somerset County, PA (Civil Action No. 160-Civil-250) (the "Somerset Action").  Heritage Holding alleged that the Strict Foreclosure was a fraudulent conveyance under Pennsylvania law.  Heritage Holding did not seek to avoid the Strict Foreclosure but sought a judgment for damages for, among other things, conversion and trespass of chattels.  Further, Heritage Holding sought injunctive relief "enjoining Bedrock from disposing or otherwise using the Equipment until such time as the disputed foreclosure of the Equipment by Bedrock can be adequately litigated."

41.    To that end, substantially contemporaneously with the filing of the Complaint in the Somerset Action, Heritage Holding filed an emergency motion for a temporary restraining order (the "Somerset TRO Motion").  On March 13, 2025, the Court of Common Pleas entered an order granting injunctive relief that, among other things, enjoined through March 27, 2025, both Heritage and Bedrock from "disposing of, selling, transferring, liquidating, conveying,

15

encumbering, injuring, damaging, devaluing, or otherwise taking any action that will or may cause physical, regulatory, or financial harm to the HCNR's equipment located in Somerset County, PA as set forth in the UCC-1 Financing Statements attached to the [Somerset TRO Motion]."

42.    On March 13, 2025, the Court of Common Pleas of Somerset County, PA entered a mutual temporary restraining order  (the "March 13 TRO") enjoining until March 27, 2025 at 10:00 a.m. (i) Heritage Holdings, (ii) Bedrock and (iii) all persons or entities acting on their behalf from "disposing of, selling, transferring, liquidating, conveying, encumbering, injuring, damaging, devaluing, or otherwise taking any action that will or may cause physical, regulatory, or financial harm to the equipment that is physically located in Somerset County, Pennsylvania, as enumerated in the UCC-1 Financing Statements attached to [the Somerset TRO Motion]."  Further, among other things, the March 13 TRO expressly provided that nothing in the order would affect any other party that is not a party to the Somerset Action, or any action by Heritage Holdings or Bedrock related to or in connection with any third parties' action, including but not limited to Cleveland Bros and Caterpillar.

43.    On March 21, 2025, the Somerset Court entered an Amended Order of Court which provided that largely reiterated the terms of the March 13 TRO but extended the preliminary injunction period until "the conclusion of the hearing scheduled for April 9, 2025 at 1:30 p.m. (or until such time as this Order is extended or superseded by a subsequent Order of Court)".

### E.    Causes of the Bankruptcy Filing

44.    The Debtors' bankruptcy cases were caused by a confluence of events, some of which are general economic issues related to the coal industry, and others were the directly and proximately result of the actions taken by Heritage Holding and the Svonavecs (collectively the "Seller Parties").

16

45.     First, the quality of the coal produced by HCNR was inferior to the representations and expectations made by the Seller Parties. When KTRV purchased Heritage Holding's interest in HCNR, it understood based upon the representations of the Seller Parties and their agents that the coal produced by HCNR was of quality suitable for the fulfilment of HCNR's customer contracts.  Only after the sale closed, did KTRV learn of a scheme perpetuated by Mr. Svonavec that fraudulently represented HCNR coal qualities to HCNR customers.  Not only did this put HCNR at significant legal and financial risk, but in order to operate the business and fulfill contract obligations where possible, HCNR would be required to incur significant extra cost. There were also certain quality specifications under contract that HCNR was unable to achieve, and thus HCNR would be unable to continue to perform under those contracts to which HCNR was a party prior to the change in ownership.  HCNR has thus been required to find alternative outlets for the inferior quality coal product that, in the past, was fraudulently sold into contracts.

46.     Second, the price of coal fell rapidly since the sale transaction closed.  In February 2024, the index price of metallurgical coal that HCNR produced was approximately $265 per metric ton, resulting in a realized price for HCNR's metallurgical coal sales of $159 per short ton during the first calendar quarter of 2024.  As of December 30, 2024, that same index price was down to $188 per metric ton.  As of March 10, 2025, the price had further dropped to $177.50 per metric ton with estimated realized price for March 2025 of $98 to $99 per short ton.  Based upon the current price of coal and the limited demand for HCNR's inferior quality coal product, it is not economically viable for HCNR to continue to mining coal from its sites.

47.     Finally, the actions taken by the Seller Parties - from the multiple streams of parallel litigation to the vandalism caused by the Seller Parties' agents - caused significant damage to a business already facing economic headwinds.

17228340/4

**PART II - The Debtors' Business Operations and Finances**

**A.      Current Employees and Operations**

48.      HCNR currently own 5 operating mining sites, plus other sites which are not currently operating or in reclamation, a wash plant, plus certain equipment.   Additionally, HCNR leases certain real property and, since the Strict Foreclosure, it leases certain equipment necessary for its operations from Bedrock.

49.      Prior to February 28, 2025, HCNR had 112 employees.  Based in no small part by the price of coal, but also the unforeseeable incapacitation of the HCNR's equipment caused by HCNR's former owner, and other factors, on or about of February 28, 2025, the Debtors terminated more than half of their employees.  HCNR now has approximately 44 employees, which can be divided as follows: 22 employees in mining operations sales and logistics, 16 employees in wash plant operations, and 6 office employees.  12 of those employees are salaried and 32 of which are paid on an hourly basis.

**B.      Divestiture of Assets**

50.      When KTRV first purchased the interests in HCNR in February 2024, HCNR operated a total of four producing mines in Pennsylvania in Maryland, two wash plants (one in Pennsylvania and one in Maryland),[10] and owned and operated significant equipment necessary for the operation of the mines and wash plants.  Since then, for the reasons set forth hereinabove, HCNR has been in the process of ceasing their operations and divesting themselves of assets, including mines that are no longer in operation.

---

[10] A coal wash plant, also known as a coal preparation plant, cleans coal by removing impurities like soil, rock, and other non-combustible materials, improving its quality.  HCNR used its wash plants to process coal extracted from its own mines, as well the coal extracted from other parties' mines.

17228340/4

51.    On January 31, 2025, HCNR transferred ownership of its wash plant in Lonaconing Maryland to Cobra Mining, Inc. ("Cobra") in exchange for $2.5 million.  Consistent with the Forbearance Agreement, HCNR received $1.5 million in proceeds (which remained Bedrock's cash collateral) and Bedrock received $1 million.

52.    On March 25, 2025, HCNR executed agreements to sell to Cobra the permits, rights under its leases of real property, and certain other collateral under the respective surety bonds for its Walker site in Carlos, MD (the "Walker Site") and Beechwood site in Lonaconing, MD (the "Beechwood Site").

53.    HCNR was subject to a lease with Allegany Coal and Land Company for the Walker Site. For approximately 5 years, the operations at the Walker Site have been in temporary cessation on successive 6 month terms.  For many years prior to HCNR's current ownership, there was limited mining at the Walker site.  HCNR estimated that the reclamation costs at the Walker Site would total between $1.75 million and $2.75 million, and the coal reserves at the Walker Site aggregates approximately 150,000 tons.  Accordingly, HCNR believed that, at best, the Walker Site had a neutral value during a mid-cycle market.  At the current prices, the value of the Walker Site is negative and would require a significant upfront investment in mine development and equipment.  As a necessary condition for operation of a coal mine in Maryland (and elsewhere), the operator is required to maintain a reclamation bond to ensure that the land is restored after the mining at the site has ceased.  HCNR has a surety bond with Rockwood Casualty Insurance ("Rockwood") of approximately $382,500 for the Walker Site. HCNR is required to maintain 33% cash collateral at Rockwood across its entire bond portfolio (i.e., Rockwood is holding $127,500 of cash as collateral under the bond for the Walker Site). As part of its sale of the Walker Site, HCNR received approval from Allegany Coal and Land Company ("ACLC"), the surface and

mineral owner of the Walker Site, under which ACLC and Cobra will enter into a new lease agreement. Pursuant to the sale agreement, Cobra will assume the surety bond obligations, and HCNR arranged for the transfer of the requisite cash collateral at Rockwood to Cobra.  Cobra is required to begin the permit transfer process through the state of Maryland within 10 days of the signing of the agreement.

54.    HCNR was subject to a lease with for the Beechwood Site.  Operations at the Beechwood Site ceased in 2023, and the site has been in reclamation since then.  HCNR believes that there is between $100,000 and $150,000 of near-term costs of reclamation at the Beechwood Site, plus additional costs, which may ultimately aggregate as much as $250,000.  HCNR estimated that the Beechwood Site has a small area of mineable coal, which, at current prices, renders the Beechwood Site to be a negative value.  HCNR has three surety bonds with Rockwood totaling approximately $508,500 for the Beechwood Site.  Accordingly, Rockwood is holding $169,500 of cash as collateral under the bond. The sale of the Beechwood Site did not require the approval from the landlord for the assignment of the lease to Cobra, Pursuant to the sale agreement, Cobra will assume the surety bond obligations, and HCNR arranged for the transfer of its the requisite cash collateral at Rockwood to Cobra. Cobra is required to begin the permit transfer process through the state of Maryland within 10 days of the signing of the agreement.

55.    As noted above, HCNR executed the agreement with Cobra, on March 25, 2025, however, due to the logistics of transfer of the surety bond and permits, the process for completion of the transfer was not finalized prior to the Debtors filing of the petitions.  In connection with these bankruptcy cases, and as more fully set forth herein, the Debtors will be seeking approval from this Court for the approval of the sale of the permits and other assets to Cobra consistent with the sale agreements.

**C      The Debtors' Current Finances**

56.      The Debtors currently owe their secured creditors a total of approximately $11,800,000.[11]  This includes an amount not less than $5,600,000 principal amount to Bedrock as a result of the strict foreclosure,[12] approximately $4,800,000 to Caterpillar and approximately $1,380,000 to Cleveland Bros.

57.      As a general matter, the Debtors are paying their unsecured debts as they come due.[13]  Specifically, the Debtors owe the universe of trade debt a total of approximately $2.5 million.  The Debtors are also current with their obligations on account of taxes, utilities, insurance, and employees.

**PART III - First Day Motions**

58.      Substantially contemporaneously herewith, the Debtors have filed the following pleadings in these Chapter 11 Cases and have requested that each be granted on either an interim or final basis, as applicable at the "first day hearing:"

- Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Cases and (II) Granting Related Relief;

- Debtors' Application for Appointment of Stretto, Inc. as Claims and Noticing Agent, effective as of the Petition Date;

- Debtors' Motion Pursuant to Sections 105 And 366 of the Bankruptcy Code for Entry of Interim and Final Orders (I) Prohibiting Utility Companies From Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtors, (II) Determining that the Utility Companies are Adequately Assured of Post-Petition Payment And (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance;

---

[11] This excludes the Seller Parties, who the Debtors believe have only unsecured claims, which are subject to setoff in whole or in part based upon damages caused to HCNR.

[12] This amount is premised upon the approval of the settlement with Bedrock to, among other things, vacate the Strict Foreclosure to put the parties into the position that they were immediately prior to the Strict Foreclosure, in which case Bedrock's claim will be approximately $10 million higher, plus interest.

[13] Again, this excludes the Seller Parties, against whom the Debtors have significant claims.

17228340/4

- Debtors' Motion for Entry of Interim and Final Orders Authorizing (I) Maintenance of Existing Bank Accounts, (II) Suspending the Requirements of Section 345(b); (III) Continued Use of Existing Cash Management System; (II) Continued Use of Business Forms; and (V) Granting Related Relief;

- Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay or Honor Prepetition Claims of Critical Vendors; (II) Authorizing and Directing Finance Institutions to Honor All Related Checks and Electronic Payment Requests; and (III) Granting Related Relief;

- Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Claims of Shippers and Other Lien Claimants; (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (III) Granting Related Relief;

- Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees; (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests; and (III) Granting Related Relief;

- Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Employee Benefits Obligations, and Other Compensation, and (B) Continue Employee Benefits Programs and Pay Related Administrative Obligations and (II) Granting Related Relief;

- Debtors Motion for an Interim Order Under Sections §§105(A), 363(B), 363(C), and 503(B) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 6003 Authorizing Debtors to Pay All Obligations in Connection with All of the Debtors' Existing Insurance Policies and Surety Bonds;

- Debtors' Motion Seeking Entry of an Order (I) Enforcing the Automatic Stay, (II) Staying All State Actions, (III) Enforcing Protections of the Bankruptcy Code, (IV) Approving the Form and Manner of Notice, and (V) Granting Related Relief; and

- Debtors Motion for Interim and Final Orders (I) Authorizing Debtors and Debtors-In-Possession to (A) Use Cash Collateral and (B) Grant Adequate Protection to the Prepetition Lender; (II) Modifying the Automatic Stay; and (III) Granting Related Relief.

(collectively, the "First Day Pleadings").

59.    I have reviewed each of the First Day Motions and, as a result of my first-hand knowledge, and through my review of various materials and information, discussions with members of the Debtors' management, and discussions with the Debtors' other professionals, I

believe that the factual support set forth in each of the First Day Pleadings is correct and accurate to the best of my knowledge, information, and belief.  Further, I have formed opinions as to (a) the necessity of obtaining the relief  sought by the Debtors in the First Day Motions, (b) the need for the Debtors to continue to operate effectively while working to maximize the value of their assets for the benefit of all stakeholders and (c) the immediate and irreparable harm to which the Debtors and their businesses will be exposed unless the relief requested in the First Day Motions is granted without delay.

60.    As described more fully herein, the Debtors, in consultation with their professionals, have carefully tailored the relief requested in the First Day Motions to ensure the Debtors' immediate operational needs are met, and that the Debtors suffer no immediate and irreparable harm. I, or other members of the Debtors' management and/or operational teams, participated in the analysis that informed each First Day Motion and assisted in developing the relief requested therein, and reviewed the pleadings related thereto. At all times, the Debtors' management and professionals remained cognizant of the limitations imposed on a debtor in possession and, in light of those limitations, the Debtors narrowed the relief requested at the outset of these Chapter 11 cases to those matters that require urgent relief to sustain the Debtors' immediate operations and preserve value during the pendency of these Chapter 11 cases.

17228340/4

**9019 Settlement Motion**

61.     Additionally, although not included as a "First Day Motion" because the Debtors are not seeking to have it heard at the first day hearing,[14] the Debtors have negotiated and will be filing a Motion for Order Pursuant To 11 U.S.C. §§ 105(A) and 363 and Fed. R. Bankr. P. 9019(B) Authorizing and Approving a Global Settlement with Bedrock (the "Bedrock Settlement Motion").

62.     By and through the Bedrock Settlement Motion, the Debtors will seek to approve a settlement with Bedrock that will, among other things, result in

-       Vacating of the Strict Foreclosure to restore the Debtors and Bedrock (and without prejudice to the Debtors and Bedrock, or Heritage Holding) to the position that they were prior to the Strict Foreclosure

-       The Foreclosed Equipment revesting title with the Debtors for the benefit of the estates and all creditors, subject to the security interest of Bedrock and any other secured party that was affected by the Strict Foreclosure.

-       Subject to Bankruptcy Court approval after notice and an opportunity for hearing, the Debtors will retain a third party to market and sell the Foreclosed Equipment.

-       Subject to approval of the Bankruptcy Court after notice and an opportunity for hearing, the Debtors will be seeking approval of sales of the Foreclosed Equipment, including specifically seek authority to pay Cleveland Bros. and Caterpillar (who have purported senior liens to Bedrock and who were unaffected by the Strict Foreclosure), Bedrock, and all other parties with valid security interests from the proceeds of the sales of the Foreclosed Equipment in accordance with the priority of such claims under applicable non-bankruptcy law, and if there is excess after the secured claims are paid in full, the remaining proceeds shall remain assets of the estates for distribution in accordance with the Bankruptcy Code.

63.     The Bedrock Settlement Motion and the Debtor's Motion for Use of Cash Collateral,[15] together with the other First Day Motions, create a path to maximize the value of the

---

[14] Because the relief sought by the Bedrock Settlement Motion will create a path for the cases to proceed to liquidation of the assets on an orderly but expedited basis, including approval for retention of a liquidator, the Debtors will be seeking to have the Bedrock Settlement Motion heard on an expedited basis prior to the "second day hearing."

[15] The Debtors are also engaged in negotiations for a postpetition financing facility to fund these cases and the maximization of the Debtors' assets.

17228340/4

Debtors' estates through an orderly and expedited liquidation of the Debtors' assets, and therefore present the greatest opportunity to maximize recovery for all creditors.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 30, 2025

/s/ Brian Ryniker
Brian Ryniker
Chief Restructuring Officer

17228340/4