**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| KTRV LLC, *et al.*,[1] | Case No. 25-10601 (MFW) |
| Debtors. | (Joint Administration Requested) |

**MOTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION**
**FOR ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 363 AND**
**FED. R. BANKR. P. 9019(B) AUTHORIZING AND APPROVING A GLOBAL**
**SETTLEMENT WITH BEDROCK INDUSTRIES INVESTCO 1 LLC WITH**
**RESPECT TO THE STRICT FORECLOSURE AND FORECLOSED EQUIPMENT**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), move this Court (this "Motion"), for entry of an order (the "Proposed Order"), substantially in the form attached hereto as **Exhibit A** pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019(b) of the Federal Rules of Bankruptcy Procedure to approve a global settlement with respect to the Strict Foreclosure and Foreclosed Equipment (the "Settlement Agreement"), by and between the Debtors and Bedrock Industries Investco 1 LLC ("Bedrock"), and in support of the Motion, the Debtors respectfully incorporate the Declaration of Brian Ryniker in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings (the "First Day Declaration") and state as follows:

**PRELIMINARY STATEMENT**

Over the past year, the Debtors have faced declining coal prices and reduced demand for coal. Further, in the months before the Petition Date, the Debtors faced financial and operational challenges that put the business and creditors' recoveries in jeopardy. The Debtors were operating

---

[1]    The Debtors in these chapter 11 cases, along with each the last four digits of each Debtor's tax identification number, are as follows: KTRV LLC (9993), Heritage Coal & Natural Resources, LLC (8326). The Debtors' service address is 1521 Concord Pike, Suite 201, Wilmington, DE 19803.

at a loss including the inability to make equipment financing payments, trade and vendor payments, all of which resulted in the Debtors having severe liquidity challenges and receiving pressure from their equipment financiers.

In January 2025, the Debtors defaulted on the secured loan from Bedrock and entered into a forbearance agreement with Bedrock in an attempt to extend their runway and provide an opportunity to sell all or some of their assets and business divisions. Unfortunately, given the overhang of the actions and activities of the former owner and their principals to undermine the business and operations and interfere with the rights of the Debtors and secured creditors, the Debtors' ability to close on proposed sales were limited and eventually failed.

By February 2025, the Debtors were unable to meet certain conditions and defaulted under the forbearance agreement. Thereafter, after extensive and protracted negotiations, between Bedrock and the Debtors and their respective professionals, Bedrock exercised remedies through a strict foreclosure under UCC § 9-620 in which HCNR conveyed to Bedrock a portion of its equipment collateral in satisfaction of certain of the obligations owed to Bedrock. Simultaneously, in order to minimize disruption to the Debtors' business and operations, preserve value and enable the Debtors to fulfill existing contracts, Bedrock leased back that equipment to the Debtors so the Debtors could continue their mining operations.

In addition and separately, the Debtors were fielding accusations and demands from their prior equity owner, Heritage Holding, from which KTRV purchased the membership interests in HCNR, about amounts allegedly due and owing under an earn out agreement. Heritage Holding and its principals also alleged that they held second or third priority interest on certain of the equipment that secured the obligations to Bedrock (an assertion the Debtors dispute).

Litigation ensued.  The Debtors and their assets are directly and indirectly implicated in the myriad of claims brought in several state court proceedings.  Heritage Holding and its principals commenced a proceeding in Pennsylvania against Bedrock, that among other things, asserted that the strict foreclosure was a fraudulent conveyance and sought to enjoin any sale or the continued lease of the equipment to the HCNR.  Bedrock sought a mutual injunction precluding Heritage Holding from further damaging the property.  In a separate proceeding commenced in New York, Bedrock filed an action against the Debtors, Heritage Holding and Mr. and Mrs. Svonavec, seeking among other things, a declaration that Bedrock is the owner of the equipment, an order requiring that Heritage Holding return the equipment it took to HCNR and damages for Heritage Holding's interference with the sale of the equipment after it threatened potential purchasers.

Meanwhile, the Debtors' business faced growing uncertainty, particularly with litigation in various jurisdictions among numerous parties about rights to HCNR's property.  The Debtors' business and operations continued to deteriorate, faced continued liquidity challenges and was unable to consummate any sales due to the activities of Heritage Holding and their principals.  The Debtors retained an independent CRO and restructuring advisors to evaluate alternatives and the best paths forward.

After weeks of contentious and protracted negotiations between the Debtors and Bedrock, and their respective professionals, including an independent CRO, and after considering alternative transactions and paths, the Debtors have reached a settlement with Bedrock that will avoid disruption and risk to the business and operations of the Debtors and serve as the cornerstone of a process to maximize value for the benefit of the estates and all creditors. The foundation of the settlement provides for (i) the revesting and return to HCNR of equipment previously conveyed to

17259316/1

Bedrock in the strict foreclosure, (ii) restoring the secured creditor to its pre-foreclosure status and position, and (iii) enabling a court approved, orderly and public process to sell the equipment.

The Debtors believe that because of the complexity, inherent delay and substantial exposure of litigation, the issues and disputes with Bedrock (including any potential estate claims avoiding the strict foreclosure as a fraudulent conveyance), the length of time necessary to resolve each issue and dispute and the continuous disruption of the Debtors' ability to maximize value, it is in the Debtors' and estates' best interest to resolve disputes and related matters with Bedrock. Certainty surrounding the ownership of the equipment assets and a transparent sale process is critical for the Debtors to move forward and maximize the value of the estates. Otherwise, the Debtors face years of litigation while these assets diminish in value and are subjected to harm and risk.

In short, the failure to gain approval of the settlement will materially and adversely affect the Debtors and their estates and creditors and likely forever preclude the ability to maximize value, if any value. Approving the settlement on the other hand, restores the assets to the Debtors, puts Bedrock and Heritage Holding in the same position they were in before the foreclosure and forges a path before this Court to monetize the Debtors' assets for the benefit of the estates and their creditors.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A). Venue of this proceeding and the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief sought herein are sections 105(a) and 363 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure.

17259316/1

## BACKGROUND

A.    **Purchase and Loan Agreements**

3.    As set forth in the First Day Declaration, on February 5, 2024, KTRV, LLC ("KTRV") purchased all of the membership interests in Heritage Coal & Natural Resources ("HCNR") from Heritage Holding Co., LLC ("Heritage Holding") pursuant to a membership interest purchase agreement dated February 5, 2024 (the "MIPA").  Bedrock provided financing for KTRV's purchase of the membership interests in HCNR.[2]

4.    On February 2, 2024, (i) Bedrock extended $10 million in bridge financing to KTRV and KTRV issued a promissory note to Bedrock to evidence the indebtedness (the "Bridge Note"); (ii) HCNR guaranteed the Bridge Note by signing a guaranty, and (iii) KTRV pledged all of its interest in the HCNR membership interests to Bedrock; and (iv) HCNR executed a Security Agreement (the "Security Agreement") pursuant to which HCNR granted Bedrock a security interest in substantially all of HCNR's personal property assets, including HCNR's equipment (the "Equipment").

5.    In conjunction with the MIPA, KTRV executed an earn out agreement dated February 5, 2024 (the "Earn-Out Agreement"), which provides for certain payments by KTRV to Heritage Holding based on the gross profits generated by HCNR from the sale of coal and rock, subject to certain adjustments and conditions. Section 8.2 of the MIPA (the "Incremental Tax Liability Provision") provides for reimbursement of certain tax liabilities by KTRV to Heritage Holding based on the tax structuring of the sale of HCNR to KTRV. The earn-out payments and incremental tax liability reimbursements are subject to set-off against amounts that Heritage

---

[2]    One of Bedrock's principals is the father and father-in-law of certain members and/or managers of KTRV, however all transactions in connection with the original loan agreement and related documents, the Amended Loan Agreement, Strict Foreclosure and related agreements, and the Settlement Agreement contemplated hereunder, were the product of significant arms' length negotiation in which each of the parties was separately represented by counsel.

Holding owes to KTRV at any time when earn-out payments and incremental tax liability payments are due.  Notably, HCNR was not a party to either the MIPA or the Earn-Out Agreement.

6.      The MIPA and the Earn-Out Agreement (collectively, the "Sale Agreement Documents")[3] state that HCNR will not allow the filing of any UCC-1 financing statements on the equipment listed in the MIPA (the "Equipment") - other than any preexisting filings – unless three conditions are met: (a) KTRV or HCNR obtain permanent term and/or working capital financing; (b) that financing is obtained by, and the associated UCC-1 financing statement us filed by, June 30, 2024; and (c) the applicable creditor's debt secured by the equipment does not exceed $20 million.

7.      The Sale Agreement Documents also state that  after the Debtors have financing and the related UCC-1 financing statements have been filed, Heritage Holding "… may file a UCC-1 financing statement [to] put a lien on the [equipment], provided that such UCC-1 financing statement shall be subordinate to the UCC-1 financing statement associated with the [permanent term and/or working capital financing obtained by the Debtors]." Earn-Out Agreement, § 2.01(f); MIPA § 2.2.

8.      On June 27, 2024, Bedrock and lender and the Debtors as borrowers entered into an Amended and Restated Loan Agreement (the "Amended Loan Agreement"). The Amended Loan Agreement converted the Bridge Note to permanent financing and made revolving credit in the amount of $15 million available to the Debtors for working capital and other purposes (the "Revolving Credit Commitment"). Ultimately, the total amount available under the Amended Loan Agreement was $20 million, from which $15 million was drawn after June 27, 2024.

---

[3]      Although the Sale Agreement Documents do include this statement, HCNR is not a party to the Sale Agreement Documents and is therefore neither benefitted by nor bound by them.

17259316/1

9.      On June 27, 2024, Bedrock filed a UCC-1 financing statement in Delaware against KTRV and a UCC - 1 financing statement in Pennsylvania against HCNR, thereby perfecting its security interest in the Equipment and other collateral provided by the Debtors) as authorized by each of KTRV and HCNR in the Amended Loan Agreement.  Bedrock's Delaware UCC-1 filing identified KTRV as debtor and described the collateral as KTRV's membership interest in HCNR and all proceeds of that membership interest.  Bedrock's Pennsylvania UCC-1 filing identified HCNR as the debtor and described the collateral in substance as all of HCNR's personal property (which expressly included the Equipment).

10.     Bedrock's UCC-1 financing statements were authorized by KTRV and HCNR pursuant to the Amended Loan Agreement, the Security Agreement between HCNR and Bedrock, and Section 9-509(a) of the Uniform Commercial Code. The Debtors' respective grants of security to Bedrock complied with the conditions stated in the Sale Agreement Documents because the debt secured by the Equipment for permanent term and working capital financing did not exceed $20 million, and the UCC-1 financing statements perfecting the security interests securing the Debtors' obligations to Bedrock were filed before June 30, 2024.

**B.      Default by KTRV and Strict Foreclosure by Bedrock**

11.     On January 20, 2025, Bedrock sent the Debtors a Notice of Events of Default and Acceleration (the "Notice of Default") stating that, pursuant to the terms of the Amended Loan Agreement and related documents, KTRV was in default, and the time to remedy the default had passed. In the Notice of Default, Bedrock declared all amounts owing under the Amended Loan Agreement immediately due and payable and imposed the default interest rate of 15% per annum on all outstanding balances and amounts due to Bedrock.

12.      Bedrock, the Debtors, and the managers of the Debtors, Jordan Kestenbaum ("Mr. Kestenbaum") and David Tradburks ("Mr. Tradburks") (collectively, the "Managers"), executed a Forbearance Agreement (the "Forbearance Agreement") effective as of January 31, 2025. The Debtors and Managers acknowledged in the Forbearance Agreement that the KTRV and HCNR defaulted under the Amended Loan Agreement. Pursuant to the Forbearance Agreement, Bedrock agreed to abstain from exercising its remedial rights under the Amended Loan Agreement and related documents through February 10, 2025, in exchange for a grant from KTRV of a security interest in certain additional collateral. KTRV and HCNR failed to satisfy the conditions precedent of the Forbearance Agreement before the forbearance period expired.

13.      On or about February 12, 2025, after contentious and protracted negotiations and advice of their respective counsel, HCNR entered into an agreement with Bedrock consistent with UCC §9-620 (the "Strict Foreclosure"), by which HCNR conveyed to Bedrock a portion of the Equipment (the "Foreclosed Equipment")[4] in satisfaction of $10,000,000.00 of the outstanding obligations due to Bedrock under the Amended Loan Agreement. After giving effect to that $10 million credit, the remaining monetary obligations of the Debtors due under the Amended Loan Agreement as of the Petition Date were at least $5,650,000 in principal, plus all accrued and accruing but unpaid interest, costs, and fees (including professional fees and costs).

14.      Further, HCNR agreed that, upon Bedrock's request, HCNR would execute and deliver any bill(s) of sale or other typical conveyancing documents to provide furthers assurances to Bedrock and any transferees of any Foreclosed Equipment from Bedrock, in form and substance reasonably acceptable to the Bedrock. The Debtors further agreed to waive any rights they might

---

[4]      Certain equipment, most notably two 100-ton haul trucks (i.e., "triple sevens"), were not the subject of the Strict Foreclosure and were therefore not included in "Foreclosed Equipment."

8

otherwise have to redeem the Foreclosed Equipment and confirmed that Bedrock would continue to have the right to foreclose on any of the collateral that was not included in the Foreclosed Equipment.

15.     Substantially contemporaneously with the Strict Foreclosure, Bedrock and HCNR entered into an Equipment Lease Agreement (the "Equipment Lease Agreement") through which Bedrock agreed to lease the Foreclosed Equipment to HCNR through March 15, 2025, with an option to renew the lease for up to ten one-week increments for a fixed weekly rent of $105,000.[5] The Equipment Lease Agreement enabled HCNR to continue its ongoing revenue-producing mining operations and otherwise operate and maximize the value of the assets of HCNR (which would redound to the benefit of not only Bedrock but also all other creditors of HCNR). At the same time, HCNR and Bedrock conferred with a third-party professional auction company with experience selling equipment of this type, about selling the Foreclosed Equipment once the Equipment Lease Agreement terminated.

### C.     Legal Actions

16.     As more fully set forth in the First Day Declaration, the Debtors have been directly and indirectly involved in a number of legal actions involving Bedrock, Heritage Holding, and the Heritage Holding's owner, Angela Svonavec ("Ms. Svonavec"), and her husband, who is the former General Manager of HCNR, Jason Svonavec ("Mr. Svonavec" and together with Ms. Svonavec, the "Svonavecs").  Most immediately is a civil action commenced by Heritage Holding against Bedrock on March 6, 2025, in the Court of Common Pleas of Somerset County, PA (Civil Action No. 160-Civil-250) (the "Somerset Action").

---

[5]     Effective as of March 14, 2025, the HCNR and Bedrock agreed to reduce the rent to $50,000/week for the balance of the Equipment Lease Agreement until it is terminated.

17.     In the Somerset Action, Heritage Holding alleged that the Strict Foreclosure was an actual voidable transfer under 12 Pa. C.S.A. § 5104(a)(1) of Pennsylvania law. Heritage Holding did not seek to avoid the Strict Foreclosure but sought a judgment for damages for, among other things, conversion and trespass of chattels. Further, Heritage Holding sought injunctive relief "enjoining Bedrock from disposing or otherwise using the Equipment until such time as the disputed foreclosure of the Equipment by Bedrock can be adequately litigated."

18.     Substantially contemporaneously with the filing of the complaint in the Somerset Action, Heritage Holding filed an emergency motion for a temporary restraining order (the "Somerset TRO Motion").

19.     On March 13, 2025, the Court of Common Pleas of Somerset, PA (the "Somerset Court") entered a temporary restraining order (the "March 13 TRO") enjoining until March 27, 2025 at 10:00 a.m., Heritage Holding, Bedrock and all persons or entities acting on their before from "disposing of, selling, transferring, liquidating, conveying, encumbering, injuring, damaging, devaluing, or otherwise taking any action that will or may cause physical, regulatory, or financial harm to the equipment that is physically located in Somerset County, Pennsylvania, as enumerated in the UCC-1 Financing Statements attached to [Somerset TRO Motion]." Further, among other things, the March 13 TRO expressly provided that nothing in the order would affect any other party that is not a party to the Somerset Action, or any action by Heritage Holding or Bedrock related to or in connection with any third parties' action, including Cleveland Bros. and Caterpillar.

20.     On March 21, 2025, the Somerset Court entered an Amended Order of Court which provided that largely reiterated the terms of the March 13 TRO but extended the preliminary injunction period until "the conclusion of the hearing scheduled for April 9, 2025 at 1:30pm (or until such time as this Order is extended or superseded by a subsequent Order of Court)".

21.     The Debtors continue to operate their business and manage their properties as debtors in possession as authorized by sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases.

22.     No creditors committee has yet been appointed by the Office of the United States Trustee for the District of Delaware.

### D.      Proposed Settlement

23.     The Debtors have concluded that because of, among other things, the complexity, inherent delay and substantial exposure of litigation, the issues and disputes between the Debtors and Bedrock, the length of time necessary to resolve each dispute and issue presented, the complexity and uncertainty involved and the continuous disruption to the Debtors' efforts to generate value for the benefit of the Debtors and their estates and all creditors, it is to the Debtors and estates interest to resolve the dispute and related matters between Debtors and Bedrock.  The settlement will avoid disruption of the Debtors' business and operations and will enable the Debtors to market and sell the Equipment in a value maximizing manner for the benefit of the estates.

24.     As a means of maximizing the value of the estates and otherwise resolving pending or ripe disputes and issues, the Debtors negotiated at arm's length[6] and entered into the Settlement Agreement with Bedrock, the terms of which are as follows:[7]

-      The Strict Foreclosure will be vacated and set aside to restore the Debtors and Bedrock (and without prejudice to the Debtors and Bedrock, or Heritage Holding) to the position that they were prior to the Strict Foreclosure.

-      The Foreclosed Equipment will revest title with HCNR and its bankruptcy estate, who will become the lawful owners, subject to the security interests of Bedrock and any

---

[6]        The negotiation of the Settlement Agreement was by the Debtors' Chief Restructuring Officer.

[7]        This is only a summary of the terms of the Settlement Agreement.  In the event that the terms summarized herein differ from the Settlement Agreement, the terms of the Settlement Agreement shall control.

17259316/1

other secured party that was affected by the Strict Foreclosure. To the extent the Foreclosed Equipment is leased, sold, conveyed, transferred, or assigned, any other pre-existing valid, perfected and enforceable security interest shall attach to the proceeds of such lease, sale, conveyance, transfer, or assignment with the same priority that it had to the Foreclosed Equipment before the Strict Foreclosure; subject to any rights, claims, and defenses that the Debtors and their bankruptcy estates had before the Strict Foreclosure, (other than as to Bedrock which claims and security interests in the Equipment is permanently allowed and enforceable)

- Subject to agreement by the Debtors and Bedrock to a separate sale and auction process approved by the Bankruptcy Court, all sales of the Foreclosed Equipment will be subject to the approval of the Bankruptcy Court after notice and an opportunity for hearing. Any requests for the approval of such sales shall specifically seek authority to pay the allowed claims of Cleveland Bros. Equipment Co. ("Cleveland Bros."), Caterpillar Financial Services Corporation ("Caterpillar"), Wells Fargo Bank, N.A., and GM Finance as their interests may appear because they claim a security interest in certain of the Foreclosed Equipment, and their positions were senior to Bedrock's security interests in certain of the Foreclosed Equipment and their positions were therefore unaffected by the Strict Foreclosure. Any requests for approval of such sales also shall specifically seek authority to pay the balance of the proceeds (after any payments to Cleveland Bros., Caterpillar, Wells Fargo Bank, N.A., and GM Finance as to their collateral) first to Bedrock and then to pay any remaining proceeds to other secured parties with an allowed claim and valid, perfected and enforceable pre-petition security interests in the Foreclosed Equipment in accordance with the priority of their security interests under applicable non-bankruptcy law, subject to the security interests of Bedrock. The foregoing notwithstanding, nothing herein shall alter or affect the relief granted in the Cash Collateral Order. If the net proceeds from the sale exceed the allowed claims secured by valid perfected and enforceable and non-avoidable security interests, the remaining proceeds shall remain assets of the bankruptcy estates for distribution in accordance with the Bankruptcy Code.

- Bedrock has agreed to the Debtors' use of cash collateral during the Chapter 11 cases in accordance with a negotiated budget and certain terms, as negotiated between the parties. Further, Bedrock has agreed to negotiate in good faith to provide postpetition financing for the Debtors to enable to the liquidation of the Debtors' Equipment.

- If the proceeds from the sales of the Foreclosed Equipment are insufficient to pay off Bedrock, Bedrock shall continue to maintain its security interests in the remaining assets and properties of Debtors and any balance due shall be paid from the future sales of the Debtors' assets.

- All rights of the Debtors and Bedrock with respect to the allocation of the proceeds of any sales or other transactions of the Foreclosed Equipment are expressly reserved, and the Debtors and Bedrock will attempt to negotiate any such allocation in good faith, and in the absence of an agreement, such allocation shall be determined by the Bankruptcy Court.

- Except with respect to a breach of the Settlement Agreement, the Debtors and their bankruptcy estates (and any party acting directly or derivatively through the Debtors) shall be deemed to have released and discharged Bedrock, together with its officers, directors, members, employees, agents, attorneys, professionals, affiliates, subsidiaries, assigns and/or successors, from any and all claims and causes of action, demands, rights, or liabilities of every kind, character or nature whatsoever, in law or in equity or under the Bankruptcy Code, known or unknown, whether asserted or unasserted, arising out of, based upon or related to, in whole or in part, the Strict Foreclosure (or the process thereof), Forbearance Agreement, Prepetition Loan Documents, the Settlement Agreement, or any of Bedrock's prepetition relationships and dealings with the Debtors or any affiliate of the Debtors as it relates to, concerns, or arises out of the Foreclosed Equipment and Strict Foreclosure, including, without limitation, any claims or defenses as to the claims of Bedrock and the validity, priority, or enforceability and avoidability, reclassification or subordination of Bedrock's prepetition security interests, the obligations owed to Bedrock, or any claims or defenses under Chapter 5 of the Bankruptcy Code or any other causes of action.

- All of the Debtors' and their bankruptcy estates' claims and causes of action, whether direct or derivative, whether for fraudulent conveyance or for similar claims, whether arising under the Bankruptcy Code or state law, or arising under the applicable provisions of the Uniform Commercial Code, that is or could be asserted with respect to the Equipment and Strict Foreclosure or the process related thereto is settled, compromised, and resolved.

- Without limiting any other order or agreement, and without the need for the execution and delivery of addition documentation, the Debtors and their bankruptcy estates (and any predecessor, successor or assign), shall be deemed to have waived, released and discharged any and all claims, whether directly or derivatively, known or unknown, or at law, equity or under the Bankruptcy Code (including, but not limited to, provisions of the applicable Uniform Commercial Code) against Bedrock and its affiliates, successors, assigns, members, employees, officers, agents and advisors with respect to or relating to the Equipment, Forbearance Agreement or the Strict Foreclosure.

- Nothing in the Settlement Agreement shall affect, impair, modify, release, discharge, or terminate Bedrock's rights under Section 363(k) of the Bankruptcy Code, and Bedrock shall have the right to credit bid with respect to any sale, conveyance, or assignment of the Foreclosed Equipment.  For the avoidance of doubt, Bedrock shall have the right to credit bid up to the full amount of its allowed claim in the sale of any of the Foreclosed Equipment without further order of the Bankruptcy Court.

- Bedrock's claims and security interests shall be as it was prior to the Strict Foreclosure as through the Strict Foreclosure had not occurred.

- Nothing in the settlement will affect, alter, or impair the Debtors' and their bankruptcy estates' rights to litigate and adjudicate any claims, causes of action, or other defenses against Heritage Holding or the Svonavecs; provided, however, that any settlement or

resolution between the Debtors and their bankruptcy estates on one hand, and Heritage Holding and/or the Svonavecs, on the other hand, may not adversely affect or impair any rights or claims of Bedrock, including any rights, entitlements and provisions under the terms of the Settlement Agreement.

- Bedrock's security interests in the Foreclosed Equipment are valid, perfected, enforceable, and non-avoidable, and not subject to vacatur, defenses, reclassification, subordination, reconsideration, or other objection or challenge, and only subject to the ownership or senior security interests of the allowed claims, if any, of Cleveland Bros., Caterpillar, Wells Fargo Bank, N.A., and GM Finance. To the extent Heritage Holding or its principals, Angela Svonavec and Jason Svonavec, have an allowed claim against HCNR, and if it is determined that Heritage Holding or the Svonavecs have valid, perfected and enforceable security interests in the Foreclosed Equipment securing such allowed claim that is not avoided, subordinated, disallowed, or reclassified, (i) such security interests are junior in priority to the ownership or senior security interests of Cleveland Bros., Caterpillar, Wells Fargo Bank, N.A., and GM Finance in the Foreclosed Equipment, (ii) such security interests are junior in priority to Bedrock's security interests in certain of the Foreclosed Equipment, and (iii) such security interests shall attach to the proceeds of the Foreclosed Equipment; provided however, that nothing in this settlement shall alter or affect the relief granted in the Cash Collateral Order and rights and claims of Debtors and their bankruptcy estates and Bedrock against Heritage Holding and the Svonavecs are reserved.

- Entry of an order approving the Settlement Agreement shall be sufficient and conclusive evidence of security interests of Bedrock and the priorities set forth under this agreement without the necessity of creating, filing, recording or serving any financing statements or other documents or instruments that might otherwise be required under federal or state law.

- Whether or not the Debtors or Bedrock maintain insurance or is the loss payee under the insurance policies of the Debtors, the Debtors shall be deemed the owner of the Foreclosed Equipment as provided under this Settlement Agreement and have the standing and right to pursue any insurance claims with respect to Heritage Holding's and the Svonavecs' theft and conversion of the Foreclosed Equipment and the loss of and damage to the Obligors, and the proceeds of such recovery shall be distributed to Bedrock until its allowed claim is indefeasibly paid in full.

- The terms and provisions of the Settlement Agreement are expressly subject to the following conditions (unless waived, in writing, by the Parties): (a) the execution and delivery of the Settlement Agreement by of the entities identified on the signature pages of the Settlement Agreement, (b) the Debtors having the power and authority to enter into the Settlement Agreement and perform its obligations hereunder, (c) entry of an order approving the Settlement Agreement in form and substance acceptable to Bedrock, and (d) such order approving the Settlement Agreement is entered by the 20th day after the Petition Date.  The Settlement Agreement may be terminated if the foregoing conditions are not satisfied.  In the event of the termination of the Settlement Agreement, the Settlement Agreement shall become null and void and be deemed of

14

no force and effect, with no liability on the part of any Party hereto. Upon termination, neither the Settlement Agreement nor any terms or provisions set forth herein shall be admissible in any dispute, litigation, proceeding, or controversy among the Parties or any third party, and nothing herein shall constitute or be deemed to be an admission by any Party as to any matter, it being understood that the statements and resolutions reached herein were as a result of negotiations and compromises of the respective positions of the Parties.

- If there is any inconsistency between the settlement and the applicable provisions of the Uniform Commercial Code, the terms of the Settlement Agreement shall prevail.

- The Debtors and any person or entity that might claim through on behalf of the Debtors whether directly or derivatively, shall have been deemed to have waived and released any claims, causes of action, demands, rights, or liabilities of every kind, character or nature whatsoever, in law or in equity, know or unknown, whether asserted or unasserted, against Bedrock with respect to or concerning or arising out of the Strict Foreclosure and matters related thereto.

- The settlement is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including the merits of any claim or defense) by any party to any other party or any other person with respect to any of the matters addressed in this settlement.

- None of the settlement (including, without limitation, the allegations or statements in the motion) or any act performed, transactions executed or document, instruments or agreements executed pursuant to the settlement is or may be deemed to be or may be used as an admission or evidence of the validity of any claim or any allegation made in any of the pending litigations or of any wrongdoing or liability of any party, or is or may be deemed to be or may be used as an admission or evidence of any liability, fault, wrongdoing or omission of any party in any civil, criminal or administrative proceeding in any court or other tribunal and shall not be admissible in any proceeding for any purpose.

- Bedrock and the Debtors stipulate and agree that the automatic stay under Section 362 of the Bankruptcy Code stays further prosecution or other action with respect to the Somerset Litigation[8] and New York Litigation[9] and the Debtors shall file a letter with the court stating that the Somerset Litigation is stayed and the orders entered in the case should be vacated as a result of the bankruptcy proceedings and use its best efforts take such steps as is necessary and required to stay the Somerset Litigation and vacate the orders entered in that proceeding and Bedrock shall advise the court that the New York

---

[8]    *Heritage Holding Co., LLC v. Bedrock Industries Investco 1 LLC*, Case No. 160 Civil 2025 (Pa. Somerset Cty. March 6, 2025) (the "Somerset Litigation").

[9]    *Bedrock Industries Investco 1 LLC v. Heritage Holding Co., LLC, et al*., Case No. 651177-2025 (N.Y. Sup. Ct., Comm. Div. February 28, 2025) (the "New York Litigation").

17259316/1

Litigation is stayed and use its best efforts to dismiss without prejudice the New York Litigation as soon as practicable

- Nothing in the settlement, express or implied, is intended or shall be construed to confer upon, or to give to, any other person other than the parties, any right, remedy or claim under or by reason of this settlement.

- The Settlement Agreement shall be binding upon all parties in interest in these cases and their successors and assigns, including any Chapter 7 or Chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the bankruptcy estate of either of the Debtors and shall inure to the benefit of the Debtors and Bedrock.

- The provisions of the agreement shall be irrevocable and may not be amended or modified and shall not be subject to amendment or modification by the Bankruptcy Court, except in a writing signed by and upon the joint requests of the Obligors and Bedrock.

- Nothing contained in any Chapter 11 plan confirmed in the Debtors' bankruptcy cases or any order confirming any such plan or in any other order in these cases (including any order entered after any conversion of any of these cases to a case under Chapter 7 of the Bankruptcy Code) or any sale order entered in these cases shall alter, conflict with, or derogate from, the provisions of this Settlement Agreement without the consent of the Debtors and Bedrock.

- Other than as set forth in the Settlement Agreement, nothing in this Settlement Agreement shall amend, modify, or limit the rights and claims of Bedrock or be deemed to amend, modify, or limit the rights and claims of Bedrock under the Cash Collateral Order, Prepetition Loan Documents, or at law or under the Bankruptcy Code.

- The Parties agree that the Bankruptcy Court retains exclusive jurisdiction with respect to any disputes arising from or other actions to interpret, administer, or enforce the terms and provisions of this Settlement Agreement

## RELIEF REQUESTED

25.    By this Motion, the Debtors seek approval of the Settlement Agreement with Bedrock pursuant to Sections 105 and 363 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure.

## BASIS FOR THE RELIEF REQUESTED

26.    This Court has the authority to grant the relief requested in this Motion pursuant to Section 105 of the Bankruptcy Code and Bankruptcy Rule 9019.  Section 105(a) of the Bankruptcy

Code provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provision of this title."

27.    Bankruptcy Rule 9019 grants the Court authority to approve settlements of claims and controversies after notice and a hearing.[10]    Under this authority, the Third Circuit has emphasized that "to minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'" Myers v. Martin (In re Martin), 91 F. 3d 389, 393 (3d Cir. 1996) (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)).  In addition, courts in this district have recognized that the approval of a proposed compromise and settlement is committed to the sound discretion of the bankruptcy court.  See In re Louise's, Inc., 211 B.R. 798, 801 (D. Del. 1997).

28.    Before approving a settlement under Bankruptcy Rule 9019, a court must determine whether "the compromise is fair, reasonable, and in the interests of the estate." In re Marvel Enter. Group, Inc., 222 B.R. 243, 249 (D. Del. 1998) (quoting Louise's, 211 B.R. at 801).  To reach such a determination, the court must assess the value of the claim that is being settled and balance it against the value to the estate of the approval of the settlement.  Martin, 91 F.3d at 393.  In striking this balance, the court should consider the following factors:

(a)    The probability of success in the litigation;
(b)    The complexity, expense and likely duration of the litigation;
(c)    The possibilities of collecting on any judgment which might be obtained;
(d)    All other factors relevant to making a full and fair assessment of the wisdom of the proposed compromise; and
(e)    Whether the proposed compromise is fair and equitable to the Debtor, his creditors, and other parties in interest.

---

[10]    Bankruptcy Rule 9019 provides in pertinent part that "[o]n motion by the trustee and after notice and a hearing, **the** court may approve a compromise or settlement."

Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-425 (1968).  See also Martin, 91 F.3d at 393.  Basic to the process of evaluating proposed settlements is "the need to compare the terms of the compromise with the likely rewards of litigation."  TMT Trailer Ferry, 390 U.S. at 425.  The TMT rule does not require the Court to hold a full evidentiary hearing before a compromise can be approved, rather, the Court's obligation is "to canvass the issues and see whether the settlement 'falls below the lowest point in a range of reasonableness.'"  10 Collier on Bankruptcy, ¶ 9019.2, 9019-4 (15th ed.) (quoting In re Drexel Lambert Group, Inc., 134 B.R. 493 (Bankr. S.D.N.Y. 1991)).  See also Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983), cert. denied, 464 U.S. 822 (1983).

29.     "It is axiomatic that settlement will almost always reduce the complexity and inconvenience of litigation." Will v. Northwestern Univ. (In re Nutraquest, Inc.), 434 F.3d 639, 646 (3d Cir. 2006).   That is certainly the case here.  While the Debtors and Bedrock had agreed on the Strict Foreclosure process and Bedrock asserts it was valid and conducted in accordance with the UCC, the foreclosure and the ownership of the Foreclosed Equipment are the subject of active litigation. If the Debtors seek to avoid the Strict Foreclosure, such a claim would need to be brought by the Debtors' estate which would be costly.  Moreover, if the Debtors were successful in that claim, the Foreclosed Equipment would be returned to Debtors' ownership.  The Settlement Agreement achieves that end result without the need to engage in costly litigation.

30.     More than that, the Debtors focused primarily on the effect of the return of the Foreclosed Equipment from the Strict Foreclosure, and an agreement for a sale process that will allow the Debtors to maximize the value of the estates for the benefit of creditors.  Importantly, the settlement does not seek to elevate Bedrock's rights over any other party, but provides the outline of measured process for the sale of the Foreclosed Equipment and distribution of proceeds

17259316/1

in accordance with the priority under applicable nonbankruptcy law and the Bankruptcy Code. Further, Bedrock's claims are allowed, including the right to credit bid, but the allowance and recognition of such claims and rights remain subject to challenge rights under the Local Rules.

31.     The Settlement Agreement is paramount to the benefit of all creditors.  It establishes ownership of the Foreclosed Equipment and renders the dispute moot.  Without this agreement, the Debtors would be forced to litigate the dispute without any resources to fund that challenge. By establishing Debtors' ownership of the equipment through the Settlement Agreement, the Debtors preserve the value of the estates and can move towards a transparent and public sale process for the Debtors' assets.   Even more than that, terms of the Settlement Agreement put the Debtors in a position as good – if not better – than they would be from any judgment that they could receive, all without the time, expense and risk of litigation. In short, this settlement is the best of all possible worlds.

32.     For the foregoing reasons, the Debtors, in their business judgment has determined that the proposed settlement is in the best interests of the Debtors' estates. Accordingly, the Debtors respectfully submit that the proposed settlement meets the standards set forth in <u>TMT Trailer Ferry</u> and should be approved by the Court.

<u>**NOTICE**</u>

33.     The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee; (b) Bedrock; (c) Caterpillar Financial Services Corporation, (d) Cleveland Brothers Equipment Co., Inc. (e) Wells Fargo, Bank, N.A., (f) Heritage Holding, Co., LLC, (g) all parties asserting a security interest in the Equipment, (h), the United States Trustee, and (i) the twenty (20) largest unsecured creditors.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

19

**NO PRIOR RELIEF**

34.    No prior request for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that this Court enter an Order, a copy of which is attached hereto (i) authorizing the Debtors to enter into the Settlement Agreement; (ii) approving the Settlement Agreement; and (iii) granting such other and further relief as is just and proper.

Dated:  April 1, 2025
Wilmington, Delaware

**MORRIS JAMES LLP**

*/s/ Jeffrey R. Waxman*
Jeffrey R. Waxman (DE Bar No. 4159)
Eric J. Monzo (DE Bar No. 5214)
Christopher M. Donnelly (DE Bar No. 7149)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: jwaxman@morrisjames.com
　　　　emonzo@morrisjames.com
　　　　cdonnelly@morrisjames.com

*Proposed Counsel to the Debtors and Debtors in Possession*

17259316/1