IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| KTRV, LLC, *et al.*,[1] | Case No. 25-10601 (MFW) |
| Debtors. | (Jointly Administered) |
| | Re: Docket No. 26 |
| | Hearing Date: Apr. 17, 2025 at 3:00 p.m. (ET) |
| | Obj. Deadline: Apr. 10, 2025 at 4:00 p.m. (ET) |

**UNITED STATES TRUSTEE'S OBJECTION TO
MOTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION
FOR ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 363 AND
FED. R. BANKR. P. 9019(b) AUTHORIZING AND APPROVING A GLOBAL
SETTLEMENT WITH BEDROCK INDUSTRIES INVESTCO 1 LLC
WITH RESPECT TO STRICT FORECLOSURE AND FORECLOSED EQUIPMENT**

Andrew R. Vara, the United States Trustee for Regions Three and Nine (the "U.S. Trustee"), through his undersigned counsel, hereby objects (this "Objection") to the *Motion of the Debtors and Debtors-in-Possession for Order Pursuant to 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 9019(b) Authorizing and Approving a Global Settlement with Bedrock Industries Investco 1 LLC with Respect to the Strict Foreclosure and Foreclosed Equipment* [D.I. 26] (the "Motion"),[2] and in support of this Objection respectfully states:

---

[1] The Debtors in these chapter 11 cases, along with each the last four digits of each Debtor's tax identification number, are as follows: KTRV LLC (9993), Heritage Coal & Natural Resources, LLC (8326). The Debtors' service address is 1521 Concord Pike, Suite 201, Wilmington, DE 19803.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

**PRELIMINARY STATEMENT**

1. The Court should deny the Motion for the following separate and independent reasons:

   (a) **The proposed settlement is an insider transaction that should be subject to heightened scrutiny, and the Debtors have not met their burden of showing that the settlement is fair and reasonable.** This is a settlement between multiple entities that are all controlled by the same family. The "principal" of the Debtors' lender—who stands to receive fulsome releases for essentially all prepetition conduct and dealings with respect to the Debtors—is related to or affiliated with every single member and Manager of Debtor KTRV. Accordingly, the Court should subject this transaction to heightened scrutiny. Even if the Court does not do so, it should nonetheless find that the Debtors have not met their burden. In the Motion and any supporting papers filed to date, the Debtors have failed to create a record in support of the settlement, leaving this Court with no information to "canvass the issues" and determine whether relief is appropriate. Moreover, the practical effects of the settlement will be that the Debtors receive property that they lack the resources to monetize, their secured debt will increase by $10,000,000, and they will provide releases that wipe out parties' challenge rights. Put simply, this is not fair and reasonable.

   (b) **The proposed settlement would terminate the challenge period less than three weeks into these cases.** Both the Court's Local Bankruptcy Rules and its interim cash collateral order provide for a challenge period of at least seventy-five days. The settlement would terminate that challenge period effective immediately upon its approval, which is sought less than three weeks into the cases and before any committee has been appointed. The settlement agreement seeks to establish the validity, priority, perfection and enforceability of the lender's liens and claims on a final basis. The settlement agreement also releases virtually *all* the Debtors' prepetition claims against the lender—both directly and derivatively—including avoidance actions under chapter 5 of the Bankruptcy Code. This would wipe out parties' challenge rights and should not be approved.

2. The U.S. Trustee also objects to miscellaneous provisions of the proposed settlement. These objections relate to, among other things, the lender's proposed credit bid rights, the Court's findings as to good faith and the Court's ability to modify or amend the settlement once approved.

3. Accordingly, and for the reasons set forth in more detail herein, the U.S. Trustee respectfully requests that the Court deny the Motion.

## JURISDICTION AND STANDING

4. This Court has jurisdiction to hear and determine the Motion and this Objection pursuant to: (i) 28 U.S.C. § 1334; (ii) applicable order(s) of the United States District Court of the District of Delaware issued pursuant to 28 U.S.C. § 157(a); and (iii) 28 U.S.C. § 157(b)(2).

5. Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of chapter 11 cases filed in this judicial district. The duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the Courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

6. The U.S. Trustee has standing to be heard on this Objection pursuant to 11 U.S.C. § 307. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest).

## BACKGROUND

**A.    The Chapter 11 Cases**

7. On March 30, 2025 (the "Petition Date"), each of the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code," or "Code"), in the United States Bankruptcy Court for the District of Delaware (this "Court"), thereby commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases").

8. The Debtors continue to manage and operate their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

9. As of the date hereof, no committee has been appointed and no trustee or examiner has been requested in the Chapter 11 Cases.

10. The Debtors have not filed their schedules of assets and liabilities or their statements of financial affairs. No 341 meeting has been scheduled or held in the Chapter 11 Cases.

11. On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors and Debtors in Possession to (A) Use Cash Collateral and (B) Grant Adequate Protection to the Prepetition Lender; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* [D.I. 14] (the "Cash Collateral Motion").

12. On April 2, 2025, the Court entered an order granting the Cash Collateral Motion on an interim basis. D.I. 57 (the "Interim Cash Collateral Order").

13. Attached to the Interim Cash Collateral Order as Exhibit 2 is a budget projecting that the Debtors will run out of available cash following the week ending April 25, 2025. *Id.* at Ex. 2.

14. The Debtors have not filed a motion seeking authority to obtain postpetition financing and have no other apparent source of available cash.

**B.    The Debtors' Prepetition Loan Transactions with Bedrock**

15. On February 5, 2024, Debtor KTRV LLC ("KTRV") purchased all of the membership interests in Debtor Heritage Coal & Natural Resources, LLC ("HCNR") from Heritage Holding Co. ("Heritage Holding"). *Declaration of Brian Ryniker in Support of the*

4

*Debtors' Chapter 11 Petitions and First Day Pleadings* [D.I. 15] (the "Ryniker Declaration," or "Ryniker Decl."), ¶ 9. KTRV's sole asset is its membership interest in HCNR. *Id.* at ¶ 6.

16. Bedrock Industries Investco 1 LLC ("Bedrock") financed KTRV's purchase of the membership interests in HCNR. *Id.* at ¶ 9. Specifically, on February 2, 2024, Bedrock provided KTRV with $10,000,000 in bridge financing pursuant to a promissory note (the "Bridge Note"). *Id.* at ¶ 10. HCNR guaranteed the Bridge Note and granted Bedrock a security interest in substantially all of HCNR's personal property assets, including its equipment. *Id.*

17. On June 27, 2024, Bedrock and the Debtors entered into an Amended and Restated Loan Agreement (the "Amended Loan Agreement"). *Id.* at ¶ 14. The Amended Loan Agreement converted the Bridge Note to permanent working capital financing and increased the Debtors' available revolving credit to $20,000,000. *Id.* The Debtors drew down $15,000,000 from the available credit following execution of the Amended Loan Agreement. *Id.* Bedrock filed UCC-1 financing statements in Pennsylvania and Delaware to perfect its purported security interest in the Debtors' Equipment and other collateral. *Id.* at ¶ 15.

18. On January 20, 2025, Bedrock noticed a default under the parties' loan documents and accelerated the entire outstanding loan balance. *Id.* at ¶ 28. On January 31, 2025, the Debtors, their Managers (Jordan Kestenbaum and David Tradburks) and Bedrock entered into a forbearance agreement (the "Forbearance Agreement"). *Id.* at ¶ 29. Pursuant to the Forbearance Agreement, the Debtors "granted Bedrock a security interest on certain additional collateral[.]" *Id.* The Debtors evidently then defaulted under the Forbearance Agreement. *Id.*

C. **Bedrock and KTRV Are Both Owned and/or Controlled by the Kestenbaum Family**

19. "One of Bedrock's principals is the father and father-in-law of certain members and/or managers of KTRV." *Id.* at ¶ 9 n.3. Upon information and belief, that Bedrock principal is Alan Kestenbaum. Alan Kestenbaum is listed as the "Founder" of Bedrock Industries on that

5

entity's website.[3] Bedrock Industries is "privately funded by Alan Kestenbaum and [has] a network of funds and family offices that invest alongside Bedrock Industries."[4] Upon information and belief, Alan Kestenbaum signed the Amended Loan Agreement on behalf of Bedrock.

20. On February 25, 2025, HCNR filed its Complaint in the Second W.D. Pa. Action (Ryniker Decl., ¶ 38), which provides that KTRV's members include the following: (a) Jordan Kestenbaum; (b) Deborah Kestenbaum; (c) JGK Holdings LLC; and (d) ALK Holdings LLC. *Heritage Coal & Natural Resources, LLC v. Heritage Holding Co., LLC, et al.*, Civil Action No. 3:25-cv-00059, D.I. 1, ¶ 2 (W.D. Pa. Feb. 25, 2025). JGK Holdings is a trust whose sole trustee is Alan Kestenbaum, and whose sole beneficiary is his son, Jacob Kestenbaum. *Id.* ALK Holdings is a trust whose sole trustee is Deborah Kestenbaum, and whose sole beneficiary is Arielle Kestenbaum. *Id.* Jordan Kestenbaum is also a Manager of KTRV. Ryniker Decl., ¶ 29. Upon information and belief, Arielle Kestenbaum is Alan Kestenbaum's daughter and is married to David Tradburks. David Tradburks is a Manager of KTRV. *Id.* He is also a manager of HCNR. Second W.D. Pa. Action, Compl., ¶ 10.[5]

21. As confirmed above, KTRV wholly owns HCNR. Thus: (a) the Kestenbaum family—directly and indirectly—wholly owns both Debtors; and (b) Alan Kestenbaum is the

---

[3] https://bi15.com/leadership.html (last visited Apr. 8, 2025) ("[Mr. Kestenbaum] has extensive investing and operating experience in the metals and mining sectors, as well as a successful track record in growing businesses, turnarounds and restructurings.").

[4] https://bi15.com/about.html (last visited Apr. 8, 2025).

[5] Mr. Tradburks may also be a member of KTRV. *See Heritage Holding Co. LLC v. KTRV LLC*, Civil Action No. 2:24-1448, D.I. 26, Opinion, p. 4 (W.D. Pa. Feb. 27, 2025) ("The parties agree that KTRV's members are David Tradburks, Jordan Kestenbaum, JGK Holdings LLC and ALK Holdings LLC.").

founder and private funder of Bedrock, *i.e.*, the Debtors' purported secured lender and the counterparty to the settlement outlined in the Motion and described in more detail herein.

**D.    The Strict Foreclosure**

22.    On or about February 12, 2025, HCNR entered into an agreement with Bedrock "pursuant to UCC § 9-620" (the "Strict Foreclosure"). Ryniker Decl., ¶ 30. Pursuant to the Strict Foreclosure, HCNR transferred certain Equipment collateral (the "Foreclosed Equipment") to Bedrock in partial satisfaction of the Debtors' outstanding obligations due to Bedrock under the parties' loan documents. *Id.*

23.    Bedrock accepted the Foreclosed Equipment in satisfaction of $10,000,000 of such obligations, leaving "remaining monetary obligations" of the Debtors of "at least $5,650,000 in principal" as of the Petition Date, plus interest, costs and fees. *Id.*

24.    Bedrock then immediately leased the Foreclosed Equipment back to HCNR through March 14, 2025 at a fixed weekly rent of $105,000. *Id.* at ¶ 32. Bedrock and HCNR subsequently extended the Equipment Lease Agreement for an additional four-week period at a fixed weekly rent of $50,000.[6] *Id.* at ¶ 32 n.8.

25.    On March 6, 2025, Heritage Holding commenced a state court action in the Court of Common Pleas of Somerset County, PA designated Civil Action No. 160-Civil-250. *Id.* at ¶ 40. Heritage Holding—which also asserts a security interest in certain of the Debtors' assets and Equipment—alleged that the Strict Foreclosure was a fraudulent conveyance under Pennsylvania law. *Id.*

---

[6] These disclosures suggest that the Debtors paid Bedrock over $500,000 to lease the Foreclosed Equipment during the six weeks preceding the Petition Date. The Debtors entered the Chapter 11 Cases with an opening cash balance of approximately $1,200,000. Interim Cash Collateral Order, Ex. 2 (Budget).

7

E. **The Motion and the Proposed Settlement**

26. On April 1, 2025, the Debtors filed the Motion. The Debtors did not file a declaration or any other sworn statement or evidence in support of the Motion. Many of the factual allegations in the Motion come from the Ryniker Declaration in support of "first day" relief.

27. By and through the Motion, the Debtors seek the entry of an order approving the proposed settlement (the "Settlement") between the Debtors' estates and Bedrock. A copy of the proposed form of settlement agreement is attached to the Proposed Order as Exhibit 2 (the "Settlement Agreement").

28. The Debtors contend that the purpose of the Settlement is to unwind the Strict Foreclosure and restore the parties to the *status quo ante* as if the Strict Foreclosure had never occurred. Proposed Order, ¶ 3.

29. The Settlement includes the following provisions that are relevant to this Objection:

 **(i)** **Provisions Unwinding the Strict Foreclosure**

30. The Settlement Agreement provides that "[t]he Strict Foreclosure will be vacated and set aside" and that the Debtors, Bedrock and Heritage Holding "shall be restored to the position that they were in prior to the Strict Foreclosure[.]" Settlement Agreement, ¶ 2. Further, "[a]ll right, title and interest in the Foreclosed Equipment will revest with HCNR" for the benefit of the Debtors and their bankruptcy estates. *Id.* at ¶ 3.

31. The practical effect of this relief is that the Debtors' purported secured debt will increase by approximately $10,000,000. Ryniker Decl., ¶ 56 n.12 ("Bedrock's claim will be approximately $10 million higher, plus interest."). As of the Petition Date, the Debtors assert that

their secured debt totaled approximately $11,800,000 in the aggregate. *Id.* at ¶ 56. Thus, the Settlement, if approved, will increase the Debtors' secured debt by approximately 85%.

32.     It does not appear that the Debtors or their estates will receive any cash consideration as part of the Settlement. As of April 18, 2025 (the day after the Motion is set to be heard), the cash collateral budget reflects that the Debtors will have approximately $86,000 in cash on hand. Interim Cash Collateral Order, Ex. 2.

33.     Additionally, it does not appear that the Settlement will unwind the Forbearance Agreement or any other agreements between Bedrock on the one hand and the Debtors and/or their Managers on the other.

### (ii)     Provisions Granting Fulsome Releases for Bedrock and Its Related Parties

34.     Paragraph 10 of the Settlement Agreement provides as follows:

> Without limiting any other order or agreement, and without the need for the execution and delivery of addition [*sic*] documentation, the [Debtors] and their bankruptcy estates (and any predecessor, successor or assign), ***shall be deemed to have waived, released and discharged any and all claims, whether directly or derivatively, known or unknown, or at law, equity or under the Bankruptcy Code*** (including, but not limited to, provisions of the applicable Uniform Commercial Code) ***against Bedrock and its affiliates, successors, assigns, members, employees, officers, agents and advisors with respect to or relating to the Foreclosed Equipment, Forbearance Agreement or the Strict Foreclosure***.

Proposed Order, Ex. 1, ¶ 10 (emphasis added).

35.     Paragraph 11 of the Settlement Agreement provides as follows:

> [T]he [Debtors] and their bankruptcy estates (***and any party acting directly or derivatively through the [Debtors]) shall be deemed to have released and discharged Bedrock, together with its officers, directors, members, employees, agents, attorneys, professionals, affiliates, subsidiaries, assigns and/or successors, from any and all claims and causes of action, demands, rights, or liabilities of every kind, character or nature whatsoever***, in law or in equity or under the Bankruptcy Code, known or unknown, whether asserted or unasserted, arising out of, based upon or related to, in whole or in part, the Strict Foreclosure (or the process thereof), ***Forbearance Agreement***, ***Prepetition Loan Documents***, the Settlement Agreement, or any of Bedrock's prepetition relationships and dealings with the [Debtors] ***or any affiliate of the [Debtors]*** as it relates to,

> concerns, or arises out of the Foreclosed Equipment and Strict Foreclosure, ***including, without limitation, any claims or defenses as to the claims of Bedrock and the validity, priority, or enforceability and avoidability, reclassification or subordination of Bedrock's prepetition security interests, the obligations owed to Bedrock, or any claims or defenses under Chapter 5 of the Bankruptcy Code or any other causes of action***.

*Id.* at ¶ 11 (emphasis added).

36. Paragraphs 10 and 11 of the Settlement Agreement shall be referred to herein as the "<u>Release Provisions</u>."

### (iii)   Provisions Determining the Validity and Priority of Bedrock's Claims and Liens

37. Paragraph 13 of the Settlement Agreement provides as follows:

> ***Bedrock's security interests in the Foreclosed Equipment and the proceeds thereof are valid, perfected, enforceable, and non-avoidable, and not subject to vacatur, defenses, reclassification, subordination, reconsideration, or other objection or challenge***, and only subject to security interests of the allowed claims, if any, of Cleveland Bros., Caterpillar, Wells Fargo Bank, N.A., and GM Finance, which are senior in priority to Bedrock. To the extent Heritage Holding or its principals, Angela Svonavec and Jason Svonavec (together, the "<u>Svonavecs</u>"), have an allowed claim against HCNR, and if it is determined that Heritage Holding or the Svonavecs have valid, perfected and enforceable security interests in the Foreclosed Equipment securing such allowed claim that is not avoided, subordinated, disallowed, or reclassified, ***(i) such security interests are junior in priority to the senior security interests of Cleveland Bros., Caterpillar, Wells Fargo Bank, N.A., and GM Finance in certain of the Foreclosed Equipment, (ii) such security interests are junior in priority to Bedrock's security interests in all of the Foreclosed Equipment, and (iii) such security interests shall attach to the proceeds of the Foreclosed Equipment***; provided however, that nothing in this settlement shall alter or affect the relief granted in the Cash Collateral Order and rights and claims of Debtors and their bankruptcy estates and Bedrock against Heritage Holding and the Svonavecs are reserved.

*Id.* at ¶ 13 (emphasis added).

38. Paragraph 14 of the Settlement Agreement provides as follows:

> ***Entry of an order approving this Settlement Agreement shall be sufficient and conclusive evidence of security interests*** [*sic*] ***of Bedrock and the priorities set forth under this agreement*** without the necessity of creating, filing, recording or serving any financing statements or other documents or instruments that might otherwise be required under federal or state law.

10

*Id.* at ¶ 14 (emphasis added).

39. Paragraphs 13 and 14 of the Settlement Agreement shall be referred to herein as the "Challenge Provisions."

**(iv)    Miscellaneous Provisions**

40. Paragraph 12 of the Settlement Agreement purports to establish the validity and extent of Bedrock's credit bid rights on a final basis. *Id.* at ¶ 12.

41. Paragraph 18 of the Settlement Agreement provides in part that the parties thereto "acknowledge[] that the negotiations leading up to this agreement were conducted regularly and at arm's length and in good faith." *Id.* at ¶ 18.

42. Paragraph 19 of the Settlement Agreement provides that it shall "prevail" over contrary provisions of the Uniform Commercial Code "or state law." *Id.* at ¶ 19.

43. Paragraph 24 of the Settlement Agreement provides that this Court may not amend or modify the terms and provisions thereof without the consent of the Debtors and Bedrock. *Id.* at ¶ 24.

## OBJECTION

**I.    The Court Should Deny the Motion Because the Debtors Have Not Met Their Burden**

**A.    Applicable Legal Standard**

44. Bankruptcy Rule 9019 provides that "[o]n the trustee's motion and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).

45. In determining whether to approve a proposed settlement under Bankruptcy Rule 9019, the Court must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). In *In re Martin*, the Third Circuit recognized

11

"four criteria that a bankruptcy court should consider in striking this balance": (i) the probability of success in litigation; (ii) the likely difficulties in collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (iv) the paramount interest of the creditors. *Id.* (citations omitted).

46.     The Court "must be apprised of all relevant information that will enable it to determine what course of action will be in the best interest of the estate." *Id.* at 394; *see also In re LATAM Airlines Grp. S.A.*, Case No. 20-11254 (JLG), 2022 WL 272167, at *12 (Bankr. S.D.N.Y. Jan. 28, 2022) ("The proposed settlement must be supported by an adequate record with sufficient detail for the Court to conduct a thorough and informed canvassing of the issues and distinguish the Court's decision from 'mere boilerplate approval.'") (citations omitted).

47.     Before approving a proposed settlement, the Court must first determine that the settlement "is fair and equitable and in the best interests of the estate." *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991) (cleaned up) (citations omitted). Ordinarily, this only requires "that the settlement exceed the lowest point in the range of reasonableness." *In re Exaeris, Inc.*, 380 B.R. 741, 746 (Bankr. D. Del. 2008) (quotations and citations omitted). However, bankruptcy courts have held that proposed settlements between debtors and their insiders should be "subjected … to closer scrutiny." *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. at 498 (holding that "closer scrutiny of insider agreements should be added to the cook book list of factors that Courts use to determine whether a settlement is fair and reasonable."). Indeed, "the conduct of bankruptcy proceedings not only should be right but must seem right." *In re Ira Haupt & Co.*, 361 F.2d 164, 168 (2d Cir. 1966).

**B.     The Settlement is an Insider Transaction**

48.     Here, the Court should subject the Motion and proposed Settlement to heightened scrutiny because the Settlement is an insider transaction. Section 101(31)(B) of the Bankruptcy

Code defines an "insider" of a corporation to include: (i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor. 11 U.S.C. § 101(31)(B); *see also In re QDN, LLC*, 363 F. App'x 873, 876 n.4 (3d Cir. 2010) ("Limited liability companies are eligible to file bankruptcy petitions because they are sufficiently similar to a corporation and limit responsibility for the debts to the capital subscribed.") (collecting cases). Section 101(45) of the Code, in turn, defines "relative" as an "individual related by affinity or consanguinity within the third degree as determined by the common law, or individual in a step or adoptive relationship within such third degree." 11 U.S.C. § 101(45).

49.     The Court can find that the Settlement is an insider transaction on any number of bases. Alan Kestenbaum is the founder of Bedrock Industries, which he personally funds. And Alan appears to be related to or otherwise affiliated with every single member and Manager of KTRV.[7] This includes Jordan Kestenbaum (member and Manager of KTRV), David Tradburks (member and Manager of KTRV) and Deborah Kestenbaum (member of KTRV, and trustee for KTRV member ALK Holdings). In addition to being a member of KTRV, ALK Holdings is a trust maintained for the benefit of Alan's daughter, Arielle Kestenbaum. Finally, Alan is actually himself the trustee of KTRV member JGK Holdings, which is a trust maintained for the benefit of Alan's son, Jacob Kestenbaum.

50.     Accordingly, the Court would be well supported in determining that the Settlement is an insider transaction and subjecting it to heightened scrutiny.

---

[7] The U.S. Trustee's use of the parties' first names is solely for the purpose of clarity (given that many of these individuals share the same surname) and is not in any way intended to suggest familiarity.

### C.  The Debtors Have Failed to Show That the Settlement is Fair and Reasonable

51. Whether or not the Court determines that the Settlement is an insider transaction, the Court should nonetheless deny the Motion because the Debtors have failed to meet their burden under either standard.

52. Initially, the Debtors have failed to demonstrate their success under the *Martin* factors. The Debtors rely on conclusory assertions that the Settlement will avoid the necessity of litigation by the estate. Motion, ¶ 29. The Debtors further assert that the Settlement will enable them to focus on a sale of the Foreclosed Equipment that will benefit all creditors. *Id.* at ¶ 30.

53. But this misses the point. Even if title in the Foreclosed Equipment revests in the estates, the Debtors will be administratively insolvent in a matter of days (if they are not already). Their cash collateral budget reflects that they will have less than $90,000 in available cash following the week ending April 18, 2025, and they are not receiving any new cash as a result of the Settlement. Therefore, the Debtors will have no money to fund a marketing and sale process in the Chapter 11 Cases. The Debtors make no effort to show that they have satisfied the remaining *Martin* factors.

54. Further, the Debtors have failed to create any record in support of the Motion. Among other things, the Debtors did not file a declaration in support of the Motion or Settlement. They have never filed the Amended Loan Agreement, the Forbearance Agreement or the Strict Foreclosure—notwithstanding that they seek to grant Bedrock and its related parties full releases with respect to *all* of these agreements. They have provided zero evidence establishing the validity, priority or enforceability of Bedrock's liens and claims—yet the Settlement Agreement purports to accomplish exactly that, on a final basis, effectively nullifying the challenge period. And they have also provided no evidence that the Settlement was negotiated in good faith or at arm's length. Rather, the Motion includes in a footnote that "The

14

negotiation of the Settlement Agreement was by the Debtors' Chief Restructuring Officer." Motion, ¶ 24 n.6. But there is *also* no record in these cases as to when the CRO was selected, by whom or through what process. Moreover, the Debtors have no independent manager, which suggests that one or more of the Kestenbaum parties selected the CRO.

55.     The Debtors' failure to make a full record in support of the proposed Settlement is a separate and independent basis upon which the Court can deny the Motion. *See generally In re Martin*, 91 F.3d at 394; *In re Exaeris*, 380 B.R. at 746 (noting that "the Court is unable to measure the reasonableness of the settlement on the evidence submitted" without ruling thereon).

## II. The Court Should Deny the Motion Because the Settlement Nullifies the Challenge Period.

56.     Local Rule 4001-2 provides, in connection with financing orders in chapter 11 cases, that the estate and parties in interest (including a committee) shall have "at least 75 days from the entry of the first interim [financing] order to commence a challenge" as to the validity, perfection, or amount of a prepetition claim or lien. Del. Bankr. L.R. 4001-2(a)(i)(Q). In compliance with this provision, the Interim Cash Collateral Order provides that:

> The Committee and all other non-debtor parties-in-interest … shall have seventy-five (75) days from the date of entry of this Order (the "Challenge Deadline"), to investigate the validity, perfection and enforceability of the Prepetition Bedrock Liens and the Prepetition Loan Obligations, and to obtain standing to prosecute such claims or causes of action, or objection related thereto (each, a "Challenge").

Interim Cash Collateral Order, ¶ 10.

57.     The Settlement will nullify these provisions of the Local Rules and the Interim Cash Collateral Order and should not be approved.

58.     The Challenge Provisions of the Settlement provide that "Bedrock's security interests in the Foreclosed Equipment and the proceeds thereof are valid, perfected, enforceable, and non-avoidable, and not subject to vacatur, defenses, reclassification, subordination,

15

reconsideration, or other objection or challenge." Settlement Agreement, ¶ 13. Further, the entry of an order approving the Settlement Agreement "shall be sufficient and conclusive evidence of [the] security interests of Bedrock and the priorities set forth under this agreement[.]" *Id.* at ¶ 14. The foregoing provisions unequivocally terminate the challenge period, thereby prejudicing parties in interest in the Chapter 11 Cases including any unsecured creditors committee that may be appointed.

59. Moreover, while the Debtors represent that the purpose of the Settlement is to restore parties to the status quo prior to the Strict Foreclosure, the scope of the proposed Release Provisions is actually much broader. Indeed, the Release Provisions provide that the Debtors and their estates:

> shall be deemed to have waived, released and discharged any and all claims, ***whether directly or derivatively*** … against Bedrock and its affiliates, successors, assigns, members, employees, officers, agents and advisors with respect to or relating to the Foreclosed Equipment, Forbearance Agreement or the Strict Foreclosure.

*Id.* at ¶ 10 (emphasis added).

60. The Release Provisions further provide that the Debtors, their estates "and any party acting directly or derivatively through" the Debtors:

> shall be deemed to have released and discharged Bedrock, together with its officers, directors, members, employees, agents, attorneys, professionals, affiliates, subsidiaries, assigns and/or successors, ***from any and all claims and causes of action, demands, rights or liabilities of any kind, character or nature whatsoever***" in connection with, among other things, the Strict Foreclosure, the Forbearance Agreement ***and the Prepetition Loan Documents***[.]

*Id.* at ¶ 11 (emphasis added). These releases specifically apply to claims and defenses as to the validity, priority, enforceability and avoidability of Bedrock's asserted claims and interests, and include avoidance actions under chapter 5 of the Bankruptcy Code and "any other causes of action." *Id.* Among other things, this would include any avoidance actions the estates might hold

16

against Bedrock related to the more than $500,000 in equipment lease payments that the Debtors paid Bedrock during the six weeks preceding the Petition Date.

61.     Taken together, the Challenge Provisions and the Release Provisions will grant fulsome releases to Bedrock and its related parties—including, potentially, KTRV's members and Managers—and will completely thwart the challenge procedures in the Local Rules and Interim Cash Collateral Order. This relief is not reasonable, not supported by the record and should not be approved, in particular less than three weeks into these cases.

### III.    Miscellaneous Objections

62.     In addition to the objections raised above, the Court should also not approve the proposed Settlement with respect to the following provisions.

63.     *Credit Bid Rights* – paragraph 12 of the Settlement Agreement provides that Bedrock "shall have the right to credit bid with respect to any sale, conveyance, or assignment of the Foreclosed Equipment." This relief is premature and should be subject to the challenge procedures of the Local Rules and Interim Cash Collateral Order.

64.     *Good Faith Findings* – paragraph 18 of the Settlement Agreement provides in part that the parties "acknowledge[] that the negotiations leading up to this agreement were conducted regularly and at arm's length and in good faith." The Debtors have not provided any record in support of this good faith finding. Moreover, while the Debtors represent that the CRO negotiated the Settlement, there is no evidence as to when, how and by whom the CRO was selected. The Debtors have no independent manager, which suggests that one of the existing Managers selected the CRO. But both Managers are directly and intimately related to and affiliated with Bedrock Industries' founder and private funder, Alan Kestenbaum. Alan will directly benefit from the releases and other relief contained in the proposed Settlement. These

facts call into question whether the negotiation of the Settlement was in fact conducted in good faith and at arm's length.

65.  *Conflicts with State Law* – paragraph 19 of the Settlement Agreement provides that it shall "prevail" over any contrary provisions of the Uniform Commercial Code "or state law." The Debtors provide no legal authority for this requested relief. It is unclear whether the Court can approve this provision at all.

66.  *Amendments* – paragraph 24 of the Settlement Agreement provides that this Court may not amend or modify the terms and provisions thereof without the consent of the Debtors and Bedrock. This provision inappropriately constrains the Court's ability to fashion the relief it deems appropriate, including as to its own prior orders in the Chapter 11 Cases. The Court should not grant this relief.

## **RESERVATION OF RIGHTS**

67.  The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and all rights, remedies and obligations to, among other things: (i) complement, supplement, augment, alter or modify this Objection; (ii) assert any objection; (iii) file any appropriate motion; (iv) conduct any and all discovery as may be deemed necessary or as may be required; and (v) assert such other grounds as may become apparent upon further factual discovery.

[*Remainder of Page Intentionally Left Blank*]

**WHEREFORE**, the U.S. Trustee respectfully requests that the Court enter an order: (i) denying the Motion; and (ii) granting such other and further relief as the Court deems just and equitable.

Dated: April 10, 2025

                                                    Respectfully submitted,

                                                    **ANDREW R. VARA**
                                                    **UNITED STATES TRUSTEE**
                                                    **REGIONS 3 AND 9**

                                        By: */s/ Malcolm M. Bates*
                                                    Malcolm M. Bates
                                                    Trial Attorney
                                                    United States Department of Justice
                                                    Office of the United States Trustee
                                                    J. Caleb Boggs Federal Building
                                                    844 N. King Street, Room 2207, Lockbox 35
                                                    Wilmington, DE 19801
                                                    Telephone: (302) 573-6491
                                                    Email:   Malcolm.M.Bates@usdoj.gov

## CERTIFICATE OF SERVICE

I, Malcolm M. Bates, hereby certify that on April 10, 2025, I caused to be served a copy of the foregoing Objection by electronic service on the registered parties via the Court's CM/ECF system and courtesy copies were served via email on parties in interest.

Dated: April 10, 2025                    */s/ Malcolm M. Bates*
                                          Malcolm M. Bates