IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>KTRV LLC, *et al.*,[1]<br>                      Debtors. | Chapter 11<br><br>Case No. 25-10601 (MFW)<br>(Jointly Administered)<br><br>Hearing Date: April 17, 2025 at 3:00 p.m. (ET)<br>Obj. Deadline: April 10, 2025 at 4:00 p.m. (ET)<br>Re: Docket No. 26 |

**OBJECTION OF ANGELA SVONAVEC, JASON SVONAVEC, AND HERITAGE HOLDING CO., LLC TO THE MOTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION FOR ORDER PURSUANT TO 11 U.S.C. §§ 105(A) AND 363 AND FED. R. BANKR. P. 9019(B) AUTHORIZING AND APPROVING A GLOBAL SETTLEMENT WITH BEDROCK INDUSTRIES INVESTCO 1 LLC WITH RESPECT TO THE STRICT FORECLOSURE AND FORECLOSED EQUIPMENT**

Angela Svonavec ("Mrs. Svonavec"), Jason Svonavec ("Mr. Svonavec," and together with Mrs. Svonavec, the "Svonavecs"), and Heritage Holding Co., LLC ("HHC," and collectively, the "Objecting Parties") hereby object (this "Objection") to the *Motion of the Debtors and Debtors-in-Possession for Order Pursuant to 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 9019(b) Authorizing and Approving a Global Settlement with Bedrock Industries Investco 1 LLC with Respect to the Strict Foreclosure and Foreclosed Equipment* [D.I. 26] (the "Settlement Motion")[2], filed by KTRV LLC ("KTRV") and Heritage Coal & Natural Resources, LLC ("HCNR," and together with KTRV, the "Debtors") seeking approval of a settlement with Bedrock Industries Investco 1 LLC ("Bedrock"). In support of this Objection, the Objecting Parties state as follows:

---

[1] The Debtors in these chapter 11 cases, along with each the last four digits of each Debtor's tax identification number, are as follows: KTRV LLC (9993), Heritage Coal & Natural Resources, LLC (8326). The Debtors' service address is 1521 Concord Pike, Suite 201, Wilmington, DE 19803.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning given to them in the Settlement Motion.

## I.  INTRODUCTION

1. The Settlement Motion asserts the settlement is "***the cornerstone*** of a process to maximize value for the benefit of the estates and ***all creditors***" and the Settlement Agreement restores parties to the same position they held prior to Bedrock's improper Strict Foreclosure. However, the Debtors' proposed settlement with Bedrock does no such thing.

2. Instead, the proposed settlement places Bedrock in control of the Debtors' bankruptcy cases by permanently allowing Bedrock's alleged security interests, liens, and claims as first-priority liens (or second-priority liens to the extent that valid purchase money security interests exist with respect to particular equipment) without the benefit of the typical 75 day period for an Official Committee of Unsecured Creditors, should one be formed, or other creditors to investigate Bedrock's alleged security interests, liens, and claims and potential valuable causes of action against Bedrock. It also permanently establishes Bedrock's right to credit bid and grants Bedrock a broad release of claims. At bottom, the settlement would guaranty Bedrock's recovery of its purported claims from the Debtors' equipment, which appears to be the Debtors' most valuable asset, at the expense and to the detriment of all of the Debtors' other creditors, including the Objection Parties who are owed over $50 million by the Debtors and are the Debtors' largest creditors.

3. The Debtors' proposed settlement with Bedrock appears to be the continuation of a contrived series of actions by Bedrock and the Debtors that began in mid-January 2025 aimed at insuring Bedrock recovers at the expense of other creditors and to avoid a fulsome review and analysis of Bedrock's claims and asserted liens. Over a course of months, the Debtors have repeatedly demonstrated a willingness to allow Bedrock to take the remaining value of the Debtors' assets because doing so will keep the value of the Debtors' equipment within the

Kestenbaum family, through Bedrock, and insure the Kestenbaum family, as a whole, minimizes its losses from their failed effort to operate the Debtors' businesses profitably.[3]

4. The very recent appointment of Brian Ryniker as the Debtors' chief restructuring officer does not magically cleanse these prepetition actions or solve the problems with the proposed insider settlement. None of the Debtors, Mr. Ryniker, nor any independent attorneys retained by the Debtors have engaged in a meaningful investigation or analysis of the potential claims against Bedrock. Indeed, the Settlement Motion, despite seeking to release such claims and stipulate to the permanent allowance of Bedrock's claims and liens, fails to properly describe what claims might exist, the facts and circumstances that form the basis for the potential claims, and the steps the Debtors took to investigate and evaluate these potential claims. These claims may include recharacterization of the indebtedness claimed by Bedrock as equity, equitable subordination, and avoidance of preferential and fraudulent transfers against Bedrock, including a $500,000 "restructuring fee" paid to Bedrock in February 2025 in exchange for a 6 day forbearance period and the granting of additional liens to Bedrock in February 2025, on the very same day as the strict foreclosure.

5. Against this backdrop, the Settlement Motion should not be approved.

## II.    ARGUMENT

### A.    General Standard for Reviewing a Proposed Settlement

6. Under Bankruptcy Rule 9019, the bankruptcy court must determine whether a settlement "is fair, reasonable, and in the best interest of the estate." *In re Spansion, Inc.*, No. 09-

---

[3] Prior to selling their membership interests in HCNR, the Svonavecs profitably ran HCNR for over fifteen years producing quality metallurgical and thermal coal, while at the same time remaining committed to the quality of its coal, the safety of its employees and surrounding communities, and environmental stewardship. HCNR's reclamation efforts received awards, as HCNR and its leadership was committed to restoring its mined lands in Pennsylvania and Maryland.

10690 (KJC), 2009 WL 1531788, at *7 (Bankr. D. Del. June 2, 2009) (citing *In re TSIC, Inc.*, 393 B.R. 71, 78 (Bankr.D.Del.2008) (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D.Del.1997))). "Under the 'fair and equitable' standard, [the court looks] to the fairness of the settlement to the other persons, i.e., the parties who did not settle." *Id.* (citing *Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 645 (3d Cir.2006).

7. The burden is on the Debtors to provide evidence that the proposed settlement is within the range of reasonableness, and although "a court generally gives deference to the Debtors' business judgment in deciding whether to settle a matter, the Debtors have the burden of persuading the bankruptcy court that the compromise is fair and equitable and should be approved." *Key3Media Group, Inc. v. Pulver.com, Inc. (In re Key3Media Group, Inc.)*, 336 B.R. 87, 93 (Bankr. D. Del.2005); *see also, In re Y-Knot Const., Inc.,* 369 B.R. 405, 408 (B.A.P. 8th Cir. 2007) (explaining that a chapter 7 trustee had "the burden of showing by a preponderance of the evidence that the proposed settlement" was in the best interest of the estate).

8. As one District Court explained, "when presented with the question of whether to approve a proposed settlement, the Bankruptcy Court must make an 'informed and independent judgment as to whether a proposed compromise is fair and equitable' after apprising itself of 'all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated.'" *In re NW Invs. II, LLC*, No. 06 CV 5078(ADS), 2007 WL 2228151, at *4 (E.D.N.Y. July 30, 2007) (citing *TMT Trailer Ferry, Inc.*, 390 U.S. 414, 424 (1968); *In re Telcar Group, Inc.*, 363 B.R. 345, 352 (Bankr. E.D.N.Y. 2007)).

9. To be fully informed, the bankruptcy court "must be apprised of all relevant information that will enable it to determine what course of action will be in the best interest of the estate." *See Martin*, 91 F.3d at 394; *In re Louise's, Inc.*, 211 B.R. at 802.

4

10. In the Third Circuit, courts consider the following factors articulated in *Martin* when evaluating a settlement—"(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (4) the paramount interest of creditors. *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir.1996); *Nutraquest*, 434 F.3d at 644.

### B. Insider Settlements Must be Reviewed More Closely

11. Settlements with insiders, such as the one presented to this Court through the Settlement Motion, are subject to heightened scrutiny.[4] *In re Hyloft, Inc.* 451 B.R. 104, 113-14 (Bankr. D. Nev. 2011) (citing S.REP. NO. 95-989, 95TH CONG., 2D SESS. 25 (1978) ("An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor."); H.R.REP. NO. 95-595, 95TH CONG., 2D SESS. 312 (1978) (same); *Spradlin v. Williams (In re Alma Energy, LLC)*, Civil No. 10-80-ART., 2010 WL 4736905, at *5 (E.D. Ky. 2010) ("[t]he bankruptcy court must subject the dealings between an insider and a debtor to closer scrutiny."); *In re Drexel Burnham Lambert Group, Inc.,* 134 B.R. 493, 498 (Bankr. S.D.N.Y. 1991) (when determining whether a proposed settlement is fair and reasonable under FRBP 9019(a), a bankruptcy court should scrutinize insider agreements more closely than agreements between debtor and non-insider parties)).

---

[4] Section 101(31) of the Bankruptcy Code defines an "insider" as *inter alia* a "relative of a general partner, director, officer, or person in control of the debtor" if the debtor is a corporation. *See also, Dye v. Brown (In re AFI Holding, Inc.)*, 530 F.3d 832, 849 (9th Cir. 2008) (the term insider is deliberately an open-ended term, including when the individual or entity has a relationship with the debtor, close enough to gain an advantage attributable simply to affinity rather than to the course of business dealings between the parties.) (quotations and citations omitted).

12. Courts have explained that they will weigh and give considerable weight to "[t]he extent [that a] settlement is truly the product of 'arm-length' bargaining and not fraud or collusion." *In re Exide Techs.*, 303 B.R. 48, 68 (Bankr. D. Del. 2003).

13. Furthermore, a proposed settlement is not the product of arms' length bargaining where it is driven by motivations other than maximizing recovery of creditors. *See Dacotah Mktg. & Research, L.L.C. v. Versatility, Inc.*, 21 F. Supp. 2d 570, 578 (E.D. Va. 1998); *see also Oritz v. Fibreboard Corp., 527 U.S. 815, 852 (1999)* (settlement not arm's length where negotiating party had incentives other than realizing "best possible arrangement" for stakeholders).

**C.  There Are Very Extensive and Close Familial Relationships Among the Debtors and Bedrock that were Not Disclosed**

14. At the first day hearing and in the first day declaration, the Debtors disclosed that the Debtors' managers are the son and son-in-law of Bedrock's principal. Although not named by the Debtors, Bedrock's principal and father/father-in-law to the Debtors' managers is Alan Kestenbaum. However, the Debtors inexplicably failed to disclose at the first day hearing or in any pleading filed in the Debtors' cases to date (including the Settlement Motion) the full extent of the familial and insider relationships between the Debtors and Bedrock. The chart below shows the equity ownership of the Debtors.



15.     Alan Kestenbaum's wife, Deborah Kestenbaum owns a 5% membership interest in KTRV. Jordan Kestenbaum holds a 41% membership interest in KTRV, is a manager of KTRV, and is Alan's son. Jacob Kestenbaum, Alan Kestenbaum's son, is the beneficiary of a trust—for which Alan Kestenbaum is the sole trustee—that holds a 13% membership interest in KTRV. Arielle Kestenbaum, Alan Kestenbaum's daughter, is the beneficiary of a trust—for which Deborah Kestenbaum is the sole trustee—that holds a 41% membership interest in KTRV. David Tradburk is a manager of KTRV and is Alan Kestenbaum's son-in-law. While the statement of equity interest holders filed by the Debtors named the entities in the ownership chain, it did not disclose that Alan Kestenbaum serves as a trustee for one of the trusts in the equity chain or explain that the family relationships in the equity ownership include Alan Kestenbaum's wife, daughter, and other son. Instead, creditors and this Court were led to believe that the only relationship

between the Debtors and Bedrock was that Alan Kestenbaum is the father and father in law of the Debtors' two managers.

16. Meanwhile, Alan Kestenbaum is the founder, CEO, manager and beneficial owner of Bedrock. Bedrock is described by its Managing Partner, Gaurav Mehta as a "privately funded *family office*" that has a "network of funds and *family offices* that invest alongside Bedrock Industries." *See* Gaurav Mehta LinkedIn Page, accessed on April 5, 2025 and attached here as **Exhibit A** (emphasis added). The "family office" is a reference to the Kestenbaum family. Below is a chart showing the members of the Kestenbaum family.



17. The Settlement Agreement is so one-sided that it would only be agreed to by parties seeking to protect insiders. It is not fair and equitable for other creditors. *See e.g., In re Matco Electronics Group, Inc.*, 287 B.R. 68 (Bankr. N.D. N.Y. 2002) (denying a settlement motion where there were "serious questions raised as to whether it represents an arms-length transaction", where argument in support of the settlement agreement "emphasized the interests not of the estate and of the Debtors" but of other parties, and where the "major consideration for the Court is the interests of the unsecured creditors committee, who in this case have through the Committee expressed

serious objections to the Settlement Agreement."); *In re The Present Co., Inc.*, 141 B.R. 18, 24 (Bankr.W.D.N.Y.1992) (explaining that the court was not persuaded to "approve [a] compromise over the objection of the only appearing non-insider parties so long as insiders limit the information available to those parties.").

18. Although the Debtors recently appointed Brian Ryniker as Chief Restructuring Officer, there is no information provided about the timing of his appointment and, given the degree of the undisclosed insider relationship that exists in the cases, Mr. Ryniker's recent involvement does not cleanse the Debtors of the insider relationships in connection with the Settlement Motion. *In re CS Mining, LLC*, 574 B.R. 259 (Bankr. D.Utah 2017) (denying a mining debtor's settlement motion because it sought to settle claims from insider transactions and inequitable conduct and the settlement would have primarily benefitted parties closely related to the Debtors while not being in the best interest of creditors and the estate and noting that "a CRO's authority and skill becomes meaningless in a contentious bankruptcy case when the CRO's hands are tied by the Debtor.").

    **D.**    **Valuable Claims May Exist Against Bedrock Based on their Prepetition Efforts to Extract All Value from the Debtors**

19. Between January 2025 and the Petition Date, the Debtors exhibited a pattern of behaving in a manner that directly benefitted Bedrock—not the Debtors or their other creditors.

20. On January 20, 2025, Bedrock issued a notice of default and acceleration of the loan to KTRV as Borrower and HCNR as Guarantor based on the Debtors' failure to *inter alia* make a $150,000.00 interest payment that was due on or before January 15, 2025 (the "<u>Default Notice</u>") under the Amended Loan Agreement. A true and correct copy of the Default Notice is attached here as **Exhibit B**. The Default Notice, which was issued a *mere five calendar days* after the Debtors failed to make one interest payment, immediately accelerated the loan in the same

default. The Debtors did nothing to stop Bedrock from issuing this Notice of Default and there is no evidence the Debtors lacked the cash to make the interest payment to Bedrock.

21. Shortly thereafter, on February 4, 2025, Bedrock, KTRV, HCNR, Jordan Kestenbaum, and David Tradburks entered into that certain Forbearance Agreement (the "Forbearance Agreement") with an effective date of January 31, 2025. A true and correct copy of the Forbearance Agreement is attached hereto as **Exhibit C**. Pursuant to the Forbearance Agreement, based on the Notice of Default, Bedrock agreed to forebear from exercising its remedies under the loan documents—for only six days—until February 10, 2025. In exchange for that agreement, Bedrock received a $500,000 restructuring fee—which amounts to a payment of *$83,333.33 per day of forbearance* that was agreed to effectively eleven calendar days after the debtors failed to make a $150,000 interest payment. The Debtors also agreed to provide Bedrock $2 million of the proceeds from the sale of certain of the Debtor's assets and the Maryland Wash Plant, for which the total purchase price was $2.5 million based on unrecorded mortgages. Of the purchase price from the Maryland Wash Plant, $500,000 was used by the Debtors to pay the restructuring fee to Bedrock and Bedrock received $2 million, of which only $1 million was re-advanced to the Debtors. This restructuring fee was not credited towards the principal amounts due under the loan, and instead was *in addition* to the Debtors' existing indebtedness to Bedrock.

22. The Forbearance Agreement also gave Bedrock liens on (i) all general intangibles—including claims KTRV may have against the Objecting Parties relating to allegations for fraud, intentional or innocent misrepresentation, breach of contract, breach of representation or warrant, KTRV's rights to tax refunds, and KTRV's rights to intercompany obligations owed by HCNR; (ii) any commercial tort claims or counterclaims that may be asserted against the Objecting Parties in the suit pending before the District Court for the Western District

of Pennsylvania entitled *Heritage Holding Co. LLC v. KTRV LLC*, Civil No. 2:24-1448; and the proceeds of the collateral listed in (i) and (ii).

23. To further extract value from the Debtors, Bedrock (with the consent of the Debtors) "strictly foreclosed" on the Equipment on February 12, 2025 (the "Strict Foreclosure") for a $10 million reduction in indebtedness even though the Equipment is likely worth between $20 million and $31 million. However, the Strict Foreclosure was procedurally deficient, Bedrock did not comply with 13 Pa.C.S. § 9-621(a) and did not provide any advanced notice to HHC.

24. Finally, on February 13, 2025, Bedrock and HCNR entered into that certain Equipment Lease Agreement (the "Equipment Lease"), pursuant to which HCNR agreed to pay Bedrock a fixed weekly rent of $105,000 for the use of the Equipment. A true and correct copy of the Equipment Lease is attached hereto as **Exhibit D**. HCNR entered into this Equipment Lease and agreed to monthly payments that were 2.8 times the interest payment that they failed to make during the prior month. That the Debtors suddenly had the cash flow available and were able to agree to these payments less than a month after defaulting, raises the question of whether the Debtors actually did not have the cash on hand to the pay the January interest payment, or whether the default and immediate issuance of the Notice of Default was a coordinated and contrived effort to hand control of the Debtors' assets to Bedrock.

    a. **The Settlement Does Not Value the First Lien Security Interest that it Guarantees Bedrock**

25. The Debtors do not analyze or describe the value that they have attributed to establishing as part of the Settlement Agreement that Bedrock will have valid, perfected, enforceable, and non-avoidable security interests of the Foreclosed Equipment.

26. Furthermore, certain of the Foreclosed Equipment include vehicles that upon information and believe are titled vehicles, and therefore a UCC-1 filing would not perfect the lien

on this Foreclosed Equipment. The Settlement Motion does not provide sufficient information for whether the alleged liens that Bedrock asserts were noted on the title for these vehicles registered with the Pennsylvania Department of Transportation.

### b. The Claims That May Exist Against Bedrock are Not Described, much less Analyzed, in the Settlement Motion

27. The Settlement Motion also provides no legal analysis of the claims that would be released against Bedrock and provides no evidence that such claims were investigated by the Debtors. The Settlement Motion vaguely states that—

> By establishing Debtors' ownership of the equipment through the Settlement Agreement, the Debtors preserve the value of the estates and can move towards a transparent and public sale process for the Debtors' assets. Even more than that, terms of the Settlement Agreement put the Debtors in a position as good – if not better – than they would be from any judgment that they could receive, all without the time, expense and risk of litigation. In short, this settlement is the best of all possible worlds.

The Settlement Motion leaves open the question of what "litigation" is being discussed. The Settlement Motion alleges that due to the "complexity, inherent delay and substantial exposure of litigation" where the Debtors may "face years of litigation while these assets diminish in value and are subjected to harm and risk" that will "likely forever preclude the ability to maximize value, if any." These allegations are not explained, aside from generalized concerns of expense, time and risk, and no further explanation for why all claims against Bedrock are being released and what exactly creditors are receiving in exchange for the release is offered in the Settlement Motion.

28. Due to this lack of disclosure and the failure to describe any legal analysis of the claims that may exist, creditors and this Court are left to guess what claims the Debtors may be releasing.

### c. Potential Claims Against Bedrock

29. While the Objecting Parties do not have the burden to specifically allege or bring the claims that are being released by the Debtors, based on the information that was made available in just the first few days since the Debtors' filed for bankruptcy, the Objecting Parties believe that the Debtors may have valuable and cognizable claims against Bedrock for—

- **Recharacterization** —"The Third Circuit has held that the overarching inquiry with respect to recharacterizing debt as equity is whether the parties to the transaction in question intended the loan to be a disguised equity contribution." *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 572–73 (Bankr. D. Del. 2012) (quoting *In re Fedders N. Am., Inc.*, 405 B.R. 527, 544 (Bankr.D.Del.2009)). In examining whether the entire indebtedness claimed by Bedrock should be recharacterized as equity, the court would look at the economic reality of the circumstances as the Third Circuit has rejected a "mechanistic scorecard." ." *Id.* (quoting *In re Friedman's Inc.*, 452 B.R. 512, 518 (Bankr. D. Del.2011)). Here, certain of the factors that would weigh heavily in favor of finding that the loan should be recharacterized as equity are the (i) identity of interests between the parties, Bedrock's CEO and founder is related to all of the Debtors' equity holders (who include Alan Kestenbaum's wife, a trust for which he serves as trustee, and all three of his children) and managers at the time of the transactions; (ii) that the loan documents do not reflect a maturity date; (iii) there was no loan agreement between the parties when the bridge "loan" was made in February 2024, and (iv) the bridge "loan" was made in connection with KTRV's acquisition of the membership interests in HCNR by Alan Kestenbaum's wife, children, and family trusts. *See*

Loan Agreement attached hereto as **Exhibit E**; *see also, In re Autobacs Strauss, Inc.*, 473 B.R. at 572–73 (citing factors considered for recharacterization); *see also, In re Moll Indus., Inc.*, 454 B.R. 574, 582 (Bankr. D. Del. 2011) (same).

- **Equitable Subordination**—Under section 510 of the Bankruptcy Code, Bedrock's claim could be subordinated. "Equitable subordination requires proof of three elements: (i) the defendant engaged in some type of inequitable conduct; (ii) the misconduct caused injury to the creditors or conferred an unfair advantage on the defendant; and (iii) equitable subordination of the claim is consistent with bankruptcy law." *Id.* (citing *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir.1977)).  Courts consider whether a party was an insider or an outsider, specifically courts have explained that "[t]he most important factor in determining if a claimant has engaged in inequitable conduct for the purposes of equitable subordination is whether the claimant was an insider or outsider in relation to the debtor at the time of the act. An insider's conduct is rigorously scrutinized. . . " *In re Broadstripe, LLC*, 444 B.R. 51, 79 (Bankr. D. Del. 2010) (internal quotations and citations omitted). Furthermore, as the court explained in *Broadstripe*, "[i]n circumstances where the plaintiff seeks to equitably subordinate the claim of a fiduciary or insider of the debtor who is also a creditor, the line between the defendant creditor and the debtor is often blurred. ***The insider creditor is typically in a position to exert control over the debtor. . . . In its efforts to collect its debt, therefore, the creditor may act directly or cause the debtor to act***." *Id.* (emphasis added). In this case, Bedrock was an insider, who in the months preceding the bankruptcy acted to extract value from the Debtors directly for the broader benefit

14

of the Kestenbaum family with the Debtors consent, gave them an advantage over other creditors. Furthermore, all less than a month after failing to make a $150,000 interest payment, the Debtors agreed to (i) pay a Bedrock $500,000 restructuring fee for six days of forbearance, (ii) allow Bedrock to strictly foreclose on their collateral; (iii) pay Bedrock $2 million from a sale, which had a $2.5 million purchase price; and (iv) pay Bedrock $105,000 per week for the use of their Equipment. Moreover, on February 2, 2024 KTRV executed a Membership Interest Power and Assignment ("**Assignment**"), a true and correct copy of which is attached hereto as **Exhibit F**, which provides that KTRV assigned all of its rights, title and interest to shares in HCNR to Bedrock. It is unclear (because the Settlement Motion does not describe claims that may exist) if Bedrock utilized the Assignment to control the Debtors in the months preceding the Petition Date. The facts here suggest that equitable subordination is appropriate as Bedrock, may have controlled the Debtors or had outsized influence over the Debtors because of the familial relationships, and that the Debtors were a willing accomplice who did nothing to stop Bedrock.

- **Fraudulent Transfers**—Under section 548 of the Bankruptcy Code, the payment to Bedrock of $500,000 as a restructuring fee six days before the Debtors and Bedrock agreed to the Strict Foreclose is likely avoidable as a fraudulent transfer for which the Debtors did not receive reasonably equivalent value.

- **Preferential Transfers**—Based on the amounts received under the Forbearance Agreement and Equipment Lease alone, Bedrock received approximately,

15

$3,070,000.00[5] in transfers in the ninety days before the Petition Date. These payments "enable[d] a [Bedrock] to receive payment of a greater percentage of [its] claim against the debtor than [it] would have received if the transfer had not been made and he had participated in the distribution of the assets of the bankruptcy estate." *In re Cambridge Indus. Holdings, Inc.,* No. 00-1919(LK), 2006 WL 516764, at *2 (D. Del. Mar. 2, 2006) (citing H.R.Rep. No. 95–595, at 177 (1978), as reprinted in 1978 U.S.C.C.A.N. 5963, 6138). Furthermore, as Bedrock is an insider, the appropriate lookback period for preference claims would be one year. *Broadstripe, LLC*, 444 B.R. at 108-09 (section 547(b)(4)(B) provides that a trustee "may avoid any transfer of an interest of the debtor in property made between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider.").

30. Additionally, upon information and belief, there was no loan agreement between Bedrock and the Debtors until June 27, 2024, and the loan agreement references only the original bridge loan note, at such time the security agreement would have been insufficient to cover the advances Bedrock allegedly made when it "restated" the loan. To remedy this Bedrock amended the security agreement on February 12, 2025—the same day as the Strict Foreclosure—to revise the definition of "Obligations Secured" and to provide for the security of "all other obligations of [HCNR] otherwise incurred and payable to [Bedrock]." Based on the documents available to the Objecting Parties, Bedrock may have only held a partial security interest in the collateral until February 12, 2025, at which time the collateral was secured during the preference period. The

---

[5] This calculations assumes that four weekly rental payments were made for Equipment in the amount of $105,000.00 and three weekly rental payments were made for Equipment in the amount of $50,000.00.

Settlement Motion does not disclose these facts let alone discuss why Bedrock would not only be partially secured (at best) or its liens subject to avoidance to the extent improved by the amendment to the Security Agreement made in February 2025.

31. The Debtors course of conduct during the months prior to the bankruptcy filing exhibit a preference toward Bedrock and the Settlement Agreement would further enable Bedrock to extract all value from the Debtors' in this case—while providing no possibility of reclamation for other creditors' interests.

### E. The Debtors have Not Proposed a Fair and Reasonable Settlement

32. The Debtors have not provided the Court with sufficient evidence in support of the Settlement Motion and the failure to describe or analyze the specific claims that they hold against Bedrock that are being released under the Settlement Agreement weigh against approval of the Settlement Motion under the *Martin* factors. The Debtors have not provided any evidence that it would be difficult to collect from Bedrock, which acts as a privately held investment vehicle focused on investments in metals, mining and other natural resources.

33. Moreover, although the Debtors note the complexity of the litigation involved and the expense involved, the Debtors do not provide anything more than cursory recitation that such claims litigation will be complex and expensive. This litigation would secure possession of the Debtors' most valuable assets, which could be utilized for the benefit of the estate and all creditors in the absence of the Settlement Agreement.

34. Finally, the Settlement Agreement maximizes the recovery of *one* insider creditor—Bedrock. The Settlement Agreement disproportionately benefits Bedrock by providing releases of valuable estate causes of action and perfecting liens that may be unperfected or otherwise subject to challenge. Under the Settlement Agreement, the benefit provided to *other*

creditors is the return of equipment wrongfully seized as part of a procedurally deficient Strict Foreclosure that took place within the 90 days before the Petition Date.

35. In addition to failing under the *Martin* factors, the Settlement Motion should also be denied as the Settlement Agreement seeks to dictate the ultimate treatment of claims in these cases and foist onto creditors a predetermined distribution schedule in favor of Bedrock, while limiting recovery to other creditors—including the Objecting Parties.

36. The Settlement Agreement would finally determine the priority of Bedrock's disputed claims and liens without any meaningful analysis having been undertaken by the Debtors and would release potentially very valuable claims. *See In re Louise's, Inc.*, 211 B.R. 798, 802 (D. Del. 1997) ("I find that the Settlement Agreement. . . would ultimately lead to a proposed plan of reorganization, the terms of which could reasonably be found to have been pre-determined . . . thereby circumventing a meaningful consideration of the requirements of Chapter 11 regarding confirmation of a reorganization plan."); *In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983) (debtor's estate and its assets cannot be restructured or reallocated without providing all creditors the protections intended by chapter 11); *The Comm. Of Equity Holders v. The Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1062, 1069 (2d Cir. 1983) (agreements that fix the term of a plan based on pre-plan motions without the protections afforded to creditors through the plan process are to be eschewed).

### III. CONCLUSION

37. For the reasons set forth above, the Settlement Motion should be denied.

**WHEREFORE**, Angela Svonavec, Jason Svonavec, and Heritage Holding Co., LLC respectfully request that the Court deny the Settlement Motion and grant such other relief as this Court deems fair and appropriate.

| | |
|---|---|
| Dated: April 10, 2025<br>Wilmington, Delaware | */s/ Matthew G. Summers*<br>Matthew G. Summers (No. 5533)<br>Margaret A. Vesper (No. 6995)<br>Erin L. Williamson (No. 7286)<br>BALLARD SPAHR LLP<br>919 N. Market Street, 11th Floor<br>Wilmington, Delaware 19801-3034<br>Telephone: (302) 252-4428<br>Facsimile: (302) 252-4466<br>Email: summersm@ballardspahr.com<br>   vesperm@ballardspahr.com<br>   williamsone@ballardspahr.com<br><br>-and-<br><br>Mark G. Claypool<br>Bryan G. Baumann<br>KNOX MCLAUGHLIN GORNALL & SENNETT, P.C.<br>120 West Tenth Street<br>Erie, PA 16501<br>Telephone: (814) 459-2800<br>Facsimile: (814) 453-4530<br>Email: mclaypool@kmgslaw.com<br>   bbaumann@kmgslaw.com<br><br>*Counsel for Angela Svonavec, Jason Svonavec, and Heritage Holding Co., LLC* |