**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| KTRV LLC, *et al.*,[1] | Case No. 25-10601 (MFW) |
| Debtors. | (Jointly Administered) |

**DEBTORS' APPLICATION FOR**
**(I) THE RETENTION AND EMPLOYMENT OF RITCHIE BROS.**
**AUCTIONEERS, INC. AS AUCTIONEER, *NUNC PRO TUNC* TO APRIL 24, 2025,**
**(II) AUTHORIZING THE SALE OF EQUIPMENT AND CLEAR OF ALL LIENS,**
**CLAIMS AND ENCUMBRANCES; AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (the "Debtors"), pursuant to sections 327(a) and 328(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), hereby submits this application (the "Application") for entry of an order, substantially in the form of the order attached hereto as **Exhibit A**, (i) authorizing the Debtors to employ Ritchie Bros. Auctioneers (America), Inc. and certain of its affiliates (collectively "RBA") as their auctioneer and listing agent and for related services, *nunc pro tunc* to April 24, 2025, pursuant to the Contract to Auction dated April 24, 2025 (the "Auction Agreement"); (i) authorizing the sale of the equipment free and clear of all liens, claims and encumbrances; and (iii) granting related relief, and in support of this Application, the Debtors rely upon the Declaration of David Tradburks (the "Tradburks Declaration") and Declaration of James W. Chadwick II (the "Chadwick

---

[1] The Debtors in these chapter 11 cases, along with each the last four digits of each Debtor's tax identification number, are as follows: KTRV LLC (9993), Heritage Coal & Natural Resources, LLC (8326). The Debtors' service address is 1521 Concord Pike, Suite 201, Wilmington, DE 19803.

Declaration"), attached hereto as **Exhibit B** and **Exhibit C**, respectively. In further support of this Application, the Debtors respectfully represent as follows:

**JURISDICTION AND VENUE**

1.      The United States Bankruptcy Court for the District of Delaware (this "Court") has jurisdiction over these Chapter 11 Cases and this Application pursuant to 28 U.S.C. §§ 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and the Debtors confirm its consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Application to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final order or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested in this Application are sections 105(a), 327(a), 328(a), 363, and 1107(b) the Bankruptcy Code, Rules 2014(a), 6004 and 6005 of the Bankruptcy Rules, and Local Rules 2014-1 and 6004-1.

**RELIEF REQUESTED**

4.      By this Application, the Debtors respectfully request the entry of an order pursuant to sections 327(a) and 328(a) of the Bankruptcy Code (a) authorizing the Debtors to retain and employ RBA *nunc pro tunc* to April 24, 2025; (b) approving the terms and conditions contained in the Auction Agreement; and (c) granting related relief.  A copy of the Auction Agreement is attached hereto as **Exhibit D**.

2

## BACKGROUND[2]

5.      On March 30, 2025 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (collectively the "Chapter 11 Cases").  The Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

5.      KTRV, LLC is a Delaware holding company whose sole asset is its membership interest in Heritage Coal & Natural Resources, LLC ("HCNR"), a Pennsylvania Limited Liability Company.

6.      HCNR currently owns and operates five producing coal mines and related operations in Pennsylvania and Maryland.   Specifically, HCNR owns the following: (i) the Carlos site (located in Frostburg, MD) which is shipping and mining coal with a substantially reduced work crew, (ii) the Cabin Run site (located in Frostburg, MD) which is currently shipping coal and mining coal with a substantially reduced work crew, (iii) Summit #2 site (located in Meyersdale, PA) which is not currently mining or shipping coal, (iv) the Fisher #3 site (located in Meyersdale, PA) which is not currently mining or shipping coal, and (v) the Saylor Hill #2 site (located in Meyersdale, PA) which is currently mining coal with a substantially reduced work crew.   Additionally, HCNR owns an operating wash plant located in Meyersdale, PA.  Additionally, HCNR owns a number of permits for other sites that are currently in cessation or reclamation.  HCNR's main office is located in Meyersdale, PA.

7.      In the Debtors' normal course of business, the Debtors are in possession of a wide array of equipment associated with the Debtors' mining activities, including but not limited to

---

[2]      Additional facts regarding the Debtors and their business operations, capital and debt structures, and the events leading to the filing of these Chapter 11 cases, is set forth in detail in the *Declaration of Brian Ryniker in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 15] (the "First Day Declaration"), which is fully incorporated into this Application by reference.

commercial vehicles, trackhoes, mining excavators, and hundred-ton dump trucks. As of the Petition Date, the Debtors possess estimate that they possess approximately close to 200 pieces of equipment that they are seeking authority to sell in an expedited, but orderly manner as listed in Schedule A to the Auction Agreement (the "Equipment").[3]

8.      The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9.      A committee of unsecured creditors was appointed on April 15, 2025 [Docket No. 95] (the "Committee").

10.     By this Application, the Debtors seek authority to employ RBA as auctioneer pursuant to Sections 327(a) and 328 of the Bankruptcy Code.

11.     The Debtors also filed their *Motion for Entry of an Order: Approving the Bidding Procedures, (II) Authorizing the Debtors to Enter into One or More Stalking Horse Agreements and Provide BID Protections, (III) Approving the Form and Manner of Sale Notice, (IV) Scheduling an Auction and Sale Hearing, (V) Approving  the Procedures for the Assumption and Assignment of Contracts, (VI) Approving the Sale of the Debtors' Assets Free and Clear, and (VIII) Granting Related Relief* ("Sale Motion") [Docket No. 156 ].

12.     The Debtors require an auctioneer to market and ultimately sell the Equipment for the highest and best value.  The Debtors selected RBA because of its market access and selling

---

[3]     HCNR entered into an agreement its secured lender Bedrock Industries Investco 1 LLC ("Bedrock") with Bedrock (the "Strict Foreclosure") pursuant to UCC § 9-620, by and through which HCNR transferred to Bedrock title and ownership of some of its equipment in satisfaction of $10,000,000.00 of the obligations due to Bedrock. On April 1, 2025, the Debtors filed a *Motion Pursuant to 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 9019(B) Authorizing and Approving a Global Settlement With Bedrock Industries Investco 1 LLC With Respect to the Strict Foreclosure and Foreclosed Equipment* [Docket No. 26] (the "9019 Motion").  By and through the 9019 Motion, and subject to Court approval, the Debtors and Bedrock have agreed to a settlement which will, among other things, revert the parties to the position prior to the Strict Foreclosure (i.e., ownership of the equipment will revest with the Debtors). If the 9019 Motion is not approved, the Debtors, together with Bedrock, may need to seek to revise the Auction Agreement with RBA because approval of the 9019 Motion is a condition precedent to the sale of the Equipment by RBA.

4

platform, particularly with respect to industrial equipment.  Additionally, and importantly, RBA has extensive experience selling assets through bankruptcy proceedings.

13.      To that end, on April 24, 2025 the Debtors and RBA entered into the Auction Agreement, pursuant to which RBA will market and sell the Equipment and receive a commission based on a fixed seven percent (7%) of the gross price assigned to the Equipment that RBA sells, without inclusion of the payment of related expenses, as provided for under the Auction Agreement (the "Commission").[4] The Debtors understand that RBA will be entitled to receive reimbursement for expenses and fees that RBA incurs directly from performing its duties as set out in the Auction Agreement. [5]In addition, as consistent with its standard practices, RB Group will impose a transaction fee upon the buyers of the Equipment as set out below:

| FINAL SELLING PRICE | TRANSACTION FEE |
|---|---|
| $1 to $25,000 | 10% of the final selling price (minus $100) |
| $25,001 to $75,000 | 5% of the final selling price (minus $2,500) |
| $75,001 and above | $3,750 |

For the avoidance of doubt, the Debtors will not be charged for any portion of the transaction fee imposed upon the buyers.

---

[4]      As provided for in the Auction Agreement, the "gross sales price" will include any sales to Bedrock, Caterpillar Financial Services Corporation and Cleveland Brothers Equipment Co., Inc. based upon bids by them under section 363(k) of the Bankruptcy Code, and Auctioneer will accept bids of Bedrock, Caterpillar Financial Services Corporation, and Cleveland Brothers Equipment Co., Inc. (the "363(k) Bidders", and each a "363(k) Bidder") as provided for under section 363(k) of the Bankruptcy Code, but only if the 363(k) Bidder agrees in writing before the Auction Date to pay the Auctioneer's Commission, fees (including the transaction fee that must be paid by all buyers in auctions conducted by Auctioneer) and expenses related to the Equipment purchased with such a bid (and such payment may be made from proceeds of the sale(s) to buyers other than a 363(k) Bidder of other Equipment serving as collateral for the 363(k) Bidder, if such 363(k) Bidder elects in writing).

[5]      Such expenses and fees include and relate to (i) refurbishing and transportation (Auction Agreement at 3.01); (ii) title fees (if any) (Auction Agreement at 3.03(b); and (iii) IronPlanet listing fees (if any) (Auction Agreement at 1.07).

17300437/1

14.     The Debtors reserve the right to remove Equipment from the Equipment list outlined in Schedule A to the Auction Agreement through and including June 6, 2025 (the "Withdraw Deadline") in order to pursue sale of same as part of a going concern sale (the "Mining Asset Sale") sought pursuant to the Sale Motion. RBA will be compensated for any Equipment removed from the Equipment list prior to and through the Withdraw Deadline at a rate of three percent (3%) the "auction low" value assigned to the relevant piece(s) of Equipment in Schedule A to the Auction Agreement, up to an aggregate maximum of $550,000, plus the Auctioneer's out of pocket costs incurred with request to such withdrawn Equipment, and RBA shall be paid the related fees and expenses from the proceeds of the Mining Asset Sale. RBA and the Debtors agree that no Equipment will be removed after the Withdraw Deadline.

15.     The Auction Agreement includes the potential removal of all of the Equipment, as listed in Schedule A attached to the Auction Agreement. In addition, the Auction Agreement provides that RBA may conduct a combination of in-person and online-only auctions to liquidate the Equipment.  In connection with the auction of the Equipment, the Debtors will receive from RBA the net proceeds of the auction (being the gross sale price of the Equipment, less the Commission and other fees as set out in the Auction Agreement to be paid to RBA). The Debtor will be responsible for making payments to parties holding a valid and perfected lien interest in the respective Equipment sold, and related fees associated with the sale of the Equipment that are outside of the scope of the Auction Agreement.

16.     Importantly, the Debtors anticipate the sale of certain or all of their operations in these Chapter 11 Cases.  Some purchasers may seek to purchase the Debtors' operations as a going concern, including the Equipment located at those sites.  To maintain flexibility to maximize the

17300437/1

value of the Debtors' assets, the Debtors and RBA negotiated for the ability to remove pieces of the Equipment from the list of Equipment to be sold under the Auction Agreement.

17.    The employment arrangement proposed in the Auction Agreement is beneficial to the Debtors' estates. The proposed compensation structure provides certainty and appropriate inducement for RBA to act expeditiously and prudently to assist the Debtors with the proper liquidation of any of the Equipment that is no longer necessary to the Debtors' operations. Approval of this Application will assist in the effective and deliberate reduction of the Debtors' business and operating expenses.

## **RELIEF REQUESTED**

18.    By and through this Application, the Debtors seek, entry of an order, pursuant to sections 105(a), 327(a), 328(a), 363 and 1107(b) of the Bankruptcy Code, Bankruptcy Rules 2014(a), 6004 and 6005, and Local Rules 2014-1 and 6004-1, entry of the Proposed Order (i) authorizing the Debtors to employ and retain RBA as auctioneer and broker to perform the scope of services set forth in the Auction Agreement, *nunc pro tunc* to April 24, 2025, and (ii) authorizing the sale of the Equipment free and clear of all liens, claims and encumbrances; and (iii) granting related relief.

## **BASIS FOR RELIEF REQUESTED**

### **A.    Retention of Ritchie Brothers is Appropriate**

19.    Pursuant to section 327(a) of the Bankruptcy Code, a debtors-in-possession, with the Court's approval, may employ professionals "that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtors-in-possession] in carrying out [its] duties under this title." 11 U.S.C. § 327(a). Section 101(14) of the Bankruptcy Code defines "disinterested person" as a person that:

a. is not a creditor, an equity security holder, or an insider;

b. is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtors, and

c. does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtors, or for any reason.

11 U.S.C. § 101(14).

20.     Bankruptcy Rule 2014 requires that an application for retention include:

[S]pecific facts showing the necessity for the employment, the name of the [firm] to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the [firm's] connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

Fed. R. Bankr. P. 2014.

21.     The Debtors respectfully submit that the retention and employment of RBA as auctioneer and broker under the terms of the Auction Agreement in connection with these Chapter 11 Cases is permitted by sections 327(a) and 328(a) of the Bankruptcy Code, and this Application meets the requirements of Bankruptcy Rule 2014. Furthermore, the Debtors submit that the retention of RBA is reasonable and in the best interest of the Debtors, their estates, their creditors, and other parties in interest.

### i.     Qualifications

22.     RBA has a principal place of business at 4000 Pine Lake Road, in the City of Lincoln, in the State of Nebraska, 68516. RBA conducted approximately 324 auctions in 2024 throughout the United States, Canada and Mexico, serving privately and publicly-held companies, parties in cases pending in front of the United States Bankruptcy Court and other lending institutions and turnaround management companies. RBA expects to host approximately a similar

Case 25-10601-MFW    Doc 165    Filed 04/25/25    Page 9 of 16

number of auctions between those regions in 2025. The Debtors believe, after conducting a search for appropriate candidates, that RBA is well qualified to handle the unique issues presented by the Debtors' business.

### ii.    Scope of Services

23.    Pursuant to the Auction Agreement, RBA agrees to provide the following services to the Debtors, subject to authorization by the Court:

- Determination of the best method for selling the Equipment, whether by unreserved auctions, live or online, or negotiated sales;

- Establishment of prices for the Equipment to be sold through negotiated sales;

- Disposition of the Equipment;

- For online auctions, the use of RBA's proprietary online bidding service;

- Marketing of the Equipment for purposes of conducting sales;

- Repairs, restoration, or refurbishment of the Equipment, if necessary, based upon the approval and consultation with the Debtors. The Debtors will decide in their sole discretion if such restoration, repairs, or refurbishment are necessary;

- Transfer of title with the support of the Debtors; and

- Collection of sale proceeds on behalf of the Debtors and deduction of fees and commissions pursuant to the Auction Agreement.

24.    RBA has not shared or agreed to share any compensation to be received by it in this case with any other person, except as among members of RBA.

25.    RBA is aware of the provisions of Bankruptcy Code Section 328(a) and has agreed, notwithstanding the terms and conditions of employment herein, that the Court may allow compensation different from the compensation provided herein if such terms and conditions prove

9

17300437/1

to have been improvident in light of developments unanticipated at the time of the fixing of such terms and conditions.

26.     Cause exists for allowance of the auctioneer's compensation under Bankruptcy Code 503(b)[6] as (i) the claim for compensation arises from services to be performed at the request of the Debtors on behalf of the Debtors' estates, and (ii) the services are an actual and necessary cost of preserving the estate and will greatly benefit the estate.[7]  RBA will assist the Debtors with respect to the best way to advertise an auction sale to attract interest and garner offers, and advertise and market the Equipment for an auction sale.

### iii.    Disinterestedness

27.     RBA conducted a conflict search based on the list of interested parties attached to the Chadwick Declaration as **Schedule 1**. RBA conducted a reasonable and diligent investigation, and determined it has no connection with the Debtors, creditors, any other party in interest, their respective attorneys and accountants, the United States  Trustee, or any personal employed in the Office of the United States Trustee or this Court, other than as disclosed in the Chadwick Declaration.

28.     Accordingly, the Debtors believe that RBA (a) is a "disinterested person" within the meaning of Sections 101(14) and 327(a) of the Bankruptcy Code, and (b) does not hold or represent an interest adverse to the Debtor's estate.

---

[6]     11 U.S.C. § 503(b)(1)(A) provides that:[a]fter notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502[f] of this title, including the actual, necessary costs and expenses of preserving the estate. . . .

[7]     In order to obtain administrative expense priority and qualify as "actual, necessary costs and expenses of preserving the estate," two elements must be satisfied: (1) it must have arisen from a transaction with the estate, and (2) it must have directly and substantially benefitted the estate.  See Microsoft Corp. v. DAK Indus., Inc. (In re DAK Indus. Inc.), 66 F.3d 1091, 1094 (9th Cir. 1995).

17300437/1

### iv.    *Nunc Pro Tunc* **Relief Is Appropriate**

29.     Pursuant to the Auction Agreement, RBA is providing certain services to the Debtors, including but not limited to the marketing, auctioning, and retrieval of certain items of the Debtors' Equipment. The Debtors submit that no party in interest will be prejudiced by the grant of *nunc pro tunc* relief. In fact, all parties in interest will benefit from *nunc pro tunc* relief, as these services are necessary for ensuring that the Debtors receive the highest and best offers for the Debtors' Equipment, and RBA has the experience and expertise to perform these services efficiently.

**B.    Sale of the Equipment Free and Clear Under § 363**

30.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). This Court's power under section 363 is supplemented by section 105(a), which provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title…." § 105(a).

31.     A debtor should be authorized to sell assets out of the ordinary course of business pursuant to section 363 of the Bankruptcy Code and prior to obtaining a confirmed plan of reorganization if it demonstrates a sound business purpose for doing so. See In re Del. & Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991) (finding that the sale of substantially all of debtor's assets outside of a plan of reorganization is appropriate when a sound business reason justifies such a sale); Myers v. Martin (In re Martin), 91 F.3d 389, 394–95 (3d Cir. 1996) (citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513 (7th Cir. 1991)); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070–71 (2d Cir. 1983).

32.     Courts have applied the following four factors in determining whether a sound business justification exists: (a) whether a sound business reason exists for the proposed transaction; (b) whether fair and reasonable consideration is provided; (c) whether the transaction has been proposed and negotiated in good faith; and (d) whether adequate and reasonable notice is provided. See In re Del. & Hudson Ry. Co., 124 B.R. at 175–76 (adopting Lionel factors to consider in determining whether sound business purpose exists for sale outside ordinary course of business in this District); Lionel Corp., 722 F.2d at 1071 (setting forth the "sound business" purpose test); In re Abbotts Dairies of Penn., Inc., 788 F.2d 143, 147–49 (3d Cir. 1986) (implicitly adopting the articulated business justification test set forth in *Lionel* and adding the "good faith" requirement).

33.     Here, the Debtors have exercised sound business judgment and set forth sound business justifications for pursuing the sale of the Equipment by RBA, pursuant to the factors discussed above. RBA is best positioned to market the Equipment extensively, thereby ensuring that the Debtors receive the highest or otherwise best offer possible. Moreover, RBA is already familiar with the Debtors, these Chapter 11 Cases, and the Equipment, by virtue of its visits to the Debtors' site, evaluation of the Equipment, and ongoing discussions with the Debtors regarding the potential sale of the Equipment. In short, the Debtors believe that a sale of the Equipment pursuant to and in accordance with the procedures proposed by RBA will allow for the greatest possible consideration for the Equipment while minimizing the potential downside for the Debtors' and their estates. Accordingly, the Debtors believe that the retention of RBA will provide a fair, reasonable, and prudent method of selling the Equipment to ensure the Debtors maximize their recovery for the benefit of their estates, creditors of their estates, and other parties in interest.

17300437/1

34.     Once debtors articulate a valid business justification, their decision to sell property out of the ordinary course of business enjoys a strong "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in an honest belief that the action taken was in the best interests of the company." In re Integrated Res. Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). Therefore, any party objecting to a debtor's proposed asset sale must make a showing of "bad faith, self-interest, or gross negligence," as courts are loath to interfere with corporate decisions absent such a showing. See id. at 656.

35.     As discussed above, the Debtors entered into the Auction Agreement because they believe that RBA will be able to obtain the highest prices for the Equipment at the least cost to the Debtors' estates. Any sale will be conducted in good faith. The Debtors are prohibited from making a bid or offer for all or any part of the Equipment, whether directly, indirectly, through an agent or otherwise. Moreover, if an auction is conducted, all bidders will be required to confirm that no collusion has taken place with respect to the sale of or bidding on the Equipment.

36.     The Debtors respectfully submit that they have satisfied the requirements of sections 105 and 363 as those sections have been construed by courts in the Third Circuit and that the sale of the Equipment by RBA, whether by auction or private sale, meets the standard set forth in section 363(b) for sales outside of the ordinary course of a debtor's business.

37.     Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property free and clear of any lien, claim, interest, or encumbrance in such property if, among other things:

(1)     Applicable non-bankruptcy law permits sale of such property free and clear of such interest;
(2)     Such entity consents;

13

(3)     Such interest is a lien and the price at which such property is sold is
        greater than the aggregate value of all liens on such property;
(4)     Such interest is in bona fide dispute; or
(5)     Such entity could be compelled, in a legal or equitable proceeding, to
        accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

38.     Because section 363(f) is stated in the disjunctive, satisfaction of any one of its five

requirements will suffice to warrant approval of the proposed sale. See In re Collins, 180 B.R. 447,

450 (Bankr. E.D. Va. 1995) ("Section 363(f) is phrased in the disjunctive, such that only one of

the enumerated conditions must be met in order for the Court to approve the proposed sale.");

Scherer v. Fed. Nat'l Mortg. Ass'n (In re Terrace Chalet Apts., Ltd.), 159 B.R. 821, 827 (N.D. Ill.

1993) (sale extinguishes liens under section 363(f) as long as one of the five specified exceptions

applies).

39.     The Debtors stipulate that the Equipment is subject to the liens of Bedrock,

Caterpillar Financial Services Corporation, and Cleveland Brothers Equipment Co., Inc.[8] Such

liens will attach to the proceeds of each sale of the Equipment in accordance with the liens of each

secured party.  Therefore, the Equipment may be sold free and clear under section 363(f)(2).

40.     Any party, other than Bedrock, Caterpillar Financial Services Corporation, and

Cleveland Brothers Equipment Co., Inc that believes that it holds a valid lien on any piece of the

Equipment will have received notice of the Application and may assert its alleged interest. Finally,

to the extent there is a mechanics lien or other such lien right asserted against any item in the

Equipment, and the value of each item exceeds the lien (which should be true in every case),

section 363(f)(3) of the Bankruptcy Code provides the basis for a free and clear sale. To the extent

---

[8]     The Debtors object to the liens asserted by Jason and Angela Svonavec, and Heritage Holding Co. LLC
pursuant to the facts outlined in the First Day Declaration, which is incorporated in full herein by reference.
Furthermore, the Debtors reserve the right to object any other lien interest asserted by a party.

14

there are any valid liens against any items in the Equipment, those liens will attach to the net proceeds received by the estates for any such item with the same validity and priority as exist in such item. Therefore, the Debtors respectfully request that any sale of the Equipment be free and clear of all liens, claims, encumbrances and other interests.

### NOTICE

41.     The Debtors have provided notice of this Application to the following parties (a) the United States Trustee for the District of Delaware (b) counsel to Bedrock Industries Investco 1 LLC; (c) counsel to the Committee; (d) the Debtors' twenty (20) largest unsecured creditors; and (d) all parties who, as of the filing of this Application, have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtor respectfully submits that no further notice is necessary.

### NO PRIOR REQUEST

42.     No previous application for the relief requested herein has been made in these Chapter 11 Cases.

17300437/1

**WHEREFORE**, the Debtors respectfully request that the Court enter the form of Order

attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief

as the Court deems appropriate.

Dated:  April 25, 2025
Wilmington, Delaware

**MORRIS JAMES LLP**

*/s/ Jeffrey R. Waxman*
Jeffrey R. Waxman (DE Bar No. 4159)
Eric J. Monzo (DE Bar No. 5214)
Christopher M. Donnelly (DE Bar No. 7149)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: jwaxman@morrisjames.com
         emonzo@morrisjames.com
         cdonnelly@morrisjames.com

*Proposed Counsel to the Debtors and Debtors
in Possession*

17300437/1