**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| KTRV LLC, *et al.*,[1] | Case No. 25-10601 (MFW) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: May 5, 2025 at 11:30 a.m. (ET)** |
| | **Objection Deadline: Extended to April 29, 2025 at 12:00 p.m. (ET) for the Committee** |
| | **Ref. No. 14** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR ENTRY OF A FINAL ORDER (I) AUTHORIZING DEBTORS AND DEBTORS IN POSSESSION TO (A) USE CASH COLLATERAL AND (B) GRANT ADEQUATE PROTECTION TO THE PREPETITION LENDER; (II) MODIFYING THE AUTOMATIC STAY; AND (III) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") of KTRV LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), by its undersigned proposed counsel, Frost Brown Todd LLP and Landis Rath & Cobb LLP, files this objection (the "Objection") to the *Motion For Entry of Interim And Final Orders (I) Authorizing Debtors and Debtors in Possession To (A) Use Cash Collateral and (B) Grant Adequate Protection to the Prepetition Lender; (II) Modifying the Automatic Stay; And (III) Granting Related Relief* [D.I. 14] (the "Cash Collateral Motion") and to the entry of a final order approving the Cash Collateral Motion ("Final Cash Collateral Order").[2]

**PRELIMINARY STATEMENT**

---

[1] The Debtors in these Chapter 11 Cases, along with each the last four digits of each Debtors' tax identification number, are as follows: KTRV LLC (9993) and Heritage Coal & Natural Resources, LLC (8326). The location of the Debtors' principal place of business and service address is 1521 Concord Pike, Suite 201, Wilmington, DE 19803.

1.     The Committee has serious concerns about the Cash Collateral Motion, including but not limited to, (1) whether the Debtors' estates will be administratively solvent, (2) the extent to which the Cash Collateral Motion and the proposed Final Cash Collateral Order improves the position of Bedrock (defined below) to the detriment of general unsecured creditors, and (3) whether the Challenge Period in the Cash Collateral Motion is a sham due to certain language in the *Motion of the Debtors and Debtors-In-Possession for Order Pursuant to 11 U.S.C. §§ 105(A) and 363 and Fed. R. Bankr. P. 9019(B) Authorizing and Approving a Global Settlement with Bedrock Industries Investco 1 LLC With Respect to the Strict Foreclosure and Foreclosed Equipment* (the "9019 Motion") that would render Bedrock's alleged liens unchallengeable. Given the insider relationships between Bedrock and the Debtors that have been detailed on other filings in these Chapter 11 Cases, it is troubling that the Debtors would agree to grant Bedrock broad and sweeping releases, provide Bedrock with value-destructive benefits far beyond mere adequate protection, and render Bedrock's liens immune to challenge. Coupled with the obvious rush by the Debtors and Bedrock to expedite these Chapter 11 Cases and the approval process, without affording the Committee a reasonable opportunity to investigate all matters involving the Debtors and their chapter 11 cases, there is very real cause for concern that Bedrock seeks a windfall at the expense of unsecured creditors and other stakeholders in these Chapter 11 Cases.

2.     The Committee has not conducted formal discovery[3] and has only been presented with the opportunity to review documents that were publicly filed in various forums; consequently, the Committee is not able to provide this Court with a detailed "*Statement of the*

---

[2] As of the filing of this Objection, the Committee has not been provided with a proposed Final Cash Collateral Order.

[3] The Committee has been working as quickly and efficiently as possible to prepare informal document requests concerning these various matters, which requests have been served as of the same date of this filing.

*Case*" in this Objection. This, of course, is one of many reasons why the Committee believes it is prudent for this Court to slow down these Chapter 11 Cases, allow the Committee to protect its constituency and the the Debtors' estates, and afford the Committee an appropriate amount of time to investigate and duly determine its position on the myriad of complex and disputed facts, circumstances and issues as alleged by various parties.[4]

### FACTUAL BACKGROUND

3.      On March 30, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (this "Court"). The Debtors continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The Debtors have not yet filed their schedules or statements of financial affairs.[5]

4.      The Debtors filed the Cash Collateral Motion on March 30, 2025, and were granted interim orders approving the use of cash collateral on April 2, 2025 (D.I. 57, the "First Interim Cash Collateral Order"), April 17, 2025 (D.I. 132, the "Second Interim Cash Collateral Order") and April 23, 2025 (D.I. 153, the "Third Interim Cash Collateral Order" and together with he First Interim Cash Collateral Order and the Second Interim Cash Collateral Order, the "Interim Cash Collateral Orders"). An objection to the Cash Collateral Motion was filed by Angela Svonavec, Jason Svonavec, and Heritage Holdings Co., LLC (collectively "HHC") on

---

[4] On April 17, 2025, joint-debtor HCNR filed a complaint against HHC and Angela and Jason Svonavec, alleging the avoidance of certain alleged liens on the assets of HCNR in favor of the defendants, as well as claims for recovery of money and property. This adversary proceeding is styled *Heritage Coal & Natural Resources, LLC v. Heritage Holding Co., LLC, Angela Svonavec, and Jason Svonavec*, Adversary No. 25-10601-mfw.

[5] The Debtors have filed a motion requesting permission to extend the deadline to file their schedules and statements of financial affairs through May 14, 2025 [D.I. No. 94].

{1497.001-W0081222.}

April 15, 2025 (D.I. 101).   The final hearing on the Cash Collateral Motion currently is scheduled for May 5, 2025, at 11:30 pm.

5.       The Committee was appointed on April 15, 2025 [D.I. 95], and on April 15, 2025, selected its proposed counsel, Frost Brown Todd LLP and Landis Rath & Cobb LLP.

6.       Since its appointment and the selection of proposed counsel, the Committee has been focused on reviewing the filings in these Chapter 11 Cases and having preliminary discussions with certain of the stakeholders, including counsel for the Debtors, counsel for Bedrock Industries Invesco 1 LLC ("Bedrock"), and counsel for HHC. Because the Committee has only been involved in these Chapter 11 Cases for a brief period of time, its understanding of the facts, circumstances and the parties is constantly developing.

7.       The Committee has not yet been provided with a proposed Final Cash Collateral Order; accordingly, the Committee reserves the right to supplement or amend this Objection when it has been afforded the opportunity to properly review such a proposed Final Cash Collateral Order.[6] The objections and issues raised by the Committee in this Objection are to the terms in the Cash Collateral Motion and the  Interim Cash Collateral Orders.

## OBJECTIONS

**A.** **Read in Conjunction with the Pending 9019 Motion, the Challenge Period in the Cash Collateral Motion is a Sham, and Would Allow Bedrock to Avoid Any Meaningful Investigation of its Alleged Liens or Complex Prepetition Insider Transactions, and the Challenge Period is Inadequate**

8.       The Cash Collateral Motion requests a total release of all claims by the Debtors against Bedrock and only provides a limited window and a minuscule budget for the Committee

to protect the interests of unsecured creditors in these chapter 11 cases, including investigating Bedrock's alleged prepetition liens or transactions and to seek standing to challenge the alleged liens or transactions. The Debtors' 9019 Motion, however, would waive all of the Debtors' claims against Bedrock, *without* any exception for a challenge by the Committee. This action by the Debtors (without any evidence that the Debtors have conducted an independent investigation of Bedrock) renders the already problematic challenge provisions in the Cash Collateral Motion illusory – if both the Cash Collateral Motion and 9019 Motion are granted by this Court to the extent of the proposed orders tendered by the Debtors, there will be no investigation and no challenge of Bedrock and the Debtors' complex series of prepetition insider transactions.

9.     The Cash Collateral Motion purports to afford the Committee seventy-five (75) days from the date of the entry of the First Interim Cash Collateral Order (*i.e.* a date before the Committee was even appointed) to conduct its challenge investigation *and* to be granted standing to assert a challenge claim against Bedrock. First, this "deadline" is itself illusory because the First Interim Cash Collateral Order was entered on April 2, 2025, or thirteen days before the Committee was even formed. It could be several more weeks before cash collateral usage issues are resolved by this Court, and the Committee cannot significantly invest in its challenge until a final order is entered by this Court. Also, if there is any contest to the Committee's standing to assert a challenge, it could take an unknown amount of time to resolve that critical issue; meaning that expecting the Committee to have been *granted* standing before the end of the

---

[6] The Committee further notes that the Debtors have not yet filed the Final Cash Collateral Order with this Court providing other parties the opportunity to review and comment.  To the extent that the Final Cash Collateral Order contains material revisions from the terms of the Second Interim Cash Collateral Order, the Committee respectfully requests that this Court adjourn the hearing scheduled for April 24, 2025 to afford parties an additional period of time to review and comment and file objections, to the extent necessary.  In reviewing the proposed budget, it appears to the Committee that the Debtors have sufficient liquidity through the first week of May 2025.

{1497.001-W0081222.}

challenge period is unreasonable and arbitrary, and this Court should not approve a requirement that the Committee obtain such a ruling in the proposed compressed timeframe.

10.     Because of these issues, the Committee objects to the 75-day challenge period as currently contemplated by the Cash Collateral Motion, and requests that the Committee be given seventy-five days from the date of entry of a *final* order granting use of cash collateral.   In addition, the Committee requests that it only be required to file a motion with this Court *seeking* standing prior to the expiration of the challenge period, not to actually be granted standing, the timing of which is unpredictable and largely out of the Committee's control. In other words, the Committee respectfully believes that the challenge period should be tolled by the filing of a standing motion until the resolution of such motion, with a reasonable period following such resolution to file a challenge action when and if standing to bring a challenge motion is granted to the Committee.

11.     The Committee believes that the accelerated pace of these Chapter 11 Cases warrants the Committee's requested modifications to the challenge period.   This need is heightened when the Court considers the singular focus of the Debtors and Bedrock to quickly liquidate the Debtors' assets (and provide Bedrock with sweeping releases), to the extreme detriment of the general unsecured creditors, through an aggressive and expedited sale process. Though the Debtors have requested that their schedules and statements of financial affairs not be required to be filed until May 15, 2025, the Debtors and Bedrock seek to force the parties into high-leverage decisions regarding cash collateral use and whether to support or oppose the complex 9019 Motion. As this Court is well aware, coal mining equipment is not perishable. Some time is warranted before making decisions that cannot be undone.

12.     As will be addressed below, the Committee understands that the most recently proposed budget for Committee professionals for the entire case may be $200,000 but will first address the most recently proposed budget that is in the record. The text of the Third Interim Cash Collateral Order sets a $25,000 budget for the Committee, which is beyond inadequate for the Committee to properly represent the interests of general unsecured creditors in these Chapter 11 Cases and conduct a challenge investigation of Bedrock. And this is not solely the budget for the challenge period, but appears to be the *entire* proposed budget. For a case of this complexity, $25,000 is a fraction of what will be adequate. The budget attached to the Third Interim Cash Collateral Order [D.I. 153-1] actually does not provide for any professional fee budget over the first weeks of the case, but the Second Interim Cash Collateral Order has a line item for $1.27 million in professionals' fees – yet based on the Second Interim Cash Collateral Order (under the assumption this is what the Debtors will revert to), the Debtors believe the Committee should only be provided $25,000 of that funding, or 1.97% of the budget for professionals, which is egregious.

13.     The Debtors have since provided an updated 13-week budget to the Committee that includes a professional fee schedule, and that document contemplates a $2,530,000 budget for professionals' fees throughout the pendency of the case, with $200,000 budgeted for "other professionals." Assuming that the Committee is not sharing that budget with any "other professionals," the Committee is still being offered an inequitable and unworkable 7.9% of the total budget for professionals. That revised schedule was provided in connection with a possible DIP financing facility that the Debtors have not yet requested approval of—indeed, the Debtors have not even provided the Committee with a draft of a DIP financing proposal. Under those conditions, the Committee questions the relevance of such a hypothetical budget in the context of

the Cash Collateral Motion. In any event, regardless of the ultimate budget the Debtors propose, the Court should not approve any budget that applies an inappropriate "cap" on the Committee's professionals. *See, e.g.*, *In re Evergreen Solar, Inc.*, Case No. 11-12590 (MFW), Hr'g Tr. at 42-51 (Bankr. D. Del. Sept. 6, 2011) (declining to apply the debtor's proposed caps and instead, substituting a general pool for all professionals from which debtor and committee professionals could recover fees on a pro rata basis); *In re Channel Master Holdings, Inc.*, No. 13-13004, 2004 Bankr. LEXIS 576, *8-9 (Bankr. D. Del. Apr. 26, 2004) (refusing to enforce a $75,000 cap on committee's professional fees under a postpetition financing facility, finding such cap unreasonable in light of the much larger caps on the other professionals in the case); *In re TOUSA, Inc.*, Case No. 11-11071, Docket No. 2355 (Bankr. S.D. Fla. Jan. 9, 2009) (placing no cap on the use of cash collateral to investigate claims); *In re Tropicana Entm't*, LLC, No. 08-10856 (KJC), Docket No. 219 (Bankr. D. Del. May 30, 2008) (same); *In re Delta Air Lines, Inc*., No. 05-17923, (Bankr. S.D.N.Y. Oct. 6, 2005) (same). In addition, challenge budgets are routinely approved for amounts well above the proposed $25,000. *See, e.g., In re Cambrian Holding Company, Inc.*, No. 19-51200, Docket No. 283 (Bankr. E.D. Ky. July 25, 2019) ($75,000 cap); *In re Licking River Mining, LLC,* No. 14-10201, Docket No. 447 (Bankr. E.D. Ky. Sept. 5, 2014) ($150,000 cap); *In re Trinity Coal Corporation*, No. 13-50364, Docket No. 267 (Bankr. E.D. Ky. Apr. 8, 2013) ($100,000 cap); *In re Swift Energy Co.*, No. 15- 12670 (MFW), Docket No. 224, (Bankr. D. Del. Feb. 2, 2016) ($200,000 cap).

14.     The opinion from *Tenney Village*, 104 BR. 562 (Bankr. D.N.H. 1989), explains why a sufficient challenge budget is necessary to protect the integrity of the bankruptcy process:

> [T]he Bank would close the purse strings to payment of Debtor's counsel for services devoted to any claim or defense against the Bank, except for the $25,000 retainer. . . . It is said that a Chapter 11 lender should not be required to finance the prosecution of

> claims and defenses against it. That is true. If the lender believes
> that this will occur, it can elect not to make the loan. It cannot
> expect, however, to change the rules of a Chapter 11 case. We
> have here much more than the common provision giving counsel to
> a creditors' committee a limited period to object to a lender's liens.

*Id*. at 568-9. As to the Committee professionals' budgeted amount in the Carve Out, reasonable

carve-outs for professional fees are "designed to provide for payment of the fees of debtor's and

the committees' counsel and possible trustee's counsel in order to preserve the adversary system.

Absent such protection, the collective rights and expectations of all parties-in-interest are sorely

prejudiced." *Ames*, 115 B.R. at 38; *see also In re Cottrell Int'l, LLC*, 2000 WL 1180282, at *3

(Bankr. D. Colo. July 19, 2000) (bankruptcy courts should not unduly restrict the availability of

funds to pay professionals in the case, including counsel for the creditors' committee).

15.    Under the budget attached to the Second Interim Cash Collateral Order, the

professionals' fees appear to total $1.27 million through only the first five weeks of these

Chapter 11 Cases. The Committee's professionals should be treated fairly, and adequate funds

must be budgeted for the payment of projected Committee professional fees. The Committee

requests that its professionals be budgeted at least 33.3% of the total amount budgeted for

professionals' fees in these cases, without any cap. In the alternative, if the Committee is not

afforded an adequate line in the budget for its professionals, then there should be no line item for

specific professionals, and all estate professionals should share in the Carve Out, subject to the

budget and approval of their compensation applications.

### B. The Committee Should Be Granted Standing to Challenge the Alleged Debt and Alleged Liens, if Appropriate under the Facts and Circumstances

16.    The Cash Collateral Motion seeks to limit the standing of the Committee to

commence a challenge action against Bedrock, if the Committee determines that a challenge

should be commenced. The Committee should not be burdened in furtherance of its duties if the

Committee elects to initiate a challenge to, among other things, Bedrock's alleged prepetition liens or to the characterization of Bedrock's myriad prepetition insider transactions with the Debtors, particularly when the Debtors have already waived their right to do so in the Third Interim Cash Collateral Order. The Committee respectfully submits that this Court should grant the Committee automatic standing to file an adversary proceeding challenging, among other things, the validity of Bedrock's alleged liens, alleged debt, and prepetition transactions, should the Committee ultimately determine, in the exercise of its reasonable judgment, that it is appropriate to do so under the facts and circumstances.

17.     Moreover, as this Court is aware, the time required to brief and argue a standing motion is significant. In the interest of avoiding unnecessary delays and promoting the full investigation of liens and potential claims in the face of broad stipulations by the debtors, courts have also approved financing orders providing creditors' committees with automatic standing to commence an adversary proceeding without the need to file a motion seeking standing to bring such an action. *In re YogaWorks, Inc.*, No. 20-12599, Docket No. 133 at ¶ 19(a) (KBO) (Bankr. D. Del. Nov. 9, 2020) ("The Committee shall have automatic standing to commence a Challenge as to the validity, extent, priority, perfection and enforceability of the Prepetition Liens."); *In re Cambrian Holding Company, Inc.*, No. 19-51200, Docket No. 283 (Bankr. E.D. Ky. July 25, 2019) (vesting the creditors' committee with automatic standing to commence an adversary proceeding); *In re Phoenix Payment Sys., Inc.*, No. 14-11848, Docket No. 149 (MFW) (Bankr. D. Del. Sept. 3, 2014) (same); *In re Licking River Mining, LLC*, No. 14-10201, Docket No. 447 (Bankr. E.D. Ky. Sept. 5, 2014) (same).

18.     At a minimum, the Debtors and Bedrock must be required to include language in the proposed Final Cash Collateral Order sufficient to defeat any arguments under *CML V, LLC*

*v. Bax*, 28 A.3d 1037, 1039 (Del. 2011), *as corrected* (Sept. 6, 2011) that the Committee cannot bring derivative claims on behalf of the Debtors' estates, which would render the challenge period illusory and any challenge to Bedrock moot. The Committee has proposed the following language to be added to any Final Cash Collateral Order:

> …if these Chapter 11 Cases are converted to chapter 7 or a chapter 7 or chapter 11 trustee is appointed or elected prior to the expiration of the Challenge Deadline, any such estate representative or trustee shall receive the full benefit of any remaining time before expiration of the Challenge Deadline, which, solely if not yet expired, shall be extended for a period of sixty (60) days; and (B) this Court enters judgment in favor of the plaintiff or movant in any such timely commenced Challenge proceeding and any such judgment has become a final judgment that is not subject to any further review or appeal. The Challenge Deadline set forth herein shall be tolled if a party-in-interest (including the Committee) files a motion seeking standing to bring a Challenge ("Standing Motion"), which attaches one or more draft complaints that detail the alleged challenge(s) that the applicable party in interest seeks to file, until such time as the Court decides the Standing Motion and solely with respect to (i) the party-in-interest that files the Standing Motion and (ii) the contents of the complaint attached to the Standing Motion, provided, further, that so long as the Committee otherwise satisfies the requirements set forth in this paragraph 10, nothing herein shall limit the rights of the Prepetition Lender, or (b) asserting or prosecuting any Avoidance Action or any other claims, counterclaims or causes of action, objections, contests or defenses against any Prepetition Lender or their respective subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof in connection with or related to the Prepetition Loan Documents, the Prepetition Liens and the Prepetition Collateral. The Committee's ability to (i) file a timely motion seeking standing in respect of any timely Challenge for which it cannot obtain standing as a matter of law because the applicable Debtor is a limited liability company (an "LLC Challenge Motion"), and (ii) seek pursuant to such LLC Challenge Motion a mechanism by which to prosecute such Challenge, and the applicable parties shall meet and confer with respect to an appropriate process (if any) for the prosecution of such Challenge.

Notwithstanding any other provision in this Final Order, the Court retains the right to enter any appropriate remedy.

**C. Bedrock's Replacement Liens Should Not Attach to Unencumbered Property, Unencumbered Property Should Not Satisfy Bedrock's Superpriority Claim, and the Parties Should Reserve Rights as to Application of Monthly Adequate Protection Payments**

19.     As set forth above, Bedrock, an insider of the Debtors, is not providing new funding to the Debtors to support these Chapter 11 Cases. Bedrock is merely "consenting" to the use of its cash collateral to allow the Chapter 11 Cases to proceed for a few short weeks until the Debtors have liquidated their assets for what appears to be the sole and singular benefit of Bedrock. Bedrock, subject to the right of the Committee to investigate the validity, extent and priority of Bedrock's liens, claims and encumbrances, is simply entitled to adequate protection. Nothing more and nothing less.

20.     Adequate protection can include: (a) cash payment or periodic cash payments; (b) granting of replacement liens; or (c) providing other relief as will result in the secured creditor's realization of the "indubitable equivalent" of its interest in its prepetition collateral.  11 U.S.C. § 361. As will be discussed in detail, adequate protection does not include broad and sweeping liability releases, liens on previously unburdened assets, and total control of the Chapter 11 Cases through paper-thin "termination" events.

21.     The Replacement Liens Must Not Encumber Property That Was Free and Clear Before the Petition Date. The Cash Collateral Motion proposes that this Court approve the grant of replacement liens to Bedrock on:

> …all present and after-acquired property and assets of any nature whatsoever, whether real or personal, tangible or intangible, wherever located (including but not limited to, inventory, raw materials, coal, mining and extraction rights, contracts, plants, fixtures, machinery, equipment, leases, wash plant, general intangibles, documents, instruments, securities, goodwill, chattel

paper, deposit accounts, refunds, deposits, patents, copyrights, trademarks, trade names, rights under license agreements, permits, licenses, causes of action, insurance policies and proceeds, and tax refunds) of the Debtors and their estates, including debtor or estate claims, and including the proceeds, products, rends and profits of the foregoing…

22.    An adequate replacement lien should not secure the prepetition obligations to an insider secured creditor; it should be limited to the creditor's claim for the diminution in value of its pre-petition collateral caused by the Debtors' use of such collateral. *See In re Westport Holdings Tampa, Ltd. P'ship*, 595 B.R. 428, 433 (Bankr. M.D. Fla. 2018). This broad and sweeping grant of liens *to an insider* who is not advancing new funding is unacceptable and should not be approved by this Court. *See In re Latam Airlines Grp. S.A.,* 620 B.R. 722, 813 (Bankr. S.D.N.Y. 2020) (Releases even to a *DIP lender* should only be given to extent of a new DIP facility – not for other prepetition actions of lender).

23.    The Cash Collateral Motion (and section 5(b) of the Third Interim Cash Collateral Order) requests that this Court grant Bedrock a superpriority section 507(b) claim payable from all assets of the Debtors' estates, including from the proceeds of Avoidance Actions.[7] Further, to the extent of any actual diminution in Bedrock's alleged collateral, the Debtors propose that this Court grant Bedrock adequate protection replacement liens and superpriority claims payable from all of the Debtors' assets, including, among other assets, Avoidance Actions and other unencumbered assets, subject only to the Carve Out.  It is clear that in addition to their other "grabs", Bedrock wants to make a "grab" for all unencumbered assets of the Debtors to repay their alleged claims as consideration for the mere use of cash collateral by the Debtors, when, as currently contemplated by the Debtors, the cash collateral is simply being used to liquidate the

---

[7] As used in this Objection, the term "Avoidance Actions" shall mean "any and all claims, causes of action or rights of recovery arising under Chapter 5 of the Bankruptcy Code as well as any claims under applicable state fraudulent conveyance/transfer law and any property recovered pursuant thereto or proceeds thereof.

{1497.001-W0081222.}

assets of the Debtors and pay down the alleged obligations owing to Bedrock on an accelerated basis. In other words, Bedrock is asking the Debtors to pay very generously for the right to use Bedrock's alleged collateral to benefit Bedrock. This "grab" by Bedrock is without regard to the interests of unsecured creditors and should not be approved by this Court.

24.     The Cash Collateral Motion requests that this Court grant Bedrock replacement liens on all property created post-petition, even property upon which Bedrock lacked a prepetition lien or which arises solely because of these Chapter 11 Cases.  If approved by this Court, replacement liens should only allow Bedrock, an insider, to maintain but not to improve its position. *In re S-Tek 1, LLC*, 625 B.R. 519, 528 (Bankr. D.N.M. 2020) ("A debtor is not required to pay ongoing debt service as a condition to use of cash collateral provided the creditor's interest in cash collateral is adequately protected. See § 361(1) (requiring adequate protection of cash or periodic cash payments to the extent use of cash collateral 'results in a decrease in the value of' the creditor's interest in cash collateral"). Therefore, Bedrock should not receive liens on any assets upon which it did not have a valid prepetition lien. *See In re Erickson Ret. Communities, LLC*, 2012 WL 13341023, at *4 (Bankr. N.D. Tex. Nov. 7, 2012). Any such lien would have the effect of providing a roll-up to Bedrock whereby post petition adequate protection is securing the payment of prepetition debt. This practice is disfavored even in the DIP financing context but is particularly inappropriate when the secured lender is only providing consent for the use of cash collateral. *See In re Grupo HIMA San Pablo, Inc.*, 2023 WL 5498101, at *3 (Bankr. D.P.R. Aug. 24, 2023) (UST successfully argues that a roll-up "constitutes extraordinary relief"). Finally, the sum of the monthly payments and the obligations secured by the post-petition collateral must not exceed the total diminution value of Bedrock's perfected pre-petition collateral, if any. *See Westport Holdings*, 595 B.R. at 433. In other words,

the adequate protection payments to Bedrock must be applied against the value of any other post-petition adequate protection Bedrock receives, so that Bedrock is only given value up to any depreciation in its collateral.

25.     Bankruptcy courts routinely exclude unencumbered assets from the scope of adequate protection liens and superpriority claims. *See, e.g., In re SFX Entm't, Inc.*, Hr'g Tr. 21:17-20, 26:9-23, No. 16-10238 (MFW) (Bankr. D. Del. Mar. 4, 2016) (refusing to grant liens to DIP lenders on unencumbered assets); *In re Aralez Pharmaceuticals US Inc.*, Case No. 18-12425 (MG), Docket No. 98 at ¶ 15(i)-(ii) (Bankr. S.D.N.Y. Sept. 14, 2018) (providing that adequate protection liens only attach to prepetition collateral and further providing that adequate protection claims cannot be paid out of the proceeds of avoidance actions).

26.     <u>The Replacement Liens Must Not Encumber Avoidance Actions</u>. The Committee objects to any grant of liens or superpriority claims against the Avoidance Actions, their proceeds and any other unencumbered assets of the Debtors. Once again, the Debtors have failed to provide any facts or compelling circumstances to establish why the Debtors should burden these chapter 11 estates with liens on the Avoidance Actions and other unencumbered assets of the Debtors in favor of Bedrock, despite the Local Bankruptcy Rule 4001-2(a)(i))[8] considering it extraordinary relief.   There are no compelling circumstances in the record as to why the Avoidance Actions and their proceeds should now be encumbered in favor of Bedrock and this Court should not approve that request by the Debtors.

27.     Courts have consistently held that Avoidance Actions are uniquely for the benefit of general unsecured creditors of a chapter 11 estate, not secured creditors, and are rarely

---

[8] Local Rule 4001-2(a)(i) requires debtors to provide justification for "[p]rovisions that immediately grant the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, and 548 of the Code or their proceeds."

encumbered in favor of secured lenders. *In re Tribune Co.*, 464 B.R. 126, 171 (Bankr. D. Del. 2011) (noting "that case law permits all unsecured creditors to benefit from avoidance action recoveries"). The intent behind avoidance powers and a debtor's power to bring causes of actions is to allow the debtor-in-possession to gain recoveries for the benefit of all unsecured creditors. *See Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. Partn. IV*, 229 F.3d 245, 250 (3d Cir. 2000) (stating that "[w]hen recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors"); *In re Cybergenics Corp.*, 226 F.3d 237, 244 (3d Cir. 2000) (stating that "the debtor in possession is similarly endowed to bring [avoidance] claims on behalf of, and for the benefit of, all creditors"), *rev'd en banc on other grounds*, 330 F.3d 548 (3d Cir. 2003); *In re Sweetwater*, 55 B.R. 724, 735 (D. Utah 1985) (avoiding powers are meant to benefit creditors generally and promote equitable distribution among all creditors); see also *Official Comm. of Unsecured Creditors v. Goold Elecs. Corp.*, 1993 U.S. Dist. LEXIS 14318, at *12 (N.D. Ill. Sep. 22, 1993) (vacating financing order "to the extent that the order assigns to the bank a security interest in the debtor's preference actions").

28.     For these reasons, DIP financing orders in this District routinely exclude Avoidance Actions and their proceeds from the DIP Collateral. *In re Orchids Paper Product Company*, Case No. 19-10729 (MFW), Docket No. 490 at ¶¶ 11, 18 (excluding avoidance actions and proceeds thereof from adequate protection and DIP liens and claims); *In re The Weinstein Company Holdings LLC*, Case No. 18-10601 (MFW), Docket No. 267 at ¶ 12(d)-(e) (Bankr. D. Del. Apr. 19, 2018) (excluding avoidance actions and commercial tort claims from adequate protection liens and claims); *In re Promise Healthcare Group, LLC*, Case No. 18-12491 (CSS), Docket No. 218 at ¶¶ 12, 14 (Bankr. D. Del. Dec. 4, 2018) (excluding avoidance

actions and the proceeds thereof and commercial tort claims and the proceeds thereof, in part, from adequate protection liens and claims); *In re SFX Entertainment, Inc*., Case No. 16-10238 (MFW), Docket No. 203 at ¶ 11(a)(i)-(ii) (Bankr. D. Del. Mar. 8, 2016) (excluding avoidance actions and the proceeds thereof from adequate protection liens and claims); *In re Ravn Air Group, Inc.*, Case No. 20-10755 (BLS), Apr. 29, 2020 Hr'g Tr. at 80:21-81:1 (Bankr. D. Del. May 5, 2020) ("I'll say this, I don't believe that I have ever approved . . . a lien on avoidance actions or proceeds of avoidance actions over a committee [objection], and I would be reluctant to do so, especially in the context of a case that is now directly and candidly postures as a liquidation."); *id.* at 91:25-92:2 ("And so I would not be prepared to authorize a lien on the proceeds of avoidance actions, again, over a committee objection . . .").

29.     To allow Bedrock to strip the Avoidance Actions and their proceeds from the Debtors' estates, as opposed to allowing the Avoidance Actions and their proceeds to benefit unsecured creditors, turns settled bankruptcy law on its head.  *See, e.g., In re Tek-Aids Indus., Inc.*, 145 B.R. 253, 256 (Bankr. N.D. Ill. 1992) (holding that granting a lien on preference actions to secured creditors "would not only defy logic but would undermine the policy behind the avoidance powers as well"). Bedrock did not have a lien on Avoidance Actions or their proceeds on the Petition Date and should not be granted a lien on Avoidance Actions and their proceeds in the Final Cash Collateral Order. This Court should not condone this end-run around what could be a meaningful source of recovery for unsecured creditors.

   **D.  The Events of Default and Termination Provisions in the Cash Collateral Motion are Vague, Arbitrary, and Would Permit Bedrock to Indulge in Capricious Decisions, Essentially Holding These Chapter 11 Cases Hostage to a Whim**

30.     The Committee understands that prior to the entry of the Second Cash Collateral Order the Debtors were apparently in default under the terms of the Cash Collateral Motion and

First Interim Cash Collateral Order; it is an "Event of Default" if the Debtors do not file a sale motion on or before seven (7) days after the Petition Date, or separately if the Debtors do move to employ a broker on or before seven (7) days after the Petition Date. While the Second Interim Cash Collateral Order does reset those milestones, the Committee believes that the milestones remain very aggressive (a sale motion and a motion to employ broker by April 28, 2025) and should not be approved by this Court as proposed. Because those deadlines are set prior to any reasonable time for the Committee to discuss the sale process with the Debtors and their advisors or investigate Bedrock's prepetition activity and alleged liens, it appears to the Committee that Bedrock seeks to preserve its ability to simply end these Chapter 11 Cases whenever it chooses. It is not appropriate that Bedrock appears to hold a sword of Damocles over these Chapter 11 Cases at all times by having a default pre-baked into a Final Cash Collateral Order before such order is even entered.

31.    Not surprisingly, there are equally troubling default provisions proposed by the Debtors and Bedrock.  As drafted, additional Events of Default in the Third Interim Cash Collateral Order include requirements that certain actions by the Debtors be "acceptable" to Bedrock – specifically Events of Default (d) (requiring a Court-approved DIP acceptable to Bedrock), (e) (filing a Bankruptcy Rule 9019 motion acceptable to Bedrock), and (f) (having an order entered on a 9019 motion acceptable to Bedrock). Of course, if the only standard is Bedrock's subjective decision regarding "acceptability" – that is no standard at all. That is simply carte blanche for Bedrock to end these Chapter 11 Cases whenever it chooses. The Committee's position is that instead of acceptability to Bedrock, the standard should be acceptability to this Court after all parties have received due notice and opportunity to be heard under the prevailing legal standards.

32.     In addition, beyond the previously identified "acceptability" issue, of Default (e) and (f), requiring the filing of the 9019 Motion and requiring this Court to enter an order approving the 9019 Motion, are completely inappropriate and should not be in any Final Cash Collateral Order approved by this Court. The inclusion of these two Events of Default literally means that if the Court determines Bedrock can be investigated for its prepetition activity or viability of its alleged liens, then Bedrock can simply end these Chapter 11 Cases under the proposed Events of Default.[9] Mere use of cash collateral while Bedrock's position is maintained should not be tied to the 9019 Motion.

33.     Event of Default (b) should be stricken entirely: "the Debtors attempt a sale of any material portion of the Debtors' Collateral, other than any sale in the ordinary course of business that is contemplated by the Approved Budget, without the consent of [Bedrock]." The Debtors should not be precluded from exercising their business judgment and "attempting" anything by filing an appropriate motion. Bedrock, like all other parties in interest, would have the opportunity to be heard on any such motion.

34.     Other Events of Default or actions that invoke a Termination Date based on actions or events entirely beyond the Debtors' control, such as whether a third-party obtains stay relief (including even equipment lenders with purchase-money security interests) (Event of Default (n)) or whether Brian Ryniker chooses to remain as the Debtors' CRO (Event of Default (g)) are also completely inappropriate.

---

[9] As discussed above, the 9019 Motion would render Bedrock's liens unchallengeable if granted in full, meaning that if Bedrock can terminate cash use because the 9019 Motion is not granted, Bedrock can terminate cash use as long as its liens are not fixed and the Committee is able to investigate.

{1497.001-W0081222.}

35.     Event of Default (j), concerning if there is a cessation of Debtor's business or any failure to preserve, renew, or maintain its legal standing, should also be qualified to apply to occurrences other than through *force majure*.

**E.   Defaults Under Any Final Cash Collateral Order Should Not Result in the Right for Bedrock to Terminate Without Stay Relief, and a New Deposit Control Agreement for This Insider Secured Lender is an Excessive and Inappropriate Remedy**

36.     The Cash Collateral Motion contemplates a five (5) day cure period between the declaration of an Event of Default and an automatic termination of the automatic stay without further order of this Court; meaning that Bedrock will be able to terminate cash use (and thus these Chapter 11 Cases) without further Court approval. If an Event of Default occurs, the Committee understands that Bedrock should be able to seek stay relief regarding cash use on an expedited basis, but Bedrock should *not* be able to immediately terminate the automatic stay with no further order of this Court and exercise its alleged state law rights with respect to the Collateral without first presenting that motion to this Court.

37.     Further, section 4 of the Third Interim Cash Collateral Order inappropriately provides a Deposit Account Control Agreement to Bedrock if one did not exist prepetition. The Final Cash Collateral Order should not include section 4 of the Third Interim Cash Collateral Order, which would allow Bedrock to sweep the Debtors' funds without first obtaining relief from the automatic stay. This language constructively installs Bedrock as the party with total control over these Chapter 11 Cases. If Bedrock did not have this protection prepetition, granting such rights to Bedrock in connection with the use of cash collateral would be a significant expansion of Bedrock's prepetition rights, not simply maintenance of its position as required by the Bankruptcy Code.

**F.   Bedrock Has Not Established That it is Oversecured, and Cannot Have its Attorneys' Fees Paid Pursuant to the Cash Collateral Motion**

38.    Among the other concessions made by the Debtors in favor of Bedrock merely to have its alleged cash collateral used for its own benefit, the Debtors would pay Bedrock's attorneys' fees for amounts accrued both prepetition and postpetition. Based on the allegations of certain parties in these Chapter 11 Cases, it appears that Bedrock's prepetition attorneys' fees were largely due to Bedrock's efforts to extract value from the Debtors' assets. It is nonsensical that the Debtors' estates should bear the burden of the cost of these actions, which solely benefit Bedrock (an insider of the Debtors).[10] The most recent budget provided to the Committee would pay Bedrock's attorneys $905,000, or 35.8% of the total budget for the case, and *425.5%* of the budget allotted to the Committee.

39.    Further, to the extent that Bedrock seeks any payment for its fees or expenses whatsoever from assets of the Debtors' estates, Bedrock must be required to provide a detailed statement of such fees or expenses to the Debtors, the Committee, and the United States Trustee, with a reasonable period of time for any of these parties to file an objection prior to any payment to Bedrock, at a minimum of five (5) business days.

### G.    The Budget Has Changed Several Times With Little Explanation, Yet None of the Budgets Have Accounted for Administrative Claims

40.    The Debtors have attached proposed budgets to the Cash Collateral Motion (D.I. 14-2), the First Interim Cash Collateral Order (D.I. 57-1), the Second Interim Cash Collateral

---

[10] *Bronze Group, Ltd. v. Sender (In re Hedged-Investments Assocs.)*, 293 B.R. 523, 526 (Bankr. D. Colo. 2003) ("Therefore, creditors may only recover post-petition fees and costs when their claims are oversecured.") (*citing See Wade v. Hatcher (In re Hatcher)*, 208 B.R. 959, 964 (B.A.P. 10th Cir. 1997) ("Under § 506(b) . . . secured creditors are entitled to post-petition attorney's fees provided that (i) the creditor is oversecured, (ii) the fees are reasonable, and (iii) the fees are provided for in the agreement between the parties." (emphasis added)); *In re Welzel*, 275 F.3d 1308, 1317 (11th Cir. 2001); *In re Loewen Group Int'l, Inc*., 274 B.R. 427 (Bankr. D. Del. 2002); *In re Smith*, 206 B.R. 113, 115 (Bankr. D. Md. 1997); *In re Woodmere*, 178 B.R. 346, 356 (Bankr. S.D.N.Y. 1995); *In re Saunders*, 130 B.R. 208, 214 (Bankr. W.D. Va. 1991); In re Sakowitz, Inc., 110 B.R. 268, 275 (Bankr. S.D. Tex. 1989); *In re Canaveral Seafoods, Inc.*, 79 B.R. 57, 58 (Bankr. M.D. Fla. 1987); *In re Mobley*, 47 B.R. 62, 63 (Bankr. N.D. Ga. 1985); 4 Collier on Bankruptcy ¶ 506.01, at 506-6 (Lawrence P. King ed., 15th ed. 2001) ("Section 506(b) begins by stating that it applies in the context of an allowed secured claim that is secured by property that is greater in value than the claim amount.")).

{1497.001-W0081222.}

Order (D.I. 132-1), and the Third Interim Cash Collateral Order (D.I. 153-1). The first and second budgets projected cash balances sharply declining each week from $1.2 million on April 4, 2025 to only $86,100 on April 25, 2025, indicating cash use that would run out quickly. The third budget indicated that the estates will have a cash balance of $667,400 on 4/25/25 and $568,800 on 5/2/25, showing a much different picture. The first two budgets show $205,000 for professionals' fees, whereas the third budget shows $1.27 million. The Debtors have provided a fourth budget to the Committee which has not been filed on the docket and appears to contemplate a DIP financing facility for which no motion has been filed. The fifth budget, attached to the Third Interim Cash Collateral Order, actually shows nothing earmarked for professionals. The Committee has been provided insufficient explanations about the dramatic changes in the budget, and prior to the entry of a Final Cash Collateral Order, a final budget pertaining to what is currently before the Court – use of Bedrock's cash collateral – must be proposed and explained in detail.

41.     Concerning to the Committee, none of the proposed budgets appear to address section 503(b)(9) claims, which if not properly addressed by the Debtors, might leave these Chapter 11 estates administratively insolvent. *In re NEC Holdings Corp.*, No. 10-11890 (PJW) Hr'g Tr. 100:12-101:6 (Bankr. D. Del. July 13, 2010) (stating that "there has to be something other than a wing and a prayer on the payment of the admin claims."); *In re AFA Investments Inc.*, No. 12-11127 (MFW) Hr'g Tr. 39:24-40:1 (Bankr. D. Del. July 12, 2012) (Judge Walrath stating that "you're not going to come in here and let administratives accrue just for your own benefit" when discussing payment of 503(b)(9) claims in the context of approval of a sale, and holding that certain sale proceeds will be escrowed pending resolution of a dispute between 503(b)(9) claimants and second lienholders). Because schedules and statements of affairs have

not yet been filed by the Debtors, it is difficult for the Committee at this time to fully assess any gaps between the budget and what the administrative claims might look like.

42.      It is integral to the overall success of these Chapter 11 Cases that all contemplated post-petition expenses entitled to priority under sections 503(b) and 507(a) of the Bankruptcy Code be paid in full.  Accordingly, any Final Cash Collateral Order approved by this Court must recognize these legitimate interests and, if entered, must ensure the full payment of the allowed claims of administrative and priority creditors. The accelerated pace of the liquidation process proposed by the Debtors and the speed by which Bedrock seeks to be paid in these Chapter 11 Cases undeniably benefits Bedrock, and with that benefit comes the responsibility to ensure that all administrative claimants are paid in full.

## H. **Other Objections**

43.      The Committee Must Be Granted the Same Rights to Access Information as Bedrock. Section 7 of the Second Interim Cash Collateral Order requires that the Debtors provide Bedrock reasonable access to their premises and books and records and reasonably cooperate to make available any such persons who have information that Bedrock requests. In addition, section G requires the Debtors to send weekly variance reports to Bedrock. The Committee must be granted equal access to the Debtors' books, records, and individuals with requested information and be provided with the same weekly variance reports.

44.      Any Final Cash Collateral Order Should Include Language Unambiguously Reserving All Rights. The Committee proposes that the following language be included in Section B: "Subject to the rights of the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases (the "Committee") set forth herein, any objections to the Motion with respect to the entry of the Order that have not been withdrawn, waived, resolved, or settled are

hereby denied and overruled. Entry of this Order is without prejudice to any of the rights and remedies of the Committee." Further, the Committee's right to challenge whether Bedrock should be deemed to be in control of the Debtors or constructively acting as an "owner or operator" of the Debtors should be preserved, a right which is otherwise waived in section G(ix) of the Third Interim Cash Collateral Order.

### RESERVATION OF RIGHTS

45.     The Committee expressly reserves its respective rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Objection, to seek discovery, and to raise any objections during any hearing regarding entry of a Final Cash Collateral Order or approval of the 9019 Motion.

### CONCLUSION

46.     The Bankruptcy Code, case law, and sound policy dictate that Bedrock cannot manipulate the chapter 11 process to receive a windfall while freezing out all other stakeholders. Even while running these cases for its sole benefit, it appears to the Committee that Bedrock brazenly is insisting that these Chapter 11 Cases cannot move forward unless Bedrock is granted value-destructive special protections. While the Committee will conduct a comprehensive investigation, at this time, it is inappropriate to enable Bedrock to improve its position postpetition for the mere use of cash collateral and to allow it to benefit from the liquidation of the Debtors' assets inside of chapter 11 without ensuring the costs attendant thereto are paid. . Moreover, with the added value available in chapter 11, which will largely benefit Bedrock, comes the foundational requirement that some of that value must be shared with other stakeholders that will spend time, effort, and money to advance these Chapter 11 Cases. Anything less would be an abuse of the chapter 11 process.

{1497.001-W0081222.}

**WHEREFORE**, the Committee respectfully requests that this Court: (a) sustain this Objection; (b) only enter a Final Cash Collateral Order that is subject to the objections and limitations described in this Objection; and (c) grant the Committee such other and further relief as this Court deems just and appropriate under the circumstances.

Dated: April 29, 2025                           **LANDIS RATH & COBB LLP**

Wilmington, Delaware

*/s/ Kimberly A. Brown*
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
Elizabeth A. Rogers (No. 7335)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: brown@lrclaw.com
          pierce@lrclaw.com
          erogers@lrclaw.com

-and-

**FROST BROWN TODD LLP**
Jordan S. Blask, Esq. (admitted *pro hac vice*)
Union Trust Building
501 Grant Street, Suite 800
Pittsburgh, PA 15219
Telephone: (412) 513-4300
Facsimile: (412) 513-4299
Email: jblask@fbtlaw.com

-and-

Ronald E. Gold, Esq. (admitted *pro hac vice*)
Great American Tower
301 East Fourth Street, Suite 3300
Cincinnati, OH 45202
Telephone: (513) 651-6800
Facsimile: (513) 651-6981
Email: rgold@fbtlaw.com

-and-

Bryan J. K. Sisto, Esq. (admitted *pro hac vice*)
400 West Market Street, Suite 3200
Louisville, KY 40202
Telephone: (502) 589-5400
Facsimile:  (502) 589-1087
Email:  bsisto@fbtlaw.com

*Proposed Counsel to the Official Committee of
Unsecured Creditors*