**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>KTRV LLC, *et al.*,[1]<br>       Debtors. | Chapter 11<br><br>Case No. 25-10601 (MFW)<br>(Jointly Administered)<br><br>**Hearing Date: TBD**<br>**Obj. Deadline: TBD** |

**MOTION OF ANGELA SVONAVEC, JASON SVONAVEC, AND HERITAGE HOLDING CO., LLC TO COMPEL FULL ACCESS TO DATA ROOM AND DEBTOR INFORMATION IN CONNECTION WITH SALE**

Angela Svonavec ("Mrs. Svonavec"), Jason Svonavec ("Mr. Svonavec," and together with Mrs. Svonavec, the "Svonavecs"), and Heritage Holding Co., LLC ("HHC," and collectively with the Svonvecs, the "HHC Parties"), by their undersigned attorneys, hereby move (the "Motion") for an order substantially in the form attached hereto as **Exhibit A**, compelling KTRV LLC ("KTRV") and Heritage Coal & Natural Resources, LLC ("HCNR," and together with KTRV, the "Debtors") to provide the HHC Parties with access to the data room established and maintained by the Debtors in connection with their sale and marketing process contemplated under the *Debtors' Motion for Entry of an Order (I) Approving the Bidding Procedures, (II) Authorizing the Debtors to Enter Into One or More Stalking Horse Agreements and Provide Bid Protections, (III) Approving the Form and Manner of Sale Notice, (IV) Scheduling an Auction and Sale Hearing, (V) Approving the Procedures for the Assumption and Assignment of Contracts, (VI) Approving the Sale of the Debtors' Assets Free and Clear, and (VII) Granting Related Relief* [D.I. 156] (the "Bid Procedures Motion") and to provide the HHC Parties with other information or access to the

---

[1] The Debtors in these chapter 11 cases, along with each the last four digits of each Debtor's tax identification number, are as follows: KTRV LLC (9993), Heritage Coal & Natural Resources, LLC (8326). The Debtors' service address is 1521 Concord Pike, Suite 201, Wilmington, DE 19803.

NG-58S8J20W #4918-2079-7754 v5

assets contemplated for sale provided to potential bidders pursuant to the Bid Procedures Motion. In support of this Motion, the HHC Parties state the following:

**PRELIMINARY STATEMENT**

1. The HHC Parties—as the largest creditor in these cases owed in excess of $60 million, the former owners who successfully operated the Debtors' business for over 15 years, and an obvious potential bidder in these cases—file this motion simply to get access to the sale data room established by the Debtors which the Debtors are providing to other potential bidders but have refused to provide to the HHC Parties.

2. The HHC Parties sought to gain routine access to the data room and asked the Debtors to provide them with the form NDA that was being provided to other bidders in this sale process. Instead of providing the NDA—the Debtors have sought to impose onerous restrictions on the HHC Parties' access to the data room. Specifically, the Debtors have stated—

- The HHC Parties do not need any new access to the Debtors' information as the HHC Parties sold the assets to KTRV over 15 months ago, notwithstanding the obvious and substantial decline of the Debtors' assets and operations since sale by the HHC Parties to KTRV closed and the HHC Parties' lack of key financial information from operations during this 15 month period;

- The HHC Parties will not abide by the terms of any confidentiality agreement due to Mr. Svonavec's "convict[ion for] crimes of dishonesty," despite the fact that the HHC Parties have never violated the terms of a confidentiality or nondisclosure agreement, the Debtors knew about the tax charges and Mr. Svonavec's plea throughout their

diligence prior to acquiring the interests, and despite the fact neither Mrs. Svonavec nor HHC were charged with any crime;

- That confidential information will only be provided to the HHC Parties on a "professionals eyes only basis to a financial advisory or investment banking firm that the Debtors, after consultation with the Creditors Committee and Bedrock, believe are legitimate"; the HHC Parties as former owners and operators of the Debtors' business have an industry expertise and do not intend to utilize a financial advisor or investment banker in connection with this sale process, and, in any event, would need to evaluate the information obtained themselves in making a determination whether and how much to bid; and

- That the NDA will include a liquidated damages clause providing for $500,000 in damages for each violation of the NDA, which is an extraordinarily punitive provision and leads the HHC Parties to wonder what information is available in the data room that would cause any damage, let alone $500,000 in damage to the Debtors, for an alleged violation of the NDA; and

- That the Debtors will require a deposit of $500,000 to be held in escrow by Ballard Spahr LLP[2] before access is granted to confidential information, which is also punitive and an attempt to prevent the HHC Parties from bidding.

3. The Debtors' failure to provide the HHC Parties with access to the data room except on the extraordinarily punitive terms also raise concerns about the manner in which the sale process is being conducted. The HHC Parties by this Motion merely seek to engage in the sale process on

---

[2] Ballard Spahr LLP has a long standing firm policy against serving as an escrow agent.

3

the same terms and with the same access as other bidders. Allowing the HHC Parties such access will benefit the estates and is required in order for the estates to maximize value through the sale process.

## JURISDICTION & VENUE

4. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

5. Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 & 1409.

6. Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the HHC Parties consent to the entry of final orders or judgments by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## BACKGROUND

A. **The Svonavecs and Their Successful Operation of HCNR**

7. HCNR was founded in 2008 by Mrs. Svonavec, and through its responsible operation of multiple surface mining sites throughout Pennsylvania and Maryland established a legacy of mining excellence.

8. For over fifteen (15) years—while run by the Svonavecs—HCNR profitably produced both metallurgical and thermal coal, which is relied on by the steel and energy industries. During this time, HCNR also remained committed to the quality of its coal, the safety of its employees and surrounding communities, and environmental stewardship. HCNR's reclamation

efforts received awards, as HCNR and its leadership were committed to restoring its mined lands in Pennsylvania and Maryland.

9. In February 2024, after having responsibly and profitably run HCNR for sixteen (16) years, Angela Svonavec sold her outstanding membership interests to KTRV, which interest were held by HHC.[3] Negotiations over the sale proceeded over a period of approximately one year preceding the February 2024 closing.

10. Prior to this time, on January 18, 2024, Mr. Svonavec plead guilty in United States District Court for the Western District of Pennsylvania for two counts based on charges of tax evasion and filing a false income tax return.

11. Prior to and at all times during the transaction between KTRV and the HHC Parties for the purchase of the membership interests in HCNR, ***KTRV knew that Mr. Svonavec had been charged (and, ultimately, in January 2024) plead guilty to these charges***.

12. The maximum sentence for these charges was 14 months in prison, a fine of $500,000 or both. On August 14, 2025, Mr. Svonavec was sentenced to serve one year and one day in prison, followed by a year of supervised release, and to pay a fine of $40,000 and restitution of $207,378 to the Internal Revenue Service. Due to good behavior, Mr. Svonavec has already

---

[3] Additional background regarding the history between the HHC Parties, the Debtors, and Bedrock Industries Investco 1 LLC ("Bedrock") is provided in the *Objection of Angela Svonavec, Jason Svonavec, and Heritage Holding Co., LLC to the Motion of the Debtors and Debtors-In-Possession for Order Pursuant to 11 U.S.C. §§ 105(A) and 363 and Fed. R. Bankr. P. 9019(B) Authorizing and Approving a Global Settlement with Bedrock Industries Investco 1 LLC With Respect to the Strict Foreclosure and Foreclosed Equipment* [D.I. 86, 100] (the "Settlement Motion Objection") filed in response to the *Motion of the Debtors and Debtors-in-Possession for Order Pursuant to 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 9019(b) Authorizing and Approving a Global Settlement with Bedrock Industries Investco 1 LLC with Respect to the Strict Foreclosure and Foreclosed Equipment* [D.I. 26] (the "Settlement Motion") and *Objection of Angela Svonavec, Jason Svonavec, and Heritage Holding Co., LLC to Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors and Debtors In Possession to (A) Use Cash Collateral and (B) Grant Adequate Protection to the Prepetition Lender; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* [D.I. 87, 101] (the "Cash Collateral Objection"). The factual background and the arguments raised in the Settlement Motion Objection and the Cash Collateral Objection are adopted as if set forth herein. Capitalized terms used but not otherwise defined herein, shall have the meaning given to them in the Settlement Motion Objection.

been released from prison and is currently under supervised release. Mr. Svonavec has also paid the restitution, fines, penalties, and interest.

### B. Protection of Collateral

13. Following the failure of HCNR to make payments owed to the HHC Parties pursuant to the purchase of the membership interests and due to concerns that KTRV may be disposing of or planning to dispose equipment that served as the HHC Parties' collateral (the "Equipment"), HHC initially demanded adequate assurance from KTRV that it was not planning to dispose of the Equipment or that KTRV was planning to satisfy its payment obligations to HHC in connection with the disposition of the Equipment. After failing to receive payments owed by KTRV pursuant to the purchase of the HHC Parties' membership interests, and after KTRV entered into the Forbearance Agreement, which inured to the benefit of Bedrock and compromised the Equipment—to protect its interest in the Equipment, HHC through its agents exercised its remedies under 13 Pa.C.S. § 9-609 and repossessed the by disabling the equipment rather than physically removing the Equipment from its location due to the size of the Equipment.

### C. The Bankruptcy

14. On March 31, 2025 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), which cases were jointly administered for procedural purposes only (these "Chapter 11 Cases").

15. On the Petition Date, the Debtors also filed *Debtors' Motion for Order to Show Cause Against Heritage Holding Co., LLC and Angela Svonavec* [D.I. 20] (the "Show Cause Motion") pursuant to which the Debtors requested an order requiring HHC and Mrs. Svonavec to "appear before the Court and demonstrate cause why they should not be sanctioned and held in civil contempt for their continued possession of property of the Debtors' estates."

16. After the Petition Date, the HHC Parties returned the electronic control modules to the Debtors and, on April 3, 2025, the Debtors withdrew the Show Cause Motion as to the HHC Parties and acknowledged that the HHC Parties had returned the electronic control modules and that the equipment from which the modules had been removed was operational.

**D.    Data Room Access**

17. On April 18, 2025, counsel to the HHC Parties sent an e-mail to Debtors' counsel (the "**NDA Request**"), a true and correct copy of which is attached here as **Exhibit B**, which requested a copy of the nondisclosure agreement ("NDA") that would need to be signed to gain access to the Debtors' data room in connection with the sale process.

18. On April 19, 2025, Debtors' counsel responded to the NDA Request (the "April 19 Response"), stating –

> I have conferred with my client, and while the Debtors - on their own behalf and for the benefit of their estates and creditors - recognize their duty to maximize the value of the estates, ***the Debtors are not willing to provide your clients access to the Debtors' data room, even under an executed form of nondisclosure agreement (NDA).*** First and foremost, your client should not need any information from the dataroom as it sold the operating assets to KTRV less than 15 months ago. Second, the Debtors do not believe that your clients will abide by any terms of a confidentiality agreement; as you are well aware, Jason Svonavec has been convicted of crimes of dishonesty and has not yet finished completing his sentence for those crimes. Further, the Debtors have no confidence that any information shared with Angela Svonavec will not be shared with her husband, particularly in light of the fact that Ms. Svonavec authorized and directed agents to break into the Debtors' facilities and vandalize the Debtors' equipment. ***In short, the Debtors have no reason to believe that the Svonavecs need information or that their possession of any equipment that they receive will not be done for nefarious purposes.***

> That having been said, in an effort to accommodate your clients' request, the ***Debtors will, after an execution of an NDA, provide access on a professionals' eyes only basis to an financial advisory or investment banking firm that the Debtors, after consultation with the Creditors Committee and Bedrock, believe are legitimate***. Such NDA will include a liquidated damages clause, specifically liquidating damages in the amount of $500,000 for each violation of the NDA. Further, prior to access being granted, ***the Debtors will require a deposit of $500,000***, to be held in escrow in an interest bearing account by Ballard Spahr. Finally, any NDA executed on behalf of your clients must be approved by the Bankruptcy Court prior to the Svonavecs' investment banker being granted access.

*See* April 19 Response, true and correct copy of which is attached hereto as **Exhibit C** (emphasis added).

19. On April 22, 2025, HHC Parties' counsel responded that the position taken by the Debtors created insurmountable and arbitrary obstacles to the HHC Parties participation in the sale process and asked that Debtors' counsel reconsider their position.

20. On April 23, 2025, Debtors' counsel responded that the conditions that they proposed "were narrowly tailored to address the concerns of the Debtors, the Committee, and Bedrock with respect to potential harm that may be caused by [the HHC parties] being given access to confidential proprietary information." *See* Exhibit C. Furthermore, the Debtors stated that the HHC Parties "are not being treated like any other bidder because they are not 'like any other bidder'. . . ."

21. That same day, counsel to the HHC Parties responded further explaining that the conditions imposed by the Debtors' were unacceptable and advising that this Motion would be filed.

**RELIEF REQUESTED**

22. The HHC Parties respectfully request that the Court enter an order compelling the Debtors to provide the HHC Parties with access to the data room established and maintained by the Debtors in connection with their sale and marketing process contemplated under the Bid Procedures Motion and to provide the HHC Parties with other information or access to the assets contemplated for sale provided to potential bidders pursuant to the Bid Procedures Motion.

**ARGUMENT IN SUPPORT OF RELIEF REQUESTED**

23. As "[m]any courts have recognized [] debtors 'in conducting the sale process, have a fiduciary duty to maximize the value of their estates.'" *In re Parkcliffe Dev.*, Case No. 24-30814, 2025 Bankr. LEXIS 171, at *19 (Bankr. N.D. Ohio Jan. 28, 2025) (collecting cases); *Pacificorp Ky. Energy Corp. v. Big Rivers Elec. Corp. (In re Big Rivers Elec. Corp.)*, 233 B.R. 739, 752 ("'[W]hen a debtor desires to sell an asset, its main responsibility, and the primary concern of the bankruptcy court, is the maximization of the value of the asset sold.' This duty to maximize the estate often trumps other duties the debtor may owe to individual creditors or third parties.") (citations omitted).

24. The Debtors in their Bid Procedures Motion appear to facially acknowledge this principle, as under the Debtors' Bid Procedures Motion, the Debtors request this Court's approval to "establish an open process for solicitation, receipt, and evaluation of bids in a fair, accessible, and expeditions manner." *See* Bid Procedures Motion, ¶ 16. Furthermore, the Debtors explain that the procedures proposed "recognize the Debtors' fiduciary obligations to maximize value and preserve the Debtors' right to modify the Bidding Procedures in accordance with their terms as necessary or appropriate to maximize value for the Debtors' estate."

25. The HHC Parties—given their history of success in the coal industry, and specifically with operating HCNR—are an obvious potential bidder that could provide value to

the estates through the Sale Process. However, rather than providing the HHC Parties access to the data room and despite efforts by counsel to work through this issue, the Debtors have stridently refused to provide the HHC Parties with data room access and have instead cast aspersions on the Svonavecs' character.

26. Without complete access to the information in the Debtor's data room, and any other information supplied to prospective bidders, the HHC Parties will be unfairly disadvantaged in comparison to other prospective bidders and will not be able to make an informed judgment whether to submit an offer to purchase some or all of the Debtors' assets.

27. Inherent in a fair and open auction and sale process is the provision of access to the same information to all prospective bidders. *See In re Dial-A-Mattress Operating Corp.*, 2009 WL 1851059, at *8 (Bankr. E.D.N.Y. June 24, 2009) ("The debtors have shown that they conducted an open and fair auction process. The debtors established a Virtual Data Room so that all potential bidders would have access to the same information."); *In re Summit Global Logistics, Inc.,* 2008 WL 819934, at *12 (Bankr. D.N.J. Mar. 26, 2008) (noting that data room access was provided to all bidders).

28. The Debtors have withheld substantial and critical information from the HHC Parties under the guise that disclosure of such information to the HHC Parties will be used to harm the Debtors.

29. First, the Debtors' assertion that information that the HHC Parties may have from February 2024—prior to the sale of their membership interests—regarding the Debtors' assets and financial performance is sufficient diligence for the sale of the Debtors' business over a year later is untenable. The Debtors have managed the assets at issue for nearly 15 months, and it is critical for any bidder in the sale process to understand the Debtors' assets before bidding on them.

Suggesting that the HHC Parties do not need any diligence on the assets does not comport with the Debtors' obligation to maximize the value to the estates.

30. Second, the Debtors have continued to belabor Mr. Svonavec's tax evasion plea and have used that to characterize the HHC Parties as dishonest criminals. Mr. Svoanvec's plea was known to KTRV before the parties entered into the membership purchase agreement, and yet KTRV chose to enter into such an agreement and to negotiate and do business with the Svonavecs. Now, the Debtors' vitriol has extended to Mrs. Svonavec, who the Debtors suggest would not abide by an NDA without any reason other than her marriage to Mr. Svonavec.

31. However, the Debtors have not been able to substantiate these aspersions and have not provided an example of a single instance where the HHC Parties have breached an obligation for confidentiality or nondisclosure. To the contrary, the HHC Parties have not previously breached a confidentiality or nondisclosure obligation, and are willing to review the form NDA that is being provided to other bidders in this sale process. Upon signing the NDA, the HHC Parties would be bound by such agreement.

32. Third, the Debtors request for an escrow of $500,000 for liquidated damages under the punitive NDA proposed for the HHC Parties because they are "not like other bidders" is meant to bar the HHC Parties from participating in the sale. This amount is five times more than the overbid amounts at auction and is the same amount that the Debtors paid to Bedrock as part of a fraudulent transfer for only days of forbearance. Furthermore, notably, the Debtors have not provided any substantiated or specific harms that would befall the Debtors if the information were shared with the HHC Parties—subject to a routine NDA, without the onerous requirements described by the Debtors.

33. Finally, the Debtors are only willing to provide information to the HHC Parties' professionals. This requirement precludes the HHC Parties from making informed decisions about bidding as it is the HHC Parties, not their professionals that must make decisions. Moreover, the HHC Parties have not retained an investment banker and do not intend to retain one

34. The Debtors—in ongoing cooperation with Bedrock—are operating with the clear intent to chill and exclude the HHC Parties from participation in the sale process and are attempting to use the imposition of arbitrary, onerous, and punitive requirements for the HHC Parties to simply gain access to the data room is improper and without any valid basis.

35. As a result, this Court should compel the Debtors to permit the HHC Parties to have access to the sale data room upon signing an NDA agreement on the same terms as every other potential bidder is being permitted to have access.

## **NO PRIOR REQUEST**

36. No prior request for the relief sought in this Motion has been made to this or any other Court.

## **NOTICE**

37. Notice of this Motion is being provided to: (i) counsel for the Debtors, (ii) counsel for the Official Committee of Unsecured Creditors, (iii) the Office of The United States Trustee, and (iv) electronically via CM/ECF on all parties that have filed a request for service of notices in this case. In light of the relief requested, the HHC Parties submit that no other or further notice is required.

**WHEREFORE**, the HHC Parties respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit A, compelling the Debtors to provide the HHC Parties with access to the data room established and maintained by the Debtors in connection with

their sale and marketing process contemplated under the Bid Procedures Motion and to provide the HHC Parties with other information or access to the assets contemplated for sale provided to potential bidders pursuant to the Bid Procedures Motion, and grant such other and further relief as this Court deems just and proper.

| | |
|---|---|
| Dated: April 29, 2025<br>Wilmington, Delaware | */s/ Matthew G. Summers*<br>Matthew G. Summers (No. 5533)<br>Margaret A. Vesper (No. 6995)<br>Erin L. Williamson (No. 7286)<br>BALLARD SPAHR LLP<br>919 N. Market Street, 11th Floor<br>Wilmington, Delaware 19801-3034<br>Telephone: (302) 252-4428<br>Facsimile: (302) 252-4466<br>Email: summersm@ballardspahr.com<br>　　　　vesperm@ballardspahr.com<br>　　　　williamsone@ballardspahr.com<br><br>-and-<br><br>Mark G. Claypool<br>Bryan G. Baumann<br>KNOX MCLAUGHLIN GORNALL & SENNETT, P.C.<br>120 West Tenth Street<br>Erie, PA 16501<br>Telephone: (814) 459-2800<br>Facsimile: (814) 453-4530<br>Email: mclaypool@kmgslaw.com<br>　　　　bbaumann@kmgslaw.com<br><br>*Counsel for Angela Svonavec, Jason Svonavec, and Heritage Holding Co.* |