## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| KTRV, LLC, *et al.*, | Case No. 25-10601 (MFW) |
| Debtors[1]. | (Jointly Administered) |
| | **Re: Docket Nos. 26, 68, 83, 86 & 170** |

### BEDROCK INDUSTRIES INVESTCO 1 LLC'S STATEMENT IN SUPPORT OF AND REPLY TO OBJECTIONS TO MOTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION FOR ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 363 AND FED. R. BANKR. P. 9019(B) AUTHORIZING AND APPROVING A GLOBAL SETTLEMENT WITH BEDROCK INDUSTRIES INVESTCO 1 LLC WITH RESPECT TO THE STRICT FORECLOSURE AND FORECLOSED EQUIPMENT

Bedrock Industries Investco 1 LLC ("Bedrock"), by and through its undersigned counsel, hereby submits this statement in support of, and omnibus reply to objections to, the *Motion of the Debtors and Debtors-in-Possession for Order Pursuant to 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 9019(b) Authorizing and Approving a Global Settlement with Bedrock Industries Investco 1 LLC with Respect to the Strict Foreclosure and Foreclosed Equipment* [Docket No. 26] (the "Settlement Motion").[2]  In support hereof, Bedrock states as follows:

### PRELIMINARY STATEMENT

1.      The Debtors, with Bedrock's support, believe that engaging in an orderly sale process of Foreclosed Equipment under the aegis of the Bankruptcy Court, and without the cloud of the state court litigations and uncertainty, will enable an actual auction process to occur and maximize the value obtained for the Foreclosed Equipment.  Creating a framework and platform

---

[1]     The Debtors in these chapter 11 cases, along with each the last four digits of each Debtor's tax identification number, are as follows: KTRV LLC (9993), Heritage Coal & Natural Resources, LLC (8326). The Debtors' service address is 1521 Concord Pike Suite 201, Wilmington, DE 19803.

[2]     Capitalized terms used but not defined in this Order shall have the same meanings ascribed to such terms in the Settlement Motion.

to dispose of the Foreclosed Equipment could result in residual value for the Heritage estate after satisfying secured creditors' interests and help resolve the Debtors' ongoing liquidity challenges so these cases can move towards a successful result for the stakeholders.

2.     To make this outcome possible, the Debtors seek approval of the global settlement set forth in the Settlement Motion (the "Settlement Agreement").  The Settlement Agreement has four core elements.  First, title to the Foreclosed Equipment will revest to the Debtors after the Strict Foreclosure is vacated and set aside.  Second, the Debtors and their secured parties, including Bedrock, will be restored to their positions as though the Strict Foreclosure did not occur.  Third, the Debtors and their estates shall be deemed to release and discharge Bedrock from any and all claims and causes of action, permanently resolving any disputes and issues between the Debtors and their estates and Bedrock as to Bedrock's security interests in and valid, perfected and enforceable security interests in the Foreclosed Equipment.  Fourth, the claims of the Debtors and their bankruptcy estates against Heritage Holding or the Svonavecs are preserved for the benefit of the estates.  In short, the Debtors get the Foreclosed Equipment back, and in exchange, Bedrock's valid, perfected and enforceable security interests in such equipment would not be subject to challenge and litigation.

3.     Each element of the Settlement Agreement is interdependent, and the result of weeks of contentious, protracted and arms-length negotiations between the Debtors (through an independent CRO) and Bedrock.  These terms were reached after the Debtors attempted unsuccessfully to sell the Debtors' business operations and assets prepetition and Bedrock attempted to sell the Foreclosed Equipment, while litigation in multiple jurisdictions hung a cloud of uncertainty over the Foreclosed Equipment and assets of the Debtors, and after the Debtors and Bedrock explored the available strategic options.

4.      The Settlement Agreement enables a value-maximizing sale of the Foreclosed Equipment and provides the Debtors flexibility to obtain vital post-petition financing (from either Bedrock or another third party who has expressed interest) and sell their mining operations with the necessary Equipment to run those operations.  It resolves two pending state court cases, the claims that could be asserted in those cases, and Debtor and estate claims articulated in the state court proceedings that could be brought before the Bankruptcy Court—all without elevating Bedrock's rights over any other party.  Those estate claims essentially sought to undo the Strict Foreclosure and return the Foreclosed Equipment to the Debtors.  The Settlement Agreement accomplishes that result.

5.      Heritage Holding Co., LLC, Angela Svonavec and Jason Svonavec (collectively the "Heritage Holding Parties")[3], who owned HCNR prior to KTRV's acquisition, the United States Trustee (the "U.S. Trustee")[4], and the Official Committee of Unsecured Creditors (the "Committee,"[5] and with the Heritage Holding Parties, the U.S. Trustee and Robindale,[6] the "Objecting Parties"), object to approval of the Settlement Agreement.  Among other reasons, the Objecting Parties complain that the familial relationships between the owners and management

---

[3]     *See Objection of Angela Svonavec, Jason Svonavec, and Heritage Holding Co., LLC to the Motion of the Debtors and Debtors-in-Possession for Order Pursuant to 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 9019(b) Authorizing and Approving a Global Settlement with Bedrock Industries Investco 1 LLC with Respect to the Strict Foreclosure and Foreclosed Equipment* [Docket No. 86] (the "Heritage Holding Parties Objection").

[4]     *See United States Trustee's Objection to Motion of the Debtors and Debtors-in-Possession for Order Pursuant to 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 9019(b) Authorizing and Approving a Global Settlement with Bedrock Industries Investco 1 LLC with Respect to the Strict Foreclosure and Foreclosed Equipment* [Docket No. 83] (the "U.S. Trustee Objection").

[5]     *See Preliminary Objection of the Official Committee of Unsecured Creditors to Motion of the Debtors and Debtors-in-Possession for Order Pursuant to 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 9019(b) Authorizing and Approving a Global Settlement with Bedrock Industries Investco 1 LLC with Respect to the Strict Foreclosure and Foreclosed Equipment* [Docket No. 170] (the "Committee Objection").

[6]     Robindale Coal Sales, LLC and Robindale Export, LLC (collectively, "Robindale") also filed an objection and reservation of rights [Docket No. 68] that raises the same concerns as the Heritage Holding Parties Objection and the U.S. Trustee Objection.

of Bedrock and the Debtors render the Settlement Agreement unfair and unreasonable, and that the Debtors are forfeiting prepetition lien challenge rights without sufficient analysis of possible claims.

6.      The objections are to no avail.  First, the family relations between Bedrock and the Debtors have been known and disclosed.  The Debtors appointed an independent chief restructuring officer (the "CRO") with full, exclusive authority to consider and approve or disapprove a transaction with Bedrock.  The Settlement Agreement is the result of negotiations between Bedrock and the CRO and the Debtors' independent advisors.  The Objecting Parties provide no reason to question the CRO's judgment.  Simply repeating over again the familial relationship, is not a basis to deny the relief requested.

7.      Second, these objections do not dispute that the Settlement Agreement will benefit the Debtors' estates and creditors generally.  It is unimaginable that the Objecting Parties, who include the former owner of debtor HCNR and a potential source of DIP financing and a stalking horse bid, believe that the process sought by the Debtors, that will maximize asset values and possibly create residual value for the Debtors' estates, is a bad thing, even if Bedrock's claims and security interests are permanently allowed.  The record is clear that the Bedrock releases are exchanged for resolution of ongoing, contentious litigation and revesting of key assets to the Debtors.  The speculative potential claims that the Objecting Parties assert either have no basis in fact, or specifically fit into the Debtors' assertions, as laid out in the Settlement Motion, that such claims would be exceedingly difficult to succeed upon in the context of protracted, extensive litigation between Bedrock and the Debtors.

8.      Third, the Settlement Motion has been on file for 28 days and will have been on file for 34 days by the time of the hearing.  Parties have had ample opportunity to review the

prepetition loan documents to determine if there are any infirmities with Bedrock's security interests in and liens on the Foreclosed Equipment that the Settlement Agreement ratifies. Such a review is not complex. To date, no party has identified or raised an issue. These Chapter 11 Cases cannot afford litigation and delays.

9.      For the Debtors, obtaining the Foreclosed Equipment has numerous other benefits. Without the Foreclosed Equipment, the Debtors will likely be unable to access necessary financing, the sale of the Debtors' mining operations will be prevented or at best impeded—the Debtors' retention of Ritchie Bros. Auctioneers, Inc. to run an auction process for the Debtors' assets is conditioned upon approval of the Settlement Agreement—and the value of those assets diminished, and the Foreclosed Equipment will continue to be held hostage to the pending litigation, putting at risk possible residual value for the Debtors' estates.

10.     Bedrock's professionals have engaged with the Committee's and other stakeholders' professionals extensively, in attempt to reach consensus over the Settlement Agreement. Bedrock has also engaged with the Debtors to attempt to resolve the pending objections. Bedrock has repeatedly requested potential alternative paths from all of the parties. No party has suggested any alternatives to even consider. The reason is because the Settlement Agreement as proposed has undisputed, numerous benefits for the estates, including returning the Foreclosed Equipment without costly litigation. The cost is that Bedrock has requested that it will have certainty over the validity of the liens in that Foreclosed Equipment and certain releases related only to that Foreclosed Equipment. The Debtors carefully considered the cost and delay of prosecuting any such claims being advocated by the other stakeholders, the negative impact of such a path on these proceedings, and the attendant risks associated with a litigation approach.

11.     The Debtors, Bedrock and their respective professionals have been working hard to address many of the issues and comments raised by the Objecting Parties.  It is Bedrock's understanding that the Debtors will shortly file a revised Settlement Agreement and settlement approval order.  One of the major revisions to the Settlement Agreement and settlement approval order is to make clear that the debtor and estate releases are narrowly tailored by relating to the Foreclosed Equipment, Strict Foreclosure, and related matters and dealings, and that the permanent allowance of Bedrock's claim and security interest is tied to the Foreclosed Collateral.

12.     The Court should therefore overrule all objections to and approve the Settlement Motion.

## BACKGROUND

### I.    Bedrock's Prepetition Loans to the Debtors.

13.     Bedrock is a senior lender of the Debtors with valid, perfected security interests on the Foreclosed Equipment.  On February 2, 2024, Bedrock extended $10 million in bridge financing to KTRV pursuant to a promissory note executed by KTRV (the "Bridge Note").  KTRV used the bridge financing to purchase all of the membership interests in HCNR from Heritage Holding.  Debtor HCNR guaranteed the Bridge Note by signing a guaranty and granted Bedrock a security interest in substantially all of HCNR's personal property assets via security agreement (the "Security Agreement").  In connection with this transaction, KTRV executed with Heritage Holding an earn-out agreement dated February 5, 2024 (the "Earn-Out Agreement"), providing for certain payments based on HCNR's gross profits and reimbursement of certain tax liabilities.

14.     On June 27, 2024, pursuant to an Amended and Restated Loan Agreement (the "Amended Loan Agreement" and with the Bridge Note, the Security Agreement and the Earn-Out Agreement, the "Loan Documents"), Bedrock and the Debtors agreed to recast and convert

the Bridge Note to permanent and working capital financing, with a total revolving credit commitment of $20 million, from which KTRV and HCNR drew $15 million after June 27, 2024. Bedrock perfected its security interest in the Foreclosed Equipment and other collateral provided by KTRV and HCNR by contemporaneously filing two UCC-1 financing statements: one in Delaware against KTRV, and another in Pennsylvania against HCNR.

## II.    **Default and Forbearance.**

15.    On January 20, 2025, Bedrock sent the Debtors a Notice of Events of Default and Acceleration (the "Notice of Default"), informing the Debtors that KTRV defaulted on the terms of the Amended Loan Agreement, the period to remedy the default had passed, and that Bedrock declared the entire outstanding principal balance of the Bridge Note and the Amended Loan Agreement immediately due and payable.

16.    On February 4, 2025 the Debtors and Bedrock entered into a forbearance agreement effective as of January 31, 2025 (the "Forbearance Agreement") that provided the Debtors with runway and time to implement certain transactions expected to provide value for the Debtors, and in exchange, the Debtors provided Bedrock a security interest on certain additional collateral. However, the Debtors were unable to meet their obligations under the Forbearance Agreement and defaulted.

17.    On or about February 12, 2025, Bedrock and HCNR entered into an agreement pursuant to UCC § 9-620 (the "Strict Foreclosure"), by and through which HCNR transferred to Bedrock the Foreclosed Equipment in satisfaction of $10 million of the obligations due to Bedrock. The Strict Foreclosure left KTRV and HCNR obligated to Bedrock under the Loan Agreement for at least $5,650,000 in principal (plus accrued and accruing but unpaid interest, costs and fees). Contemporaneously with the Strict Foreclosure, Bedrock entered into an agreement with HCNR

to lease the Foreclosed Equipment to HCNR, so that it could continue revenue-producing mining operations and maximize the value of HCNR's assets.

## STATEMENT IN SUPPORT OF SETTLEMENT AGREEMENT

**A.     The Settlement Agreement Represents an Integrated Deal to Facilitate These Chapter 11 Cases.**

18.     Each element of the Settlement Agreement is integral to the whole.  Each of the terms—the return of and revesting of title in the Foreclosed Equipment, the Bedrock Releases, and the retaining of claims and causes of action against the Heritage Holding Parties—were extensively negotiated between Bedrock's counsel and the Debtors' restructuring counsel and independent CRO.  The terms of the Settlement Agreement reflect the reality of the Debtors' situation.  Absent settlement, Bedrock retains title to the Foreclosed Equipment, which the Debtors need to maximize the value of their assets.  And the Debtors (and Bedrock) remain party to litigation, including the New York Litigation and the Somerset Litigation, against the Heritage Holding Parties, who claim security interests in the Debtors' assets and who have used extralegal methods to disrupt the Debtors' operations.  *See* First Day Declaration ¶¶ 20-27.

19.     The deal proposed by the Settlement Agreement is the only offer on the table that will allow the Debtors to sustain these Chapter 11 Cases.  Prepetition, the Debtors attempted to sell their business operations, Equipment, and other assets, but due to the actions of the Heritage Holding Parties, and the litigation casting doubt over the Debtors' assets, the Debtors were unable to consummate any sales, other than a disposition of some of the Maryland assets to a third party.  Similarly, the Foreclosed Equipment was being held hostage to the state court litigations, and disposition was not possible.  A consequence of the inability to dispose of the Foreclosed Equipment was that it was diminished in value by weather, the elements, vandalism and theft, including by agents of the Svonavecs breaking in, damaging and stealing various parts of the

Foreclosed Equipment, rendering much of the Foreclosed Equipment unusable. The Debtors retained the CRO and spent weeks negotiating and evaluating alternatives with Bedrock before reaching the terms of the Settlement Agreement.

20.     Return of the Foreclosed Equipment pursuant to the Settlement Agreement is necessary for the Debtors to maximize the value of their assets in these Chapter 11 Cases. The Debtors' Equipment, including the Foreclosed Equipment, is specialized and integral to the operation of the Debtors' mining assets. The mining assets cannot be operated without this Equipment, and therefore the mining assets are less valuable, and will yield less recovery for the Debtors' estates if and when sold, if not sold along with the requisite Equipment. The return of the Equipment will also obviate any future accruals of rent obligations to Bedrock. However, the Debtors are not able to sell the Foreclosed Equipment while the ownership of and title to it remains in limbo. The Settlement Agreement solves this problem.

21.     The Settlement Agreement also provides the best and possibly only means for the Debtors to obtain access to mission-critical debtor-in-possession financing, whether by Bedrock or by a third party. The Debtors have been unable to access debtor-in-possession financing due to an insufficient asset base, the pending litigation and a speculative litigation claim to the Foreclosed Equipment. A proposed non-Bedrock lender was also considered by the Debtors, and that proposed lender not only requested a priming loan but also a security interest in the Foreclosed Equipment, which would require revesting the Foreclosed Equipment to the Debtors. By returning and revesting title to the Foreclosed Equipment to the Debtors, the Debtors will have access to a greatly expanded pool of assets that can be used to secure such financing.

**B.**     **The Settlement Agreement is Fair, Reasonable, and in the Best Interest of the Debtors' Estate.**

22.     The Court has the discretion to approve settlements under Bankruptcy Rule 9019. *Key3Media Grp. v. Pulver.com, Inc. (In re Key3Media Grp., Inc.)*, 336 B.R. 87, 92 (Bankr. D. Del. 2005). The court must decide whether the settlement is "fair, reasonable, and in the best interest of the estate." *In re TSIC, Inc.*, 393 B.R. 71, 78 (Bankr. D. Del. 2008), (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)). The Third Circuit has identified four criteria to consider in this analysis: (1) the probability of success in litigation; (2) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; (3) the likely difficulties in collecting on any judgment; and (4) the paramount interest of creditors. *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). Courts may also consider other factors, including the competency and experience of counsel who support the settlement; the nature and breadth of releases for the parties to the settlement; and the extent to which settlement is the product of arm's length bargaining. *Stanziale v. Ironridge Glob. IV, Ltd. (In re ScripsAmerica, Inc.)*, 634 B.R. 863, 874 (Bankr. D. Del. 2021).

23.     The Court does not need to find that the proposed settlement is the best possible compromise, only that the settlement "falls within the reasonable range of litigation possibilities somewhere above the lowest point in the range of reasonableness." *In re Nortel Networks, Inc.*, 522 B.R. 491, 510 (Bankr. D. Del. 2014) (quoting *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 833 (Bankr. D. Del. 2008)). The Court also does not need to conclusively determine the claims subject to the compromise; "[t]he court is not supposed to have a 'mini-trial' on the merits, but should 'canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness.'" *Key3Media Grp.*, 336 B.R. at 92 (internal citations omitted). While the court must give some deference to the views of parties-in-interest who object to the proposed settlement,

those views are not dispositive and "cannot be permitted to predominate over the best interests of the estate as a whole." *Nortel*, 522 B.R. at 513 (quoting *Key3Media Grp.*, 336 B.R. at 97). A settlement can be approved even over the objections of major creditors so long as the Debtors demonstrate that the balance of the *Martin* factors, including the paramount interests of creditors, weighs in favor of settlement. *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 519 (Bankr. D. Del 2010).

24.     The Settlement Agreement resolves two pending state court cases, claims that could be brought in those cases, and Debtor and estate claims that could be brought in these Chapter 11 Cases. In those proceedings, the Svonavecs asserted that the Strict Foreclosure was a fraudulent conveyance and the property should be returned to the estate. In essence, the Settlement Agreement provides the Debtors with the ultimate beneficial outcome of victory in the litigation—return of title to the Foreclosed Equipment—without the substantial time and expense necessary to litigate that uncertain outcome.

25.     This outcome is undoubtedly in the paramount interest of all creditors of the Debtors. The Debtors do not have resources to litigate these pending disputes, nor the questionable, hypothetical claims the Objecting Parties raise. The Debtors, if they are able to sell their remaining assets at all, would be forced to sell them at diminished value, while the Foreclosed Equipment is held hostage by the pending litigation and possible residual value for the Debtors' estates is lost forever.

i.     <u>The Settlement Agreement is Fair and Reasonable Notwithstanding the Insider Relationships</u>.

26.     The Objecting Parties place considerable weight on the interfamilial relationships between the Debtors and Bedrock as grounds for rejecting the Settlement Agreement. In particular, the Objecting Parties focus on the relationship between Alan Kestenbaum, a principal of Bedrock,

and his son and son-in-law, respectively Jordan Kestenbaum and David Tradburks, who are the managers of the Debtors.

27.     Firstly, neither Bedrock nor the Debtors are keeping the family connections secret. KTRV's Voluntary Petition [Docket No. 1] clearly names ALK Holdings LLC, Deborah Kestenbaum, JGK Holdings LLC and Jordan Kestenbaum as its equity security holders.  Alan Kestenbaum is publicly represented as the founder of Bedrock,[7] and the First Day Declaration elaborates that "[o]ne of Bedrock's principals is the father and father-in-law of certain members and/or managers of KTRV."  *See* First Day Declaration at n. 3.

28.     Secondly, Bedrock does not disagree with the Objecting Parties that settlements with insiders should be subjected to a higher level of scrutiny than non-insider transactions. However, the involvement of insiders is but one factor to be weighed by the court to determine whether the proposed settlement is fair and reasonable and in the best interest of the Debtors' estates, and the facts associated with this proposed settlement meet that heightened scrutiny.  *See In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 498 (Bankr. S.D.N.Y. 1991) (court holds that "closer scrutiny of insider agreements should be added to the cook book list of factors that Courts use to determine whether a settlement is fair and reasonable."); *see also In re Exaeris Inc.,* 380 B.R. 741, 746-47 (Bankr. D. Del. 2008) ("What is clear is that a court can and should consider whether an insider is receiving a release when evaluating the 'good faith' criterion.").  Indeed, courts do approve settlements with insider involvement.  *See generally In re Drexel Burnham Lambert Grp.*, 134 B.R. 493 (settlement was fair and equitable, in debtors' best interest and those of its creditors', despite being settlement between debtor and insider).

---

[7]     *See* https://bi15.com/about.html ("We are privately funded by Alan Kestenbaum and have a network of funds and family offices that invest alongside Bedrock Industries.")

29.     Either way, the Settlement Agreement meets that higher level of scrutiny. The Debtors gave the CRO *exclusive* authority to consider and approve or disapprove any transaction between the Debtors and Bedrock.  *See* Voluntary Petition of HCNR [Case No. 25-10602, Docket No. 1]; Voluntary Petition of KTRV [Case No. 25-10601, Docket No. 1].  Despite the insinuations of the Objecting Parties,[8] the CRO independently negotiated the terms of the Settlement Agreement with Bedrock on behalf of the Debtors.  The Debtors and Bedrock each retained their own independent advisors to negotiate the terms of the Settlement Agreement with the CRO.  No party can point to any indication that the CRO was less than independent when negotiating the settlement with Bedrock, nor that the settlement was reached in less than good faith.[9]  *See In re Tribune Co.*, 464 B.R. 126, 156 (Bankr. D. Del. 2011), (citing *In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011)) ("The Court's focus, however, is not on the existence of connections, but on whether such connections rise to potential or actual conflicts.")

ii.     <u>The Settlement Agreement Reflects Sufficient Consideration of the Claims Being Settled</u>.

30.     The Objecting Parties argue further that the Settlement Agreement will "nullify" prepetition lien challenge periods under Local Rule 4001-2.  *See* U.S. Trustee Objection ¶¶ 56-61; *see also* Heritage Holding Objection ¶ 2.  The Objecting Parties also argue that the Settlement Agreement is not fair and reasonable because it fails to detail the investigation into and analysis of claims against Bedrock.  *See* Heritage Holding Objection ¶ 4.

---

[8]     *See, e.g.*, Heritage Holding Parties Objection at ¶ 18 (". . . given the degree of the undisclosed insider relationship that exists in the cases, Mr. Ryniker's recent involvement does not cleanse the Debtors of the insider relationships in connection with the Settlement Motion.")

[9]     The Heritage Holding Objection cites to *In re CS Mining, LLC*, 574 B.R. 259 (Bankr. D. Utah 2017) for the proposition that "a CRO's authority and skill becomes meaningless in a contentious bankruptcy case when the CRO's hands are tied by the Debtor."  However, that case involved an extensive record demonstrating that members of the debtor's board, who were selected by and represented one of the debtor's prepetition lenders, overrode the CRO's recommendations, imposed restrictions on the CRO's authority, and turned down alternative transactions in favor of a settlement benefitting that prepetition lender.  There are very few parallels between the facts in *CS Mining* and here, where the CRO was given complete authority to enter into the Settlement Agreement, and no alternate transactions were on the table.

31.     The Settlement Agreement and the attendant Motion seek to settle ripe and real disputes and pending litigation, and create a path to realize upon and dispose of the Foreclosed Equipment.  Neither seek to approve the use of cash collateral or postpetition financing.  Local Rule 4001-2 addresses cash collateral and financing orders and imposes a minimum 75-day challenge period requirement for such orders.  *See* Local Rule 4001-2(a)(i)(Q).  Local Rule 4001-2 is not implicated at all by the Settlement Agreement or the Motion.  It is not being waived or violated.

32.     The Settlement Agreement reflects a thorough analysis by the Debtors of potential claims against Bedrock, their likelihood of success on those claims, and the attendant risks.  The viability of the voidable transfer claims already asserted by the Heritage Holding Parties in the Somerset Litigation (and now reverted to the Debtors' estates) are questionable at best.  Specifically, the Heritage Holding Parties have initially alleged that the loans were made with an actual intent to defraud creditors of KTRV.  Such claims, like all other claims of fraud, must be pled to a clear and convincing standard, and the facts surrounding such loans clearly do not support such allegations.  And if not relying on fraud, any litigation would require the estate (through a chapter 7 trustee or other fiduciary) to challenge the Strict Foreclosure by a secured lender of a debtor in clear default, where the validity of the liens is not in dispute by the Debtors or any other party.  Moreover, there is evidence that the independent CRO considered various paths and alternatives, but it appears none of those were attractive, or even an option, without revesting the Foreclosed Equipment to the Debtors.  Such conclusion is validated by the fact that none of the Objecting Parties have formulated, put forth or disclosed a path for these cases in the event the Settlement Agreement is not approved.  There is evidence presented demonstrating the independent CRO's carefully balanced decision.

33.    Even if the Debtors' estates pursued constructive voidable transfer claims against Bedrock under Bankruptcy Code section 548 or applicable state laws, it is clear from the February 2024 and June 2024 transactions, that all involved parties, including the Heritage Holding Parties (who accepted an Earn-Out Agreement through which payment was largely dependent on the future profitability of KTRV), intended and expected the Debtors' businesses to survive and flourish.  Each of the transfers occurring between Bedrock and the Debtors, even if considered during the year prior to the Petition Date, have all been made either in the ordinary course of business (with respect to routine interest payments) or in connection with contemporaneous exchanges for value (with respect to the amended and restated increased loan, the grants of additional security, and the Strict Foreclosure).

34.    The additional potential claims that the Heritage Holding Parties argue may be viable against Bedrock would be both time- and resource-intensive for the Debtors' estates to prosecute, and fairly easy for Bedrock to defeat.  As referenced above, it is clear that Bedrock's principal motivation in making both the Bridge Note loan and the subsequent permanent financing loan to KTRV and HCNR was the profitability of those loans.  There was no identity of interests among the borrowers and Bedrock, nor was there any inequitable conduct.  Bedrock analyzed the Debtors' business plans and projections, along with an analysis of its own profits from making these loans, and the potential losses if it did not convert the Bridge Note in June 2024.  Much like any lender, Bedrock hoped and expected that its borrowers would succeed in order to preserve the likelihood that the loans would be paid promptly, without resorting to foreclosure and litigation. Even if one assumes that the Debtors and estates are giving up some claims with respect to the Foreclosed Collateral and Strict Foreclosure, that in and of itself is not sufficient to deny or defeat approval of the Settlement Agreement.  The record shows that the Debtors carefully considered

the cost and delay of prosecuting any such claims being advocated by the other stakeholders, the negative impact of such a path on these proceedings, and the attendant risks associated with a litigation approach.  The record in these Chapter 11 Cases shows that settlement is the best course, a course designed to maintain these proceedings and provide a platform for a possible successful case.

35.     At the time of hearing on Motion, the Debtors will have been in chapter 11 for 36 days, and the Committee will have been appointed for 20 days.  This Motion will have been pending for more than a month.  The Objecting Parties have had this pending time to review Bedrock's security interests in the Foreclosed Equipment, which are straightforward, valid, and perfected.  The Heritage Holding Parties in particular have had ample opportunity to review the full set of loan documents between Bedrock and the Debtors, and are unable to point to any irregularities, improprieties, or shortcomings in the borrower-lender relationship identified therein. The Debtors' Chapter 11 Cases cannot be held hostage by Objecting Parties so they can stretch out what should be a simple and quick analysis of potential claims against Bedrock.

36.     As should be resoundingly clear from the discussion above, the Settlement Agreement reflects a hard-fought, negotiated, and well-reasoned, good-faith resolution of the Debtors' claims, both pending and potential, against Bedrock, and vice-versa.  The Debtors have no funds to continue the ongoing New York and Somerset Litigations or to challenge the Strict Foreclosure, much less the hypothetical (and, in Bedrock's view, completely unfounded) causes of action laid out by the Heritage Holding Parties.  The Debtors face two options.  One, pursue the Settlement Agreement, which will resolve the disputes over the Foreclosed Equipment and provide the Debtors with a means to continue operations, obtain postpetition debtor-in-possession financing, and market and engage in value-maximizing sales of their assets—in other words, a

means to emerge from chapter 11.  Two, attempt to reclaim the Foreclosed Equipment, litigate the New York and Somerset Litigations, and supposedly *initiate new litigation against Bedrock* with cash about to run out, and a cloud continuing to hang over assets that the Debtors have been unable to sell to date.  The former option is clearly fair, reasonable, and in the best interests of the Debtors and their creditors as opposed to the latter.

## **RESERVATION OF RIGHTS**

37.     Bedrock expressly reserves all rights, claims, arguments, defenses, and remedies with respect to the objections of the Objecting Parties, the Settlement Motion and the Settlement Agreement, or any other issue in these Chapter 11 Cases; to supplement, modify, and amend this Statement; and to raise additional arguments in writing or orally at the hearing on the Settlement Motion.

[*Remainder of Page Intentionally Left Blank*]

## **CONCLUSION**

WHEREFORE, Bedrock respectfully requests that the Court enter an Order approving the

Settlement Agreement.

Dated: May 1, 2025
      Wilmington, Delaware

*/s/ Christopher M. Samis*

Christopher M. Samis (No. 4909)
Aaron H. Stulman (No. 5807)
Ethan H. Sulik (No. 7270)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: csamis@potteranderson.com
      astulman@potteranderson.com
      esulik@potteranderson.com

-and-

Andrew I. Silfen, Esq. (admitted *pro hac vice*)
Beth M. Brownstein, Esq. (admitted *pro hac vice*)
Patrick Feeney, Esq. (admitted *pro hac vice*)
Carolyn Indelicato, Esq. (admitted *pro hac vice*)
**ARENTFOX SCHIFF LLP**
1301 Avenue of the Americas, 42nd Floor
New York, New York 10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990
Email: andrew.silfen@afslaw.com
      beth.brownstein@afslaw.com
      patrick.feeney@afslaw.com
      carolyn.indelicato@afslaw.com

*Counsel for Bedrock Industries Investco 1 LLC*