**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>KTRV, LLC, *et al.*,<br><br>        Debtors[1]. | Chapter 11<br><br>Case No. 25-10601 (MFW)<br><br>(Jointly Administered) |

**DECLARATION OF BRIAN RYNIKER, CHIEF RESTRUCTURING OFFICER IN
SUPPORT OF THE DEBTORS MOTION FOR APPROVAL OF SETTLEMENT WITH
BEDROCK INDUSTRIES INVESTCO 1 LLC AND MOTION FOR APPROVAL OF
POSTPETITION FINANCING AND USE OF CASH COLLATERAL**

I, Brian Ryniker, being duly sworn, hereby state as follows:

1.      I am a founding member at RK Consultants LLC. Prior to forming RK Consultants, I provided bankruptcy consulting and forensic services with a top 10 accounting and advisory firm for more than 20 years,

2.      I am over 18 years of age. If called as a witness, I could and would competently testify with respect to the matters set forth in this declaration from my own personal knowledge or from knowledge gathered from others within the organization of the above-captioned debtors (the "Debtors") and the Debtors' advisors, my review of relevant documents, or my opinion based upon my experience concerning the Debtors' business and operations.[2]

3.      I hereby submit this declaration in support of the Debtors' motion for approval of the settlement (the "Proposed Settlement") with Bedrock Industries Investco 1 LLC ("Bedrock") and with respect to any motion for authority to obtain postpetition financing from Bedrock.

---

[1]      The Debtors in these chapter 11 cases, along with each the last four digits of each Debtor's tax identification number, are as follows: KTRV LLC (9993), Heritage Coal & Natural Resources, LLC (8326). The Debtors' service address is 1521 Concord Pike Suite 201, Wilmington, DE 19803.

[2]      The historical information contained in this Declaration is derived from information provided by the Debtors' management, board and/or advisors.

4.      On March 10, 2025, the Debtors retained RK to provide the Debtors with certain services in anticipation of and related to the filing of the Debtors' filing for Chapter 11 relief. Such services specifically included my agreement to act as the Debtors' appointed Chief Restructuring Officer.

5.      On March 14, 2025, the Board of Managers for each of the Debtors executed a written consent that provided that I was "authorized to make all decisions with respect to the Debtors' transactions in which the Managers have a personal interest." Further, on March 27, 2025, the Boards of Managers for each of the Debtors held a meeting after which the boards each executed written consents that, among other things, provided that "Mr. Ryniker shall remain the Authorized Person with exclusive authority to consider and approve or disapprove any transactions in which the Managers have a personal interest, including any transaction with Bedrock Industries Investco 1 LLC.. . . "

6.      Shortly after I was first retained by the Debtors, I learned that, on or about February 12, 2025, HCNR entered into an agreement with Bedrock (the "Strict Foreclosure") pursuant to UCC § 9-620, by and through which HCNR transferred to Bedrock title and ownership of the portion of equipment that served as Bedrock's collateral (the "Foreclosed Equipment")[3] in satisfaction of $10,000,000.00 of the obligations due to Bedrock. As a result, the remaining monetary obligations of the Debtors due to Bedrock under the loan documents are at least $5,650,000 in principle, plus all accrued and accruing but unpaid interest, costs, and fees.

7.      Further, HCNR agreed that, upon Bedrock's request, HCNR would execute and deliver any bill(s) of sale or other typical conveyancing documents to provide furthers assurances

---

[3] The two 100-ton haul trucks (i.e., "triple sevens") were not the subject of the Strict Foreclosure, and were therefore not included in "Foreclosed Equipment."

to Bedrock and any transferees of any Foreclosed Equipment from Bedrock, in form and substance reasonably acceptable to Bedrock. The Debtors further agreed to waive any rights they might otherwise have to redeem the Foreclosed Equipment and confirmed that Bedrock would continue to have the right to foreclose on any of the collateral that is not included in the Foreclosed Equipment and other rights granted to them.

8.      Substantially contemporaneously with the Strict Foreclosure, Bedrock and HCNR entered into an agreement (the "Equipment Lease Agreement") by and through which Bedrock agreed to lease the Foreclosed Equipment to HCNR through March 14, 2025, with an option to renew the lease for up to ten one-week increments for a fixed weekly rent of $105,000.[4]

9.      Almost immediately upon being retained as Chief Restructuring Officer, I also became aware of multiple pieces of litigation involving the Strict Foreclosure and Foreclosed Equipment, one of which was initiated in the Supreme Court of the State of New York by Bedrock against the former owner of HCNR, Heritage Holding Co. ("Heritage Holding"), Angela Svonavec, the owner of Heritage Holding Co., and her husband and former general manager of HCNR, Jason Svonavec (the "New York Action"). The Debtors were also included as defendants in the New York Action.

10.     The second action was commenced Heritage Holding against Bedrock in the Court of Common Pleas of Somerset County, PA (the "Somerset Action") in which Heritage Holding alleged that the Strict Foreclosure was a fraudulent conveyance under Pennsylvania law. Heritage Holding did not seek to avoid the Strict Foreclosure but sought a judgment for damages for, among other things, conversion and trespass of chattels. Further, Heritage Holding sought injunctive

---

[4]      On or prior to March 14, 2025, the Debtors and Bedrock agreed to extend the term of the Equipment Lease Agreement for an additional four week period at a reduced rate of $50,000 per week.

relief to enjoin Bedrock from disposing or otherwise using the Equipment until such time as the disputed foreclosure of the Equipment by Bedrock can be adequately litigated.

11.     After being retained as Chief Restructuring Officer, two of the immediate issues to be addressed were financing and the Foreclosed Equipment, some of which I understood had been disabled by at least two agents of Heritage Holding and Angela Svonavec. Based upon the Boards of Managers' written consents, I was vested with the authority to negotiate with Bedrock the terms of any settlement agreement with Bedrock and in connection with financing, including the use of cash collateral, whether through Bedrock or a third party.

12.     In order to address the issues with financing and the Foreclosed Equipment, I engaged directly and indirectly (i.e. through counsel) with Bedrock.  Specifically, I had a number of conferences with Guarav Mehta, the Managing Partner of Bedrock.  I also had a number of conferences and other communications with Bedrock's counsel.  Additionally, I had conversations with other third parties with respect to proposed financing.

13.     While David Tradburks, one of the managers of HCNR, was aware of, and in some instances, was in attendance during conversations with respect to the Proposed Settlement with Bedrock and financing from Bedrock, I understood at all times that I was the person vested with exclusive authority to make decisions with respect to Bedrock, and all of the Debtors' decisions with respect to the Proposed Settlement with Bedrock and financing with respect were my decisions.

14.     When negotiating and considering the Proposed Settlement, I considered a number of issues, including the value of the Foreclosed Equipment and the value of the estates' potential claims against Bedrock related to the Strict Foreclosure.  Specifically, the Debtors were aware of Bedrock's UCC filings dated June 27, 2024, in which they asserted a security interest in:

> All personal property of debtor, whether such property or debtor's right, title or interest therein or thereto is now owned or existing or hereafter acquired or arising, and wherever located, including, without limitation, all inventory, equipment, other goods, accounts (including, without limitation, accounts receivable), general intangibles (including, without limitation, patents, trademarks, copyrights and other intellectual property and goodwill), chattel paper (whether tangible or electronic), instruments (including, without limitation, promissory notes), as -extracted collateral, commercial tort claims, investment property (including, without limitation, securities, securities accounts, commodity contracts and commodity accounts), documents, deposit accounts, letter -of -credit rights and supporting obligations, and all proceeds of the foregoing.

I understood that, other than the security interests filed by certain equipment financers, the Bedrock security interests in the equipment are senior to any other security interest in the Foreclosed Equipment and other assets to be perfected under the Uniform Commercial Code. A copy of the search of the UCC filings through the Secretary of State for the Commonwealth of Pennsylvania, including the specific UCC Financing Statement filed by Bedrock is attached hereto as **Exhibit A**.

15.    Further, I was also aware of the terms of the forbearance, including the payment to Bedrock on account of the forbearance and the terms of the Strict Foreclosure. Although I had not yet been employed by the Debtors at the time of the forbearance or the Strict Foreclosure, based upon my review of the Debtors' records and having spoken with the parties, I understand that, at the time of the forbearance, the Debtors did not have sufficient liquidity to pay their obligations to Bedrock. Further, of the $1 million paid to Bedrock as part of the forbearance, $500,000 was applied to the Debtors' secured obligation to Bedrock.

16.    Additionally, at the time of the Strict Foreclosure, the Debtors were in default and Bedrock had the option to foreclose upon all of the Debtors' equipment and other assets. By and through the Strict Foreclosure, taken together with the Equipment Lease Agreement, HCNR was able to continue its ongoing revenue-producing mining operations and otherwise operate and maximize the value of the assets of HCNR. I understand that, at the same time, HCNR and

Bedrock conferred with a third-party professional auction company with experience selling equipment of this type, about selling the Foreclosed Equipment once the Equipment Lease Agreement terminated.

17.    Although there are familiar relationships between the principals of the Debtors and Bedrock, I have not seen any evidence that Bedrock exercised control over the Debtors beyond those of a contractual nature, or have caused the Debtors to suffer damages or have unfairly burdened them with loan obligations.

18.    While the Debtors and their bankruptcy estates may have claims against Bedrock, as related to the Strict Foreclosure, it is unclear whether such claims would be successful.  Further, the value of those claims would be reduced by the costs of litigation, which, considering the Debtors' finances, would likely need to be brought by contingency counsel.

19.    In addition to issue of the certainty and value of the claims, in considering the Proposed Settlement and financing, I considered the Debtors' finances.  Immediately prior to bankruptcy, the Debtors did not have adequate liquidity to fund their bankruptcy cases.  The Proposed Settlement was considered in tandem with the agreement negotiated between the Debtors and Bedrock for the continued use of cash collateral and additional financing from Bedrock sufficient to get through a sale process of substantially all of the Debtors' assets in an expedited but orderly liquidation designed to maximize the value of the Debtors' estate.  I have reviewed a valuation of the Debtors' equipment and based upon the ranges in values of the equipment, it appears that, after the payment of the secured claims of the equipment financers, the Debtors may have sufficient equity to pay Bedrock's claim in full.

20.    Ultimately, as part of my negotiations with respect to financing, Bedrock would not agree to the use of cash collateral or providing new financing unless the Debtors' agreed to the

Proposed Settlement, which, among other things, fixed Bedrock's security interest in the Foreclosed Equipment and waived certain claims related to the forbearance, Foreclosed Equipment, and Strict Foreclosure.

21.     I spoke with at least 5 other potential lenders with respect to postpetition financing sufficient to provide liquidity to get through the liquidation of the Debtors' assets, but no other lender offered economic terms significantly better than the terms provided by Bedrock, particularly when considering the Debtors' adequate protection obligations, including interest and legal fees, that would be due by Bedrock.  Further, those parties who expressed an interest in lending to the Debtors would not do so without a lien senior to Bedrock's liens on certain assets.  Bedrock would not agree to senior liens without a significant pay-down in the outstanding loan amount, which other potential lenders would not agree provide.

22.      Taken together, I believe as an exercise of my business judgment that the Proposed Settlement, together with the financing from Bedrock, is in the best interests of the Debtors, their estates, and their creditors.  While the Proposed Settlement does not allow the official committee of unsecured creditors or any other party, the opportunity to challenge certain liens and claims of Bedrock, it will provide financing necessary to provide the Debtors the best opportunity for the estates to liquidate their assets, including the Foreclosed Equipment, in an orderly manner.

23.     Absent approval of the settlement and proposed financing, the Debtors' bankruptcy cases would almost certainly be dismissed or converted to Chapter 7, at which point, the Foreclosed Equipment would not be returned to the estates for sale, and the Debtors' businesses could not be sold as a going concern.

24.     Based upon the foregoing and as an exercise of my business judgment, I believe that the Settlement Agreement, by itself but certainly when considered in tandem with the proposed financing, is in the best interest of the Debtors, their estates and the Debtors' creditors.

May 2, 2025                                      _/s/ Brian Ryniker_____
                                                Brian Ryniker
                                                Chief Restructuring Officer

        .