## **EXHIBIT 1**

**Revised Proposed Confirmation Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| KTRV LLC, *et al.*,[1] | Case No. 25-10601 (MFW) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket Nos. 493, 499, 535, 556, and 572** |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
(I) APPROVING DISCLOSURE STATEMENT ON A FINAL BASIS;
AND (II) CONFIRMING COMBINED DISCLOSURE STATEMENT AND
PLAN OF LIQUIDATION DATED SEPTEMBER 1, 2025**

The above-captioned debtors and debtors-in-possession (the "Debtors" or the "Plan Proponent") having filed the *Chapter 11 Combined Plan & Disclosure Statement Dated September 1, 2025* [Docket No. 493] (together with the Plan Supplement and all exhibits and any other modifications, amendments, or supplements thereto, the "Plan");[2] the Court having entered, on September 2, 2025, the *Order Granting the Debtors' Motion for an Order (I) Approving on an Interim Basis the Adequacy of Disclosures in the Combined Plan and Disclosure Statement, (II) Scheduling the Confirmation Hearing and Deadline for Filing Objections, (III) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Combined Plan and Disclosure Statement, (IV) Approving the Form of Ballot and Solicitation Package, and (V) Approving the Notice Provisions* [Docket No. 499] (the "Solicitation Procedures Order"), establishing, among other things, certain solicitation and voting tabulation procedures associated with the Plan; and the Court having conducted a hearing on October 15, 2025, to consider approval

---

[1]    The Debtors in these chapter 11 cases, along with each the last four digits of each Debtor's tax identification number, are as follows: KTRV LLC (9993), Heritage Coal & Natural Resources, LLC (8326). The Debtors' service address is 1521 Concord Pike, Suite 201, Wilmington, DE 19803.

[2]    Capitalized terms used but not defined herein shall have the same meanings given to them in the Plan.

of the Disclosure Statement on a final basis and confirmation of the Plan (the "Confirmation Hearing"); the Court having considered: (a) the witness testimony at the Confirmation Hearing, as well as the declarations included among the exhibits admitted into evidence at the Confirmation Hearing, including the (i) *Declaration of Brian Ryniker in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 15] (the "First Day Declaration"); (ii) *Declaration of Brian Ryniker in Support of Confirmation of the Combined Disclosure Statement and Chapter 11 Plan of Liquidation Dated September 1, 2025* [Docket No. 557] (the "Ryniker Confirmation Declaration,"), the *Declaration of Roland Davis in Support of Confirmation of the Combined Disclosure Statement and Chapter 11 Plan of Liquidation Dated September 1, 2025 Support of Confirmation of the Combined Disclosure Statement and Chapter 11 Plan of Liquidation Dated September 1, 2025* (the "Davis Declaration") [Docket No. 558]*;* and (vi) *Certification of Adam J. Fialkowski of Stretto Regarding Voting and Tabulation of Ballots Cast on Combined Disclosure Statement and Plan of Liquidation* [Docket No. 553] (the "Voting Declaration," and, together with the First Day Declaration, the Ryniker Confirmation Declaration, and the Davis Declaration, the "Declarations"); (b) the arguments of counsel and all evidence proffered or adduced at the Confirmation Hearing; (c) the resolution and settlement or overruling of any filed objections or informal comments received relating to the Plan; and (d) the additional filings made by the Debtors in support of the Plan, including the affidavit of service for the Plan, the ballots and other solicitation materials [Docket No. 501, 504, 516, 520, 531] (the "Service Affidavits"); the Court being familiar with the Plan, and the relevant facts and circumstances concerning the Chapter 11 cases (the "Chapter 11 Cases") of the above-captioned debtors (the "Debtors"); the Court having taken judicial notice of the entire docket of the Chapter 11 Cases and all pleadings and other documents filed, all orders entered, and evidence and arguments made, proffered, or adduced at

17576844/4

the hearings held before the Court during the Chapter 11 Cases; the Court having found that due and proper notice has been given with respect to the Confirmation Hearing and the deadlines and procedures for voting on the Plan and asserting objections to the Plan consistent with the Solicitation Procedures Order and the Bankruptcy Code; the appearance of all interested parties having been duly noted in the record of the Hearing; and upon the record of the Confirmation Hearing, and after due deliberation thereon, and sufficient cause appearing therefor

IT IS HEREBY FOUND, DETERMINED, ORDERED, ADJUDGED, AND DECREED AS FOLLOWS:

## **FINDINGS OF FACT**

A.      Findings of Fact and Conclusions of Law. The findings set forth herein and on the record of the Confirmation Hearing constitute the Court's findings of fact pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      Judicial Notice. The Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of the Court, including, without limitation, all pleadings and other documents filed, all orders entered, and all evidence admitted and arguments made at the hearings held before the Court during the pendency of the Chapter 11 Cases.

C.      Exclusive Jurisdiction; Core Proceeding; Venue. This Court has jurisdiction over the Chapter 11 Cases and to confirm the Plan pursuant to 28 U.S.C. § 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated as of February 29, 2019. Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C.

§ 157(b). Venue is proper before this Court and in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    Chapter 11 Petition. On March 30, 2025 (the "Petition Date"), the Debtors each commenced a voluntary case under Chapter 11 of the Bankruptcy Code.

E.    Eligibility for Relief. The Debtors are each an eligible debtor under section 109 of the Bankruptcy Code.

F.    Appointment of Creditors Committee.  On April 15, 2025, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") formed Committee.

G.    Solicitation Procedures Order. On September 2, 2025, the Court entered the Solicitation Procedures Order, approving the adequacy of the Disclosure Statement on an interim basis, and establishing the procedures for solicitation of the Plan. Among other things, the Solicitation Procedures Order set October 7, 2025 at 4:00 p.m. as the deadline for submission of ballots and for filing of objections in opposition to confirmation.

H.    Notice, Transmittal, and Mailing of Solicitation Materials. As evidenced by the Service Affidavit, due, adequate, and sufficient notice of the Plan, and the Confirmation Hearing, together with all deadlines for objecting to and voting to accept or reject the Plan, have been provided as required by the Solicitation Procedures Order.  No other or further notice is necessary or shall be required.

I.    Solicitation. In compliance with the Solicitation Procedures Order, on or about September 5, 2025, the Debtors caused copies of the following documents to be served (i) the Confirmation Hearing Notice on the creditor matrix and all other parties required to receive such notice pursuant to the Solicitation Procedures Order, (ii) Confirmation Hearing Notice, Solicitation Procedures Order, and Unimpaired Non-Voting Status Notice, (iii) Solicitation Packages

17576844/4

consisting of the Plan, the Solicitation Procedures Order, customized copy of the Ballot, a notice of hearing to consider approval of the Plan, a cover letter to all holders of claims or interests entitled to vote on the Plan, and a pre-addressed postage prepaid return envelope on all known Holders of Claims in Class 3 (Bedrock Claim), Class 4 (General Unsecured Claims), and Class 5 (Convenience Class Claims), (iv) the Unimpaired Non-Voting Status Notice in lieu of a Solicitation Package on all known Holders of Unimpaired Claims in Classes 1 (Priority Non-Tax Claims) and 2 (Secured Claims), and (v) the Confirmation Hearing Notice, Solicitation Procedures Order, and Impaired Non-Voting Status Notice in lieu of a Solicitation Package on all known Holders of Impaired Claims in Class 6 (Equity Interests). A Certificate of Service evidencing the service of the foregoing was filed with the Court on September 19, 2025 [Docket No. 516, 520, and 531]. Based on the foregoing, the Court finds that (i) all persons entitled to receive notice of the Plan, and the Confirmation Hearing have received proper, timely, and adequate notice in accordance with the Solicitation Procedures Order, the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, and have had an opportunity to appear and be heard with respect thereto; (ii) the Debtors are in compliance with section 1128 of the Bankruptcy Code and Bankruptcy Rules 2002(b) and 3017(d)–(f); (iii) no other or further notice is required; and (iv) votes for acceptance and rejection of the Plan were solicited in good faith and in compliance with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, the Solicitation Procedures Order, all applicable provisions of the Bankruptcy Code, and all other applicable rules, laws, and regulations.

J.      Vote Certification. All procedures used to tabulate the Ballots were fair and conducted in accordance with the Solicitation Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and all other applicable rules, laws, and regulations. As

17576844/4

evidenced by the Voting Declaration, the only classes eligible to vote whether to accept or reject the Plan, Classes 3, 4 and 5 voted to accept the Plan. Specifically, (i) the only Class 3 Ballot received by the Voting Agent voted to accept the Plan; (ii) 87.5% of the Class 4 Ballots received by the Voting Agent (7 of 8 votes, including 3 opt ins), representing 85.9% of the amount of Class 4 claims ($371,753.76 of $432,996.00) voted to accept the Plan; and (iii) 93.8% of the Class 5 Ballots received by the Voting Agent (15 of 16 votes), representing 81.1% of the amount of Class 5 claims ($72,275.21 of $89,084.79) voted to accept the Plan and, according to the Solicitation Procedures Order, the Plan is deemed accepted by the Holders of such Claims in such Class.

K.    <u>Plan Supplement</u>. On September 30, 2025, the Debtors filed the *Plan Supplement* [Docket No. 535], which included the form of Liquidating Trust Agreement. All information and documents included in the Plan Supplement and the amendments thereto are integral to, part of, and incorporated by reference into the Plan. The Plan Supplement complies with the terms of the Plan, and the filing and notice of such documents provided due, adequate, and sufficient notice in accordance with the Solicitation Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice is necessary or shall be required. On October 10, 2025, the Debtors filed an *Amended Plan Supplement* [Docket No. 556]. Consistent with the terms of the Plan, the Debtors reserve their right to further alter, amend, update, or modify the Plan Supplement before the Effective Date.

L.    <u>Bankruptcy Rule 3016</u>. The Plan is dated and identifies its proponent in accordance with Bankruptcy Rule 3016(a), and the Disclosure Statement satisfies Bankruptcy Rule 3016(b).

M.    <u>Liquidating Trust</u>. Entry into the Liquidating Trust Agreement is in the best interests of the Debtors, their Estates, and Holders of Claims. The establishment of the Liquidating Trust, the selection of the Liquidating Trustee, and the form of the proposed Liquidating Trust Agreement

17576844/4

(as it may be modified or amended in accordance with the terms thereof) are appropriate and in the best interests of the Debtors, their Estates, and Holders of Claims. The Liquidating Trust Agreement will, upon execution, be valid, binding, and enforceable in accordance with its terms. The Liquidating Trustee is not, and will not be deemed to be, successor-in-interest of the Debtors for any purposes other than as expressly set forth in the Plan or in the Liquidating Trust Agreement.

**I.      The Plan Satisfies Section 1125 of the Bankruptcy Code**

N.      The Plan provides Holders of Claims and Interests in the Chapter 11 Cases with information, including among other things: (i) the circumstances that gave rise to the filing of the Debtors' bankruptcy petitions; (ii) an estimate of the Estates' assets and liabilities; (iii) the Debtors' actions and conditions during the Chapter 11 Cases, including the sale of substantially all of the Debtors' assets; (iv) the proposed treatment of Claims and Interests under the Plan and likely distributions to be received on account of each Class of Claims and Interests under the Plan; (v) an analysis as to the distributions creditors would receive from the Debtors' Estates if they were liquidated under Chapter 7 of the Bankruptcy Code; (vi) a summary of what remaining assets are left to be liquidated by the Liquidating Trust after the Effective Date; (vii) a disclaimer stating that no statements or information regarding the Debtors, their assets or securities are authorized, other than those included in the Plan; (viii) the relevant sources of information contained in the Plan; (ix) information regarding the Liquidating Trust, including the identity of the Liquidating Trustee and its compensation; (x) financial information necessary to allow a creditor to decide whether to approve or reject the Plan; (xi) information regarding the risks being taken by the Holders of Claims and Interests prior to voting; (xii) a description of potential avoidance actions and nonbankruptcy litigation that are Liquidating Trust Assets; (xiii) the right and ability of the Liquidating Trustee to  collect, market for sale, liquidate, assert, compromise or dispose of the Liquidating Trust Assets, including certain Causes of Action without further notice to Creditors or

17576844/4

Interest Holders or authorization of the Bankruptcy Court; (xiv) certain tax considerations under the Plan; (xv) conspicuous language containing limitation of liabilities and the injunction to be entered by and in connection with the Plan; and (xvi) such other and further information that informs Holders of Claims and Interests of their rights arising from and relating to the Plan.

O.      The Plan provides Holders of Claims and Interests with adequate information with respect to such Claim and Interest, to enable those Holders of Claims and Interests sufficient information to make an informed decision whether to vote to accept or reject the plan and satisfies the requirements of Section 1125 of the Bankruptcy Code.

## II.    Compliance with Section 1129 of the Bankruptcy Code

P.      Section 1129(a)(1). The Plan complies with section 1129(a)(1) of the Bankruptcy Code, as the Plan complies with each applicable provision of the Bankruptcy Code. In particular, the Plan complies with the requirements of sections 1122 and 1123 of the Bankruptcy Code as follows:

(i)     In accordance with section 1122(a) of the Bankruptcy Code, (a) Article IV of the Plan classifies Claims and Equity Interests into six (6) separate Classes reflecting the differing characteristics of those Claims and Equity Interests between Classes and the distinct legal rights of the holders of those Claims and Equity Interests in the separate Classes; and (b) the Claims and Equity Interests within each Class are substantially similar to the other Claims or Equity Interests within the same Class.

(ii)    In accordance with section 1123(a)(1) of the Bankruptcy Code, Article IV of the Plan properly classifies all Claims and Equity Interests that require classification.

(iii)   In accordance with section 1123(a)(2) of the Bankruptcy Code, Article IV of the Plan properly identifies and describes that Classes 1 and 2 are not impaired under the Plan and are deemed to accept.

(iv)    In accordance with section 1123(a)(3) of the Bankruptcy Code, Article IV of the Plan properly identifies and describes that Classes 3, 4 and 5 are impaired under the Plan are entitled to vote.

(v)     In accordance with section 1123(a)(3) of the Bankruptcy Code, Article IV of the Plan properly identifies and describes that Class 6 is impaired under the Plan and is deemed to reject the Plan and not entitled to vote.

(vi)     In accordance with section 1123(a)(4) of the Bankruptcy Code, Article IV of the Plan treats each Claim or Equity Interest against the Debtors, in each respective Class, the same as each other Claim or Interest in such Class.

(vii)    In accordance with section 1123(a)(5) of the Bankruptcy Code, the Plan provides adequate means for its implementation, including, without limitation, (a) the vesting of the Estates' assets in the Liquidating Trust, (b) the appointment and powers of the Liquidating Trustee, (c) the establishment and funding of the Liquidating Trust, and (d) the distribution to be received by the Liquidating Trust on account of Allowed Claims.

(viii)   The documents included in the Plan Supplement, conform to section 1123(a)(6) of the Bankruptcy Code's prohibition on the issuance of non-voting equity securities.

(ix)     Section 6.01 of the Plan provides for the creation of the Liquidating Trust, the appointment of the Liquidating Trustee to serve with respect to the Liquidating Trust, including with the authority set forth therein and in the Liquidating Trust Agreement. Further, the Plan Supplement containing the Liquidating Trust Agreement provides for the creation of the Oversight Committee, including the Oversight Committee's composition, rights and duties. The Liquidating Trustee was selected as part of the Term Sheet approved in connection with the Sale Order, along with the setting of Liquidating Trustee's compensation and any successor Liquidating Trustee will be appointed as provided in the Liquidating Trust Agreement.  The selection, disclosure and replacement mechanisms are consistent with the interests of Holders of Claims and Equity Interests and with public policy. Thus section 1123(a)(7) of the Bankruptcy Code is satisfied.

(x)      Section 1123(a)(8) of the Bankruptcy Code is not applicable in the Chapter 11 Cases because the Debtors are not an "individual."

(xi)     Consistent with section 1123(b)(1) of the Bankruptcy Code, Article IV of the Plan impairs or leaves unimpaired, as the case may be, each Class of Claims.

(xii)    Consistent with section 1123(b)(2) of the Bankruptcy Code, Article VII of the Plan provides that any Executory Contract not previously assumed, assigned and sold or rejected by the Debtors may be assumed, assigned and sold, or rejected by the Liquidating Trustee as provided in such Article VII.

(xiii)   Consistent with section 1123(b)(3) of the Bankruptcy Code, (a) Article VI of the Plan provides for the retention of Causes of Action by the Debtors (other than those that constitute claims or causes of action that were previously waived, exculpated, released, compromised, or otherwise settled, under the Global Settlement Agreement, Sale Order, Plan or otherwise) (the "Retained Causes of Action") and transfer all Retained Causes of Action to the Liquidating Trust; (b) Section 8.01 of the Plan provides, among other things, for the pursuit of certain claim objections by the Liquidating Trust (including Professional Fee Claims) and for authority to settle claims and controversies relating to the rights that holders of Claims or Equity Interests may have with respect to any Allowed Claims or Equity Interests or any distributions made pursuant to the Plan on account of such Allowed Claims or Equity Interests.

17576844/4

(xiv)   Consistent with Section 1123(b)(4) of the Bankruptcy Code, the Plan establishes a Liquidating Trust and provides for the orderly liquidation of all of the Estates' Assets and the distribution of the proceeds thereof to Holders of Claims.

(xv)    Consistent with section 1123(b)(5) of the Bankruptcy Code, the Plan permissibly modifies the rights of holders of unsecured claims.

(xvi)   Consistent with section 1123(b)(6) of the Bankruptcy Code, the Plan includes additional appropriate provisions that are not inconsistent with applicable provisions of the Bankruptcy Code, including, without limitation, (a) Section 8.01 establishing procedures for resolving Disputed Claims and governing distributions on account of Allowed Claims; (b) Section 6.01, providing for the preservation of certain causes of action, the settlement of certain claims and controversies and injunctions against certain actions; and (c) Article XII, providing for the retention of jurisdiction by the Court over certain matters after the Effective Date.

(xvii)  Section 1123(c) of the Bankruptcy Code is not applicable in the Chapter 11 Cases because the Debtors are not an "individual."

Q.      <u>Section 1129(a)(2)</u>. The Plan Proponent has complied with all applicable provisions of the Bankruptcy Code with respect to the Plan and the solicitation of acceptances or rejections thereof. In particular, the Plan complies with the requirements of sections 1125 and 1126 of the Bankruptcy Code, and as set forth the Service Affidavit, the Plan Proponent has caused service of the Plan and solicitation materials.

R.      <u>Section 1129(a)(3)</u>. The Plan Proponent has not engaged in any collusive or unfair conduct in connection with the Plan. The Plan was negotiated at arms-length by the Debtors, the Committee, and certain other creditors and parties in interest, and without collusion with any person or entity. The Plan has been proposed in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.  The unanimous support for the Plan by the Holder of a Claim in Class 3 and the affirmative votes by Holders of claims in Classes 4 and 5 in support of confirmation further demonstrates that the Plan was proposed in good faith.

S.      <u>Section 1129(a)(4)</u>. No payment for services or costs and expenses in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases,

has been or will be made, other than payments that have been authorized by an order of the Court, including without limitation by the confirmation of the Plan by this Confirmation Order.

T.      <u>Section 1129(a)(5)</u>. The identity and affiliations of the individual that will serve as Liquidating Trustee has been disclosed in the Plan and Plan Supplement, in satisfaction of section 1129(a)(5)(A)(i) of the Bankruptcy Code. Further, in accordance with section 1129(a)(5)(A)(ii) of the Bankruptcy Code, the appointment of the Liquidating Trustee is consistent with the interests of creditors and with public policy since no objection to the proposed Liquidating Trustee was received.  In accordance with section 1129(a)(5)(B), the Plan Supplement disclosed that Dundon Advisors LLC, will be the Liquidating Trustee, and the Amended Plan Supplement disclosed Dundon Advisors LLC's compensation as Liquidating Trustee.

U.      <u>Section 1129(a)(6)</u>. The Plan does not provide for any changes in rates that require regulatory approval of any governmental agency. As such, section 1129(a)(6) of the Bankruptcy Code is inapplicable in the Chapter 11 Cases.

V.      <u>Section 1129(a)(7)</u>. Each Holder of an Impaired Claim or Equity Interest that has not accepted or is deemed to have not accepted the Plan will, on account of such Claim or Equity Interest, receive or retain property under the Plan having a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date, as evidenced by the Liquidation Analysis filed as an exhibit to the Plan. The Plan Proponent has demonstrated that the Plan is in the best interests of its creditors.

W.      <u>Section 1129(a)(8)</u>. Five (5) of the six (6) Classes under the Plan have either voted to accept the Plan, are deemed to have accepted the Plan, or are unimpaired under the Plan.  Holders of Claims in Classes 1 and 2 are unimpaired and deemed to accept, Holders of Claims in Class 3

have unanimously voted to accept the Plan, and Holders of Claims in Classes 4 and 5 voted to accept the Plan.  Holders of Interests in Class 6 are deemed to reject.  Nevertheless, with respect to Class 6, the Plan is confirmable because it satisfies section 1129(b)(1) of the Bankruptcy Code with respect to such non-accepting Class.

X.     Section 1129(a)(9).  The Plan provides treatment for Allowed Administrative Claims and Allowed Priority Tax Claims that is consistent with the requirements of section 1129(a)(9) of the Bankruptcy Code. Unless otherwise agreed to, the Holder of each Allowed Administrative Claim and Allowed Priority Tax Claim will receive full payment in Cash on account of such Claim within the prompt timeframe specified in the Plan with respect to such Claim.

Y.     Section 1129(a)(10).  The Voting Declaration sets forth the tabulation of votes and demonstrates that such tabulation was conducted in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Solicitation Procedures Order.  Further, the Court finds that, based on the foregoing, the Plan Proponent solicited votes with respect to the Plan in good faith and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules, and the Solicitation Procedures Order, and the Plan has been accepted by Classes 3, 4 and 5, each of which are Impaired under the Plan, determined without including the acceptance of the Plan by any insider.

Z.     Section 1129(a)(11).  As evidenced by the Confirmation Declaration, together with any additional evidence admitted at the Confirmation Hearing, the Plan is feasible and complies with section 1129(a)(11) of the Bankruptcy Code.

AA.    Section 1129(a)(12).  As set forth in Section 13.14 of the Plan (as modified by Paragraph 29 of this Order), all fees payable pursuant to section 1930(a) of the Judicial Code shall be paid as provided therein.

17576844/4

BB.     Section 1129(a)(13). The Plan does not modify retiree benefits (as such term is defined under section 1114 of the Bankruptcy Code), if any.  Thus, the Plan complies with Section 1129(a)(13) of the Bankruptcy Code.

CC.     Sections 1129(a)(14)-(16). Sections 1129(a)(14)-(16) of the Bankruptcy Code apply to individuals or nonprofit entities and are not applicable to the Chapter 11 Cases.

DD.     Section 1129(b). The Plan does not "discriminate unfairly" with respect to Class 6, which is the only Impaired Class under the Plan that has not accepted the Plan. In addition, the Plan is "fair and equitable" under section 1129(b) of the Bankruptcy Code with respect to Class 6 because no Holder of an interest that is junior to the Equity Interests in Class 6 is receiving or retaining any property under the Plan on account of such interest. Thus, the Plan may be confirmed notwithstanding the deemed rejection of the Plan by Class 6.

EE.     Section 1129(c). The Plan is the only plan that has been filed in the Chapter 11 Cases and it is the only plan that has been found to satisfy the requirements of subsections (a) and (b) of section 1129 of the Bankruptcy Code. Accordingly, the requirements of section 1129(c) of the Bankruptcy Code have been satisfied.

FF.     Section 1129(d). No party in interest, including but not limited to any governmental unit, has requested that the Court deny confirmation of the Plan on grounds that the principal purpose of the Plan is "the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933," and the principal purpose of the Plan is not such avoidance. Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

GG.     Section 1129(e). These Chapter 11 Cases are not "small business cases" and Section 1129(e) of the Bankruptcy Code does not apply.

### III.      Means for Implementation of the Plan

HH.      <u>Implementation</u>. The various means for implementation of the Plan, as set forth in Article VI and other provisions of the Plan (collectively, the "<u>Implementation Activities</u>"), have been designed and proposed in good faith. The Implementation Activities are adequate and will promote the maximization of the value of the ultimate recoveries under the Plan in a fair and equitable manner in accordance with the priorities established by the Bankruptcy Code. The Implementation Activities are not intended to hinder, delay, or defraud any entity to which the Debtors is indebted on the Effective Date. Pursuant to Section 6.01 of the Plan, on the Effective Date, all property of the Debtors' Estates that constitute Liquidating Trust Assets, shall vest in the Liquidating Trust, free and clear of all Claims, liens, charges, other encumbrances, Interests or other interests, subject only to the Bedrock Lien.  On and after the Effective Date, the Liquidating Trustee, in consultation with the Oversight Committee, may collect, market for sale, liquidate, compromise or dispose of Liquidating Trust Assets without Bankruptcy Court approval, subject to the terms of the Plan, the Confirmation Order, and the Liquidating Trust Agreement.

II.      <u>Securities Exempt from Registration</u>. The undertakings and obligations of the Debtors will not require the issuance of new securities, and therefore there are no issues with respect to section 1145 of the Bankruptcy Code, from Section 5 of the Securities Act of 1933 and from any and all federal, state, or local laws requiring the registration of the offer, sale or other distribution of such securities by the Debtors.

JJ.      <u>Executory Contracts</u>.   Notwithstanding anything in the Plan to the contrary, unless otherwise, (i) previously assumed and assigned or assumed, assigned and sold; or (ii) for which a motion for approval of the assumption of an Executory Contract or Unexpired Leases has been Filed and served prior to, and remains pending on the Effective Date, all Executory Contracts or Unexpired Leases shall be rejected as of the Effective Date, other than all insurance policies, which

14

pursuant to Section 7.02 of the Plan, which shall be deemed to be Executory Contracts and shall be deemed assumed by the Debtors and/or Liquidating Trust on the Effective Date as set forth therein.

KK.    <u>Plan Injunctions</u>. The Court has jurisdiction under sections 1334(a) and (b) of title 28 of the United States Code and sections 105, 524, and 1141 of the Bankruptcy Code to approve the provisions with respect to the injunction set forth in Article IX of the Plan.  Based upon the record of the Chapter 11 Cases and the evidence admitted at or prior to the Confirmation Hearing, this Court finds that the injunctions set forth in Article IX of the Plan are consistent with the Bankruptcy Code and applicable law.

LL.    <u>Other Findings</u>. To permit the Liquidating Trustee to commence his duties as quickly as practicable, to promote prompt distributions under the Plan and Liquidating Trust Agreement for the benefit of creditors and because a significant number of Implementation Activities are capable of being undertaken in short order, good cause exists to support the waiver of the stay imposed by Bankruptcy Rule 3020(e).

## <u>CONCLUSIONS OF LAW</u>

1.    <u>Disclosure Statement</u>.  The Disclosure Statement is **APPROVED** on a final basis.

2.    <u>Confirmation</u>. All requirements for confirmation of the Plan have been satisfied. The Plan is **CONFIRMED** in its entirety pursuant to section 1129 of the Bankruptcy Code. The terms of the Plan, exhibits to the Plan, the Plan Supplement, and any other documents filed in connection with the Plan and/or executed or to be executed in connection with the transactions contemplated by the Plan, and all amendments and modifications thereof, are expressly incorporated into, and form an integral part of, this Confirmation Order. A copy of the Plan in the form confirmed is attached hereto as **<u>Exhibit A</u>**.

15

3.    <u>Objections</u>. All objections that have not been withdrawn or resolved prior to the entry of this Confirmation Order, including any with respect to the Plan, are overruled in all respects for the reasons set forth in the record of the Confirmation Hearing, which record is incorporated herein, and all withdrawn objections, if any, are deemed withdrawn with prejudice.

4.    <u>Omission of Reference to Particular Plan Provisions</u>. The failure to specifically describe or include any particular provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Plan be approved and confirmed in its entirety.

5.    <u>Implementation</u>. The Debtors are authorized and directed to execute, deliver, file or record such documents, contracts, instruments, releases and other agreements, and take such other actions as may be necessary to effectuate, implement and further evidence the terms and conditions of the Plan, including all such actions delineated in Article VI of the Plan and this Confirmation Order. On the Effective Date, the Liquidating Trustee shall be authorized to execute, deliver, file or record such contracts, instruments, releases, consents, certificates, notices, resolutions, programs, and other agreements, instruments and/or documents, and take such acts and actions as may be reasonably necessary or appropriate to effectuate, implement, substantially consummate and/or further evidence the terms and conditions of the Plan and this Confirmation Order and any transactions described in or contemplated thereby.

6.    <u>Effective Date</u>. The Effective Date of the Plan shall occur on the date determined by the Plan Proponent when the conditions set forth in Article X of the Plan have been satisfied or, if applicable, waived in accordance with the Plan; provided that in accordance with Section 10.03 of the Plan, waiver of any of the conditions set forth in Sections 10.01, and 10.02 (a).

7.      <u>Modifications or Alterations to Plan</u>. The modifications made to the Plan since solicitation (i) comply in all respects with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, (ii) do not adversely affect the treatment of any Holder of Allowed Claims without their consent and (III) do not require re-solicitation of votes with respect to the Plan.

8.      <u>Binding Effect of Plan</u>. Subject to the occurrence of the Effective Date, the provisions of the Plan and this Confirmation Order shall be binding upon: (a) the Debtors; (b) the Committee, (c) the Liquidating Trust and the Liquidating Trustee; (d) all Professionals; (e) any and all non-Debtor parties to judicial or administrative proceedings in which the Debtor is a party; (f) any and all Holders of Claims, including Holders of Administrative Expenses, or Equity Interests (irrespective of (i) whether such Claims or Equity Interests are Impaired under the Plan, (ii) whether the Holders of such Claims or Equity Interests accepted, rejected, or are deemed to have accepted or rejected the Plan, or (iii) whether such Claims or Equity Interests have been asserted in a filed proof of claim, proof of interest, request for administrative expense payment or other pleading or filing); (g) any and all non-Debtor parties to Executory Contracts with one or more of the Debtors; (h) any party that had received or may be deemed to have received notice of the Plan and the Confirmation Hearing; and (i) the respective heirs, executors, administrators, trustees, affiliates, officers, directors, agents, representatives, attorneys, beneficiaries, guardians, successors or assigns, if any, of any of the foregoing, in their capacity as such.  All settlements, compromises, waivers, and injunctions set forth in the Plan shall be, and hereby are, effective and binding on all Persons who may have had standing to assert any settled, released, exculpated, or enjoined causes of action, subject to the terms of Article IX of the Plan, and no other Person or entity shall possess such standing to assert such causes of action after the Effective Date.

17576844/4

9.      <u>Distributions</u>. Subject to the terms of the Plan, on and after the Effective Date, the Distributions on account of Allowed Claims and the resolution and treatment of Disputed Claims of the Plan are authorized to occur and, without limitation on the other provisions of the Plan and this Confirmation Order concerning the powers, duties, and authority of the Liquidating Trustee, and the Liquidating Trustee shall be authorized to effectuate such Distributions, resolution, and treatment, of Claims as allowed under the Plan.  The allowed but unpaid professional fees of the debtor and committee professionals and the outstanding fees and expenses of Bedrock professionals as of the Effective Date shall be first paid out of the Allocated Estate Funds (as defined in the Global Settlement Order) subject to and in accordance with the Updated Approved and Final Cash Collateral Order, and to the extant unpaid, paid on a pro rata basis out of the Initial Distribution Fund.

10.     <u>Executory Contracts</u>. Notwithstanding anything in the Plan to the contrary, unless otherwise, (i) previously assumed and assigned or assumed, assigned and sold; or (ii) for which a motion for approval of the assumption of an Executory Contract or Unexpired Leases has been Filed and served prior to, and remains pending on the Effective Date, all Executory Contracts or Unexpired Leases shall be rejected as of the Effective Date, other than all insurance policies, which pursuant to Section 7.02 of the Plan, which shall be deemed to be Executory Contracts and shall be deemed assumed by the Debtors and/or Liquidating Trust on the Effective Date as set forth therein.

11.     <u>Bar Date for Rejection Claims</u>.  Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court by the later of (a) the General Bar Date or the Governmental Bar Date, as

applicable, or (b) 5:00 pm. (prevailing Eastern time) on the date that is 30 days following service of an order approving rejection of any Executory Contract or unexpired lease of one or more the Debtors.  Any such rejection Claim will be forever barred and will not be enforceable against the Debtors, the Estates, the Liquidating Trustee, the Liquidating Trust, or their property, as applicable, unless a Proof of Claim is Filed or unless otherwise expressly allowed by the Bankruptcy Court.

12.    <u>Causes of Action</u>. All Retained Causes of Action shall be transferred to the Liquidating Trust as set forth in the Plan.

13.    <u>Exemption from Certain Taxes</u>. The issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer the Plan or this Confirmation Order, may not be taxed under any law imposing a stamp tax or similar tax.

14.    <u>Effect of Confirmation Order</u>. Notice of entry of this Confirmation Order (a) shall have the effect of an order of the Court, (b) shall constitute sufficient notice of the entry of this Confirmation Order to such filing and recording officers, and (c) shall be a recordable instrument notwithstanding any contrary provision of applicable nonbankruptcy law. This Court retains jurisdiction to enforce the foregoing direction by contempt proceedings or otherwise.

15.    <u>Transfers by Debtors</u>. All transfers of property of the Debtors' Estates shall be free and clear of all Liens, charges, Claims, encumbrances, and other interests, except as expressly provided in the Plan or this Confirmation Order, subject only to the Bedrock Lien.

16.    <u>Extinguishment of Claims and Equity Interests</u>. Except as provided in the Plan, upon the Effective Date, all notes, instruments, certificates, warrants and other documents evidencing Claims and Interests in the Debtors shall be canceled and deemed terminated.

17.　　<u>Binding Release, Exculpation, and Injunction Provisions</u>.  Except as otherwise set forth herein, all release, exculpation and injunction provisions embodied in the Plan are approved and will be effective and binding on all persons and entities to the extent set forth therein.

18.　　<u>Vesting of Property and No Successor Liability</u>. Pursuant to section 1141 of the Bankruptcy Code and Section 6.01(c) of the Plan, except as otherwise provided in the Plan, on the Effective Date, all property of the Debtors' Estates that constitute Liquidation Trust Assets, shall vest in the Liquidating Trust, free and clear of all Claims, liens, charges, other encumbrances, Interests or other interests, subject only to the Bedrock Lien.  On and after the Effective Date, the Liquidating Trustee, may collect, market for sale, liquidate, compromise or dispose of Liquidating Trust Assets without Bankruptcy Court approval, subject to the terms of the Plan, the Confirmation Order, and the Liquidating Trust Agreement.

19.　　<u>Conditions Precedent to the Effective Date</u>.  Notwithstanding the language in the Plan to the contrary, Section 10.02(d) of the Plan shall be revised as follows:

> It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to Section 10.03 . . . . **All** of the Debtors' mining permits are sold, assumed and/assigned, abandoned, or otherwise disposed.

Further, the conditions of Section 10.02(d) cannot be waived as a condition to the Effective Date.

20.　　<u>Dissolution or Termination of the Debtors; Resignation of Employees, Officers and Directors</u>. On the Effective Date, the Debtors' remaining members, directors, managers and officers and any remaining employees shall be deemed to have resigned and the Liquidating Trustee shall be appointed as the sole officer, director, and/or manager, as applicable, of the Debtors, without the need for any corporate action to effect such resignation or appointment. After the Effective Date, the Liquidating Trustee is authorized to dissolve or terminate the existence of the Debtors for all purposes under any applicable state or federal law, without the need to take any

17576844/4

further action or file any plan of dissolution, notice or application with the Secretary of State of the State of Delaware or any other state or government authority, and without the need to pay any franchise or similar taxes in order to effectuate such dissolution.

21.     _Administrative Claim Bar Date Provisions_. Unless previously filed or as otherwise governed by an order of the Court or pursuant to the Plan, to requests for payment of Administrative Claims must be filed with the Court by the Administrative Claim Bar Date, which shall be the first Business Day that is thirty (30) days after the Effective Date.  Holders of Administrative Claims that are required to file and serve a request for payment of such Administrative Claims and that do not file and serve such a request by the Administrative Claim Bar Date shall be forever barred from asserting such Administrative Claims against one or more of the Debtors, their Estates, the Liquidating Trust, or their respective property. Objections to any requests for payment of Administrative Claims must be asserted by the Claims Objection Deadline.

22.     _Dissolution of the Committee_. The Committee shall be automatically dissolved on the Effective Date and, on the Effective Date, each member of the Committee and each Professional retained by the Committee shall be released and discharged from all rights, duties, responsibilities and obligations arising from, or related to, the Debtors, their membership on the Committee, the Plan, or the Chapter 11 Cases, except with respect to any matters concerning any Professional Fee Claim held or asserted by any Professional retained by the Committee.

23.     _Professional Compensation_. Each Professional shall file an application for allowance of final compensation and reimbursement of expenses in the Chapter 11 Cases, for the period through the Effective Date, no later than forty-five (45) days after the Effective Date. Objections to applications of professionals for compensation or reimbursement of expenses must be filed and served on the Debtors, the Liquidating Trustee, the U.S. Trustee, and the professionals

21

to whose application the objections are addressed no later than twenty-one (21) days after the Professional Fee Bar Date, or the Bankruptcy Court may enter an order authorizing the fees without a hearing. Any professional fees and reimbursements or expenses incurred by the Liquidating Trustee subsequent to the Effective Date may be paid without application to the Bankruptcy Court.

24.    Cash Collateral.  The Debtors' authority to use Cash Collateral pursuant to the *Final Order (I)* by its own terms on August 31, 2025 at 11:59 p.m.  The Final Cash Collateral Order is hereby amended to authorize the Debtors' continued use of Cash Collateral from September 1, 2025 through October 31, 2025, which date may be extended without need for further order of the Court upon written consent of Bedrock, solely in accordance with the updated budget (the "Updated Budget") attached as **Exhibit C** to this Order.

25.    Treatment of Bedrock Claim (Class 3). Notwithstanding anything to the contrary in the Plan, nothing in the Plan, the Plan Supplement or this Order shall alter any rights and obligations arising under the Global Settlement Agreement and Order Approving the Global Settlement [Docket No. 396] (the "Global Settlement Order") which are each incorporated herein by reference, including without limitation Bedrock's Allowed Class 3 Claim, and its Series A Trust Interests.

26.    No Amendment of Prior Orders or Settlement.  Nothing in the Plan or Confirmation Order shall alter, limit, or otherwise modify the Cash Collateral Order, Global Settlement Order or Global Settlement Agreement, each of which are incorporated herein by reference.

27.    Approval of Liquidating Trust. The establishment of the Liquidating Trust in accordance with the terms of the Plan and the Liquidating Trust Agreement is hereby authorized and approved in accordance with their respective terms.

17576844/4

28.    <u>Appointment of Liquidating Trustee/Oversight Committee</u>. Dundon Advisors LLC is hereby appointed to serve as the Liquidating Trustee on the terms set forth in this Confirmation Order, the Plan, and the Liquidating Trust Agreement, effective as of the Effective Date.  The Oversight Committee shall be initially comprised of: (a) a single designee of the Official Committee of Unsecured Creditors and (b) two designees of Bedrock.

29.    <u>The Authorization, Duties, and Powers of Liquidating Trustee</u>. The Liquidating Trustee is hereby authorized to take any and all actions necessary or appropriate in furtherance of, and to implement, effectuate and consummate the Plan, this Confirmation Order, and the Implementation Activities contemplated thereby and hereby, including, without limitation, all of the procedures and undertakings specified in Article VI of the Plan.

30.    <u>Directive in Furtherance of Plan</u>. Each federal, state, commonwealth, local, foreign, or other governmental agency is hereby authorized to accept any and all documents, releases, mortgages and instruments necessary or appropriate to effectuate, implement, or consummate the transactions contemplated by the Plan and this Confirmation Order.

31.    <u>Binding Effect of Prior Orders and Agreements</u>. To the maximum extent permitted pursuant to section 1141 of the Bankruptcy Code, effective as of the Confirmation Date, but subject to the occurrence of the Effective Date and subject to the terms of the Plan and this Confirmation Order, all prior orders entered in the Chapter 11 Cases, all documents and agreements executed by one or more of the Debtors, and all motions or requests for relief by the Debtors shall be binding upon and shall inure to the benefit of the Debtors, the Estates, and the Liquidating Trust.

32.    <u>Resolution of Objections by Commonwealth of Pennsylvania, Department of Environmental Protection and State of Maryland, Department of the Environment</u>.  The objections

to the Plan by Commonwealth of Pennsylvania, Department of Environmental Protection [Docket No 539] and State of Maryland, Department of the Environment [Docket No. 543] are hereby resolved as follows:

Notwithstanding anything contained in the Plan, the Plan Supplement, or this Confirmation Order to the contrary, nothing in the Plan, the Plan Supplement, or this Confirmation Order shall discharge, release, impair, enjoin, exculpate or otherwise preclude or diminish: (a) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) of the Commonwealth of Pennsylvania or the State of Maryland (a "PA/MD Governmental Unit") that is not a "claim" within the meaning of 11 U.S.C. § 101(5) of the Bankruptcy Code; (b) any liability to any PA/MD Governmental Unit arising after the Confirmation Date; (c) any liability or obligation to, or any Claim or Cause of Action by, a PA/MD Governmental Unit under police or regulatory law or environmental law to which any entity is subject as the owner, lessor, lessee, permittee, controller, or operator of real property or a mine (including any idled, closed, and inactive mines, associated impoundments, disposal areas and wells, and treatment plants) or other facility after the Plan Effective Date (whether or not such liability, obligation, Claim or Cause of Action is based in whole or in part on acts or omissions prior to the Plan Effective Date), including, but not limited to, liability for reclamation; plugging and abandonment; restoration; water treatment; stream and wetland mitigation; contamination; pollution; hazardous or toxic substances; mine drainage; water supply protection; protection of the environment; and impacts on human health, safety, and welfare; or (d) any liability to any PA/MD Governmental Unit of any non-debtor. Nothing in this Confirmation Order or the Plan shall impair any setoff or recoupment rights of any PA/MD Governmental Unit.

Except as otherwise expressly stated therein, nothing in this Confirmation Order, the Plan, or the Plan Supplement authorizes the transfer or assignment of any governmental (i) lease, (ii) license, (iii) permit, (iv) registration, (v) authorization, (vi) certification, or (vii) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under nonbankruptcy laws, regulations, and rules (including police or regulatory law or environmental law, or otherwise).

Nothing in the Plan, the Plan Supplement, or this Confirmation Order shall exculpate any third party or non-debtor from any liability owed to, or Claim, action, proceeding, or Cause of Action of, any PA/MD Governmental Unit, except to the extent that such non-debtor is exculpated for acting in its fiduciary capacity to the Debtors' estate as explicitly provided for in the Bankruptcy Code; *provided, however*, that nothing in the Plan, the Plan Supplement, or this Confirmation Order shall exculpate any person with respect to any violation of any laws intended to protect the public health and safety or any liability under environmental laws.

Upon the Effective Date, in exchange for any administrative expense to be asserted by PA DEP, the Debtors shall contribute $2,500 to a post-mining treatment trust to provide for the treatment of discharges from the Milford #3 Coal Refuse Disposal Area ("Milford

24

Trust"). In addition, any funds in the Heritage Post-Mining Treatment Trust established on May 7, 2018, as amended, that PA DEP determines are not necessary to fund water treatment at the Poorbaugh Strip, Schrock Strip, or Romesburg Strip sites shall be available to PA DEP, or a trust to which PA DEP is beneficiary, to address Debtors' outstanding environmental and compliance obligations at Debtors' mining permits that have not been sold, including but not limited to water treatment at Milford #3 Coal Refuse Disposal Area. Debtors waive any right, title, or interest in the Heritage Post-Mining Treatment Trust and waive any right to all future distributions from the Heritage Post-Mining Treatment Trust to which it may be entitled. Debtors agree to enter into agreements with PA DEP, as necessary, to effectuate this provision.

The Proofs of Claim filed by PA DEP on October 6, 2025 for Dockets 243078, 243084, 253015, and 253023 shall be Allowed in the total amount of $27,580.

PA DEP shall have the option to elect either (a) acquisition by the Milford Trust, in fee simple and free and clear of all liens, claims, and encumbrances, the real property parcels owned by Debtors covering Milford #3 CRDA (S28-007-015-00 and S28-007-014-00), or (b) a consent to right of entry executed by Debtors for the parcels that provides PA DEP, Milford Trust, and their agents perpetual access to the property for water treatment and reclamation activities. PA DEP shall exercise this option by October 31, 2025.

Any and all diesel pumps owned by Debtors that are currently used for water treatment at the Milford #3 CRDA shall be transferred to the Milford Trust.

Debtors shall continue to provide for water treatment at Debtors' unsold mining sites through October 27, 2025, other than the Milford site for which the Debtors shall continue to provide for water treatment through October 31, 2025. Debtors consent to PA DEP's forfeiture of bonds posted for Debtors' mining permits that have not been sold.

The PA/MD Governmental Units, waive any objections to the Debtors' Notice of Proposed Abandonment of Property of the Estate [Docket No. 551].

33.    U.S. Trustee Fees. Notwithstanding the language in the Plan, Section 13.14 of the

Plan shall be revised as follows:

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable ("Quarterly Fees") prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Debtors, and the Post-Effective Date Debtors and the Liquidating Trust shall be jointly and severally liable to pay any and all Quarterly Fees when due and payable. The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, each of the Post-Effective Date Debtors and the Liquidating Trustee shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. Each and every one of the Debtors, and the Post-Effective Date Debtors and

the Liquidating Trust shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file any Administrative Claim in the case and shall not be treated as providing any release under the Plan

34.     <u>Debtor releases and Exculpation.</u>   Notwithstanding anything in the Plan to the contrary, nothing herein shall provide releases or exculpation to any party and Sections 9.02 and 9.03 of the Plan shall be stricken.  Notwithstanding the foregoing, nothing shall affect or otherwise alter any releases under the Global Settlement Agreement or the Global Settlement Order.

35.     <u>Effect of Reversal</u>. If any or all of the provisions of this Confirmation Order are hereafter reversed, modified, or vacated by subsequent order of this Court or any other court, such reversal, modification or *vacatur* shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan prior to the Debtors' or the Liquidating Trustee's receipt of written notice of such order. Notwithstanding any such reversal, modification or *vacatur* of this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this Confirmation Order prior to the effective date of such reversal, modification or *vacatur* shall be governed in all respects by the provisions of this Confirmation Order and the Plan and all related documents or any amendments or modifications thereto.

36.     <u>Notice of Confirmation and Effective Date</u>. Promptly following the occurrence of the Effective Date, pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c)(2), the Liquidating Trustee is directed to serve a notice of the entry of this Confirmation Order, the establishment hereunder of bar dates for certain Claims (including the Administrative Bar Date and the Rejection Damages Bar Date) and the occurrence of the Effective Date, substantially in the form of **<u>Exhibit B</u>** attached hereto and incorporated herein by reference on all parties that received the Confirmation Hearing Notice.

17576844/4

37.    <u>Conflicts</u>. Without intending to modify any prior order of this Court (or any agreement, instrument, or document addressed by any prior order), in the event of an inconsistency between the Plan, on the one hand, and any other agreement, instrument, or document intended to implement the provisions of the Plan, on the other, the provisions of the Plan shall govern (unless otherwise expressly provided for in such agreement, instrument, or document); provided, however (a) that in the event of any inconsistency between the Plan and the Plan Supplement, the Plan Supplement shall govern; (b) in the event of any inconsistency between the Plan (including the Plan Supplement) and the terms of this Confirmation Order, the terms of this Confirmation Order shall govern and (c) if there is a conflict between this Plan and a Plan Supplement document, the Plan Supplement document, as applicable, shall govern and control. If any provision of the Plan (including a Plan Supplement) conflicts with or is in any way inconsistent with any provision of the Confirmation Order, the Confirmation Order shall govern and control.  In the event of any inconsistency between the Plan and any of: (1) the Sale Order, (2) the Term Sheet and (3) the Cash Collateral Order, the Sale Orders, the Global Settlement Order and/or Cash Collateral Order, as applicable, shall control over the Plan.

38.    <u>Defects or Omissions</u>.  After the Confirmation Date, the Debtors or the Liquidating Trustee, as applicable, may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or this Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan. Prior to the Effective Date, the Debtors may make appropriate technical adjustments and non-material changes to the Plan without further order or approval of the Bankruptcy Court.

39.    <u>Jurisdiction</u>. Notwithstanding the entry of this Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter

17576844/4

11 Cases to the extent legally permissible, including, without limitation, jurisdiction over the matters set forth in Article XII of the Plan; provided, however, for the avoidance of doubt, nothing in this Confirmation Order, the Plan or the Liquidating Trust Agreement shall prevent the Liquidating Trustee or the Liquidating Trust from commencing and prosecuting litigation that constitutes Liquidating Trust Assets in either the Bankruptcy Court, an appropriate state court, or other non-bankruptcy forum, in the Liquidating Trustee's discretion.  To the extent this paragraph modifies Section 12.01 of the Plan, such modification is non-material, does not require re-solicitation, and is otherwise permissible and approved consistent with Section 11.01 of the Plan.

40.    <u>Final Order</u>. The fourteen (14) day stay of this Confirmation Order imposed by Bankruptcy Rule 3020(e) is hereby waived in accordance with Bankruptcy Rule 3020(e). This Confirmation Order is a final order, and the period in which an appeal must be filed shall commence immediately upon the entry hereof.

## **Exhibit A**

Combined Disclosure Statement and
Plan of Liquidation Dated September 1, 2025

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| KTRV LLC,[1] | Case No. 25-10601 (MFW) |
| Debtors. | (Jointly Administered) |

**COMBINED DISCLOSURE STATEMENT AND**
**PLAN OF LIQUIDATION DATED SEPTEMBER 1, 2025**

---

[1]    The Debtors in these chapter 11 cases, along with each the last four digits of each Debtor's tax identification number, are as follows: KTRV LLC (9993), Heritage Coal & Natural Resources, LLC (8326). The Debtors' service address is 1521 Concord Pike, Suite 201, Wilmington, DE 19803.

## TABLE OF CONTENTS

**INTRODUCTION** ........................................................................................................ 3

**ARTICLE I. - DEFINITION AND CONSTRUCTION OF TERMS** ..................... 3

**ARTICLE II. – BACKGROUND** ............................................................................ 15
    **2.01**    **General Background** ................................................................... 15
    **A.**       **The Debtors' Businesses** ............................................................ 15
    **B.**       **Purchase and Financing of HCNR** .......................................... 15
    **C.**       **Actions of Heritage Holdings and Ms. Svonavec** ..................... 17
    **D.**       **Default by KTRV and Strict Foreclosure by Bedrock** ............... 18
    **E.**       **Litigation** ................................................................................. 20
    **2.02**    **Causes of the Bankruptcy Filing** ............................................. 22
    **2.03**    **Statement by the HHC Parties** ................................................. 23
    **A.**       **The Debtors' Business Operations and Finances** ...................... 24
    **2.04**    **The Chapter 11 Cases** ............................................................. 26

**ARTICLE III. - CONFIRMATION PROCEDURES** ............................................ 35
    **3.01**    Confirmation Hearing Procedures ................................................ 35
    **3.02**    Procedure for Objections ............................................................. 36
    **3.03**    Requirements for Confirmation ................................................... 36
    **3.04**    Classification of Claims and Equity Interests .............................. 36
    **3.05**    Impaired Claims or Equity Interests ............................................ 38
    **3.06**    Confirmation Without Necessary Acceptances; Cramdown ............... 38
    **3.07**    Feasibility ................................................................................... 39
    **3.08**    Best Interests Test and Liquidation Analysis ................................ 40
    **3.09**    Acceptance of the Plan ................................................................ 40

**ARTICLE IV. - CLASSIFICATION OF CLAIMS AND INTERESTS AND EXPECTED RECOVERIES** ........................................................................... 41
    **4.01**    Overview of Classification. .......................................................... 41
    **4.02**    Identification and Treatment of Unclassified Claims ..................... 41
    **4.03**    Identification of and Treatment of Classes of Claims ................... 43
    **4.04**    Unsecured Creditors' Rights to Opt In/Out of Classes 4 and 5. .......... 44
    **4.05**    Classification of Classes, Rights to Vote, and Estimated Distributions ................................................................................ 44
    **4.06**    Elimination of Vacant Classes for Voting Purposes ..................... 48

**4.07**   Controversy Concerning Classification, Impairment or Voting Rights 48

**4.08**   Insurance ................................................................................................... 48

**ARTICLE V. - CERTAIN RISK FACTORS TO BE** .............................................. 49

**CONSIDERED PRIOR TO VOTING** ................................................................... 49

**5.01**   The Plan May Not Be Accepted. ................................................................ 49

**5.02**   The Plan May Not Be Confirmed. .............................................................. 49

**5.03**   Distributions to Holders of Allowed Claims under the Plan May Be Inconsistent with Projections. ............................................................................... 49

**5.04**   Objections to Classification of Claims. ..................................................... 50

**5.05**   Failure to Consummate the Plan. ............................................................... 50

**5.06**   Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims under the Plan ......................................................................... 50

**5.07**   Reserved .................................................................................................... 51

**5.08**   Certain Tax Considerations....................................................................... 51

**ARTICLE VI. - MEANS FOR IMPLEMENTATION OF THE PLAN** ............... 51

**6.01**   Liquidation of Debtors' Assets through the Creation of the Liquidating Trust ............................................................................................... 51

**6.02**   Release of Liens ........................................................................................ 54

**6.03**   Effectuating Documents; Further Transactions ....................................... 54

**6.04**   Records ...................................................................................................... 54

**6.05**   Deemed Substantive Consolidation .......................................................... 54

**6.06**   Transfer of Privilege/No Waiver ............................................................... 55

**6.07**   Final Decree .............................................................................................. 55

**ARTICLE VII. - EXECUTORY CONTRACTS** ................................................... 55

**7.01**   Executory Contract(s) and Unexpired Leases........................................... 55

**7.02**   Insurance Policies Are Executory Contracts............................................ 56

**7.03**   Bar Date for Rejection Damages .............................................................. 56

**7.04**   Pre-Existing Obligations to a Debtor Under Executory Contracts and Unexpired Leases ...................................................................................... 57

**ARTICLE VIII. - PROVISIONS GOVERNING RESOLUTION OF CLAIMS AND DISTRIBUTIONS OF PROPERTY UNDER THE PLAN** ......................... 57

**8.01**   Claim Objections ...................................................................................... 57

    (a)   Right to Object to Claims. ....................................................... 57

    (b)   Claims Objection Deadline....................................................... 57

    (c)   Claim Estimation. .................................................................... 57

ii

8.02    Distribution Provisions ...................................................... 57

    (a)    Distributions to be Made ........................................... 57
    (b)    No Liability. ........................................................... 58
    (c)    Distributions on Account of Disputed Claims. ............ 58
    (d)    No Distributions Pending Allowance. ........................ 58
    (e)    Distributions in Cash. ............................................. 58
    (f)    Timing of Distributions. .......................................... 58
    (g)    Unclaimed Distributions. ......................................... 58
    (h)    Delivery of Distributions to Holders of Claims. ........... 59
    (i)    Undeliverable Distributions. .................................... 59
    (j)    De Minimis Distributions. ....................................... 59
    (k)    Remainder Amounts After Final Distribution. ............ 59

**ARTICLE IX. - RELEASES, INJUNCTION, AND RELATED PROVISIONS** .................................................................. 59
  **9.01**    [Reserved] ............................................................. 59
  **9.03**    Exculpation and Limitation of Liability ...................... 60
  **9.04**    Injunction ............................................................. 61

**ARTICLE X. - CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE** 62
  **10.01**    Conditions Precedent to Confirmation ...................... 62
  **10.02**    Conditions Precedent to the Effective Date ................ 62
  **10.03**    Waiver of Conditions .............................................. 62
  **10.04**    Effect of Failure of Conditions ................................. 62
  **10.05**    Filing of Notice of the Effective Date ........................ 63

**ARTICLE XI. - MODIFICATION, REVOCATION OR WITHDRAWAL OF PLAN** ............................................................................ 63
  **11.01**    Modification and Amendments ................................. 63
  **11.02**    Effect of Confirmation on Modifications .................... 63
  **11.03**    Revocation or Withdrawal of the Plan ....................... 63

**ARTICLE XII. - JURISDICTION** ........................................... 64
  **12.01**    Bankruptcy Court Jurisdiction ................................. 64
  **12.02**    Limitation on Jurisdiction ....................................... 65

**ARTICLE XIII. - MISCELLANEOUS** ..................................... 66
  **13.01**    Exemption from Taxes ............................................ 66
  **13.02**    Compliance with Tax Requirements .......................... 66
  **13.03**    Defenses and Setoff ............................................... 67
  **13.04**    Governing Law ...................................................... 67

17351979/9

**13.05**  Successors and Assigns..........................................................................................67

**13.06**  Transfer of Claims ...............................................................................................67

**13.07**  Post-Effective Date Service List ..........................................................................67

**13.08**  Notices ..................................................................................................................68
      (a)     If to the Debtors: ..................................................................................68
      (b)     If to the Committee: .............................................................................68
      (d)     If to the U.S. Trustee: ..........................................................................70

**13.09**  Immediate Binding Effect.....................................................................................70

**13.10**  Severability of Plan Provisions ............................................................................70

**13.11**  Exhibits ................................................................................................................70

**13.12**  Votes Solicited in Good Faith ..............................................................................70

**13.13**  Conflicts ...............................................................................................................71

**13.14**  U.S. Trustee Fees .................................................................................................71

**13.15**  Implementation ....................................................................................................71

**13.16**  No Admissions ......................................................................................................71

17351979/9

## DISCLAIMER

EACH HOLDER OF A CLAIM AGAINST ONE OR MORE OF THE DEBTORS ENTITLED TO VOTE TO ACCEPT OR REJECT THIS COMBINED PLAN AND DISCLOSURE STATEMENT (THE "PLAN") SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING.  NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO THE TERMS HEREOF AND SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE.  IF YOU ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THE PLAN.  THE DEBTORS, AS THE PLAN PROPONENT, URGES YOU TO VOTE TO ACCEPT THE PLAN.

THE PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 3016 AND 3017, AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST OR INTERESTS IN THE DEBTORS SHOULD EVALUATE THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.  THE PLAN SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN ONE OR MORE OF THE DEBTORS.  YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS REGARDING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE PLAN.

THE PLAN CONTAINS SUMMARIES OF CERTAIN STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, DOCUMENTS PREVIOUSLY FILED ON THE DOCKET IN THE CHAPTER 11 CASES, ANTICIPATED EVENTS IN THE CHAPTER 11 CASES, AND FINANCIAL INFORMATION.  THE PLAN PROPONENT BELIEVES THAT THE STATEMENTS AND DESCRIPTIONS CONTAINED IN THE PLAN ARE TRUE AND ACCURATE, BUT MAY BE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE DESCRIBED DOCUMENTS AND APPLICABLE STATUTORY PROVISIONS.  THE TERMS OF THE DESCRIBED DOCUMENTS AND APPLICABLE STATUTES GOVERN IN THE EVENT OF ANY DISCREPANCY WITH THE PLAN.  CREDITORS AND OTHER INTERESTED PARTIES SHOULD READ THE PLAN, THE DESCRIBED DOCUMENTS, AND THE APPLICABLE STATUTES THEMSELVES FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE FACTUAL STATEMENTS AND REPRESENTATIONS CONTAINED IN THE PLAN ARE TO THE BEST OF THE PLAN PROPONENT'S KNOWLEDGE, ACCURATE AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED, AND THE PLAN PROPONENT DISCLAIMS ANY OBLIGATION TO UPDATE ANY SUCH STATEMENTS AFTER THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN AND SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY

IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

ALL FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE PLAN PROPONENT INVOLVES MATERIAL RISKS AND UNCERTAINTIES AND ARE SUBJECT TO CHANGE BASED ON NUMEROUS FACTORS, INCLUDING FACTORS THAT ARE BEYOND THE PLAN PROPONENT'S CONTROL. ACCORDINGLY, THE DEBTORS' FUTURE PERFORMANCE AND FINANCIAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED IN ANY SUCH FORWARD-LOOKING STATEMENTS. SUCH FACTORS INCLUDE, BUT ARE NOT LIMITED TO, THOSE DESCRIBED IN THE PLAN. THE PLAN PROPONENT DOES NOT INTEND TO UPDATE OR REVISE THE FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED HEREIN WILL NOT BE REALIZED.

ANY PROJECTED RECOVERIES TO CREDITORS SET FORTH IN THIS PLAN ARE BASED UPON THE ANALYSES PERFORMED BY THE PLAN PROPONENT AND ITS ADVISORS. ALTHOUGH THE PLAN PROPONENT AND ITS ADVISORS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN, THE PLAN PROPONENT AND ITS ADVISORS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THIS INFORMATION.

IN CONNECTION WITH THE PLAN PROPONENT'S SOLICITATION OF ACCEPTANCES OF THE PLAN PURSUANT TO SECTION 1126(b) OF THE BANKRUPTCY CODE, THE PLAN PROPONENT IS FURNISHING A SOLICITATION PACKAGE, CONSISTING OF THE PLAN, THE EXHIBITS HERETO, CONFIRMATION NOTICE, AND A BALLOT TO EACH RECORD HOLDER OF CLAIMS ELIGIBLE TO VOTE OR ITS COUNSEL. THE PLAN IS TO BE USED BY EACH SUCH ELIGIBLE HOLDER SOLELY IN CONNECTION WITH ITS EVALUATION OF THE PLAN; USE OF THE PLAN FOR ANY OTHER PURPOSE IS NOT AUTHORIZED. UNLESS EXPRESSLY PROVIDED, NOTHING STATED IN THE PLAN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY. THE PLAN MAY NOT BE REPRODUCED OR PROVIDED TO ANYONE OTHER THAN ADVISORS TO THE RECIPIENT WITHOUT THE PRIOR WRITTEN CONSENT OF THE PLAN PROPONENT.

**INTRODUCTION**

The above-captioned debtors (the "Debtors," or the "Plan Proponent"), hereby proposes this Plan pursuant to sections 1125 and 1129 of the Bankruptcy Code.

This Plan contemplates the establishment of a trust by and through which a Liquidating Trustee will liquidate the Debtors' Unsold Assets, either through sale, or litigation and collection, for Distribution to holders of Allowed Claims. This Plan contains, among other things, a discussion of (i) the Debtors' history and businesses, (ii) the events leading to these Chapter 11 Cases, (iii) the Chapter 11 Cases, (iv) risk factors, (v) a summary and analysis of this Plan, and (vi) certain other related matters.

ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS ARE ENCOURAGED TO READ THE PLAN IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019, AND THE PLAN, THE PLAN PROPONENT RESERVES THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN, OR ANY PART THEREOF, PRIOR TO ITS SUBSTANTIAL CONSUMMATION.

**ARTICLE I. - DEFINITION AND CONSTRUCTION OF TERMS**

For purposes of the Plan, except as expressly provided or unless the context otherwise requires, (i) any capitalized term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable, (ii) whenever the context requires, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neutral, (iii) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (iv) any reference in the Plan to an existing document or exhibit means such document or exhibit as it may be amended, modified, or supplemented from time to time, (v) unless otherwise specified, all references in the Plan to sections, articles, schedules, and exhibits are references to sections, articles, schedules, and exhibits of or to the Plan, (vi) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan in its entirety rather than to any particular paragraph, subparagraph, or clause contained in the Plan, (vii) captions and headings to articles and sections are inserted for convenience of reference only and shall not limit or otherwise affect the provisions hereof or the interpretation of the Plan, and (viii) the rules of construction set forth in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

As used in the Plan, the following terms have the following meanings:

1.1. "**70/30 Split**" shall mean the allocation of funds to be distributed from the realization of proceeds from the Sales and the Unsold Assets as set forth in the Global Settlement

Agreement.  Such allocation remains subject to the $3 million cap for distribution to unsecured creditors as set forth in the Global Settlement Agreement.

1.2.    "**503(b)(9) Claims**" means Claims arising under section 503(b)(9) of the Bankruptcy Code against one or more of the Debtors that were to be Filed against the Debtor(s) on or before the General Bar Date.

1.3.    "**Administrative Expense**" means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases against one or more of the Debtors under section 503(b) and 507(a)(2) of the Bankruptcy Code, including any actual and necessary costs and expenses of preserving the Debtors' Estates, any actual and necessary costs and expenses of operating the Debtors' businesses, any indebtedness or obligations incurred by the Debtors after the Petition Date in connection with the conduct of its business, all compensation and reimbursement of expenses awarded or otherwise approved for payment by Final Order of the Bankruptcy Court under section 330, 503(b) or 1129(a)(4) of the Bankruptcy Code, any fees or charges assessed against the Debtors' Estates under section 1930 of chapter 123 of title 28 of the United States Code, all wages, salaries and health and other benefits on account of services rendered after the Petition Date, all post-Petition Date taxes, and all other claims entitled to administrative expense status pursuant to a Final Order of the Bankruptcy Court, in each case relating to the period from the Petition Date to the Effective Date but not beyond.

1.4.    "**Allowed**" means all or a portion of a Claim against one or more of the Debtors  (a) that has been listed by the Debtors in the Schedules as liquidated in an amount other than zero and not "disputed" or "contingent," and with respect to which no contrary Claim has been Filed, (b) as to which no Objection or request for estimation has been Filed on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Bankruptcy Court, (c) as to which any Objection has been settled, waived, withdrawn or denied by a Final Order, or (d) that is allowed (i) by a Final Order, (ii) by an agreement between the Holder of such Claim of one or more of the Debtors prior to the Effective Date, or the Liquidating Trustee on behalf of the Debtors' Estates after the Effective Date or (iii) pursuant to the terms of this Plan. For purposes of computing Distributions under this Plan, a Claim that has been deemed "Allowed" shall not include interest, costs, fees or charges on such Claim from and after the Petition Date, except as provided in section 506(b) of the Bankruptcy Code or as otherwise expressly set forth in this Plan.

1.5.    "**Asset Purchase Agreement**" means each of the agreements for the sales of assets from (i) the Debtors to 97 Mining Equipment Company, LLC and 97 Mining Operating Company, LLC, both affiliates and designees of Cobra Mining, Inc. and (ii) the Debtors to Simkol Corp. and Fearless Leasing, LLC, both affiliates of the Svonavec Parties.

1.6.    "**Assets**" means all tangible and intangible assets of every kind and nature of the Debtors and their Estates within the meaning of section 541 of the Bankruptcy Code, Cash, Causes of Action (including potential claims against the Debtors' current and former officers, managers, and directors), rights, interests and property, real and personal, tangible and intangible including all remaining files, books, and records of either of the Estates.

1.7.    "**Avoidance Actions**" means any and all avoidance, recovery, subordination, or other Claims and Causes of Actions that may be brought by or on behalf of the Debtors or their

4

Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under Chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

1.8.    "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., and as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Chapter 11 Cases.

1.9.    "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

1.10.    "**Bankruptcy Rules**" means, when referenced generally, (i) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated under section 2075 of title 28 of the United States Code, (ii) the applicable Federal Rules of Civil Procedure, as amended and promulgated under section 2072 of title 28 of the United States Code, (iii) the applicable Local Rules of Bankruptcy Practice and Procedures for the United States Bankruptcy Court for the District of Delaware, and (iv) any standing orders governing practice and procedure issues by the Bankruptcy Court, each as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Cases or proceedings therein, as the case may be; provided, however, when a specific Bankruptcy Rule is referenced (*e.g.,* Bankruptcy Rule 9019), such reference shall be to such Rule under the Federal Rules of Bankruptcy Procedure.

1.11.    "**Bar Date**" means, with respect to any particular Claim, the specific date set by the Bankruptcy Court as the last day for Filing proofs of Claim against one or more of the Debtors in the Chapter 11 Cases for that specific Claim as set forth in the Bar Date Order.

1.12.    "**Bar Date Order**" means the Order (i) Establishing Deadlines for Filing Proofs of Claim (Including Administrative Expense Claims Arising Under Section 503(b)(9) of the Bankruptcy Code ) and (ii) Approving the Form, Timing, and Manner of Notice Thereof entered by the Bankruptcy Court on June 9, 2025 [Docket No. 330].

1.13.    "**Bedrock**" means Bedrock Industries Investco 1 LLC.

1.14.    "**Bedrock Allowed Claim**" means the claims of Bedrock, as expressly set forth in the Global Settlement Agreement and Final Order approving the Cash Collateral Motion, as defined herein: (i) the Prepetition Claim and (ii) the Bedrock Superpriority Claim.

1.15.    "**Bedrock Collateral**" means all assets, properties, and interests of the Debtors whether arising pre or post-petition, including but not limited to (i) the Foreclosed Equipment, (ii) the Sold Assets; (iii) all assets, properties and interests of the Debtors and their bankruptcy estates after the Sales, including any and all claims and causes of action whether arising prepetition or postpetition (i.e., the Unsold Assets), (iv) any remaining proceeds of the Sales.

1.16.    "**Bedrock Lien**" means the valid, perfected, enforceable and non-avoidable security interest and prepetition liens and postpetition Adequate Protection Liens (as defined in the Global Settlement Agreement) on the Bedrock Collateral securing the Bedrock Allowed Claim,

which are not subject to recharacterization, vacatur, defenses, reclassification, subordination, reconsideration, disallowance or any other objection or challenge.

1.17. "**Bedrock Prepetition Claim**" means the principal amount of $15,777,852 plus accrued and unpaid interest, fees, and expenses (including professional and legal fees and expenses and charges) and other fees, expenses and charges.

1.18. **Bedrock Superpriority Claim**" means the claim of Bedrock, as expressly set forth in the Global Settlement Agreement granting an administrative expense claim pursuant to section 507(b) of the Bankruptcy Code in the amount of $2,200,000 for adequate protection incurred in connection with the Debtors' use of cash collateral.

1.19. "**Business Day**" means any day, other than a Saturday, Sunday or a legal holiday (as that term is defined in Bankruptcy Rule 9006(a)).

1.20.  "**Cash**" or "**$**" means legal tender of the United States of America or the equivalent thereof, including bank deposits, checks and cash equivalents.

1.21. "**Cash Collateral Motion**" means the Debtors' Motion to Approve Use of Cash Collateral -- Debtors' Motion for Entry of Interim Order (I) Authorizing Debtors and Debtors in Possession to (A) Use Cash Collateral and (B) Grant Adequate Protection to the Prepetition Lender; (II) Modifying the Automatic Stay; and (III) Granting Related Relief [Docket No. 14].

1.22. "**Causes of Action**" means all claims, counterclaims, crossclaims, actions, controversies, obligations, suits, judgments, damages, demands, debts, rights, preference actions, fraudulent conveyance actions and other claims or causes of action under Chapter 5 of the Bankruptcy Code and other similar state law claims and causes of action, liens, indemnities, guaranties, suits, liabilities, judgments, accounts, defenses, offsets, powers, or privileges, licenses and franchises of any kind or character whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, suspected or unsuspected, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, arising in law, equity or pursuant to any other theory of law. For the avoidance of doubt, Causes of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or Chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

1.23. "**Chapter 11 Cases**" means the Debtors' Chapter 11 cases, jointly administered under Case No. 25-10601 (MFW) in the Bankruptcy Court.

1.24. "**Claim**" or "**Claims**" means a claim or claims against one or more of the Debtors, as such term is defined in section 101(5) of the Bankruptcy Code.

1.25. "**Claims Objection Deadline**" means one hundred eighty (180) days after the Effective Date, or such later date as may be ordered by the Bankruptcy Court, *provided however*,

6

that the Liquidating Trustee may file one or more motions with the Bankruptcy Court on notice and an opportunity for a hearing to extend such deadline from time to time.

1.26.    "**Class**" means each category or group of Holders of Claims or Interests that has been designated as a class in Article IV of this Plan.

1.27.    "**Collateral Litigation**" shall mean, collectively, the civil action commenced by Heritage Holding in the Court of Common Pleas of Somerset County, PA (Civil Action No. 160-Civil-250) and the civil action commenced by Bedrock in the Supreme Court of the State of New York (Index No. 651177/2025).

1.28.    "**Committee**" means the official committee of unsecured creditors as appointed by the U.S. Trustee pursuant to section 1102(a)(1) of the Bankruptcy Code and set forth in Notice of Appointment of Committee of Unsecured Creditors [Docket No. 95], as may be amended from time to time.

1.29.    "**Confirmation**" means entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions set forth in this Plan, as may be subsequently modified or amended.

1.30.    "**Confirmation Date**" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

1.31.    "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1128(a) of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.32.    "**Confirmation Order**" means the order of the Bankruptcy Court confirming this Plan pursuant to, among others, sections 1125 and 1129 of the Bankruptcy Code.

1.33.    "**Consummation**" means the occurrence of the Effective Date.

1.34.    "**Contingent**" means, with reference to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which, or the obligation to make payment on which, is dependent upon a future event that may or may not occur.

1.35.    "**Convenience Class Claim**" means any General Unsecured Claim in the amount of $20,000 or less, including Holders of General Unsecured Claims who opt into the Class 5 of the Plan prior to the Voting Deadline.

1.36.    "**Creditor**" shall have the meaning ascribed to such term in section 101(10) of the Bankruptcy Code.

1.37.    "**Debtors**" means KTRV LLC and Heritage Coal & Natural Resources, LLC.

1.38.    "**Designation Rights**" has the meaning assigned to that term in the Asset Purchase Agreements.

1.39.   "**Disallowed**" means with respect to any Claim or portion thereof, any Claim against any of the Debtors which: (i) has been disallowed, in whole or part, by a Final Order; (ii) has been withdrawn by the Holder thereof in, whole or in part; (iii) is listed in the Schedules as zero or as Disputed, Contingent or Unliquidated and for which a proof of Claim has not been timely Filed or deemed timely Filed pursuant to the Bar Date Order, the Plan, the Bankruptcy Code or any Final Order or other applicable law; (iv) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the Filed amount of any proof of Claim; (v) is a proof of Claim which was not Filed timely and which is not subject to a Final Order which deems the proof of Claim timely; (vi) is unenforceable to the extent provided for in the Bankruptcy Code, including, for the avoidance of doubt, in section 502(b) of the Bankruptcy Code; and (vii) where the Holder of a Claim is a Person or Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, where a complaint for avoidance or an objection to such Claim has been Filed, unless such Person, Entity or transferee has paid the amount, or turned over any such property, for which such Person, Entity or transferee is liable under section 542, 543, 550, or 553 of the Bankruptcy Code. In each case a Disallowed Claim is Disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination or estimation.

1.40.   "**Disallowed Claim**" means a Claim, or any portion thereof, that is Disallowed.

1.41.   "**Disputed**" means any Claim which has not yet been Allowed or Disallowed in accordance with the terms of this Plan.

1.42.   "**Disputed Administrative Expense, Priority Tax Claim, Priority Non-Tax Claims and Secured Claims Reserves**" means the reserves established pursuant to Section 8.02 of this Plan, which reserve shall contain amounts relating to Disputed Administrative Expenses, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims.

1.43.   "**Distribution**" means any Distribution made pursuant to the Plan by the Liquidating Trustee to the Holders of Allowed Claims.

1.44.   "**Distribution Record Date**" means the date established for determining the Holders of Allowed Claims entitled to Distributions pursuant to the Plan, which shall be the Confirmation Date, including, for the avoidance of doubt, for Holders of Disputed Claims that are Allowed after the Confirmation Date or the date of the Rejection Bar Date (as defined in the Bar Date Order).

1.45.   "**Effective Date**" means the first Business Day after the date on which both (a) all conditions in Article X of this Plan have been satisfied or waived in accordance with that Article and (b) no stay of the Confirmation Order is in effect.

1.46.   "**Entity**" shall have the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

1.47.   "**Equipment Lenders**" means Caterpillar Financial Services Corporation and Cleveland Brothers Equipment Co., Inc.

1.48. "**Estates**" means the estates of the Debtors created pursuant to section 541 of the Bankruptcy Code.

1.49. "**Exculpated Parties**" means in each case in its capacity as such: (i) the Debtors, (ii) the Committee, (iii) members of the Committee, solely in their capacity as such, (iv) the Debtors' manager (under the Debtors' corporate organizational documents) , members, officers and directors who served or were employed by the Debtors during the Exculpation Period, in their capacity as such, (v) any professional retained by the foregoing entities pursuant to an order of the Bankruptcy Court in accordance with sections 327 or 1103 of the Bankruptcy Code, except for Ordinary Course Professionals provided, however, that with respect to any Person identified herein, such Person shall be considered an Exculpated Party solely to the extent that such Person participated in actions to which section 1125(e) of the Bankruptcy Code applies, and such Person shall be exculpated solely for actions taken during the Exculpation Period.  Further, the Exculpated Parties shall not be exculpated for any action or inaction related to the commencement of the Chapter 11 Cases, including the filing of the bankruptcy petitions or any decision not to dismiss the Chapter 11 Cases.

1.50. "**Exculpation Period**" means the period between March 30, 2025, and the Effective Date.

1.51. "**Executory Contract**" means a prepetition contract or unexpired lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.52. "**File**," "**Filed**," or "**Filing**" means, respectively, file, filed, or filing with the Bankruptcy Court or its authorized designee in these Chapter 11 Cases; provided, however, that with respect to proofs of Claim only, "Filed" means delivered and received in the manner provided by the Bar Date Order or as otherwise established by a Final Order of the Bankruptcy Court.

1.53. "**Final Administrative Expense Bar Date**" means the date that is 30 days after the Effective Date, which shall be the deadline for Filing requests for payment of Administrative Expenses that arose from the Petition Date and before the Effective Date.

1.54. "**Final Order**" means an unstayed order, ruling or judgment of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or request for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending, or as to which any right to appeal, petition for certiorari, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtors or the Liquidating Trustee on behalf of the Estates (on or after the Effective Date), or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been determined by the highest court to which such order was appealed, or certiorari, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules

of civil procedure, may be Filed with respect to such order, shall not cause such order not to be a Final Order.

1.55.   "**First Day Declaration**" means the Declaration of Brian Ryniker in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings [Docket No. 15].

1.56.   "**General Bar Date**" means July 9, 2025 at 5:00 p.m. (Prevailing Eastern Time) for certain Claims arising before the Petition Date, including 503(b)(9) Claims, Secured Claims, General Unsecured Claims, or Priority Non-Tax Claims as established by the Bar Date Order.

1.57.   "**General Unsecured Claim**" means any unsecured Claim against a Debtor that arose or is deemed by the Bankruptcy Code or Bankruptcy Court to have arisen before the Petition Date and that is not: (i) an Administrative Expense Claim, including a Professional Fee Claim, (ii) a Priority Tax Claim, (iii) a Secured Claim, (iv) a Priority Non-Tax Claim, or (v) a Convenience Class Claim that has not opted to be treated as a Class 4 General Unsecured Claim.

1.58.   "**Global Settlement Agreement**" means the settlement agreement among the Debtors, the Committee and Bedrock which was approved by the Court on June 25, 2025 [Docket No. 396].

1.59.   "**Governmental Unit**" shall have the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

1.60.   "**Governmental Unit Bar Date**" means December 9, 2025, at 5:00 p.m. (Prevailing Eastern Time) as established by the Bar Date Order.

1.61.   "**GUC Distribution Cap**" means the $3 million cap that may be allocated and distributed to unsecured creditors under the Global Settlement Agreement.

1.62.   "**HCNR**" means Heritage Coal & Natural Resources, LLC, one of the Debtors.

1.63.   "**Heritage Holding**" means Heritage Holding Co., one of the Svonavec Parties.

1.64.   "**HHC Parties**" means the Svonavec Parties, Banshee and their affiliates, Spencer Svonavec, Banshee Industries, LLC, Banshee Farms, LLC, Simkol Corp., and Fearless Leasing, LLC.

1.65.   "**Holder**" or "**Holders**" means the legal or beneficial holder of a Claim or Interest (and, when used in conjunction with a Class or type of Claim or Interest, means a Holder of a Claim or Interest in such Class or of such type).

1.66.   "**Impaired**" means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of Bankruptcy Code sections 1123(a)(4) and 1124.

1.67.   "**Impaired Class**" means a Class of Claims or Interests that is Impaired.

1.68.   "**Initial Distribution Fund**" means funds available on the Effective Date for payment on account of all Allowed Claims, other than the Bedrock Claim.

1.69.    "**Insider**" shall have the meaning ascribed to such term in section 101(31) of the Bankruptcy Code.

1.70.    "**Interests**" means the legal interests, equitable interests, contractual interests, equity interests or ownership interests, or other rights of any Person in one or more of the Debtors including all capital stock, stock certificates, common stock, preferred stock, partnership interests, limited liability company or membership interests, rights, treasury stock, options, warrants, contingent warrants, convertible or exchangeable securities, investment securities, subscriptions or other agreements and contractual rights to acquire or obtain such an interest or share in one or more of the Debtors, partnership interests in the Debtors' stock appreciation rights, conversion rights, repurchase rights, redemption rights, dividend rights, preemptive rights, subscription rights and liquidation preferences, puts, calls, awards or commitments of any character whatsoever relating to any such equity, common stock, preferred stock, ownership interests or other shares of capital stock of one or more of the Debtors or obligating one or more of the Debtors to issue, transfer or sell any shares of capital stock whether or not certificated, transferable, voting or denominated "stock" or a similar security.

1.71.    "**KTRV**" means KTRV LLC, one of the Debtors.

1.72.    "**Liquidating Trust**" means the trust established under the Plan, the Confirmation Order, and the Liquidating Trust Agreement.

1.73.    "**Liquidating Trustee**" means the trustee who will be governed by the Liquidating Trust Agreement, and who will be identified in the Liquidating Trust Agreement to be filed as part of the Plan Supplement.

1.74.    "**Liquidating Trust Agreement**" means the trust agreement, in form and substance acceptable to Debtors, Bedrock and the Committee, that establishes the Liquidating Trust and governs the powers, duties, and responsibilities of the Liquidating Trustee.  The Liquidating Trust Agreement shall be part of the Plan Supplement.

1.75.    "**Liquidating Trust Assets**" means all of the Estates' Assets transferred to the Liquidating Trust pursuant to section 6.01 hereof, including (i) the Initial Distribution Fund and (ii) Unsold Assets, Causes of Action and the proceeds thereof and any Interest of the Estates in the cash collateral from bonds, excluding those Unsold Assets required to be sold, abandoned or disposed of in accordance with the Plan as a condition precedent to the Effective Date.

1.76.    "**Liquidating Trust Administrative Expenses**" means the costs and expenses of the Liquidating Trust, funded from the Unsecured Claim Distribution Fund and the Initial Distribution Fund, incurred in accordance with the Plan and the Liquidating Trust Agreement to among other things, (i) reconcile General Unsecured Claims and (ii) administer distributions to holders of Allowed Priority Claims and the holders of Series B Trust Interests, including the actual and reasonable fees, costs and expenses of the Liquidating Trust's retained professionals, as determined in the reasonable discretion of the Liquidating Trustee, and the Liquidating Trustee's compensation.

1.77.    "**Liquidating Trust Expenses**" means the Liquidating Trust Administrative Expenses and the Liquidating Trust Recovery Expenses.

1.78.   "**Liquidating Trust Recovery Expenses**" means the costs and expenses of monetizing the Liquidating Trust Assets, including the actual and reasonable fees and expenses of the Liquidating Trustee and its retained professionals incurred in connection with the Liquidating Trust's prosecuting of Causes of Action to allocate proceeds in accordance with the 70/30 Split, excluding the Liquidating Trust Administrative Expenses and US Trustee Fees.

1.79.   "**Local Rules**" means the Local Rules of the United States Bankruptcy Court for the District of Delaware.

1.80.   "**Oversight Committee**" means the oversight committee consisting of members who will be identified in the Plan Supplement.

1.81.   "**Person**" shall have the meaning ascribed to such term in section 101(41) of the Bankruptcy Code.

1.82.   "**Petition Date**" means March 30, 2025, the date on which each of the Debtors commenced the Chapter 11 Cases in the Bankruptcy Court.

1.83.   "**Plan**" means this entire Combined Disclosure Statement and Plan of Liquidation, and all exhibits, schedules and related documents, whether annexed hereto or Filed in connection herewith (including, for the avoidance of doubt, the Plan Supplement), as it may be altered, amended, modified or supplemented from time to time including in accordance with any documents submitted in support hereof and the Bankruptcy Code or the Bankruptcy Rules.

1.84.   "**Plan Supplement**" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to this Plan, and which shall be Filed in the Chapter 11 Cases no later than _____, 2025 in form and substance acceptable to the Debtors, the Committee, and Bedrock.  For the avoidance of doubt, the Plan Supplement may be filed in one or more filings on a single date or on multiple dates.

1.85.   "**Priority Non-Tax Claim**" means any and all Claims accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Expense.

1.86.   "**Priority Tax Claim**" means a Claim or a portion of a Claim for which priority is accorded under section 507(a)(8) of the Bankruptcy Code.

1.87.   "**Pro Rata**" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that respective Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan, as applicable.

1.88.   "**Professional**" means any professional employed in the Chapter 11 Cases pursuant to Bankruptcy Code sections 327, 328, 363 or 1103 pursuant to a Final Order of the Bankruptcy Court.

1.89. "**Professional Fee Bar Date**" means the deadline for Filing all applications for Professional Fee Claims, which shall be forty-five (45) days after the Effective Date.

1.90. "**Professional Fee Claims**" means an Administrative Expense of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges incurred after the Petition Date and on or before the Effective Date.

1.91. "**Professional Fee Reserve**" means the balance of funds remaining for payment of Professionals' fees and expenses arising prior to the Effective Date for which there is money specifically allocated and segregated.

1.92. "**Released Party**" shall mean each of the following in their respective capacity as such: (i) the Debtors' officers, directors, managers, and members and Professionals (ii) the Committee, its Professionals and its members (only in their capacity as such), and (iii) Bedrock its officers, directors, managers, and members and Professionals.

1.93. "**Representative(s)**" means with respect to an Entity, all of that Entity's current and former affiliates, subsidiaries, officers, directors, managers, managing members, principals, members, partners, employees, agents, advisors, attorneys, professionals, accountants, investment bankers, consultants, other representatives and such Entity's respective heirs, executors, estate, servants and nominees, in each case in their capacity as such.

1.94. "**Reserves**" means the reserves established pursuant to Section 8.02 of this Plan, which reserves shall contain amounts relating to Disputed Administrative Expenses, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, Disputed Secured Claims, Disputed General Unsecured Claims, the Liquidating Trust Expenses, and any other reserves established by the Liquidating Trustee.

1.95. "**Sales**" means the sale of the Debtors' assets consummated approved by the Sale Orders.

1.96. "**Sale Orders**" means the Orders of the Bankruptcy Court dated June 25, 2025 approving the sales of the Debtors' assets [Docket Nos. 401, 402].

1.97. "**Schedules**" means the schedules of Assets and Liabilities and Statements of Financial Affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, which were filed (a) for HCNR on May 2, 2025 [Docket Nos. 197-198], as the same may have been amended, modified or supplemented from time to time and which were amended on May 8, 2025 [Docket Nos. 223], and (b) for KTRV on May 8, 2025 [Docket Nos. 225 and 226], as the same may have been amended, modified or supplemented from time to time.

1.98. "**Secured Claim**" means, pursuant to Bankruptcy Code section 506, that portion of a Claim that is (a) secured by a valid, perfected and enforceable security interest, lien, mortgage, or other encumbrance, that is not subject to avoidance under applicable bankruptcy or non-bankruptcy law, in or upon any right, title or interest of one or more of the Debtors in and to property of the Estates, to the extent of the value of the Holder's interest in such property as of the relevant determination date, or (b) Allowed as such pursuant to the terms of this Plan (subject to the

13

Confirmation Order becoming a Final Order). The defined term Secured Claim includes any Claim that is (i) subject to an offset right under applicable law as of the Petition Date, and (ii) a secured claim against one or more of the Debtors pursuant to Bankruptcy Code sections 506(a) and 553.

1.99.   "**Series A Trust Interests**" means the interests in the Liquidating Trust issued to Bedrock pursuant to the Plan.

1.100.  "**Series B Trust Interests**" means the interests in the Liquidating Trust issued to Holders of Allowed General Unsecured Claims pursuant to the Plan.

1.101.  "**Solicitation Procedures Order**" means the Bankruptcy Court's Order approving the Plan Proponent's Motion (i) Approving the Adequacy of Disclosures in the Plan of Liquidation, (ii) Scheduling the Confirmation Hearing and Deadline for Filing Objections, (iii) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan, and Approving the Form of Ballot and Solicitation Package, and (iv) Approving the Notice Provisions entered on _____, 2025 [Docket No. _____].

1.102.  "**Subordinated Claim**" means any Claim that is subordinated to General Unsecured Claims pursuant to section 510 of the Bankruptcy Code or Final Order of the Bankruptcy Court.

1.103.  "**Svonavec Parties**" means Angela Svonavec, Jason Svonavec, and Heritage Holding Co.

1.104.  "**Tax**" or "**Taxes**" means all income, gross receipts, sales, use, transfer, payroll, employment, franchise, profits, property, excise, or other similar taxes, estimated import duties, fees, stamp taxes, and duties, value added taxes, assessments, or charges of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, additions to tax, or additional amounts imposed by any taxing authority of a Governmental Unit with respect thereto.

1.105.  "**Unclaimed Distributions**" means any undeliverable or unclaimed Distributions.

1.106.  "**Unexpired Lease**" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.107.  "**Unimpaired**" means, when used in reference to a Claim or Interest, any Claim or Interest a Class of Claims or Interest that is not impaired within the meaning of section 1123(a) or 1124 of the Bankruptcy Code.

1.108.  "**Unliquidated**" means, with reference to a Claim, a Claim for which an amount certain has not been fixed, either by agreement of the parties or an Order of a court.

1.109.  "**Unsecured Claim Distribution Fund**," means Cash held by the Liquidating Trustee that is available for payment of all Allowed Unsecured Claims after realization of the 70/30 Split of the proceeds of the Liquidating Trust Assets subject to the GUC Distribution Cap. The Unsecured Claim Distribution Fund shall not include the Initial Distribution Fund.

1.110. "**Unsold Assets**" means all assets, properties and interests of the Debtors and their bankruptcy estates, including any and all claims and causes of action whether arising pre-petition or post-petition that were not sold under the Sale Orders or otherwise disposed of or abandoned prior to the Effective Date of the Plan.

1.111. "**U.S. Trustee**" means the Office of the United States Trustee for the District of Delaware.

1.112. "**Voting Agent**" means Stretto Inc.

1.113. "**Voting Deadline**" means **October 7, 2025, at 4:00 p.m. (Prevailing Eastern Time),** the date and time by which ballots to accept or reject the Plan must be received by the Voting Agent in order to be counted, as set forth by the Solicitation Procedures Order.

## ARTICLE II.– BACKGROUND

### 2.01    General Background

### A.  The Debtors' Businesses

KTRV is a Delaware holding company whose sole asset is the membership interest in HCNR, a Pennsylvania Limited Liability Company.  As of the Petition Date, HCNR owned and operated five producing coal mines and related operations in Pennsylvania and Maryland. Specifically, on the Petition Date, HCNR owned the following: (i) the Carlos site (located in Frostburg, MD), (ii) the Cabin Run site (located in Frostburg, MD), (iii) Summit #2 site (located in Meyersdale, PA), (iv) the Fisher #3 site (located in Meyersdale, PA), and (v) the Saylor Hill #2 site (located in Meyersdale, PA).  Additionally, HCNR owned (a) an operating wash plant located in Meyersdale, PA, and (b) a number of permits for other sites that were in cessation or reclamation.  As of the Petition Date, HCNR's main office was located in Meyersdale, PA.

### B.  Purchase and Financing of HCNR

Upon information and belief, at all relevant times prior to February 2024, Angela Svonavec ("Ms. Svonavec") owned all membership interests in Heritage Holding, which, in turn, owned all equity interests in HCNR.

On February 5, 2024, KTRV purchased all of the membership interests in HCNR from Heritage Holding pursuant to a membership interest purchase agreement (the "MIPA").  Bedrock provided financing for KTRV's purchase of the membership interests in HCNR.[2]

On February 2, 2024, (i) Bedrock extended $10 million in bridge financing to KTRV pursuant to a promissory note executed by KTRV (the "Bridge Note"); (ii) HCNR guaranteed the Bridge Note by signing a guaranty, and (iii) HCNR executed a Security Agreement (the "Security Agreement") pursuant to which HCNR granted Bedrock a security interest in substantially all of HCNR's personal property assets, including the company's equipment (the "Equipment").

---

[2]        A principal of Bedrock is related to the Debtors' managers and members, and therefore Bedrock may be an insider affiliate of the Debtors, as defined by Section 101(31) of the Bankruptcy Code.

In conjunction with the MIPA, KTRV and Heritage Holding executed an earn out agreement dated February 5, 2024 (the "Earn Out Agreement"), which provides for certain payments by KTRV to Heritage Holding based on the gross profits generated by HCNR from the sale of coal and rock, subject to certain adjustments and conditions. Section 8.2 of the MIPA (the "Incremental Tax Liability Provision") additionally provides for reimbursement of certain tax liabilities by KTRV to Heritage Holding based on the tax structuring of the sale of HCNR to KTRV. All earn-out payments and incremental tax liability reimbursements are subject to set-off against other amounts owing to KTRV from Heritage Holding, including indemnification obligations, at any time when such earn-out payments and incremental tax liability payments are due. KTRV individually and solely (and not HCNR) is obligated for such earn-out payments and incremental tax liability payments.

The MIPA and the Earn-Out Agreement (collectively, the "Sale Agreement Documents")[3] provide that HCNR will not allow the filing of any UCC-1 financing statements on the equipment listed in the MIPA (other than any preexisting filings) until the Debtors obtain permanent term and/or working capital financing; the Sale Agreement Documents further provide that a UCC-1financing statement would be permitted only if that financing is obtained by, and the UCC-1 financing statements are filed by, June 30, 2024, and only if the applicable creditor's debt secured by the equipment is not greater than $20 million.

The Sale Agreement Documents also state that, after the Debtors obtained financing and the related UCC-1 financing statements have been filed, Heritage Holding "… may file a UCC-1 financing statement put a lien on the [equipment], provided that such UCC-1 financing statement shall be subordinate to the UCC-1 financing statement associated with the [permanent term and/or working capital financing obtained by the Debtors]." Earn-Out Agreement, § 2.01(f) and MIPA, § 2.2.

On June 27, 2024, Bedrock and the Debtors entered into an Amended and Restated Loan Agreement (the "Amended Loan Agreement"). The Amended Loan Agreement recast and converted the Bridge Note to permanent and working capital financing. Ultimately, the total amount available under the Revolving Credit Commitment was $20 million, from which $15 million was drawn after June 27, 2024.

On June 27, 2024, Bedrock filed a UCC-1 financing statement in Delaware against KTRV and a UCC- 1 financing statement in Pennsylvania against HCNR, thereby perfecting its security interest in the Equipment and other collateral provided by the Debtors as authorized by each of KTRV and HCNR in the Agreements, Bedrock's Delaware UCC-1 filing identified KTRV as debtor and described the collateral as KTRV's membership interest in HCNR and all proceeds of such interests in HCNR. Bedrock's Pennsylvania UCC-1 filing identified HCNR as the debtor and described the collateral in substance as all of HCNR's personal property (which included the Equipment).

Bedrock's UCC-1 financing statements were authorized by Section 9-509(a) of the Uniform Commercial Code. And KTRV's grant of security to Bedrock complied with KTRV'S covenant under the MIPA and Earn Out Agreement because the debt secured by the Equipment did not exceed $20 million and the UCC-1 financing statement against HCNR was authorized by the Agreements and were only filed after the Debtors obtained permanent term and/or working

---

3        HCNR was not a party to the Sale Agreement Documents.

17351979/9

capital financing and in any event existed as of the closing.  HCNR did not make such covenant and there was no agreement or covenant made by HCNR.

**C. Actions of Heritage Holdings and Ms. Svonavec**

HCNR was not a party or signatory to the Sale Agreements and had no obligation or liability to pay or satisfy the Earn Outs. Despite never having received a grant of a security interest from HCNR with respect to any of its assets, on July 1, 2024, Heritage Holding filed a UCC-1 financing statement in Pennsylvania (the "Improper UCC Filing"). The Improper UCC Filing identified HCNR as the debtor and Heritage Holding and its owner, Ms. Svonavec and her husband and the former General Manager of HCNR, Jason Svonavec, as the secured parties and described the Foreclosed Equipment as their collateral.

HCNR never agreed or provided its consent enabling Heritage Holding to be named a secured party against HCNR or to file a financing statement.  The Sale Agreement Documents, drafted and executed by KTRV and Heritage Holding, contemplated that HCNR might grant Heritage Holding a security interest in the Equipment or other collateral, after securing a first-priority lien in favor of a new permanent and/or working capital lender, who might require a lien on all of HCNR's assets. KTRV and HCNR failed to obtain new permanent or working capital financing after the closing, and Bedrock, their existing lender, expanded and converted loans to Bedrock and retained its first-priority lien on all of their assets, including any of HCNR's equipment.

Heritage Holding's right to file a UCC-1 financing statement on the Equipment was contingent on HCNR executing a security agreement in its favor, as required by UCC §9-203(b)(3)(A) and §9-509(b). HCNR never executed such a security agreement, and none of the other conditions under §9-509(b) were met.  The Svonavec Parties filed a UCC-1 financing statement without the consent or authorization of HCNR, KTRV, or Bedrock, which the Debtors contend was in violation of the sale agreements, and which the Debtors asserted were unauthorized and impermissible UCC-1 financing statements.

On or about February 22, 2025, Ms. Svonavec authorized at least two of her agents, both former employees of HCNR, to unlawfully enter multiple HCNR mining properties in Maryland and Pennsylvania in an attempt to seize, repossess or render unusable the equipment located at each respective HCNR facility and sabotage HCNR's mining operations at those facilities.  After being asked to leave the premises by authorities and the police, they returned the following night and broke into the property again and stole additional pieces of equipment out of multiple locations.

At no time did Ms. Svonavec have authority to enter any of HCNR's premises either from HCNR (as lessee of certain of the properties and as the owner of others) or from the owner of any such properties leased by HCNR. Nor did Ms. Svonavec have a valid security interest in any of the equipment she seized and/or attempted to seize.  Even so, Mr. Hunt and Mr. Boyer showed up at two of HCNR's Maryland sites, trespassed upon the sites, and removed electronic control modules (each, an "ECM") from two-wheel loaders and two bulldozers, rendering those pieces of equipment inoperable.

After learning of Mr. Hunt's and Mr. Boyer's presence at those mining sites, an HCNR foreman drove to each location to stop Mr. Hunt and Mr. Boyer from taking any equipment. The sheriff's department was also called. But when a deputy sheriff arrived on the scene, Mr. Hunt and

Mr. Boyer presented a document signed by Ms. Svonavec in which she represented that her "agents" could "render unusable" the equipment and represented that Heritage Holding had obtained permission from the landowners to conduct these activities. Ms. Svonavec's written statements are false, and she had no legal basis to direct any party to trespass and sabotage this equipment.

Later that day, the same HCNR foreman visited a third HCNR Maryland mine site, the Carlos Mine, and found that the gate had been cut open with a welding blowtorch. The foreman found that Mr. Hunt and Mr. Boyer were still inside the facility where they had already disabled most of the equipment at that site. Without this equipment, HCNR was forced to substantially cease all mining at that site. The foreman confronted Mr. Hunt and Mr. Boyer, and Mr. Hunt falsely claimed that Heritage Holding owned the equipment before the two drove away.

Mr. Hunt and Mr. Boyer subsequently attempted to enter a fourth HCNR Maryland mining site, its Cabin Run mine. This time, HCNR's employees prevented them from entering through the front gate. Mr. Hunt and Mr. Boyer assured those HCNR employees they would not return to that facility.

However, two days later, at approximately 1:30 a.m. on Monday, February 24, 2025, a security contractor spotted two men on site at HCNR's mines in Pennsylvania. Upon seeing the security contractor, both men fled in a Ford F250 truck with several of the electronic control modules from different pieces of the equipment. Multiple pieces of equipment were disabled at HCNR's Pennsylvania site, with written notice from Heritage Holding. The truck appeared to have been one customarily driven by Mr. Hunt.

HCNR's employees again called the police, and Pennsylvania state troopers arrived and collected information. Later that night, the same HCNR contractor checked on a different HCNR mine and discovered that multiple electronic control modules from other pieces of equipment had also been removed from certain of the location's bulldozers and 6020 excavator, and the keys to several rock trucks were missing. The same written notice from HHC was placed on those pieces of equipment.

All told, Heritage Holding and its agents caused more than $200,000 of damage to the equipment, alone. As a result of the sabotage, HCNR has not been able to effectively operate these two Pennsylvania mines beyond a very limited basis, and HCNR's operations at those locations have since substantially ceased. As of the Petition Date, HCNR was still missing approximately 32 ECMs. Further, the absence of the ECMs significantly inhibited the Debtors' ability to market the equipment.

### D.  Default by KTRV and Strict Foreclosure by Bedrock

On January 20, 2025, Bedrock sent the Debtors a Notice of Events of Default and Acceleration (the "Notice of Default") stating that, pursuant to the terms of the loan agreement and related documents, the Debtors were in default, and the time to remedy the default had passed. Further, Bedrock declared the entire outstanding principal balance of the Bridge Note and all amounts owing under the loan agreement and other loan documents immediately due and payable, and imposing the default interest rate of 15% per annum on all outstanding balances and amounts due to Bedrock. Further, Bedrock made demand for payment of all unpaid obligations and amounts now due and payable by them, including, but not limited to the amounts due under the loan agreement and note.

Bedrock thereafter worked with the Debtors in attempt to address and resolve the liquidity challenge and enable the Debtors to raise cash and reduce liabilities by selling certain assets of the Debtors.  The Debtors needed time to negotiate and effectuate any sales, and given the obstacles and overhang as a result of the Svanovec Parties' actions, options were limited, but nevertheless certain strategic sales of limited assets were possible.  As a result, Bedrock informally forebore from exercising remedial rights.  Effective January 31, 2025, the Debtors, together with their managers and Bedrock, entered into a forbearance agreement (the "Forbearance Agreement") in an effort to extend the Debtors' runway and allow the Debtors to implement certain transactions expected to provide value for the Debtors.  In exchange for forbearing from exercising remedies, the Debtors granted Bedrock a security interest on certain additional collateral as set forth in the Forbearance Agreement.  Unfortunately, the Debtors were unable to meet their obligations under the Forbearance Agreement and subsequently defaulted.

On or about February 12, 2025, HCNR entered into an agreement with Bedrock (the "Strict Foreclosure") pursuant to UCC § 9-620, by and through which HCNR transferred to Bedrock title and ownership of the portion of equipment that served as Bedrock's collateral (the "Foreclosed Equipment")[4] in satisfaction of $10,000,000.00 of the obligations due to Bedrock. As a result of the Strict Foreclosure, the remaining monetary obligations of the Debtors due to Bedrock under the loan documents were at least $5,650,000 in principle, plus all accrued and accruing but unpaid interest, costs, and fees.

Further, HCNR agreed that, upon Bedrock's request, HCNR would execute and deliver any bill(s) of sale or other typical conveyancing documents to provide furthers assurances to Bedrock and any transferees of any Foreclosed Equipment from Bedrock, in form and substance reasonably acceptable to Bedrock. The Debtors further agreed to waive any rights they might otherwise have to redeem the Foreclosed Equipment and confirmed that Bedrock would continue to have the right to foreclose on any of the collateral that was not included in the Foreclosed Equipment and other rights granted to them.

Substantially contemporaneously with the Strict Foreclosure, Bedrock and HCNR entered into an agreement (the "Equipment Lease Agreement") by and through which Bedrock agreed to lease the Foreclosed Equipment to HCNR through March 14, 2025, with an option to renew the lease for up to ten one-week increments for a fixed weekly rent of $105,000.[5]  The Equipment Lease Agreement enabled HCNR to continue its ongoing revenue-producing mining operations and otherwise operate and maximize the value of the assets of HCNR.  At the same time, HCNR and Bedrock conferred with a third-party professional auction company with experience selling equipment of this type, about selling the Foreclosed Equipment once the Equipment Lease Agreement terminated.

---

[4]     Certain equipment, most notably two 100-ton haul trucks (i.e., "triple sevens") were not the subject of the Strict Foreclosure, and were therefore not included in "Foreclosed Equipment."

[5]     On or prior to March 14, 2025, the Debtors and Bedrock agreed to extend the term of the Equipment Lease Agreement for an additional four week period at a reduced rate of $50,000 per week.

### E. Litigation[6]

In addition to the sabotage of the equipment and continual refusal to return the ECM's to the Debtors, the actions by the Svonavec Parties created a maelstrom of litigation in numerous venues, all of which further depleted the Debtors' limited assets.

#### i.    The Allegheny County Action

On October 1, 2024, Heritage Holding commenced an action against KTRV (Civil Action GD-24-010899) in the Court of Common Pleas for Allegheny County, PA (the "Allegheny County Action" or the "First W.D. Pa. Action").  By and through the Allegheny County Action, Heritage sought damages arising from the MIPA and Earn-Out Agreement.  On October 17, 2024, KTRV filed a notice of removal to remove the action to the District Court for the Western District of Pennsylvania thereby initiating Civil Action 24-cv-1448.  On February 27, 2025, the District Court entered an Opinion that the greater weight of the evidence did not support a finding of complete diversity jurisdiction, the Court remanded the action back to Court of Common Pleas for Allegheny County, PA.

#### ii.    The Banshee Action

On February 5, 2024, substantially contemporaneously with the KTRV purchase of the membership interests of HCNR, Banshee Industries, LLC ("Banshee"), an affiliate of the Svonavec Parties, entered into a contract with HCNR.  By and through the agreement, HCNR agreed to sell 10,000 tons of "nut coal" to Banshee per year for ten years at a price of $75 per ton. In or about September 2024, the Debtors determined that Banshee had been fraudulently manipulating the weight of the trucks picking up the nut coal at HCNR's facilities, thereby deliberately and deceitfully causing Banshee to receive additional tons of coal without payment to HCNR.  As a result, on September 26, 2024, HCNR sent a letter to Banshee detailing Banshee's fraud, terminating the agreement, and making demand for payment of the coal that Banshee received without payment.

On October 1, 2024, Banshee commenced a civil action in the Court of Common Pleas of Somerset County Pennsylvania (630-Civil-2024) (the "Banshee Action").  By and through the Banshee Action, Banshee asserted counts for breach of contract, tortious interference with prospective relations, and injunctive relief. Banshee sought money damages as well as an emergency motion for a preliminary injunction. HCNR denied any liability.

On October 7, 2024, HCNR filed a notice of removal in the United States District Court for the Western District of Pennsylvania (Civil Action 3:24-cv-00233).  On February 27, 2025, the District Court entered an Opinion that the greater weight of the evidence did not support a finding of complete diversity jurisdiction, and an Order remanding the Banshee Action to the Somerset County Court of Common Pleas, where the Banshee Action remains pending but stayed.

---

[6]    Prior to KTRV's purchase of the interest in HCNR, HCNR was party to the following litigation that remains ongoing for which some or all of the Svonavec Parties are liable for indemnification: (i) Robindale Coal Sales, LLC, and Robindale Export, LLC v. Heritage Coal & Natural Resources, LLC (Case No. 2021-4158; CCP Westmoreland County, PA) and (ii) Appalachian Timber Products, Inc. and J.C.L. Logging, Inc. v. Heritage Coal & Natural Resources, LLC (Case No. 2022-708; CCP Somerset County, PA).

### iii.    The Second W.D. Pa. Action

On February 25, 2025, HCNR commenced a civil action in the United States District Court for the Western District of Pennsylvania (Case No. 3:25-cv-0059) against Heritage Holding Co., LLC, Angela Svonavec, Timothy Hunt, and Anthony Boyer (the "Second W.D. Pa. Action").  By and through the Second W.D. Pa. Action, HCNR asserted claims of trespass, conversion, and replevin.  Further HCNR sought injunctive relief precluding Heritage Holding, Ms. Svonavec, Mr. Hunt and Mr. Boyer from entering any property owned or leased by HCNR without specific and prior written permission from HCNR.  By Order of the District, the District Court relied upon the same Order dated February 27, 2025, in the First W.D.Pa. Action, and ordered briefing on the issue of subject matter jurisdiction.  As a result, on February 28, 2025, HCNR filed a notice of voluntary dismissal of the Second W.D. Pa. Action.  Such dismissal was expressly without prejudice.

### iv.    The New York Action

On February 28, 2025, Bedrock filed an action against Heritage Holding, Ms. Svonavec, Mr. Svonavec, HCNR and KTRV in the Supreme Court of the State of New York (Index No. 651177/2025) (the "New York Action").  By and through the New York Action, Bedrock sought, among other things: (i) damages from Heritage Holdings, Ms. Svonavec, and Mr. Svonavec for slander of Bedrock's title to the equipment; (ii) damages from the Heritage Defendants for their tortious interference with Bedrock's business relations; (iii) damages from Heritage Holding and Angela Svonavec for the authorization and direction of the trespass to chattel by removing and disabling pieces of the Equipment; (iv) damages from Heritage Holding and Angela Svonavec for the conversion of portions of the Equipment; (v) a declaratory judgment that the Heritage Defendants had no basis to assert a security interest in the equipment and Bedrock maintained the only valid security interest against the equipment; (vi) a declaratory judgment that that the Heritage Defendants UCC- 1 filings are void and of no effect, and that Bedrock's strict foreclosure agreement is valid and effective, and that Bedrock has acquired title to the collateral free and clear of any claims or liens, including any liens asserted by the Heritage Defendants. Further, by and through the New York Action, Bedrock sought an order directing the immediate return of every piece of equipment removed from HCNR's mining sites by Heritage Holding, Angela Svonavec, or their agents, and directing the Heritage Defendants to terminate and withdraw their UCC-1 filings and to refrain from filing any further UCC-1 financing statements against HCNR's personal property.  The New York Action remained pending as of the Petition Date, but upon information and belief, pursuant to and consistent with the HHC/Bedrock Settlement Agreement, the New York Action has since been dismissed.[7]

### v.    The Somerset Action

On March 6, 2025, Heritage Holding commenced an action in the Court of Common Pleas of Somerset County, PA (Civil Action No. 160-Civil-250) (the "Somerset Action").  Heritage Holding alleged that the Strict Foreclosure was a fraudulent conveyance under Pennsylvania law.  Heritage Holding did not seek to avoid the Strict Foreclosure but sought a judgment for damages for, among other things, conversion and trespass of chattels.  Further, Heritage Holding sought injunctive relief "enjoining Bedrock from disposing or otherwise using the Equipment until such time as the disputed foreclosure of the Equipment by Bedrock can be adequately litigated."

---

[7]    See Section 2.02(h).

To that end, substantially contemporaneously with the filing of the Complaint in the Somerset Action, Heritage Holding filed an emergency motion for a temporary restraining order (the "Somerset TRO Motion").  On March 13, 2025, the Court of Common Pleas entered an order granting injunctive relief that, among other things, enjoined through March 27, 2025, both Heritage and Bedrock from "disposing of, selling, transferring, liquidating, conveying, encumbering, injuring, damaging, devaluing, or otherwise taking any action that will or may cause physical, regulatory, or financial harm to HCNR's equipment located in Somerset County, PA as set forth in the UCC-1 Financing Statements attached to the [Somerset TRO Motion]."

On March 13, 2025, the Court of Common Pleas of Somerset County, PA entered a mutual temporary restraining order  (the "March 13 TRO") enjoining until March 27, 2025 at 10:00 a.m. (i) Heritage Holdings, (ii) Bedrock and (iii) all persons or entities acting on their behalf from "disposing of, selling, transferring, liquidating, conveying, encumbering, injuring, damaging, devaluing, or otherwise taking any action that will or may cause physical, regulatory, or financial harm to the equipment that is physically located in Somerset County, Pennsylvania, as enumerated in the UCC-1 Financing Statements attached to [the Somerset TRO Motion]."  Further, among other things, the March 13 TRO expressly provided that nothing in the order would affect any other party that is not a party to the Somerset Action, or any action by Heritage Holdings or Bedrock related to or in connection with any third parties' action, including but not limited to the Equipment Lenders.

On March 21, 2025, the Somerset Court entered an Amended Order of Court which provided that largely reiterated the terms of the March 13 TRO but extended the preliminary injunction period until "the conclusion of the hearing scheduled for April 9, 2025 at 1:30 p.m. (or until such time as this Order is extended or superseded by a subsequent Order of Court)".  Upon information and belief, pursuant to and consistent with the HHC/Bedrock Settlement Agreement, the Somerset Action has since been dismissed.[8]

### 2.02    Causes of the Bankruptcy Filing

The Debtors' bankruptcy cases were caused by a confluence of events, some of which are general economic issues related to the coal industry, and others were the direct and proximate result of the actions taken by Svonavec Parties.

First, the quality of the coal produced by HCNR was inferior to the representations and expectations made by the Seller Parties. When KTRV purchased Heritage Holding's interest in HCNR, it understood based upon the representations of the Seller Parties and their agents that the coal produced by HCNR was of quality suitable for the fulfilment of HCNR's customer contracts.  Only after the sale closed, did KTRV learn of a scheme perpetuated by Mr. Svonavec that fraudulently represented HCNR coal qualities to HCNR customers.  Not only did this put HCNR at significant legal and financial risk, but in order to operate the business and fulfill contract obligations where possible, HCNR would be required to incur significant extra cost. There were also certain quality specifications under contract that HCNR was unable to achieve, and thus HCNR would be unable to continue to perform under those contracts to which HCNR was a party prior to the change in ownership.  HCNR has thus been required to find alternative outlets for the inferior quality coal product that, in the past, was fraudulently sold into contracts.

---

[8]        See Section 2.02(h).

Second, the price of coal fell rapidly since the sale transaction closed. In February 2024, the index price of metallurgical coal that HCNR produced was approximately $265 per metric ton, resulting in a realized price for HCNR's metallurgical coal sales of $159 per short ton during the first calendar quarter of 2024. As of December 30, 2024, that same index price was down to $188 per metric ton. As of March 10, 2025, the price had further dropped to $177.50 per metric ton with estimated realized price for March 2025 of $98 to $99 per short ton. Based upon the current price of coal and the limited demand for that certain inferior quality coal product, it is not economically viable for HCNR to continue to mining coal from its sites.

Finally, the actions taken by the Seller Parties - from the multiple streams of parallel litigation to the vandalism caused by the Seller Parties' agents - caused significant damage to a business already facing economic headwinds.

### 2.03    Statement by the HHC Parties

As part of the Disclosure Statement and Plan Process, the HHC Parties have requested the inclusion of the following statement (the "HHC Statement"):

The HHC Parties dispute the factual background presented in this Disclosure Statement. HCNR was founded in 2008 by Mrs. Svonavec and, through its responsible operation of multiple surface mining sites throughout Pennsylvania and Maryland, established a legacy of mining excellence. For over fifteen (15) years—while under the management of Mr. and Mrs. Svonavec—HCNR profitably produced both metallurgical and thermal coal relied upon by the steel and energy industries, all while maintaining a commitment to the quality of its coal, the safety of its employees and surrounding communities, and environmental stewardship. The HHC Parties have been active participants in these Chapter 11 Cases as the largest creditor of the Debtors (owed in excess of $60 million). Throughout the bankruptcy, the HHC Parties have further demonstrated their commitment to the longstanding success of the business they founded by purchasing certain of the Debtors' Pennsylvania mining assets and equipment through the sales process.

There was significant prepetition litigation between the HHC Parties, Bedrock and the Debtors stemming from KTRV's purchase of Mrs. Svonavec's outstanding membership interests in the HCNR in February 2024. Negotiations over this sale proceeded over approximately one year prior to the closing in February 2024. And after the closing of the sale, HCNR failed to make payments owed to the HHC Parties pursuant to the purchase agreements for membership interests. Based on this failure and due to concerns that KTRV was planning to dispose of equipment serving as its collateral—the HHC Parties (through Heritage Holding) initially demanded adequate assurance from KTRV that it was not planning such disposition or that payment obligations would be satisfied with respect to disposition proceeds. After failing to receive payments owed under purchase agreements with KTRV—and after KTRV entered into a Forbearance Agreement with Bedrock, HHC exercised remedies provided under 13 Pa.C.S.§9-609 by repossessing certain equipment via disabling rather than physically removing it from its location due to size constraints. After the Petition Date and following the filing of Debtors' Motion To Show Cause, the HHC Parties returned the electronic control modules

previously removed from Debtors' equipment.  On April 3, 2025, the Debtors withdrew their Show Cause Motion acknowledging return of the electronic control modules as well as operational status restoration regarding said equipment.  There were also certain claims between the Debtors, Bedrock and the HHC Parties relating to the UCC-1s filed by the HHC Parties, which were resolved as between Bedrock and the HHC Parties in connection with the bankruptcy sale process and in conjunction with that resolution the adversary proceeding filed by the Debtors was withdrawn.

Prior to the Petition Date, the Debtors also entered into a contract with Banshee Industries, LLC pursuant to which the Debtors were to provide certain quantities of "nut coal" to Banshee.  The contracted nut coal was not provided to Banshee pursuant to the terms of the contract between the parties, and the Debtors have continued wrongfully allege that Banshee was manipulating the weight of the coal that the Debtors sold to Banshee.  Banshee disputes these mischaracterizations about its conduct in relation to the sale of nut coal and is confident that if these claims are litigated it would prevail.

The Debtors continue to allege that they hold valuable claims against the HHC Parties, which form the basis for certain of the projected recoveries under this Disclosure Statement.   The Debtors have eluded that certain of these claims may be related to allegations regarding coal quality.  The HHC Parties believe that there is no factual basis for these claims as all coal qualities were fully disclosed, sampled, and prepared by third parties. The HHC Parties dispute all of the Debtors' alleged claims, are confident that they would succeed in litigation regarding these claims and believe that these claims hold no value whatsoever and instead would cost the estate time and resources to litigate.

As more fully set forth herein, the Debtors disagree with much of the HHC Statement, and pursuant to the terms of the Plan, the Liquidating Trustee will pursue the estates' claims against the HHC Parties for the benefit of the Debtors' estates and creditors.  The Debtors and the HHC Parties each acknowledge that the inclusion of this section 2.03 is not an admission in any form or manner by the HHC Parties, the Debtors, the Debtors' estates or the Liquidating Trustee.

## A.  The Debtors' Business Operations and Finances

### 1.      Prepetition Divestiture of Assets

When KTRV first purchased the interests in HCNR in February 2024, HCNR operated a total of four producing mines in Pennsylvania in Maryland, two wash plants (one in Pennsylvania and one in Maryland),[9] and owned and operated significant equipment necessary for the operation

---

[9]      A coal wash plant, also known as a coal preparation plant, cleans coal by removing impurities like soil, rock, and other non-combustible materials, improving its quality.  HCNR used its wash plants to process coal extracted from its own mines, as well the coal extracted from other parties' mines.

17351979/9

of the mines and wash plants. Prior to the Petition Date HCNR was in the process of ceasing its operations and divesting itself of assets, including mines that are no longer in operation.

On January 31, 2025, HCNR transferred ownership of its wash plant in Lonaconing Maryland to Cobra Mining, Inc. ("Cobra") in exchange for $2.5 million. Consistent with the Forbearance Agreement, HCNR received $1.5 million in proceeds (which remained Bedrock's cash collateral) and Bedrock received $1 million.

On March 25, 2025, HCNR executed agreements to sell to Cobra the permits, rights under its leases of real property, and certain other collateral under the respective surety bonds for its Walker site in Carlos, MD (the "Walker Site") and Beechwood site in Lonaconing, MD (the "Beechwood Site").

HCNR was subject to a lease with Allegany Coal and Land Company for the Walker Site. For approximately 5 years, the operations at the Walker Site have been in temporary cessation on successive 6 month terms. For many years prior to HCNR's current ownership, there was limited mining at the Walker site. HCNR estimated that the reclamation costs at the Walker Site would total between $1.75 million and $2.75 million, and the coal reserves at the Walker Site aggregates approximately 150,000 tons. Accordingly, HCNR believed that, at best, the Walker Site had a neutral value during a mid-cycle market. At the current prices, the value of the Walker Site is negative and would require a significant upfront investment in mine development and equipment. As a necessary condition for operation of a coal mine in Maryland (and elsewhere), the operator is required to maintain a reclamation bond to ensure that the land is restored after the mining at the site has ceased. HCNR has a surety bond with Rockwood Casualty Insurance ("Rockwood") of approximately $382,500 for the Walker Site. HCNR is required to maintain 33% cash collateral at Rockwood across its entire bond portfolio (i.e., Rockwood is holding $127,500 of cash as collateral under the bond for the Walker Site). As part of its sale of the Walker Site, HCNR received approval from Allegany Coal and Land Company ("ACLC"), the surface and mineral owner of the Walker Site, under which ACLC and Cobra will enter into a new lease agreement. Pursuant to the sale agreement, Cobra will assume the surety bond obligations, and HCNR arranged for the transfer of the requisite cash collateral at Rockwood to Cobra. Cobra is required to begin the permit transfer process through the state of Maryland within 10 days of the signing of the agreement.

HCNR was subject to a lease at the Beechwood Site. Operations at the Beechwood Site ceased in 2023, and the site has been in reclamation since then. HCNR believes that there is between $100,000 and $150,000 of near-term costs of reclamation at the Beechwood Site, plus additional costs, which may ultimately aggregate as much as $250,000. HCNR estimated that the Beechwood Site has a small area of mineable coal, which, at current prices, renders the Beechwood Site to be a negative value. HCNR has three surety bonds with Rockwood totaling approximately $508,500 for the Beechwood Site. Accordingly, Rockwood is holding $169,500 of cash as collateral under the bond. The sale of the Beechwood Site did not require the approval from the landlord for the assignment of the lease to Cobra, Pursuant to the sale agreement, Cobra will assume the surety bond obligations, and HCNR arranged for the transfer of its requisite cash collateral at Rockwood to Cobra. Cobra is required to begin the permit transfer process through the state of Maryland within 10 days of the signing of the agreement.

As noted above, HCNR executed the agreement with Cobra, on March 25, 2025, however, due to the logistics of transfer of the surety bond and permits, the process for completion of the transfer was not finalized prior to the Debtors filing of the petitions. In connection with these

25

bankruptcy cases, and as more fully set forth herein, the Debtors will be seeking approval from this Court for the approval of the sale of the permits and other assets to Cobra consistent with the sale agreements.

### 2.    The Debtors' Employees and Operations

Prior to February 28, 2025, HCNR had 112 employees.  Due to the unforeseeable incapacitation of HCNR's equipment caused by HCNR's former owner, and other factors, on or about of February 28, 2025, the Debtors terminated more than half of their employees.  As of the Petition Date, the Debtors had approximately 44 employees, which could be divided as follows: 22 employees in mining operations sales and logistics, 16 employees in wash plant operations, and 6 office employees.  12 of those employees were salaried and 32 were paid on an hourly basis.

As of the Petition Date, HCNR owned 5 operating mining sites, plus other sites which were not currently operating or in reclamation, a wash plant, plus certain equipment.  Additionally, HCNR leased certain real property and, since the Strict Foreclosure, it leased certain equipment necessary for its operations from Bedrock.

### 2.04    The Chapter 11 Cases

On March 30, 2025, the Debtors each filed Chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the District of Delaware. On April 15, 2025, the U.S. Trustee appointed three creditors to serve on the Committee.

### A.    The Debtors' First Day Pleadings

On the Petition Date, the Debtors filed a number of motions and applications (collectively, the "First Day Motions").  Among other things, the Debtors sought separate motions seeking the following relief: (i) for joint administration [Docket No. 4]; (ii) to prohibit utilities from discontinuing service [Docket No. 6], (iii) for authority to (a) continue to maintain the existing cash management system, bank accounts, and business forms, (b) honor certain prepetition obligations related thereto, and (c) continue to perform ordinary course intercompany transactions; [Docket No. 7], (iv) for authority to pay or honor prepetition claims of critical vendors [Docket No. 8]; (v) for authority to pay prepetition claims of shippers and other lien claimants [Docket No. 9]; (vi) for authority to Pay Certain Prepetition Taxes and Fees[Docket No. 10]; (vii) for authority to pay prepetition employee obligations, prepetition taxes and fees [Docket No. 11]; and (viii) for authority to pay certain prepetition obligations arising under their insurance policies and surety bonds [Docket No. 12].  Each of the First Day Motions has been granted on a final basis [Docket Nos. [123, 126, 131, 124, 125, 129, 130].

Additionally, on the Petition Date, the Debtors filed a motion (i) to enforce the automatic stay, (ii) stay all state actions related to the Debtors property, (iii) enforce the protections of the Bankruptcy Code, and (iv) for related relief [Docket No. 13] (the "Auto Stay Motion").  The Auto Stay Motion sought to stay the Collateral Actions, as each asserted of the civil actions asserted claims against the Debtors and/or their assets.  On April 4, 2025, the Bankruptcy Court conducted a status conference with respect to the Auto Stay Motion. Prior to the status conference, the Debtors received comments to the proposed form of order granting the Auto Stay Motion from Heritage Holding and Bedrock.  On April 10, 2025, the Bankruptcy Court entered an Order [Docket No. 82] granting the Auto Stay Motion that provided, among other things, as follows:

Subject to section 362 of the Bankruptcy Code, all creditors of the Debtors, including but not limited to Heritage Holding and Bedrock and their respective principals are hereby stayed, restrained, and enjoined from:

(a) commencing or continuing any judicial, administrative, or other action or proceeding against the Debtors or property of the Debtors' estates, including any collateral related to Debtors' business operations, that was or could have been commenced before the Petition Date or recovering a claim against the Debtors that arose before the commencement of the Debtors' Chapter 11 cases;

(b) enforcing against the Debtors or against property of the Debtors' estates, a judgment or order obtained before the Petition Date;

(c) taking any action to obtain possession of property of the Debtors' estates, including but not limited to the Foreclosed Equipment, or to exercise control over property of the estates; and

(d) taking any action to create, perfect, or enforce against property of the Debtors' estates any lien to the extent that such lien secures a claim that arose prior to the Petition Date.

Further, parties agreed that the Collateral Litigation would be stayed until further order of the Bankruptcy Court. Pursuant to sections 105, 362, and 365(e) of the Bankruptcy Code, as applicable, and absent further Order of this Court to the contrary, all parties affiliated with the Collateral Litigation and their affiliates, would be stayed, restrained, and enjoined from altering, amending or terminating any lease or contract to which Debtors are a party, at any time during the administration of these Chapter 11 cases, and to the extent necessary or required, the Debtors, Bedrock, and Heritage Holding shall take such action as is necessary to have the state court formally vacate the restraining order dated March 21, 2025 in the Somerset Action.

By agreement of the Debtors, Heritage Holding, and Bedrock, and their respective principals, and expressly subject to further Order of the Bankruptcy Court after notice and an opportunity for hearing, neither the Debtors, Heritage Holding, Bedrock, or any other party, were permitted to dispose of, sell, transfer, liquidate, convey, encumber, injure, damage, devalue, or otherwise take any action that will cause physical, regulatory or financial harm to any of the Foreclosed Equipment or Foreclosed Equipment without the approval or further Order of the Bankruptcy Court, except the Debtors would retain the ability to use or dispose of any Foreclosed Equipment in the ordinary course of business.

## B.  Return of the ECMs from the Svonavec

As noted, in Section 2.01(c), supra, between February 22 and 24, 2025, some of the Svonavec Parties caused their agents to come onto certain of the Debtors' mining sites in Pennsylvania without authorization, and to remove 32 ECM's from the Debtors' equipment. As a result of the sabotage, HCNR was unable to effectively operate these two mines beyond a very limited basis. The Debtors believe that the actions taken by the Svonavec Parties' agents caused more than $200,000 of damage to the equipment alone, and HCNR's operations at those locations were significantly affected.

Shortly after the Petition Date, the Debtors contacted Ms. Svonavec to make demand for the return of the ECMs, and the Svonavec Parties' counsel refused stating "[Heritage Holding] has

no interest in returning said assets at this time, nor does it believe that retaining possession of the same constitutes a violation of the Bankruptcy Code."

On March 31, 2025, the Debtors filed a motion for an Order to show cause against Heritage Holding and Ms. Svonavec [Docket No. 20] (the "Motion to Show Cause"). On April 2, 2025, the Bankruptcy Court entered an order setting a hearing to consider the Motion to Show Cause. On or about April 2, the Svonavec Parties or their agents returned the ECMs to the Debtors. On April 3, the Debtors withdrew the Motion to Show Cause. The Debtors still have claims against one or more of the Svonavec Parties for damages arising from and related to the removal of the ECMs.

### C.      Schedules and Statements of Financial Affairs and Bar Dates

On May 2, 2025, the Debtors filed HCNR's Schedules [Docket Nos. 197-198], and on May 8, 2025, the Debtors filed amended Schedules for HCNR [Docket No. 223]. Also, on May 8, 2025, the Debtors filed KTRV's Schedules [Docket Nos. 225 and 226]. The Schedules, as amended, summarize the Debtors' understanding of assets and liabilities.

On May 21, 2025, the Debtors filed a motion to set deadlines for filing proofs of claim [Docket No. 298] (the "Bar Date Motion"). On June 9, 2025, the Bankruptcy Court entered the Bar Date Order [Docket No. 330] which set the Bar Date and the Governmental Unit Bar Date. The Bar Date Order did not set a deadline for filing a request for allowance of postpetition administrative expenses, other than prepetition administrative expenses arising under Section 503(b)(9) of the Bankruptcy Code.

As of the July 9, 2025 Bar Date, parties filed a total of 84 proofs of claim. Including duplicate proofs of claim, and without including claims that were not scheduled as contingent, disputed or unliquidated, and without any analysis as to the validity of the claims, the filed proofs of claim totaled in excess of $181,000,000. Those proofs of claim included approximately $10,979,500 of alleged secured claims and approximately $13,642 of priority claims arising under section 507 of the Bankruptcy Code. Some of those claims may have been satisfied in part or in whole, and again, the raw amounts do not account for any analysis as to the duplication of the proofs of claims, or the validity of the underlying claims.

### D.      Adversary for Determination of Svonavec Parties' Security Interests

On April 17, 2025, HCNR commenced Adversary Proceeding 25-50532 against the Svonavec Parties. As set forth in the complaint, the Debtors sought a declaratory judgment to determine validity, priority, and extent of asserted liens and security interests asserted by the Svonavec Parties with respect to certain of the Debtor's assets. Further, HCNR sought to avoid the improperly perfected liens asserted by the Svonavec Parties pursuant to Sections 544(b), 547, 550, and 551 of the Bankruptcy Code. HCNR also sought damages from the Svonavec Parties for failure to comply with Article 9.

HCNR and the Svonavec Parties agreed to extend the deadline for Svonavec Parties to answer or otherwise respond to the Complaint. On July 1, 2025, Bedrock and the Svonavec Parties reached an agreement in which the Svonavec Parties agreed to waive and release any rights or alleged security interests and liens in the equipment that were asserted by the Svonavec Parties' UCC filings, and that they would file UCC-3 termination statements. On July 14, 2025, and

consistent with the HHC/Bedrock Settlement Agreement, HCNR dismissed Adversary Proceeding 25-50532.[10]

### E.    Motion for Use of Cash Collateral

On the Petition Date, the Debtors filed a motion for entry of interim and final orders (i) for authority for the Debtors to (a) use cash collateral and (b) grant adequate protection to the prepetition lender; (ii) modifying the automatic stay; and (iii) granting related relief [Docket No. 14] (the "Cash Collateral Motion").  By and through the Cash Collateral Motion, the Debtors sought authority, first on an interim, and then a final basis, to use cash collateral on a consensual basis from Bedrock in accordance with a budget, and to provide adequate protection to Bedrock of the liens and security interests.  Commencing on April 2, 2025, the Court entered seven Orders approving the Cash Collateral Motion on an interim basis [Docket Nos. 57, 132, 153, 205, 234, 286, 324, and 349].

On June 23, 2025, in connection with the Global Settlement Agreement,[11] the Debtors, the Committee, and Bedrock agreed upon a final budget through August 31, 2025, by and through which, the Debtors would be authorized to use the Allocated Estate Funds and the First Unsecured Funds, as defined in the Cash Collateral Motion, up to $3,750,000 in the aggregate, plus cash proceeds of the Debtors' coal sold or otherwise disposed of in the ordinary course of their business and operations through the date of the Sale of the Sold Assets.  Among other things, the budget (the "Budget") provided for the funding of all anticipated administrative expenses incurred in connection with the Debtors' operations through August 31, 2025, including Professional fees and expenses.

The agreed-upon final order also included a waiver of the Debtors rights under 506(c) of the Bankruptcy Code, granting to Bedrock certain rights under Section 552 of the Bankruptcy Code and waiving the estates' rights to compel marshaling.  Further, the final form of order provided finality to Bedrock by fixing June 24, 2025 as the deadline for parties to assert a challenge to Bedrock's liens.  As a result of the Global Settlement Agreement, no challenge to Bedrock's liens or assertion of a claim against Bedrock was filed in the Bankruptcy Court prior to the June 24, 2025 deadline.

On June 24, 2025, the Court entered a final order granting the Cash Collateral Motion [Docket No. 390].

### F.    The First Settlement Motion

On or about March 31, 2025, the Debtors and Bedrock entered into a settlement agreement (the "First Settlement") that was intended to restore the parties back to their positions immediately prior to the Strict Foreclosure.  Specifically, the Debtors and Bedrock agreed that the Strict Foreclosure would be vacated and set aside to restore the Debtors and Bedrock to the position that they were in prior to the Strict Foreclosure, and title to the Foreclosed Equipment would be revested with HCNR and its bankruptcy estate, which would (again) become the lawful owners,

---

[10]    See Section 2.02(h).

[11]    See Section 2.03(h).

subject to the security interests of Bedrock and any other secured party that was affected by the Strict Foreclosure.

Further, the Debtors and Bedrock agreed that Bedrock's claims and security interests would revert to the status of those claims and security interests as they existed prior to the Strict Foreclosure as through the Strict Foreclosure had not occurred, and Bedrock's security interests in the Foreclosed Equipment would be deemed valid, perfected, enforceable, and non-avoidable, and not subject to vacatur, defenses, reclassification, subordination, reconsideration, or other objection or challenge, and only subject to the ownership or senior security interests of allowed secured claims.

Significantly, by and through the First Settlement, Bedrock agreed to allow the Debtors to use cash collateral and to negotiate postpetition financing to enable the Debtors to liquidate their assets as a going concern. As part of the agreement, the Debtors agreed to release all the estates' claims against Bedrock arising out of, based upon or related to, in whole or in part, the Strict Foreclosure, the Forbearance Agreement, Prepetition Loan Documents, the Settlement Agreement, or any of Bedrock's prepetition relationships and dealings with the Debtors or any affiliate of the Debtors as it related to, concerned, or arose out of the Foreclosed Equipment and Strict Foreclosure.

On April 1, 2025, the Debtors filed a motion for approval of the settlement with Bedrock with respect to the Strict Foreclosure and Foreclosed Equipment [Docket No. 26] (the "First Settlement Motion").

Prior to the hearing to consider the First Settlement Motion, the Committee [Docket No. 170], the United States Trustee [Docket No. 83], Robindale Coal Sales, LLC and Robindale Export, LLC [Docket No. 68], and Angela Svonavec, Jason Svonavec, and Heritage Holding [Docket No. 86] all filed objections to the First Settlement Motion.

Following an evidentiary hearing, oral argument, and the submission of a post-hearing brief by the Debtors, on May 22, 2025, the Bankruptcy Court denied the First Settlement Motion, finding, among other things, that the Debtors met their burden, but concluding that the standard for settlements with insiders is a strict one and that the Debtors did not meet the higher standard required. Ultimately, the Court stated that "it's in everybody's interests to proceed with a sale and if Bedrock believes that they did nothing wrong and that their claims are fully allowable and secured by the assets of the Debtor, then an investigation by the Committee should not be blocked by it."

### G.   Sale of the Debtors' Assets Free and Clear of Claims, Liens and Encumbrances

On April 23, 2025, the Debtors filed a Motion for Entry of an Order (I) Approving the Bidding Procedures, (II) Authorizing the Debtors to Enter into One or More Stalking Horse Agreements and Provide Bid Protections, (III) Approving the Form and Manner of Sale Notice, (IV) Scheduling an Auction and Sale Hearing, (V) Approving the Procedures for the Assumption and Assignment of Contracts, (VI) Approving the Sale of the Debtors' Assets Free and Clear, and (VII) Granting Related Relief [Docket No. 156] (the "Bid Procedures Motion"), which sought, among other things, to establish procedures for a sale or sales of the Debtors' assets (the "Sales") free and clear of claims, liens, and encumbrances.

17351979/9

On May 19, 2025, the Court entered an Order approving the Bidding Procedures [Docket No. 287] (as subsequently amended, the "Bidding Procedures Order"), pursuant to which the Court, among other things, set a deadline for the Debtors to enter into a stalking horse agreement, a bid deadline of June 2, 2025 (the "Bid Deadline"), setting a deadline for an auction (if necessary), setting objection deadlines, and scheduling a sale hearing.

Consistent with the Bidding Procedures Order, on May 23, 2025, the Debtors, after consultation with the Committee and Bedrock (the "Consultation Parties"), entered into a stalking horse agreement with Nations Capital, LLC ("Nations Cap") for the sale of all of the Debtors' equipment for $19 million (the "Stalking Horse Bid").

Prior to the Bid Deadline, the Debtors received fifteen bids (collectively, the "Bids") from eight bidders (collectively, the "Bidders") for their assets, including the Stalking Horse Bid, and the following: (i) a cash bid for certain mining assets and equipment in Maryland, (ii) a cash bid for certain mining assets in Pennsylvania and equipment in Maryland and Pennsylvania, (iii) a cash bid for certain mining assets and equipment in Pennsylvania and other assets, (iv), multiple cash bids for certain equipment, and (v) multiple credit bids for specific equipment. Each of the Bids was determined by the Debtors, after consultation with the Consultation Parties, to be a qualified bidder. Additionally, the Debtors received a bid from another party, who was not determined to be a qualified bidder.

Commencing on June 10, 2025, the Debtors conducted an auction at the offices of Morris James, LLP in Wilmington Delaware, although parties had the option of attending remotely (the "Auction"). The Auction continued through and including June 12, 2025, and included multiple bids by parties.

During the course of the Auction, the Debtors, after consultation with the Consultation Parties, authorized certain parties to confer to enable them to submit joint bids for the Debtors' assets. Further, the terms of certain Bids were modified during the Auction, including the addition or subtraction of certain equipment from Bids, as originally submitted, and in one instance, a release of certain estate claims was removed from a bid.

At the conclusion of the Auction, the Debtors, after consultation with the Consultation Parties, determined that the combination of (i) the bid (the "Simkol/Fearless Bid") of Simkol Corp. and Fearless Leasing, LLC ("Simkol/Fearless"),[12] and (ii) the bid (the "Cobra Bid") of Cobra Mining, Incorporated or its designee, ("Cobra") was determined to be the highest and best bid for the Debtors' assets. The combined Simkol/Fearless and Cobra bid provides the estates with $21,651,000 of consideration, plus the assumption of liabilities.

The Simkol/Fearless Bid provides for payment of $15,901,000 for 172 pieces of the Debtors' equipment located in Maryland and Pennsylvania; certain equipment inventory; and the following mining assets, all located in Pennsylvania:

- the Debtors' wash plant permit; and
- the following permits, all of which are inclusive of cash collateral related to the Bonds:
    - (i) Summit #2;
    - (ii) Saylor Hill;

---

[12]    Simkol/Fearless is an affiliate of the Svonavec Parties.

- o (iii) Shaw Mine refuse; and
- o (iv) Shaw Tipple.

Additionally, the Simkol/Fearless Bid includes the assumption and assignment of the lease of real property in Pennsylvania, pursuant to which Simkol/Fearless paid the underlying cure amount, as agreed upon between Simkol/Fearless and the landlord. The Simkol/Fearless Bid also provides Simkol/Fearless with designation rights, by and through which Simkol/Fearless may subsequently request the assumption and assignment of additional executory contracts and leases.

The Cobra Bid provided for payment of $5,750,000 for 31 pieces of equipment location in Maryland and the following mining assets located Maryland: (i) Cabin Run Mine and (ii) Carlos Mine. Additionally, the Cobra Bid includes the assumption and assignment of the lease of real property in Maryland pursuant to which Cobra paid the underlying cure amount, as agreed upon between Cobra and the landlord. The Cobra Bid also provides Cobra with designation rights by and through which Cobra may subsequently request the assumption and assignment of additional executory contracts and leases.

The Debtors, after consultation with the Consultation Parties determined that the back-up bids (collectively, the "Back-Up Bids") were (i) the Stalking Horse Bid of $19,000,000 for the Debtors' equipment and equipment inventory, (ii) the bid of RES Coal LLC of $1,978,971 for the Debtors' wash plant and related equipment, certain owned and leased property, all located in Pennsylvania, certain litigation rights, and the assumption of certain liabilities related to executory contracts and leases, and (iii) the bid of J & J Svonavec Excavating, Inc. in the amount of $10,000 for the permits for Summit #2 and Saylor Hill, plus the assumption of certain liabilities related to executory contracts and leases. The total cash component for the Back-Up Bids was $20,988,971, not including the liabilities to be assumed.

Ultimately, the Debtors, after consultation with the Consultation Parties, determined that the Back-Up Bids were, in the aggregate, lower than the combined value of the bids of Simkol/Fearless and Cobra, not only on a cash basis ($21,651,000 v $20,988,971), but also based upon the assumption of liabilities, as the combined bid of Simkol/Fearless and Cobra provided for the assumption of the Debtors' liabilities in Maryland, whereas the combination of all of the Back-Up Bids did not provide for any assumption of the Debtors' liabilities in Maryland. Significantly, the Simkol/Fearless excluded the waiver of the estates' claims against the affiliates and insiders of Simkol/Fearless.

On June 23, 2025, the Court considered the proposed sales to Cobra and Simkol/Fearless and, and on June 25, 2025, the Court entered orders approving the proposed sales [Docket Nos. 401 and 402, respectively]. On June 30, 2025, the Sales each closed.

## H. Settlement Between Bedrock and the HHC Parties

Substantially contemporaneously with the closing of the Debtors' sale to Simkol/Fearless, the HHC Parties, on the one hand, and Bedrock and its principal, Alan Kestenbaum, on the other hand, entered into a settlement agreement and mutual release (the "HHC/Bedrock Settlement Agreement"). The HHC/Bedrock Settlement Agreement provided, among other things that (i) within 5 business days of the closing of the Sale, Bedrock and HHC would take all reasonable steps necessary to dismiss the New York Action and the Somerset Action, each without prejudice, and (ii) the Svonavec Parties would waive and release any rights or alleged security interests and

17351979/9

liens in the Debtors' equipment, and that they would and within 5 business days of the closing of the Sale, file UCC-3 termination statements. The HHC/Bedrock Settlement Agreement also provided that the parties shall take all reasonable steps necessary to have the Debtors dismiss the Adversary Proceeding 25-50532 against Svonavec Parties without prejudice.

The Debtors were not a party to the HHC/Bedrock Settlement Agreement, however, as a third party beneficiary, and in reliance upon the agreements and representations therein, on July 14, 2025, HCNR filed a notice of dismissal of Adversary Proceeding 25-50532 without prejudice.

## I.      Global Settlement Between the Debtors, Committee and Bedrock

Both prior to and since the Court's May 22 ruling denying the First Settlement Motion, the Committee made informal document requests to the Debtors and Bedrock. Between April 21 and June 2, 2025, the Debtors produced more than 590 documents (4,439 image files) to the Committee, and on May 23, 2025, the Committee served Bedrock with twenty (20) formal document requests, and between May 26 and June 3, 2025, Bedrock produced to the Obligors and the Committee, 1,605 documents (10,126 image files) responsive to those requests, including but not limited to non-privileged and non-protected email correspondence, notes, agreements and drafts from the beginning of 2024 through the Petition Date.

The Initial Settlement between the Debtors and Bedrock had been based upon a narrow settlement of claims related to the Strict Foreclosure, the Forbearance Agreement, Prepetition Loan Documents, the Settlement Agreement, and any of Bedrock's prepetition relationships and dealings with the Debtors. During the subsequent discussions among Debtors, the Committee and Bedrock, the parties reached a global resolution of the estates' claims against Bedrock in exchange for the return of the Foreclosed Equipment, financing sufficient for the Debtors to confirm a plan of liquidation, and funds for distributions to unsecured creditors from the proceeds of both the Sales and the estates' remaining, unsold assets. Some of those settlement discussions were directly between the Committee and Bedrock, others involved all three parties, and in other instances, the Debtors communicated between the Committee and Bedrock in order to continue the progression of negotiations.

After weeks of protracted and often contentious negotiations between the Debtors, the Committee, and Bedrock, and their respective professionals, and after considering alternative transactions and paths, on or about June 18, 2025, the Debtors, the Committee and Bedrock agreed to the Global Settlement Agreement, the most significant terms of which are as follows:

-   Bedrock shall be entitled to a permanently allowed secured claim in the principal amount of $15,777,852 plus accrued and unpaid interest, fees and expenses and an Adequate Protection Claim with superpriority administrative expense priority under section 507(b) of the Bankruptcy Code in the amount of $2,200,000. Bedrock's claims and liens, including Bedrock's adequate protection claim, shall be perfected, enforceable, non-avoidable, and not subject to recharacterization, vacatur, defenses, reclassification, subordination, reconsideration, disallowance or any other objection or challenge. Further, the settlement resolves and releases all claims, including any derivative claim, that could be brought by the Debtors or their estates against Bedrock.

-   The strict foreclosure will be vacated and title to all of the Foreclosed Equipment will be re-vested with the estate of HCNR.

- Also, the settlement provides for a waterfall, both from the proceeds from the sales of the Debtors assets (the "Sold Assets") and the disposition of the Debtors' assets that have not yet been liquidated or otherwise disposed of (the "Unsold Assets"). Upon the closing of the Sales, the Obligors were obligated to immediately distribute or pay, or direct or cause the distribution or payment of, the proceeds of the Sales as follows:

> First, all amounts owed to Cleveland Bros. Equipment Co. ("Cleveland Bros.") and Caterpillar Financial Services Corporation ("Caterpillar"), currently estimated to be no more than $6,500,000 in the aggregate, in full and final satisfaction of their respective allowed claims and security interests, which security interests were released and satisfied upon payment;

> Second, $10,000,000 to Bedrock in partial satisfaction of its Prepetition Claim;

> Third, $1,500,000 to payment towards the professional fees and expenses of Bedrock's professionals;

> Fourth, $3,000,000 to the Debtors' Estates for payment of Debtors' and Committee's allowed professional fees, United States Trustee fees, and allowed unpaid administrative expenses of the Debtors, to be paid pursuant to and in accordance with the Final Cash Collateral Order (the "Allocated Estate Funds");

> Fifth, to the extent not otherwise covered by the budget as provided under the Final Cash Collateral Order, all operational expenses of the Debtors; and

> Sixth, the balance, if any, (i) the first $750,000 in cash proceeds (the "First Unsecured Funds") which shall be used (a) first to the Debtors' estates for the benefit of holders of allowed priority claims, and next, to holders of allowed general unsecured claims, against the Debtors' estates; then (ii) (a) 70% of all subsequent cash proceeds shall go to Bedrock, and (b) the remaining 30% shall go (1) first to the Debtors' estates for the benefit of holders of allowed priority claims, and (2) next to holders of allowed general unsecured claims, against the Debtors' estates; provided, however, the allocation and distribution and remittance to holders of claims against the Debtors' estates shall not exceed $3 million in the aggregate.

- With respect to the Unsold Assets, the cash proceeds from their sale shall be allocated and distributed and remitted as follows: (i) the First Unsecured Funds[13] which shall be used first to the Debtors' estates for the benefit of holders of allowed priority claims, and next, to holders of allowed general unsecured claims, against the Debtors' estates; then (ii) (a) 70% of all subsequent cash proceeds shall go to Bedrock, and (b) the remaining 30% shall go (1) first to the Debtors' estates for the benefit of holders of allowed priority claims, and (2) next to holders of allowed general unsecured claims, against the Debtors' estates; provided, however, the allocation and distribution and remittance to holders of claims against the Debtors' estates shall not exceed $3 million in the aggregate (the "70/30 Split"), subject to a cap of $3 million until Bedrock's Claim is indefeasibly and finally paid in full.

---

[13]     For the sake of clarity, whether received in whole or in part from the Proceeds of the Sold Assets or from the proceeds of the Unsold Assets, the Debtors' estates shall be entitled to a total of $750,000 for the benefit of unsecured creditors, plus the 70/30 Split. Further, Bedrock shall not be entitled to any distribution on account of its superpriority claim or its lien from either the First Unsecured Funds or the Debtors' estates' share of the 70/30 Split.

17351979/9

Importantly, Bedrock shall not be entitled to any portion of the First Unsecured Funds or the estates' portion of the 70/30 Split.

- HCNR, as the owner of the Foreclosed Equipment shall have the standing and right to pursue any insurance claims with respect to any claim related to or arising from any damages caused to and suffered by the Foreclosed Equipment, including any compensatory or punitive damages arising from the loss of and damage to the Obligors and their estates, and the proceeds of such recovery shall be considered a Sold Asset or Unsold Asset, and subject to distribution in accordance with the terms of the Settlement Agreement.

- The Debtors, the Committee, and the bankruptcy estates, including any successor or assign or thereto or party seeking to act derivatively of such rights, will waive, release and discharge any and all claims, and causes of action, including objections and challenges, whether directly or derivatively, known or unknown, or at law, equity or under the Bankruptcy Code (including, but not limited to, provisions of the applicable Uniform Commercial Code) against Bedrock and its affiliates, parent, subsidiaries, successors, and assigns, and the managers, members, employees, directors, officers, agents and advisors of Bedrock.  Further, except with respect to a breach of the Settlement Agreement, the Debtors, their bankruptcy estates, the Committee and their successors or assigns (and any party acting directly or derivatively thereto) shall be deemed to have fully released and discharged Bedrock, together with its officers, directors, members, employees, agents, attorneys, and professionals, and its affiliates, parent, subsidiaries, assigns and/or successors, from any and all claims and causes of action, demands, rights, or liabilities of every kind, character or nature whatsoever, in law or in equity or under the Bankruptcy Code, including any claims under Chapter 5 of the Bankruptcy Code or any other causes of action.  Further, the Debtors and the Committee shall be deemed as of the Effective Date of this Settlement Agreement to have fully and finally released, discharged, waived and resolved any possible Challenge as defined in the Cash Collateral Orders against Bedrock. The Debtors and the Committee shall not agree or cause the Challenge Deadline to be further extended.

- Notwithstanding anything in the Settlement Agreement to the contrary, nothing shall affect or impair the rights of the Debtors, the Committee, or any successor thereto - including but not limited to a chapter 11 trustee, chapter 7 trustee, or liquidating trustee - to object to any scheduled claim or filed proof of claim, other than the claim of Bedrock.

- Finally, Bedrock has consented to the use of cash collateral on a final basis, by and through which the Debtors will be able to seek confirmation of a plan of liquidation, pursuant to which a liquidating trustee will have the opportunity and ability to liquidate the Unsold Assets for the benefit of the estates and creditors.

On June 18, 2025, the Debtors filed a motion pursuant to 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 9019(b) for approval of the Global Settlement Agreement with Bedrock and the Committee [Docket No. 372] (the "Global Settlement Motion").  On June 25, 2025, the Court entered an order approving the Global Settlement Motion [Docket No. 396].

## <u>ARTICLE III.</u> - CONFIRMATION PROCEDURES

**3.01**    Confirmation Hearing Procedures

17351979/9

On August __, 2025, the Debtors filed a motion, by and through which they sought conditional approval of the Plan for solicitation purposes only and for approval of the procedures for the solicitation of the Plan [Docket No. ___].  On September __, 2025, the Bankruptcy Court entered the Solicitation Procedures Order [Docket No. ___].  Among other things, the Solicitation Procedures Order, approved the adequacy of disclosures in the Plan on an interim basis and set certain deadlines for the solicitation of the Plan, voting on the Plan, filing objections to the Plan and scheduling a hearing to consider approval of the Plan.  The Confirmation Hearing has been scheduled for **October 15, 2025 at 10:30 a.m.** (Prevailing Eastern Time) at which the Bankruptcy Court will consider the Plan pursuant to section 1129 of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time by the Plan Proponent.

### 3.02    Procedure for Objections

Any objection to final approval of the Plan, including whether it provides adequate information pursuant to section 1125 of the Bankruptcy Code and/or Confirmation of the Plan, must be made in writing and Filed with the Bankruptcy Court and served on the following parties so as to be actually received on or before **October 7, 2025 at 4:00 p.m. (Prevailing Eastern Time)** upon (a) the Debtors: Jeffrey R. Waxman, Esquire and Samantha L. Rodriguez, Esquire (E-mail: jwaxman@morrisjames.com and SRodriguez@morrisjames.com) (b) the Committee: Kimberly A. Brown, Esquire (Email: brown@lrclaw.com); Jordan S. Blask, Esquire, Mark Platt, Esquire and Bryan J. K. Sisto, Esquire (Email: jblask@fbtlaw.com, mplatt@fbtlaw.com, bsisto@fbtlaw.com); (c) Andrew I. Silfen, Esquire and Beth M. Brownstein, Esquire (Email: Email: Andrew.Silfen@afslaw.com, and Beth.Brownstein@afslaw.com) and Christopher M. Samis, Esquire (Email: csamis@potteranderson.com) and (d) the U.S. Trustee: Megan Seliber, Esquire and (email: Megan.Seliber@usdoj.gov) and Malcolm M. Bates (email: malcolm.m.bates@usdoj.gov).

**Unless an objection is timely Filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.**

### 3.03    Requirements for Confirmation

The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among other requirements, the Plan (a) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and must be "fair and equitable" with respect to, such Class; and (b) must be feasible. The Bankruptcy Court must also find that: (i) the Plan has classified Claims and Interests in a permissible manner; (ii) the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

### 3.04    Classification of Claims and Equity Interests

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to section 1123(a)(1) of the Bankruptcy

Code need not be and have not been classified). The Plan Proponent is also required, under section 1122 of the Bankruptcy Code to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Plan Proponent believes that the Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny Confirmation of the Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been Disallowed, paid, released or otherwise settled prior to the Effective Date. The Plan Proponent believes that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a Holder of a Claim or Interest may challenge the Plan Proponent's classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If such a situation develops, the Plan Proponent intends, in accordance with the terms of the Plan, and pursuant to section 1127 of the Bankruptcy Code, to make such permissible modifications to the Plan as may be necessary to permit its Confirmation. Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE ULTIMATE CLASS IN WHICH THE HOLDER IS DEEMED TO BE A MEMBER.

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distribution received by Creditors. The projected recoveries are based on information available to the Plan Proponent as of the date hereof and reflect the Plan Proponent's views as of the date hereof only.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized herein. The Plan Proponent believes that the consideration, if any, provided under the Plan to Holders of Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

**3.05    Impaired Claims or Equity Interests**

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, only Holders of Claims in Classes 3, 4, and 5 are Impaired and are entitled to vote on the Plan. Holders of Claims in Classes 1 and 2 are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan.

Holders of Interests in Class 6 (Equity Interests) will not receive anything on account of their respective claims and interests and are therefore not entitled to vote on the Plan and are deemed to reject the Plan.

A ballot for acceptance or rejection of the Plan is being provided only to Holders of Claims in Class 3 (Bedrock Claim), Class 4 (General Unsecured Claims) and Class 5 (Convenience Class Claims).

**3.06    Confirmation Without Necessary Acceptances; Cramdown**

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests. Here, because Holders of Interests in Class 6 are deemed to reject the Plan, the Plan Proponent will seek Confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Plan Proponent believes that such requirements are satisfied, as no Holder of a Claim or Interest junior to General Unsecured Claims, will receive or retain any property under the Plan.

17351979/9

A plan does not "discriminate unfairly" if (a) the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the non-accepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Plan Proponent believes that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, and no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims in such Class. Accordingly, the Plan Proponent believes that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable." In order to determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity holders, as follows:

(a) <u>Secured Creditors</u>. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

(b) <u>Unsecured Creditors</u>. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the Holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(c) <u>Equity Interests</u>. Either (i) each Holder of an Interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such Holder is entitled, the fixed redemption price to which such Holder is entitled or the value of the interest or (ii) the Holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan. As discussed above, the Plan Proponent believes that the Distributions provided under the Plan satisfy the absolute priority rule, where required.

**3.07**    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the debtors or any successor to the debtors (unless such liquidation or reorganization is proposed in the Plan). Inasmuch as the majority of Debtors' property has been liquidated and the Plan provides for the Distribution of all of the Cash proceeds of the Debtors' property to Holders of Claims that are Allowed as of the Effective Date in accordance with the Plan, for purposes of this test, Plan Proponent has analyzed the ability of the Liquidating Trust to meet its obligations under the Plan. Based on the Plan Proponent's analysis, the Liquidating Trustee will have sufficient assets to

accomplish its tasks under the Plan. Therefore, the Plan Proponent believes that the liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

**3.08**    Best Interests Test and Liquidation Analysis

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code. To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under Chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its Chapter 11 cases were converted to Chapter 7 under the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distribution from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative expenses associated with a Chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation scenario results in a distribution to holders of claims or interests in any impaired class that is greater than the distribution to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class. See Liquidation Analysis attached as **Exhibit A** to this Plan.

Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical Chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the Chapter 11 liquidation contemplated by the Plan. However, the Plan Proponent believes that in a Chapter 7 liquidation, there would be additional costs and expenses that the Estates would incur as a result of liquidating the Estates in Chapter 7.

The costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee. The Plan Proponent believes such amount would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors. The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals) that are allowed in the Chapter 7 case. Conversion also would likely delay the liquidation of the assets as well as the Distributions to Holders of Claims.

Accordingly, the Plan Proponent believes that Holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Cases were converted to Chapter 7, and therefore, the classification and treatment of Claims and Interests in the Plan complies with section 1129(a)(7) of the Bankruptcy Code.

**3.09**    Acceptance of the Plan

17351979/9

The rules and procedures governing eligibility to vote on the Plan, solicitation of votes, and submission of ballots are set forth in the Solicitation Procedures Order. In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Class entitled to vote on this plan, excluding the votes of Insiders, must actually vote to accept the Plan. **THE VOTING AGENT MUST RECEIVE BALLOTS ON OR BEFORE THE VOTING DEADLINE OF 4:00 P.M. (PREVAILING EASTERN TIME) ON OCTOBER 7, 2025.**

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY MAIL THE BALLOT YOU RECEIVE OR PROMPTLY USE THE ONLINE VOTING OPTION. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY AND TO IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE HOLDER. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT OR YOU LOST YOUR BALLOT OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, CONTACT THE VOTING AGENT AT (866) 967-0675.

## ARTICLE IV. - CLASSIFICATION OF CLAIMS AND INTERESTS AND EXPECTED RECOVERIES

**4.01**    Overview of Classification.

Pursuant to section 1122 of the Bankruptcy Code, a Claim or Interest is placed in a particular Class for purposes of voting on the Plan and receiving Distributions under the Plan only to the extent (i) the Claim or Interest qualifies within the description of that Class; and (ii) the Claim or Interest has not been paid, released, or otherwise compromised before the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses, including Professional Fee Claims, and Priority Tax Claims are not classified under the Plan and are excluded from the Classes.

**4.02**    Identification and Treatment of Unclassified Claims

(a)    <u>Administrative Expenses</u>. On the Effective Date, each Holder of an Allowed Administrative Expense, other than Bedrock on account of the Bedrock Superpriority Claim, shall receive in full and final satisfaction and release of and in exchange for such Allowed Administrative Expense: (a) Cash equal to the amount of such Allowed Administrative Expense; or (b) such other treatment as to which the Plan Proponent or the Liquidating Trustee, as applicable, and the Holder of such Allowed Administrative Expense shall have agreed upon in writing.  Cash distributed to Holders of Allowed Administrative Expenses (other than Professional Fee Claims) shall be paid from the Initial Distribution Fund. Allowed Professional Fee Claims shall be paid from the Debtor Professional Escrow, and/or Professional Fee Reserve, as set forth in the Sale Order and subject to the limitations therein, which shall, collectively, be the exclusive sources of funds for payment of Allowed Professional Fee Claims. Such amounts may be paid from either the Initial Distribution Fund or the General Unsecured Trust in the Liquidating Trustee's discretion.

41

(i) <u>Final Administrative Expense Bar Date</u>. Holders of Administrative Expenses accruing from the Petition Date through the Effective Date, other than Professional Fee Claims, shall File with the Bankruptcy Court and serve on the Liquidating Trustee requests for payment, in writing, together with supporting documents, substantially complying with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, so as to actually be received on or before the Final Administrative Expense Bar Date. Any such Claim not Filed by the Final Administrative Expense Bar Date shall be deemed waived and the Holder of such Administrative Expense Claim shall be forever barred from receiving payment on account thereof. The notice of the Effective Date to be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth the Final Administrative Expense Bar Date and shall constitute notice of such Bar Date. The Liquidating Trustee shall have one hundred and eighty (180) days (or such longer period authorized by an Order of the Bankruptcy Court on a motion of the Liquidating Trustee) following the Final Administrative Expense Bar Date to review and object to Administrative Expenses.

(ii) <u>Bar Date for Applications for Professional Fees</u>. All applications for allowance and payment of Professional Fee Claims shall be Filed with the Bankruptcy Court on or before the Professional Fee Bar Date. If an application for a Professional Fee Claim is not Filed by the Professional Fee Bar Date, such Professional Fee Claim shall be deemed waived and the Holder of such Professional Fee Claim shall be forever barred from receiving payment on account thereof. The notice of Effective Date to be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth the Professional Fee Bar Date and shall constitute notice of such Bar Date. The Professional Fee Bar Date shall be thirty (30) days after the Effective Date. All Allowed Professional Fees shall be paid from the Debtor Professional Escrow and Professional Fee Reserve and/or the Wind-Down Budget set forth in the Sale Order, subject to the limitations therein.

(iii) <u>Section 503(b)(9) Claims</u>. For the avoidance of doubt, (i) the deadline for Filing requests for payment of 503(b)(9) Claims was the General Bar Date and (ii) the deadline for Filing requests for payment of Administrative Expenses that arose between the Petition Date and the Effective Date is the Final Administrative Expense Bar Date, which is thirty (30) days after the Effective Date.

(b)    <u>Priority Tax Claims</u>. On the Effective Date, each Holder of a Priority Tax Claim that is Allowed shall receive in full and final satisfaction and release of and in exchange for such Priority Tax Claim: (a) Cash equal to the amount of such Allowed Priority Tax Claim; or (b) such other treatment as to which the Plan Proponent or the Liquidating Trustee, as applicable, and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing. Such amounts shall be paid from either the Initial Distribution Fund or the Liquidating Trust in the Liquidating Trustee's discretion.

(c)    <u>Administrative and Priority Claim Reserve.</u> As set forth in Section 8.02 of this Plan, prior to making any Distributions, the Liquidating Trustee shall establish reserves in Cash, in an amount sufficient for the payment of all Disputed Administrative Expenses, Disputed Priority

Tax Claims and other Disputed Claims and expenses (including Liquidating Trust Expenses) as deemed necessary in the reasonable discretion of the Liquidating Trustee.

    **4.03**    Identification of and Treatment of Classes of Claims

    (a)    <u>Treatment of Priority Non-Tax Claims (Class 1)</u>. Each Holder of an Allowed Priority Non-Tax Claim shall receive in exchange for full and complete satisfaction and release of such Claim, either Cash equal to the full unpaid amount of such Allowed Priority Non-Tax Claim, or such other treatment as the Debtors or the Liquidating Trustee, as applicable, and the Holder of such Allowed Priority Non-Tax Claim shall have agreed. Following the Effective Date, Distributions of Cash to Holders of Priority Non-Tax Claims shall be made as soon as reasonably practicable after it is Allowed from the Initial Distribution Fund or the Liquidating Trustee in the Liquidating Trustee's reasonable discretion. **Class 1 Claims are therefore Unimpaired and not entitled to vote.**

    (b)    <u>Treatment of Secured Claims (Class 2)</u>. Each Holder of an Allowed Secured Claim against the Debtors shall receive on the Effective Date, on account of and in full and complete satisfaction and release and in exchange for, such Allowed Secured Claim, either return of the collateral securing such Allowed Secured Claim or Cash equal to the full unpaid amount of such Allowed Secured Claim, or such other treatment as the Plan Proponent, and the Holder of such Allowed Secured Claim shall have agreed. If the Holder of an Allowed Secured Claim is to receive a Distribution in Cash, such Distribution shall be made from the Initial Distribution Fund or the Liquidating Trust on or as soon after the Effective Date or date such Claim becomes Allowed as is reasonably practicable. **Class 2 Claims are therefore Unimpaired and not entitled to vote.**

    (c)    <u>Treatment of Bedrock Claim (Class 3)</u>. The Holder of the Bedrock Allowed Claim, consistent with the Global Settlement Agreement, shall receive in full and final satisfaction and release of and in exchange for such Allowed Class 3 Claim, the Series A Trust Interests allocated based on its share of the 70/30 Split from the proceeds of the Liquidating Trust Assets. **The Class 3 Bedrock Deficiency Claim is Impaired and entitled to vote.**

    (d)    <u>Treatment of General Unsecured Claims (Class 4)</u>. **Subject to the right to opt into Class 5 as set forth below,** each Holder of an Allowed General Unsecured Claim shall receive in full and final satisfaction and release of and in exchange for such Allowed Class 4 Claim, the Pro Rata share of the Series B Trust Interests, allocated based on (a) the Initial Distribution Fund after payment or reserve of all Allowed Administrative Expenses, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Secured Claims in full and (b) to the extent that any portion of an Allowed General Unsecured Claim remains after such payment, the Unsecured Claim Distribution Fund. **Class 4 Claims are Impaired and entitled to vote.**

    (e)    <u>Treatment of Convenience Class Claims (Class 5)</u>. **Subject to the right to opt into Class 4 as set forth above,** Convenience Class Claims are unsecured claims that have been asserted in an amount of $20,000 or less. Unless a Convenience Class Claim is the subject of an objection on the Effective Date or has been satisfied, it shall be deemed Allowed and not subject to objection, and the Holder of such Convenience Class Claim shall receive a Distribution of 10% of the amount of its Allowed Convenience Class Claim. Such Distribution will be made from the Initial Distribution Fund as soon after the Effective Date as is reasonably practicable but in no

event prior to payment in full (or the establishment of reserves sufficient to allow payment in full) of all Allowed Administrative Expenses, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Secured Claims. In the event that a Convenience Class Claim Holder has opted into Class 5 and an objection to the Claim is pending on the Effective Date, the Holder of such Claim shall receive a Distribution of 10% of the amount of its Allowed Convenience Claim from the Initial Distribution Fund as soon as reasonably practicable after the Claim is Allowed. **Class 5 Claims are Impaired and entitled to vote.**

(f)    Treatment of Equity Interests (Class 6).  On the Effective Date, all Interests shall be deemed canceled, extinguished and of no further force or effect, and the Holders of Interests shall not be entitled to receive or retain any property on account of such Interest. **Class 6 Equity Interests are Impaired, and deemed to reject the Plan, and are therefore not entitled to vote.**

**4.04**    Unsecured Creditors' Rights to Opt In/Out of Classes 4 and 5.

At any time prior to the Voting Deadline, any Holder of a General Unsecured Claim in Class 4 may opt into Class 5, and any Holder of a Convenience Class Claim may opt into Class 4. At any time prior to the Voting Deadline, a Holder of a Class 4 General Unsecured Claim (which is, by definition, asserted for more than $20,000) may elect to have its claim treated as a Class 5 Convenience Class Claim.  Upon such election, if no objection to the Allowance is pending on the Effective Date, the Claim will be reduced in amount to $20,000, and will be deemed an Allowed Convenience Class Claim (i.e., not be subject to an objection if its claim is not the subject of an objection on the Effective Date) in that amount, and the Holder will receive a Distribution of 10% (i.e., $2,000) on or as soon after the Effective Date as is reasonably practicable.  Any Holder of a Class 4 General Unsecured Claim that opts into Class 5 and to have its Claim treated as a Convenience Class Claim will not receive any further distribution regardless of the Distributions made to Allowed Class 4 General Unsecured Claims.

Similarly, at any time prior to the Voting Deadline, any Holder of a Convenience Class Claim (which is, by definition, asserted for $20,000 or less) may opt into Class 4 to have its Claim treated as a General Unsecured Claim.  Upon such election, the amount of the Claim on the Effective Date will be deemed Disputed, as defined in Section 1.41 herein.  As such, the Holder of such a Claim will not receive a Distribution on the Effective Date and will only receive a Distribution in accordance with the treatment of Class 4 Claims after the Claim is Allowed. For the avoidance of doubt, a Holder of a Claim that is eligible to and does properly opt out of Convenience Class will, after the Claim is Allowed, be entitled to receive a Distribution Pro Rata to other Class 4 Claims.

**4.05**    Classification of Classes, Rights to Vote, and Estimated Distributions

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including related to the amount of Claims that exist after the claims reconciliation process.  Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to the estimates provided herein and/or the actual Distributions received by Creditors. The projected recoveries are based on information available to the Plan Proponent as of the date hereof and reflect the Plan Proponent's best estimates as of the date hereof only. In addition to the cautionary notes contained elsewhere in the Plan, it is emphasized that the

44

Plan Proponent makes no representation as to the accuracy of these recovery estimates. The Plan Proponent expressly disclaims any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered). A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

All Claims and Interests, except Administrative Expenses and Priority Tax Claims, are placed in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses, including Professional Fee Claims, and Priority Tax Claims, as described herein, have not been classified, and the respective treatment of such unclassified Claims is set forth below. The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation and Distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

Any Claim that has already been satisfied will not receive a Distribution on account of such Claim. On the Effective Date, all Interests shall be deemed canceled, extinguished and of no further force or effect, and the Holders of Interests shall not be entitled to receive or retain any property on account of such Interest.

| Class/Designation | Plan Treatment[14] | Voting Status | Estimated Claim Pool /Projected Recovery |
|---|---|---|---|
| Class 1: Priority Non-Tax Claims | Each Holder of an Allowed Priority Non-Tax Claim at the option of the Debtors or the Liquidating Trustee, as applicable, shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 1 Claim: (A) Cash equal to the amount of such Allowed Priority Non-Tax Claim; or (B) such other treatment which the Debtors or the Liquidating Trustee, as applicable, and the Holder of such Allowed Priority Non-Tax Claim have agreed upon in writing. To the extent that such Allowed Claims are satisfied from Cash, such | Unimpaired; **Not entitled to vote** (deemed to accept Plan) | Approx. $0 Recovery: 100% |

---

[14]       The following description is provided in summary form and is qualified in all respect by the treatment for such Class set forth in Section 4.03.

| | | | |
|---|---|---|---|
| | Distributions shall be made from the Initial Distribution Fund. | | |
| Class 2: Secured Claims | Each Holder of an Allowed Class 2 Claim, at the option of the Liquidating Trustee, as applicable, shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Secured Claim: (A) return of the collateral securing such Allowed Secured Claim; or (B) Cash equal to the amount of such Allowed Secured Claim; or (C) such other treatment which the Liquidating Trustee and the Holder of such Secured Claim have agreed upon in writing. To the extent that such Allowed Secured Claims are satisfied from Cash, such Distributions shall be made from the Initial Distribution Fund. | Unimpaired; **Not entitled to vote** (deemed to accept Plan) | Approx. $0 <br><br> Recovery: 100% |
| Class 3: Bedrock Claim | The Holder of the Bedrock Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 3 Claim, the Series A Trust Beneficial Interest based on its share of the 70/30 Split from the proceeds of the Liquidating Trust Assets. | Impaired; **Entitled to vote** | Pursuant to the Global Settlement Agreement, the Bedrock is entitled to (i) a secured claim in the amount of $15,777,852 plus accrued and unpaid interest, fees and expenses and (ii) an administrative expense claim pursuant to section 507(b) of the Bankruptcy Code in the amount of $2,200,000. |

46

| | | | Recovery: 0-10% |
|---|---|---|---|
| Class 4: General Unsecured Claims | Each Holder of an Allowed General Unsecured Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 4, the Pro Rata share of the Series B Trust Beneficial Interests, payable from (a) the Initial Distribution Fund after payment or reserve of all Allowed Administrative Expenses, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Secured Claims in full and (b) to the extent that any portion of an Allowed General Unsecured Claim remains after such payment, the Unsecured Claim Distribution Fund.<br><br>Right to Opt Into Class 5. Holders of General Unsecured Claims in excess of $20,000 shall have the right to opt into Class 5 as set forth in Section 4.04. | Impaired; **Entitled to vote** | (subject to opt-in or opt-out) Approx. $124 million. [15]<br><br>Recovery: .5%-10% |
| Class 5: Convenience Claims | Convenience Class Claims are unsecured claims asserted in an amount of $20,000 or less. Unless a Convenience Claim is the subject of an objection on the Effective Date or has been satisfied, it shall be deemed an Allowed Claim (i.e., not subject to objection), and the Holder of such claim shall receive a Distribution of 10% of the amount of its Allowed Convenience Claim. Such Distribution will be made from the Initial Distribution Fund as soon after the Effective Date as is reasonably practicable. In the event that a Convenience Class Claim is the | Impaired; **Entitled to vote** | (subject to opt-in or opt-out) Approx. $646,000<br><br>Recovery: 10% |

---

[15]     The Debtors anticipate that there may be more than $77,500,000 of duplicative claims.

| | | | |
|---|---|---|---|
| | subject of an objection on the Effective Date, the Holder of such claim shall receive a Distribution of 10% of the amount of its Allowed Convenience Claim from the Initial Distribution Fund as soon after the Allowed Convenience Class Claim is deemed Allowed as reasonably practicable.<br><br>Right to Opt Into Class 4. Holders of Convenience Class Claims shall have the right to opt into Class 4 as set forth in Section 4.04. | | |
| Class 6: Equity Interests | On the Effective Date, all Interests shall be deemed canceled, extinguished and of no further force or effect, and the Holders of Interests shall not be entitled to receive or retain any property on account of such Interest. | Impaired;<br><br>**Not entitled to vote** (deemed to reject) | Recovery: 0% |

**4.06**    Elimination of Vacant Classes for Voting Purposes

Any Class of Claims or Interests that is not occupied as of the date of the commencement of the Confirmation Hearing shall be deemed deleted from the Plan for purposes of voting on acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

**4.07**    Controversy Concerning Classification, Impairment or Voting Rights

In the event a controversy or dispute should arise involving issues related to the classification, impairment or voting rights of any Holder of a Claim or Interest under the Plan, whether before or after the Confirmation Date, the Bankruptcy Court may, after notice and a hearing, adjudicate such controversy.  Without limiting the foregoing, the Bankruptcy Court may estimate for voting purposes (i) the amount of any contingent or unliquidated Claim the fixing or liquidation of, as the case may be, would unduly delay the administration of the Chapter 11 Cases and (ii) any right to payment arising from an equitable remedy for breach of performance.

**4.08**    Insurance

Notwithstanding anything to the contrary herein, unless elected otherwise by the Liquidating Trustee, if any Allowed Claim is covered by an insurance policy, such Claim shall first be paid from proceeds of such Insurance Policy to the extent such proceeds are available, with the balance, if any, treated in accordance with the provisions of the Plan governing the Class

48

applicable to such Claim.

## ARTICLE V. - CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS ARE NOT EXCLUSIVE AND DO NOT CONSTITUTE THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

**5.01**    The Plan May Not Be Accepted.

The Plan Proponent can make no assurances that the requisite acceptances of the Plan will be received, and the Plan Proponent may seek to solicit an alternative plan of liquidation for the Debtors, or the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to Creditors as those proposed in the Plan.

**5.02**    The Plan May Not Be Confirmed.

Even if the Plan Proponent receives the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Plan. Even if the Bankruptcy Court determined that the Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes. If the Plan is not confirmed, it is unclear what Holders of Claims or Interests would receive under an alternative plan or in a Chapter 7 liquidation.

**5.03**    Distributions to Holders of Allowed Claims under the Plan May Be Inconsistent with Projections.

The projected Distributions discussed herein are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution. There can be no assurance that the estimated Claim amounts set forth in the Plan are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors, including specifically, the amount of Allowed Claims, and the amount to be received by the Liquidating Trust on account of Causes of Action.  Both the actual amount of Allowed Claims in a particular Class and the funds available for Distribution to such Class may differ from the Plan Proponent's estimates. If the total amount of Allowed Claims in a Class is higher than the Plan Proponent's estimates, or the funds available for Distribution to such Class are lower than the Plan Proponent's

estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

**5.04**    Objections to Classification of Claims.

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims and Interests. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Plan Proponent believes that all Claims and Interests have been appropriately classified in the Plan. To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Plan Proponent may seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Claims, may be subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, would approve the Plan as modified in such a scenario.  Except to the extent that a modification to the Plan requires resolicitation, the Plan Proponent may in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member. The Plan Proponent believes that under the Bankruptcy Rules, they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder. The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Plan Proponent believes that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny Confirmation of the Plan. Issues or disputes relating to classification and/or treatment could result in a delay in the Confirmation and Consummation of the Plan and could increase the risk that the Plan will not be consummated.

**5.05**    Failure to Consummate the Plan.

The Plan provides for certain conditions that must be satisfied (or waived) prior to Confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of the Plan, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court. Further, if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

**5.06**    Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims
             under the Plan

17351979/9

There can be no assurance that the estimated Claim amounts set forth in the Plan are correct, and the actual Allowed amounts of Claims may differ from the estimates. The estimated amounts are based on certain assumptions with respect to a variety of factors, including with respect to the Disputed Administrative Expenses, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims. Should these underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein, thereby materially reducing the recovery to the Holders of General Unsecured Claims under the Plan.

**5.07**    Reserved

**5.08**    Certain Tax Considerations.

There are a number of material income tax considerations, risks and uncertainties associated with the liquidation of the Debtors' Assets described in this Plan.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE. IN MANY CASES, THE TAX CONSEQUENCES ARE UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## <u>ARTICLE VI.</u> - MEANS FOR IMPLEMENTATION OF THE PLAN

**6.01**    Liquidation of Debtors' Assets through the Creation of the Liquidating Trust

(a)    <u>Liquidating Trust</u>

On the Effective Date the Debtors will be deemed to have transferred the Liquidating Trust Assets to the Liquidating Trust; provided that the Liquidating Trust Assets shall be subject to the Bedrock Lien. The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan. Following the Effective Date, the Liquidating Trustee shall take all actions reasonably necessary to dissolve the Debtors under any applicable laws. For the avoidance of doubt, the Debtor Professional Escrow and Professional Fee Reserve will not be transferred to the Liquidating Trust, and for which the Debtors' managers will be responsible for remittance of payments of allowed Professional Fees after the Effective Date.

(b)    <u>Appointment of Liquidating Trustee</u>

The Liquidating Trustee's duties shall commence as of the Effective Date.  The Liquidating Trustee shall administer the Liquidating Trust and shall serve as a Representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing or pursuing Causes of Action belonging to the Estates.

(c)    <u>Establishment of a Liquidating Trust.</u>

Pursuant to the Confirmation Order and the Liquidating Trust Agreement, the Liquidating Trust will be established on the Effective Date. The Liquidating Trust qualifies as a "liquidating trust" as described in Treasury Regulations Section 301.7701-4(d) and Revenue Procedure 94-45, 1994-2 C.B. 684, and will be treated for federal income tax purposes as a "grantor trust" under Internal Revenue Code sections 671-677. The Liquidating Trust shall be administered in accordance with the terms of the Liquidating Trust Agreement.

Prior to the Effective Date, any and all of the Estates' Assets shall remain Assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date, the Liquidating trust Assets shall be transferred to and vest in the Liquidating Trust in accordance with the Liquidating Trust Agreement. For the avoidance of doubt, but subject to the foregoing proviso, the Liquidating Trustee specifically retains and reserves the right to assert, after the Effective Date, any and all of the claims, Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, and no preclusion doctrine (including the doctrines of res judicata, collateral estoppel, judicial estoppel, equitable estoppel, issue preclusion, claim preclusion, and laches) shall apply to such claims or Causes of Action as Liquidating Trust Assets on or after the Effective Date. The failure to specifically identify in the Plan any potential or existing Causes of Action as a Liquidating Trust Asset is not intended to and shall not limit the rights of the Liquidating Trust to pursue any such Causes of Action. Moreover, no Person may rely on the absence of a specific reference in the Plan, the Confirmation Order, or the Liquidating Trust Agreement to any claim or Cause of Action against such Person as any indication that the Liquidating Trust will not pursue any and all available transferred claims or Causes of Actions transferred to the Liquidating Trust. The objection to the Allowance of any Claims will not in any way limit the ability or the right of the Liquidating Trust to assert, commence, or prosecute any Cause of Action transferred to the Liquidating Trust.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Liquidating Trust and the Liquidating Trustee shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Liquidating Trust Agreement, compromise or settle any Liquidating Trust Assets. From and after the Effective Date, the Liquidating Trust and the Liquidating Trustee may commence, litigate, and settle any Causes of Action or claims relating to the Liquidating Trust Assets or rights to payment or claims that belong to the Debtors or the Estates as of the Effective Date or are instituted by the Liquidating Trust and Liquidating Trustee on or after the Effective Date, except as otherwise expressly provided herein or in the Sale Order, the Global Settlement Agreement, or the Liquidating Trust Agreement. The Liquidating Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code, in each case other than Avoidance Actions and commercial tort claims against Go-Forward Creditors.

Other than as set forth herein, no other Entity may pursue such Liquidating Trust Assets on or after the Effective Date. The Liquidating Trustee shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Liquidating Trust Asset, without the need for filing any motion for such relief. On the Effective Date, the Debtors and the Liquidating Trustee shall execute the Liquidating Trust Agreement and shall have established the

Liquidating Trust pursuant hereto.  In the event of any conflict between the terms of this Article VI and the terms of the Liquidating Trust Agreement, the terms of the Liquidating Trust Agreement shall control.

For the avoidance of doubt, the Debtor Professional Escrow and Professional Fee Reserve will not be transferred to the Liquidating Trust and do not constitute Liquidating Trust Assets.

(d)    <u>Vesting of Liquidating Trust Assets</u>.

Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, on the Effective Date and periodically thereafter if additional Assets become available, the Debtors shall be deemed, subject to the Liquidating Trust Agreement, to have automatically transferred to the Liquidating Trust all of its right, title, and interest in all of the Liquidating Trust Assets, in accordance with section 1141 of the Bankruptcy Code, including the Debtors' attorney-client privilege.  All such Liquidating Trust Assets shall automatically vest in the Liquidating Trust free and clear of all Claims, liens, and other interests, subject only to the Bedrock Lien.  Thereupon, the Debtors shall have no interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust.  For the avoidance of doubt, the Liquidating Trust Expenses shall be paid from the Liquidating Trust Assets.

(e)    <u>Retained Causes of Action</u>

All Causes of Action of any of the Debtors, other than those that constitute claims that were previously waived, exculpated, released, compromised or otherwise settled, shall be retained by the Estates, and transferred to, and shall vest in the Liquidating Trust, which shall expressly retain any claims against the Svonavec Parties, including Causes of Action and claims for indemnification (the "<u>Retained Causes of Action</u>").

The Liquidating Trustee shall have the right to commence, prosecute, or settle such Retained Causes of Action, subject to the terms of the Liquidating Trust Agreement, on behalf of and for the benefit of the applicable beneficiaries shall be preserved notwithstanding the occurrence of the Effective Date. The Debtors or the Liquidating Trustee, as applicable, expressly reserve all rights to prosecute any and all Retained Causes of Action against any Entity, except as otherwise expressly provided in the Plan. The Liquidating Trustee expressly reserves all Retained Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation of the Plan.  **No entity may rely on the absence of a specific reference in this Plan or the Plan Supplement to any Retained Cause of Action against it as any indication that the Debtors or the Liquidating Trustee, as applicable, will not pursue any and all available Retained Causes of Action against it**.

The Liquidating Trustee reserves and shall retain all such Retained Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Retained Causes of Action that a Debtor may hold against any Entity shall vest in the Liquidating Trust. The Liquidating Trustee shall retain and may exclusively enforce

53

any and all such Retained Causes of Action.  Subject to the terms of the Liquidating Trust Agreement, the Liquidating trustee shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

(f)   Responsibilities of the Liquidating Trustee.

Responsibilities of the Liquidating Trustee shall be set forth in the Liquidating Trust Agreement.

**6.02**   Release of Liens

Except as otherwise provided in the Plan (including in Section 4.03(c)) or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan, all liens against the property of any Estate will be fully released, and all of the right, title and interest of any holder of such liens, including any rights to any collateral thereunder, shall attach to and be enforceable solely against any net proceeds of sales of such assets.  For the avoidance of doubt, all mortgages, deeds of trust, liens, pledges or other security interests against any property of the Estates shall be fully released on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code. Notwithstanding anything to the contrary in this Section 6.02, the Bedrock Liens shall not be released and the Liquidating Trust Assets transferred to the Liquidating Trust shall remain subject in all respects, to the Bedrock Lien.

**6.03**   Effectuating Documents; Further Transactions

On and after the Effective Date, the Liquidating Trustee is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the transactions contemplated thereby in the name of and on behalf of the Liquidating Trust without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan.

**6.04**   Records

Pursuant to the terms of the Sales, the Debtors' transferred certain of their books and records to the purchasers, subject to the Debtors' rights to reasonable access to information.  On the Effective Date, the Debtors' rights to access to the books and records shall be transferred to the Liquidating Trust.

**6.05**   Deemed Substantive Consolidation

The Plan contemplates and is predicated upon the substantive consolidation of the Estates solely for voting, confirmation, and Distribution purposes. Accordingly, on the

54

Effective Date, each Claim Filed or to be Filed against any Debtor shall be deemed filed only against HCNR, and shall be deemed a single Claim against and a single obligation of against HCNR, for Distribution purposes, which shall be paid from the Liquidating Trust, and absent an agreement prior to the Effective Date, following the Effective Date any Claim against multiple Debtors shall be disallowed as duplicative. This substantive consolidation of the Estates for Distribution purposes means that the specific Debtor against which a creditor Holds or asserts a Claim will have no effect on the Distribution (if any) provided to such creditor under the Plan.

**6.06**    Transfer of Privilege/No Waiver

On the Effective Date, all of the Debtors' evidentiary privileges, including but not limited to the attorney/client privilege, shall be deemed transferred to the Liquidating Trustee and the Liquidating Trust. The Plan shall be considered a motion pursuant to sections 105, 363 and 365 of the Bankruptcy Code for such relief. Upon such transfer, the Debtors and the Estates shall have no other further rights or obligations with respect thereto. Nothing herein shall be deemed a waiver of the Debtors' or the Estates' rights of privilege.

**6.07**    Final Decree

At any time following the Effective Date, the Liquidating Trustee shall be authorized to file a motion for entry of a final decree closing one or more of the Chapter 11 Cases.

## <u>ARTICLE VII.</u> - EXECUTORY CONTRACTS

**7.01**    Executory Contract(s) and Unexpired Leases

Except for any Executory Contracts or Unexpired Leases of the Debtors: (i) that was rejected by an Order of the Bankruptcy Court, pursuant to section 365 of the Bankruptcy Code; (ii) that was assumed and assigned or assumed, assigned and sold; or (iii) as to which a motion for approval of the assumption or rejection of such Executory Contract or Unexpired Leases has been Filed and served prior to, and remains pending on the Effective Date, all  Executory Contracts or Unexpired Leases shall be subject to the rights of the Purchaser with respect to the Designation Rights as set forth in the Asset Purchase Agreement and the Sale Order, which shall allow the Purchaser to designate Executory Contracts or Unexpired Leases for assumption, assignment and sale or rejection. After the Effective Date, the Liquidating Trustee shall assume, assign, and sell to the Purchaser those Executory Contracts or Unexpired Leases that the Purchaser designates as Assigned Contracts (as defined in the Asset Purchase Agreement). All costs associated with such Executory Contracts and Unexpired Leases, including amounts that come due thereunder, and the costs incurred in connection with assumption or rejection thereof (including professional fees) shall be borne by the Purchaser. If the Purchaser does not designate an Executory Contract or Unexpired Lease for assumption or rejection by the applicable Designation Deadline (as defined in the Asset Purchase Agreement), the Liquidating Trustee shall have the discretion whether or not to assume or reject the Executory Contract or Unexpired Lease. Solely for purposes of clarification:  By and through this Plan, the Debtors do **not** seek to extend any deadline to assume and assign any executory contracts pursuant to Section 365 of the Bankruptcy Code.

17351979/9

**7.02**    Insurance Policies Are Executory Contracts

This paragraph 7.02 shall only apply to such insurance policies and any agreements and instruments related thereto comprising "Excluded Assets" under the Asset Purchase Agreement. With respect to such insurance policies:

- All insurance policies that comprise Excluded Assets are treated as and deemed to be Executory Contracts under the Plan and, on the Effective Date, each of the Debtors or the Liquidating Trust, as applicable, shall be deemed to have assumed all insurance policies;

- The automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article IX of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (i) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable non-bankruptcy law to proceed with their claims; and (ii) the insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business (A) workers' compensation claims, and (B) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in Article IX of the Plan to proceed with its claim;

- On and after the Effective Date, the Liquidating Trust shall become and remain liable for all obligations under the insurance policies regardless of whether such obligations arose before or after the Effective Date, and without the need or requirement for insurers to file or serve any request, application, claim, proof or motion for payment or allowance of any Administrative Claim; and

- Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the assumption of each of the insurance policies by the Debtors or the Liquidating Trust, as applicable. In addition, on and after the Effective Date, the Liquidating Trust shall not terminate or otherwise reduce, the coverage under any of the directors and officers insurance policies with respect to conduct occurring prior thereto.

**7.03**    Bar Date for Rejection Damages

If the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan or otherwise gives rise to a Claim by the other party or parties thereto, such Claim shall be forever barred and shall not be enforceable against the Debtors, their Estates, or the Liquidating Trust, unless a proof of Claim is Filed no later than 30 days after the rejection date and is in accordance with the Bar Date Order; provided, however, that any party or parties to an Executory Contract or Unexpired Lease with a rejection Claim that arises or becomes Allowed on or after the Effective Date shall have 30 days from the date the Claim arises or becomes Allowed to File a proof of

Claim on account of such Claim and in accordance with the Bar Date Order, after which period any such Claim will be forever barred.

**7.04**    Pre-Existing Obligations to a Debtor Under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to a Debtor under such Executory Contract or Unexpired Leases to the extent of applicable law. In particular, to the extent afforded by applicable law, the Debtors expressly reserve and do not waive any right against counterparties to rejected Executory Contracts or Unexpired Leases to receive, or any continuing obligation of a counterparty to provide warranties, indemnifications or continued maintenance obligations on goods or services previously purchased by the contracting Debtor.

## <u>ARTICLE VIII.</u> - PROVISIONS GOVERNING RESOLUTION OF CLAIMS AND DISTRIBUTIONS OF PROPERTY UNDER THE PLAN

**8.01**    Claim Objections

(a)    Right to Object to Claims.  Other than with respect to Convenience Class Claims that are not subject to objections on the Effective Date, except insofar as a Claim is Allowed under the Plan as of or after the Effective Date, the Liquidating Trustee will have the authority, but not the obligation, to do any of the following with respect to any Claims or Interests: (1) file, withdraw, and/or litigate to judgment objections to and requests for estimation of Claims; (2) settle or compromise any Disputed Claim without any further notice to, action, order or approval by the Bankruptcy Court; and (3) administer and adjust the Claims register to reflect any such settlements or compromises without any further notice to, action, order or approval by the Bankruptcy Court. The Liquidating Trustee shall succeed to any pending objections to Claims filed by the Debtors prior to the Effective Date, and shall have and retain any and all rights and defenses the Debtors had immediately prior to the Effective Date with respect to any Disputed Claim.

(b)    Claims Objection Deadline.  Objections to Claims must be Filed with the Bankruptcy Court, and a copy of the objection must be served on the subject Creditor before the expiration of the Claims Objection Deadline; otherwise such Claims shall be deemed Allowed in accordance with section 502 of the Bankruptcy Code.  The objection shall notify the Creditor of the deadline for responding to such objection.

(c)    Claim Estimation.  Pursuant to section 502(c) of the Bankruptcy Code, the Liquidating Trustee may request estimation or liquidation of any Disputed Claim that is contingent or unliquidated or any Disputed Claim arising from a right to an equitable remedy or breach of performance.

**8.02**    Distribution Provisions

(a)    Distributions to be Made.  The Liquidating Trustee shall be responsible for making Distributions from the proceeds of the Liquidating Trust Assets in accordance with the 70/30 Split.  The Liquidating Trustee shall be required to make distributions to holders of Class 3, Class 4, and Class 5 Claims in accordance with the Plan. On the Effective Date, and after making

17351979/9

all Distributions required to be made on the Effective Date hereunder, the Liquidating Trustee shall establish and maintain a separate reserve for the estimated amount of the Liquidating Trust Expenses.

**None of the Debtors, their Estates, nor the Liquidating Trustee shall be required to reserve any Cash or other assets on account of any Disputed Claim that has been Disallowed by order of the Bankruptcy Court, regardless of whether such Order is subject to a pending appeal, unless the Holder of such Disputed Claim has filed a timely appeal of the Confirmation Order and obtained a stay pending such appeal of the Confirmation Order.**

(b)     No Liability.  The Liquidating Trustee shall only be required to act and make Distributions in accordance with the terms of the Plan.  Except on account of gross negligence, fraud, illegality, bad faith, or willful misconduct, the Liquidating Trustee shall have no (i) liability to any party for actions taken in accordance with the Plan or in reasonable reliance upon information provided to it in accordance with the Plan, or (ii) obligation or liability for Distributions under the Plan to any party who does not hold a Claim against one or more of the Debtors as of the Distribution Record Date or any other date on which a Distribution is made or who does not otherwise comply with the terms of the Plan.

(c)     Distributions on Account of Disputed Claims.  Except as otherwise provided in a Final Order or as agreed by the relevant parties, Distributions on account of Disputed Claims, if any, that become Allowed, shall be made by the Liquidating Trustee at such periodic intervals as the Liquidating Trustee determines to be reasonably prudent.

(d)     No Distributions Pending Allowance.  Notwithstanding anything herein to the contrary: (a) no Distribution shall be made with respect to any Disputed Claim until and only to the extent such Claim becomes an Allowed Claim (as applicable), and (b) unless agreed otherwise by the Liquidating Trustee no Distribution shall be made to any Person that holds both an Allowed Claim and a Disputed Claim until such Person's Disputed Claims have been resolved by settlement or Final Order.

(e)     Distributions in Cash.  Any required Cash payments to the Holders of Allowed Claims shall be made by the Liquidating Trustee: (a) in U.S. dollars by check, draft or warrant, drawn on a domestic bank, or by wire transfer from a domestic bank, and (b) by first-class mail (or by other equivalent or superior means as determined by the Liquidating Trustee).

(f)     Timing of Distributions.  Except as specifically set forth herein, the Liquidating Trustee may determine, in its discretion, the appropriate timing, amount, and cadence for Distributions.

(g)     Unclaimed Distributions.  Any Entity which fails to claim any Cash within 90 days from the date upon which a Distribution is first made to such entity shall forfeit all rights to such Distribution under the Plan, and the Liquidating Trustee shall be authorized to cancel any Distribution that is not timely claimed.  Pursuant to section 347(b) of the Bankruptcy Code, upon forfeiture, such Cash (including interest thereon, if any) shall revert to the Liquidating Trust free of any restrictions under the Plan, the Bankruptcy Code or the Bankruptcy Rules.  Upon forfeiture, the claim of any Creditor or Interest Holder with respect to such funds shall be irrevocably waived

and forever barred against the Debtors, their Estates, the Liquidating Trust, and the Liquidating Trustee, notwithstanding any federal or state escheat laws to the contrary, and such Creditor or Interest Holder shall have no claim whatsoever against any of the foregoing or against any Holder of a Claim to whom Distributions are made.

(h)     Delivery of Distributions to Holders of Claims.   Except as otherwise provided in the Plan, Distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Liquidating Trustee, as set forth on the latest date of the following documents: (a) to the address of payment set forth on any of the proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no proof of Claim is Filed); (b) at the addresses set forth in any written notices of address changes delivered to the Debtors after the date of any related proof of Claim and prior to the Effective Date; and (c) at the addresses reflected in the Schedules if no proof of Claim has been Filed and the Debtors have not received a written notice of a change of address prior to the Effective Date.

(i)     Undeliverable Distributions.   The Liquidating Trustee shall make one attempt to make the Distributions contemplated hereunder in accordance with the procedures set forth herein.  The Liquidating Trustee in its sole discretion may, but shall have no obligation to, attempt to locate Holders of undeliverable Distributions.   Any Distributions returned to the Liquidating Trustee as undeliverable or otherwise shall remain in the possession of the Liquidating Trust, until such time as a Distribution becomes deliverable, and no further Distributions shall be made to such Holder unless such Holder notifies the Liquidating Trustee of its then current address. Any Holder of an Allowed Claim entitled to a Distribution of property under this Plan that does not assert a claim pursuant to the Plan for an undeliverable Distribution, or notify the Liquidating Trustee of such Holder's then current address, within 30 days of such Distribution shall have its claim for such undeliverable Distribution irrevocably waived and shall be forever barred from asserting any such claim against the Debtors, their Estates, the Liquidating Trust, and/or the Liquidating Trustee or their respective property, and such Distribution shall be deemed unclaimed property under Section 8.02(f) of the plan.

(j)     De Minimis Distributions.  If any interim Distribution under the Plan to the Holder of an Allowed Claim would be less than $20.00, the Liquidating Trustee may withhold such Distribution until a final Distribution is made to such Holder.  If any final Distribution under the Plan to the Holder of an Allowed Claim would be less than $20.00, the Liquidating Trustee may cancel such Distribution.  Any unclaimed Distributions pursuant to this provision shall be treated as unclaimed property under Section 8.02(f) of the Plan.

(k)     Remainder Amounts After Final Distribution.  After final Distributions have been made in accordance with the terms of the Plan, if the aggregate amount of Unclaimed Distributions is less than $10,000, the Liquidating Trustee may donate up to such amount to Delaware Pro Se Bankruptcy Foundation.

## ARTICLE IX. - RELEASES, INJUNCTION, AND RELATED PROVISIONS

**9.01**     [Reserved]

17351979/9

**9.02**   Debtor Releases

Effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, their Estates, and the Debtors' successors and assigns, including the Liquidating Trustee, shall forever release, waive, and discharge each of the Released Parties from any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy, liability, action, proceeding, suit, account, controversy, agreement, promise, right to legal remedies, right to equitable remedies, or right to payment, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, for any act or omission in connection with, relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' operations, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, or the Combined Disclosure Statement and Plan, and the administration, formulation, preparation, dissemination, solicitation, negotiation, consummation, and implementation of any of the foregoing or any contract, instrument, release, or other agreement, understanding, accord, course of dealing, or document created or entered into in connection with or evidencing any of the foregoing, whether or not accrued, arising or having occurred, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, mixed, or otherwise, that may be based in whole or part on any act, omission, transaction, agreement, understanding, course of dealing, event or other occurrence or omission taking place on or prior to the Effective Date. Notwithstanding the foregoing, nothing herein shall release any claims arising out of any act or omission of a released party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a final order of a court of competent jurisdiction.

**9.03**   Exculpation and Limitation of Liability

**Except as otherwise specifically provided herein, the Exculpated Parties shall not have or incur, and are hereby released and exculpated from, any liability, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured and whether asserted or assertable directly or derivatively in law or equity, to any Holder of a Claim or an Interest, or any other party-in-interest, or any of their respective members, directors, officers, managers, trustees, employees, advisors, attorneys, professionals, agents, partners, stockholders or Affiliates, or any of their respective successors or assigns, for any act or omission in connection with, relating to or arising out of, the Chapter 11 Cases, the formulation, negotiation, or implementation of the Combined Disclosure Statement and Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the Consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence, or willful misconduct (in each case as determined by a Final Order entered by a court of competent jurisdiction), and such parties in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Combined Disclosure Statement and Plan. For the avoidance of**

doubt, nothing contained in this paragraph shall exculpate acts or omissions prior to the Petition Date or post-Effective Date.

**9.04**    Injunction

(a)    **In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Debtors. Bankruptcy Code section 1141(c) nevertheless provides, among other things, that except as provided in sections 1141(d)(2) and (d)(3) and except as otherwise provided in the plan or in the order confirming the plan, the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors. Consistent with the preceding sentence, except as otherwise expressly provided in the Plan, the Plan Supplement, related documents, or for obligations issued pursuant to the Plan, all Entities who have held, hold or may hold Claims or Interests that have been released pursuant to the Plan or as to which the Plan provides for classification and treatment or that are subject to the exculpatory provisions herein, are temporarily enjoined from taking any of the following actions from and after the Effective Date: (i) commencing or continuing in any manner any action or other proceeding of any kind  against the Debtors (but solely to the extent such action is brought against the Debtor to directly or indirectly recover upon any Assets of the Estate, including, without limitation, any such Assets that vest in the Liquidation Trust, as applicable, upon the Effective Date), or the Liquidating Trust on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the Debtors or the Liquidating Trustee on account of or in connection with or with respect to any such Claims or Interests; and (iii) creating, perfecting or enforcing any encumbrance of any kind against any Debtors or the Liquidating Trust or the property of the Estates or the Liquidating Trust on account of in connection with or with respect to any such Claims or Interests.**

(b)    **Except as otherwise provided in this Plan, or to the extent necessary to enforce the terms and conditions of this Plan, the Confirmation Order or a separate Order of the Bankruptcy Court, all Entities who have held, hold, or may hold Claims against or Interests shall be permanently enjoined from taking any of the following actions against any of the Assets of the Estates or the Liquidating Trust or any other asset or to be distributed under the Plan on account of any such Claims or Interests: (i) commencing or continuing, in any manner or in any place, any action, cause of action, or other proceeding); (ii) enforcing attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting or enforcing any lien; (iv) asserting a setoff (except  to the extent such setoff was exercised prior to the Petition Date), or the right of subrogation of any kind against any debt, liability, or obligation due to the Debtor; and (v) commencing or continuing, in any manner or in any place, any action, cause of action, or other proceeding against any of the Assets or Liquidating Trust's Assets or any other assets to be distributed under this Plan that does not comply with or is inconsistent with the provisions of this Plan.**

(c)    **Nothing in this section shall prevent the Liquidating Trustee or the Liquidating Trust from prosecuting the Liquidating Trust Assets or commencing any action or other proceeding of any kind against any party other than with respect to conduct after the Petition Date.**

61

**(d)      Notwithstanding the foregoing clauses, all Entities shall only be enjoined from commencing or continuing in any manner any action or other proceeding of any kind against an Exculpated Party for any matter expressly covered by Section 9.03 herein.**

## ARTICLE X. - CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

**10.01**   Conditions Precedent to Confirmation

It shall be a condition to Confirmation hereof that the following provisions, terms and conditions shall have been satisfied or waived pursuant to Section 10.03 herein:

(a)      The Bankruptcy Court shall have entered an Order in a form and substance reasonably acceptable to the Debtors on a final basis and determining, with respect to solicitation of the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

**10.02**   Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to Section 10.03.

(a)      The Bankruptcy Court shall have entered an order, in form and substance acceptable to the Debtors, confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

(b)      All authorizations, consents and regulatory approvals required, if any, in connection with the Plan's effectiveness shall have been obtained.

(c)      No order of a court restraining the Plan Proponent from consummating the Plan and the transactions contemplated therein shall have been entered and remain in effect, and the Confirmation Order shall be in full force and effect.

(d)      All or substantially all of the Debtors' mining permits are sold, assumed and/assigned, abandoned, or otherwise disposed.

(e)      All actions, documents (including the Liquidating Trust Agreement), certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws, and are in form and substance, acceptable to the Plan Proponent.

**10.03**   Waiver of Conditions

The conditions to Confirmation of the Plan and to the occurrence of the Effective Date set forth in this Article X may be waived in whole or in part at any time by the Debtors; provided, however, that waiver of any of the conditions set forth in 10.01, 10.02 (a), and (d) (with respect only to the Liquidating Trust Agreement).

**10.04**   Effect of Failure of Conditions

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan shall: (i) constitute a waiver or release of any claims by or Claims against the Debtors or their Estates; (ii) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other entity; or (iii) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Creditors or Interest Holders or any other entity in any respect.

**10.05**    Filing of Notice of the Effective Date.

On the Effective Date or as shortly thereafter as reasonably practicable, the Liquidating Trustee shall File a notice of the Effective Date with the Bankruptcy Court.

## ARTICLE XI. - MODIFICATION, REVOCATION OR WITHDRAWAL OF PLAN

**11.01**    Modification and Amendments

Except as otherwise specifically provided herein, and subject to the consent of Bedrock, the Plan Proponent reserves the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and Bankruptcy Rules and, as appropriate, not re-solicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Plan Proponent expressly reserves its right to alter, amend or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article. In addition, prior to the Effective Date, the Plan Proponent may make appropriate technical adjustments and modifications to the Plan, without further order or approval of the Bankruptcy Court; provided, however, that such technical adjustments and modifications do not adversely affect in a material way the treatment of Holders of Allowed Claims or Interests.

**11.02**    Effect of Confirmation on Modifications

Entry of a Confirmation Order means that all modifications or amendments to the Plan authorized by Section 11.01 above occurring after the commencement of the solicitation of votes on the Plan and prior to entry of the Confirmation Order are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**11.03**    Revocation or Withdrawal of the Plan

The Plan Proponent reserves the right to revoke or withdraw the Plan before the Effective Date, which will not affect the rights of the Debtors, their estates, the Committee, and Bedrock under the terms of the Global Settlement Agreement, and any other orders of the Bankruptcy Court. If the Plan Proponent revokes or withdraws the Plan, or if the Confirmation Date or the Effective Date does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or

compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests but, for the avoidance of doubt, expressly excluding the Term Sheet), assumption or rejection of any Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims or Interests or Claims by the Debtors against any other entity; (b) prejudice in any manner the rights of the Debtors, the Holder of any Claim or Interest or any other entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other entity. For the avoidance of doubt, the Cash Collateral Order, the Sale Order, the Global Settlement Agreement, the Term Sheet and all other orders of the Bankruptcy Court shall remain in effect and binding notwithstanding any revocation or withdrawal of the Plan.

## <u>ARTICLE XII. - JURISDICTION</u>

**12.01**   Bankruptcy Court Jurisdiction

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain and have exclusive jurisdiction over the Chapter 11 Cases to the maximum extent legally permissible, including, without limitation, for the following purposes:

(a)   To allow, disallow, determine, liquidate, classify or establish the priority or secured or unsecured status of or estimate any Claim or Interest not already Allowed hereunder, including, without limitation, the resolution of any request for payment of any Administrative Expense and the resolution of any and all objections to the allowance or priority of Claims or Interests;

(b)   To ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(c)   To determine any and all applications or motions pending before the Bankruptcy Court on the Effective Date of the Plan, including without limitation any motions for the rejection, assumption or assumption and assignment of any Executory Contract;

(d)   Any litigation commenced by the Liquidating Trustee, including Avoidance Actions and commercial tort claims including, without limitation, any and all claims against the Svonavec Parties;

(e)   To consider and approve any modification of the Plan, remedy any defect or omission, or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order;

(f)   To determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan or any related documents, or any entity's obligations in connection with the Plan or any Plan Documents, or to defend any of the rights, benefits, Estates property transferred, created, or otherwise provided or confirmed by the Plan or the Confirmation Order or to recover damages or other relief for violations thereof;

17351979/9

(g)      To consider and act on the compromise and settlement of any claim or cause of action by or against the Debtors, their Estates, the Liquidating Trust, or the Liquidating Trustee;

(h)      To decide or resolve any and all applications, motions, adversary proceedings, contested or litigated matters, and any other matters, or grant or deny any applications involving the Debtors, or their Estates that may be pending on the Effective Date or that may be brought by the Debtors or the Liquidating Trustee, or any other related proceedings by the Liquidating Trustee, and to enter and enforce any default judgment on any of the foregoing;

(i)      To adjudicate any disputes regarding the Debtors' insurance policies;

(j)      To decide or resolve any and all applications for compensation;

(k)      To issue orders in aid of execution and implementation of the Plan or any Plan Documents to the extent authorized by section 1142 of the Bankruptcy Code or provided by the terms of the Plan;

(l)      To decide issues concerning the federal or state tax liability of the Debtors which may arise in connection with the confirmation or consummation of the Plan or any Plan Documents;

(m)      To interpret and enforce any orders entered by the Bankruptcy Court in the Chapter 11 Cases; and

(n)      To enter an order or orders closing the Chapter 11 Cases.

**12.02**    Limitation on Jurisdiction

In no event shall the provisions of the Plan be deemed to confer in the Bankruptcy Court jurisdiction greater than that established by the provisions of 28 U.S.C. §§ 157 and 1334, as well as the applicable circumstances that continue jurisdiction for defense and enforcement of the Plan and Plan Documents. For the avoidance of doubt, however, such jurisdiction shall be deemed, by the entry of the Confirmation Order, to:

(a)      Permit entry of a final judgment by the Bankruptcy Court in any core proceeding referenced in 28 U.S.C. § 157(b) and to hear and resolve such proceedings in accordance with 28 U.S.C. § 157(c) and any and all related proceedings, including, without limitation, (i) all proceedings concerning disputes with, or causes of action or other claims against, any Person that the Debtors, the Estates, or the Liquidating Trust or any of their successors or assigns, may have, and (ii) any and all causes of action or other claims against any Person for harm to or with respect to any Asset of the Estate (x) conversion of such property, or (y) any property liened or transferred by the Debtors to any other Person;

(b)      Include jurisdiction over the recovery of any Property of the Estates (or property transferred by the Debtors with Bankruptcy Court approval) from any Person wrongly asserting ownership, possession or control of the same, whether pursuant to sections 542, 543, 549, and/or 550 of the Bankruptcy Code or otherwise, as well as to punish any violation of the automatic

65

stay under section 362 of the Bankruptcy Code or any other legal rights of the Debtors or their Estates under or related to the Bankruptcy Code; and

(c)    Permit the taking of any default judgment against any Person who has submitted himself or herself to the jurisdiction of the Bankruptcy Court.

## ARTICLE XIII. - MISCELLANEOUS

**13.01**    Exemption from Taxes

(a)    The Plan and the Confirmation Order provide for (a) the issuance, transfer or exchange of notes, debt instruments and equity securities under or in connection with the Plan; and (b) the creation, execution and delivery of agreements or other documents creating or evidencing the formation of the Liquidating Trust and any right or interest in the Liquidating Trust. Pursuant to section 1146 of the Bankruptcy Code and the Plan, any such act described or contemplated herein will not be subject to any stamp tax, transfer tax, filing or recording tax, or other similar tax.

**13.02**    Compliance with Tax Requirements

Notwithstanding anything to the contrary in this Plan, the Liquidating Trustee shall be entitled to deduct any federal, state or local withholding taxes from any Distributions made with respect to Allowed Claims, as appropriate. The Liquidating Trustee shall be authorized to take all actions necessary to comply with applicable withholding and reporting requirements, including, without limitation, applying a portion of any Distribution of Cash to be made under the Plan to pay applicable withholding Taxes. Any amounts withheld pursuant to the immediately preceding sentence will be deemed to have been distributed and received by the applicable recipient for all purposes of the Plan. Notwithstanding any other provision of the Plan, each Holder of an Allowed Claim that has received a Distribution under the Plan shall have sole and exclusive responsibility for the satisfaction or payment of any tax obligation imposed by any Governmental Unit, including income, withholding and other tax obligation, on account of such Distribution. The Liquidating Trustee shall have the right, but not the obligation, to not make a Distribution until the applicable recipient has made arrangements satisfactory for the payment of any Tax obligations. For tax purposes, Distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Claims until such principal amount is paid in full and then to any interest accrued on such Claim prior to the Petition Date, and the remaining portion of such Distributions, if any, will apply to any interest on such Claim after the Petition Date. The Liquidating Trustee shall be authorized to require each Holder of a Claim to provide it with an executed Form W-9, Form W-8, or any other tax form, documentation or certification as may be requested by the Liquidating Trustee as a condition precedent to being sent a Distribution. If a Holder of an Allowed Claim does not provide the Liquidating Trustee with an executed Form W-9, Form W-8 or other requested tax form within 90 days after the date of the Liquidating Trustee's initial request, the Liquidating Trustee may, in its sole discretion (a) make such Distribution net of applicable withholding or (b) reserve such Distribution, in which case (i) such Holder shall be deemed to have forfeited the right to receive any Distribution under the Plan, (ii) any such Distribution shall revert to the Liquidating Trust, for Distribution on account of other Allowed Claims and (iii) the Claim of the Holder originally entitled to such Distribution shall be irrevocably waived and forever barred

without further order of the Bankruptcy Court. The rights and obligations of the Liquidating Trustee to allocate and distribute all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and similar encumbrances is expressly preserved.

**13.03**    Defenses and Setoff

Nothing contained in this Plan shall constitute a waiver or release by the Debtors, their Estates, or the Liquidating Trustee, of any rights in respect of legal and equitable objections, defenses, setoffs, or recoupment. To the extent permitted by applicable law, the Liquidating Trustee may, but shall not be required to, set off or recoup against any Claim and the payments or other Distributions to be made under the Plan in respect of such Claim, claims of any nature whatsoever that arose before the Petition Date that the Debtors, their Estates, or the Liquidating Trust may have against the Holder of such Claim or Interest.

**13.04**    Governing Law

Except to the extent the Bankruptcy Code or the Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof.

**13.05**    Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to in the Plan or any related document shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Entity.

**13.06**    Transfer of Claims

Any transfer of a Claim shall be in accordance with Bankruptcy Rule 3001(e) and the terms of this Section. Notice of any such transfer shall be forwarded to counsel for the Debtors and the Liquidating Trustee. Both the transferee and transferor shall execute a notice, and the signatures of the parties shall be acknowledged before a notary public. The notice must clearly describe the Claim to be transferred. No partial transfer of a Claim shall be allowed. All transfers must be of one hundred percent (100%) of the transferor's interest in the Claim.

**13.07**    Post-Effective Date Service List

Pursuant to Bankruptcy Rule 2002 and any applicable Local Rule, notice of all post-Confirmation matters for which notice is required to be given shall be deemed sufficient if served upon counsel for the U.S. Trustee, counsel to the Debtors, counsel for the Liquidating Trustee, and all persons on the Bankruptcy Rule 2002 service list as well as any parties who may be affected by the relief sought.. With the exception of the Debtors, and the U.S. Trustee, any Person desiring to remain on the Bankruptcy Rule 2002 service list shall be required to file a request for continued service and to serve such request upon counsel to the Liquidating Trustee within thirty (30) days subsequent to the Effective Date. Persons shall be notified of such continued notice requirements in the notice of entry of the Confirmation Order. **Persons who do not file a request for continued**

**service within thirty (30) days subsequent to the Effective Date shall be removed from the Bankruptcy Rule 2002 service list unless and until they file and serve a subsequent request for service pursuant to Bankruptcy Rule 2002.**

**13.08**   Notices

To be effective, any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to counsel to the Debtors, the Committee, Bedrock, and the U.S. Trustee must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

(a)    <u>If to the Debtors</u>:

    1521 Concord Pike Suite 201
    Wilmington, DE 19803
    Attn: David Tradburks

        -and-

    Jeffrey R. Waxman, Esquire
    Eric J. Monzo, Esquire
    Christopher M. Donnelly, Esquire
    Samantha L. Rodriguez, Esquire
    MORRIS JAMES LLP
    500 Delaware Avenue, Suite 1500
    Wilmington, DE 19801
    Telephone: (302) 888-6800
    Facsimile: (302) 571-1750
    Email: jwaxman@morrisjames.com
        emonzo@morrisjames.com
        cdonnelly@morrisjames.com
        srodriguez@morrisjames.com

(b)    <u>If to the Committee</u>:

    Kimberly A. Brown, Esquire
    LANDIS RATH & COBB LLP
    919 Market Street, Suite 1800
    Wilmington, Delaware 19801
    Telephone: (302) 467-4400
    Facsimile: (302) 467-4450
    Email: brown@lrclaw.com

    - and-

17351979/9

FROST BROWN TODD LLP
Jordan S. Blask, Esquire
Union Trust Building
501 Grant Street, Suite 800
Pittsburgh, PA 15219
Telephone: (412) 513-4300
Facsimile: (412) 513-4299
Email: jblask@fbtlaw.com

-and-

Bryan J. K. Sisto, Esquire
400 West Market Street, Suite 3200
Louisville, KY 40202
Telephone: (502) 589-5400
Facsimile: (502) 589-1087
Email: bsisto@fbtlaw.com


(c)    If to Bedrock:

Andrew I. Silfen, Esquire
Beth M. Brownstein, Esquire
ARENTFOX SCHIFF LLP
1301 Avenue of the Americas, 42nd Floor
New York, NY 10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990
Email: Andrew.Silfen@afslaw.com
        Beth.Brownstein@afslaw.com

        -and-

Christopher M. Samis, Esquire
POTTER ANDERSON & CORROON LLP
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: csamis@potteranderson.com

    (d)    <u>If to the U.S. Trustee</u>:

        Office of the U.S. Trustee
        844 King St., Suite 2207
        Lockbox 35
        Wilmington, DE 19801
        Attn: Megan Seliber, Esquire and Malcolm M. Bates, Esquire
        Email: Megan.Seliber@usdoj.gov; malcolm.m.bates@usdoj.gov

**13.09**   Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h) and 7062 and/or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Liquidating Trustee, any and all Holders of Claims and Interests (irrespective of whether such Claims or Interests are Allowed or Disallowed or were voted to accept or reject the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each entity acquiring property under the Plan, and any and all non-debtor parties to Executory Contracts and Unexpired Leases.

**13.10**   Severability of Plan Provisions

If, before the Effective Date of the Plan, any term or provision of the Plan is held by the Bankruptcy Court or any other court exercising jurisdiction to be invalid, void or unenforceable, the Bankruptcy Court or other court exercising jurisdiction shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted so long as such term or provision is acceptable to the Debtors.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the Plan Proponent's consent; and (iii) non-severable and mutually dependent.

**13.11**   Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan, to the extent not inconsistent with the Plan.  The Plan Proponent reserves the right to amend the exhibits and schedules to the Plan any time prior to Confirmation.

**13.12**   Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Plan Proponent will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non- bankruptcy law, and pursuant to section 1125(e), the Plan Proponent and members (pursuant to the Debtors' corporate organizational documents), managers, officers, directors, employees, advisors and Professionals will be deemed to have participated in good faith and in compliance with the Bankruptcy Code, including, if applicable, in the offer, issuance, sale and purchase of any Plan securities (if any) provided under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan.

### 13.13   Conflicts

If there is a conflict between this Plan and a Plan Supplement document, the Plan Supplement document, as applicable, shall govern and control.  If any provision of this Plan (including a Plan Supplement) conflicts with or is in any way inconsistent with any provision of the Confirmation Order, the Confirmation Order shall govern and control.

In the event of any inconsistency between the Plan and any of: (1) the Sale Order, (2) the Term Sheet and (3) the Cash Collateral Order, the Sale Orders, the Global Settlement Order and/or Cash Collateral Order, as applicable, shall control over the Plan.

### 13.14   U.S. Trustee Fees

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable ("Quarterly Fees") prior to the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Debtors and the Post-Effective Date Debtors shall be jointly and severally liable to pay any and all Quarterly Fees when due and payable.  The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, each of the Post-Effective Date Debtors shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. Each and every one of the Debtors and the Post-Effective Date Debtors shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.  The U.S. Trustee shall not be required to file any Administrative Claim in the case and shall not be treated as providing any release under the Plan."

### 13.15   Implementation

The Plan Proponent shall be authorized to perform all reasonable, necessary and authorized acts to consummate the terms and conditions of the Plan and the Plan Documents, without further order from the Bankruptcy Court.

### 13.16   No Admissions

Unless expressly provided for herein, nothing contained in the Plan shall be deemed an admission by the either the Plan Proponent or the Debtors with respect to any matter set forth herein, including, without limitation, liability on any Claim or Interest or the propriety of the classification of any Claim or Equity.

Dated:  September 1, 2025
Wilmington, Delaware

**MORRIS JAMES LLP**

*/s/ Jeffrey R. Waxman*
Jeffrey R. Waxman (DE Bar No. 4159)
Eric J. Monzo (DE Bar No. 5214)
Christopher M. Donnelly (DE Bar No. 7149)
Samantha L. Rodriguez (DE Bar No. 7524)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: jwaxman@morrisjames.com
         emonzo@morrisjames.com
         cdonnelly@morrisjames.com
         srodriguez@morrisjames.com

*Counsel to the Debtors and Debtors in Possession*

72

17351979/9

# __EXHIBIT A__

Liquidation Analysis

**Liquidation Analysis**

Pursuant to Section 1129(a)(7) of the Bankruptcy Code (sometimes called the "best interests" test), the Bankruptcy Code requires that each holder of an impaired claim or equity interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.[1] The first step in meeting this test is to determine the dollar amount that would be generated from the hypothetical liquidation of the Debtor's assets and properties in the context of a liquidation in a Chapter 7 case. The gross amount of cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the cash held by the Debtors at the time of the commencement of their Chapter 7 cases. Such amount is reduced by the amount of any claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the conversion of the Bankruptcy Cases for the purposes of a hypothetical liquidation. Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with Section 726 of the Bankruptcy Code. A general summary of the assumptions used in preparing the liquidation analysis follows.

1.      **Estimate of Net Proceeds**

Estimates were made of the cash proceeds that might be realized from the liquidation of the Debtors' assets, which includes the collection of receivables and other collateral pools, and pursuit of Avoidance Actions and other Causes of Action on behalf of the estates.

2.      **Liquidation Related Costs**

The costs of liquidation under Chapter 7 would include the fees payable to a Chapter 7 trustee, as well as those that might be payable to attorneys and other professionals that such a trustee may engage. Further, costs of liquidation would include any obligations and unpaid expenses incurred by the Debtors during the Chapter 11 cases and allowed in the Chapter 7 cases, such as (i) trade obligations, (ii) compensation for attorneys, financial advisors, and other professionals, and (iii) costs and expenses of members of any statutory committee of unsecured creditors appointed by the United States Trustee pursuant to Section 1102 of the Bankruptcy Code and any other committee so appointed.

3.      **Liquidation Analysis Detail**

The following Liquidation Analysis is an estimate of the proceeds that may be generated as a result of a hypothetical liquidation of the Debtors' assets under Chapter 7 of the Bankruptcy Code. Underlying the Liquidation Analysis are a number of estimates and assumptions that are inherently subject to significant economic, operational and other uncertainties, and contingencies beyond the control of the Debtors or a Chapter 7 trustee. Therefore, there can be no assurance that the assumptions and estimates employed in determining the liquidation values of the Debtors' assets will result in an accurate estimate of the proceeds that would be realized were the Debtors to undergo an actual liquidation. The Liquidation Analysis also does not include any potential recoveries from Avoidance Actions and other Causes of Action. Therefore, the actual

---

[1]     Capitalized terms not defined herein have the meaning ascribed to such terms in the Combined Disclosure Statement and Plan (as may be amended or modified, the "Plan").

amount available for payment on account of claims could vary materially from the estimates provided herein. The Liquidation Analysis set forth below was based on the estimated values of the Debtors' assets as of August 31, 2025, unless otherwise noted.  These values have <u>not</u> been subject to any review, compilation, or audit by any independent accounting firm.

2

| LIQUIDATION ANALYSIS | | | |
|---|---|---|---|
| **Assets** | | | |
| | **As of August 31, 2025** | **Estimated recovery in Chapter 7** | **Chapter 11 Plan** |
| Cash on hand | $3,225,000[2] | $3,225,000 | $3,225,000 |
| Accounts Receivable and other assets | Unknown[3] | Unknown | Unknown |
| Avoidance Actions and other Causes of Action | Unknown[4] | Unknown | Unknown |
| Other Assets | Unknown[5] | Unknown | Unknown |
| | | | |
| **Liabilities** | | | |
| Secured Claims | $5,800,000[6] | $5,800,000 | $5,800,000 |
| Chapter 11 Administrative Claims | Approx. $100,000[7] | Approx. $100,000 | Approx. $100,000 |
| Priority Claims | $12,000[8] | $12,000 | $120,000 |
| Unsecured Claims | $124,646,000[9] | $124,646,000 | $124,646,000 |
| Chapter 7 Administrative Expenses | N/A | $245,000[10] | N/A |
| Chapter 11 Wind-Down Costs | N/A | N/A | $200,000[11] |

[2]      This includes all cash held by the Debtors as of August 22, 2025, or that will remain available to the Debtors for payment of expenses, including professional fees under the Budget and the Global Settlement Agreement.

[3]      The Debtors' books and records include certain accounts receivable, cash collateral held in support of mining permit bonds, and other amounts due to the Debtors' estates totaling $4,125,000. The Debtors anticipate that a significant portion of these amounts may not be recoverable.

[4]      While the Debtors believe that the estates' rights in avoidance actions and other recoveries will generate a significant net proceeds, for purposes of this liquidation analysis, because potential recoveries from avoidance actions and other litigation are speculative, the Debtors have assumed the net proceeds to be $0.

[5]      The Debtors' books and records include certain other assets, including prepayments and deposits. The Debtors anticipate that some of these amounts may not be recoverable.

[6]      As noted in the Global Settlement Agreement, the remaining secured creditor, Bedrock, has agreed to a sharing arrangement with the General Unsecured Claims. Bedrock is entitled to (i) a secured claim in the amount of $15,777,852 plus accrued and unpaid interest, fees and expenses and (ii) an administrative expense claim pursuant to section 507(b) of the Bankruptcy Code in the amount of $2,200,000.

[7]      The Debtors do not believe that there are limited outstanding Chapter 11 administrative expenses other than Professional fees and expenses, and the majority of those fees will have been paid either in whole or part as of the Effective Date. The Debtors estimate that there are approximately $2,340,000 of professional fees for the Debtors' and Committee's professionals. The Debtors further anticipate that the estates may incur more than an additional $200,000 of professional fees and expenses between August 31, 2025 and confirmation of the Plan.

[8]      The Debtors have not yet fully evaluated the proofs of claim filed against the estates, but they anticipate that some of the claims asserting a priority will be general unsecured claims.

[9]      The Debtors have not yet fully evaluated the proofs of claim filed against the estates, but they anticipate that a significant number of those claims will ultimately be disallowed, either as duplicates, as being late-filed, or for substantive reasons.

[10]      Section 326(a) provides that the court may allow a Chapter 7 trustee the following as reasonable compensation: "not to exceed 25 percent on the first $5,000 or less, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000, and . . . 3 percent of such moneys in excess of $1,000,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims." Assuming that the cases were to convert to Chapter 7, and the trustee were to distribute $616,350 (which is equal is to the amount of projected cash on hand as of the Effective Date), the trustee's fees would be equal to $34,065. This estimate also includes $200,000 for professional fees. Further, the Debtors anticipate that the conversion of the case to Chapter 7 and the appointment of a Chapter 7 trustee would require that the trustee and his professionals familiarize themselves with the underlying facts of these cases, including the litigation with HHC Parties. The Debtors' estimate of wind down costs in Chapter 7 includes estimated professional fees by an appointed Chapter 7 trustee may be vary significantly from this estimate, depending upon claims litigation and the pursuit of claims and Causes of Action on behalf of the estates.

3

**Distribution of Net Proceeds Under the Absolute Priority Rule**

The foregoing postpetition claims, costs, expenses, fees, and such other Claims that may arise in a Chapter 7 liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition priority and unsecured claims. Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, and no equityholder would receive any distribution until all creditors are paid in full.

After consideration of the limited amount of cash held by the Debtors and other assets readily capable of monetization, as well as the effects that a Chapter 7 liquidation would have on the ultimate proceeds, the Debtors and the Committee believe, as summarized in the following chart, that the confirmation of the Plan will provide all creditors and equity holders with a recovery that is equal to or greater than it would receive pursuant to a liquidation of the Debtor under Chapter 7 of the Bankruptcy Code.

| ESTIMATED RECOVERIES UNDER PLAN | | | |
|---|---|---|---|
| **Claims** | **Class** | **Chapter 7** | **Under the Plan** |
| Non-Tax Priority Claims | 1 | 100% | 100% |
| Secured Claims | 2 | 100% | 100% |
| Bedrock Claim | 3 | 0-10% | 0-20% |
| General Unsecured Claims Over $20,000[12] | 4 | 0-10% | 1-20% |
| General Unsecured Claims of $20,000 or less[13] | 5 | 3-10% | 10% |
| Equity Interests | 6 | 0% | 0% |

---

[11]        The Debtors' estimate of wind down costs in Chapter 11 includes estimated professional fees by the Liquidating Trustee may vary significantly from this estimate depending upon claims litigation and the pursuit of claims and Causes of Action on behalf of the Liquidating Trust.

[12]        The expected distribution on account of general unsecured claims of all size, both in Chapter 7 and under the Plan of Liquidation, will depend upon the claims reconciliation process, the success of claims and Causes of Action brought on behalf the estates by the Liquidating Trustee.

[13]        Under the Plan, Class 5 general unsecured claims will receive 10% on account of Allowed Claims under $20,000.  In Chapter 7, there will be no distinctions between general unsecured claims depending upon the size of the claims.

4

**Exhibit B**

Form of Confirmation and Effective Date Notice

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| KTRV LLC, *et al.*,[1] | Case No. 25-10601 (MFW) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket Nos. _____** |

**NOTICE OF (I) ENTRY OF ORDER CONFIRMING, AND OCCURRENCE
OF EFFECTIVE DATE OF COMBINED DISCLOSURE STATEMENT AND
PLAN OF LIQUIDATION DATED SEPTEMBER 1, 2025**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

    **A.**    **Confirmation of the Plan.**

    On October __, 2025, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entered an order [Docket No. _____] (the "Confirmation Order")[2] confirming the Combined Disclosure Statement and Plan of Liquidation dated September 1, 2025 (collectively with all exhibits and supplements and any modifications or other amendments thereto, the "Plan") in the above-captioned Chapter 11 cases (the "Chapter 11 Cases") of the above-captioned debtors (collectively, the "Debtors").

    **B.**    **Occurrence of the Effective Date, Appointment of the Trustee and the Vesting of the Estates' Assets.**

    The Plan became effective on October ___, 2025 (the "Effective Date"). As of the Effective Date, among other things, (a) the Liquidating Trustee was appointed with the power to exercise the rights, power, and authority of the Trust under applicable provisions of the Plan, Liquidating Trust Agreement, and bankruptcy and non-bankruptcy law; and (c) except as otherwise provided in the Plan, all property of the Debtors and the Estates and became the property of, and vested in, the Liquidating Trust free and clear of all Claims, Liens, charges, other encumbrances, and interests, subject only to the Bedrock Lien.

---

[1]    The Debtors in these chapter 11 cases, along with each the last four digits of each Debtor's tax identification number, are as follows: KTRV LLC (9993), Heritage Coal & Natural Resources, LLC (8326). The Debtors' service address is 1521 Concord Pike, Suite 201, Wilmington, DE 19803.

[2]    Capitalized terms used but not defined in this Notice shall have the same meanings given to them in the Plan and the Confirmation Order.

17576844/4

## C.    Resolution of Disputed Claims.

Notwithstanding anything to the contrary as provided in the Plan, and any requirements that may be imposed pursuant to Bankruptcy Rule 9019, except insofar as a Claim is Allowed under the Plan on and after the Effective Date, the Liquidating Trustee will have the authority, but not the obligation, to do any of the following with respect to any Claims or Interests: (1) file, withdraw or litigate to judgment objections to and requests for estimation of Claims; (2) settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (3) administer and adjust the Claims register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Bankruptcy Court. The Liquidating Trustee shall succeed to any pending objections to Claims filed by the Debtors or the Committee prior to the Effective Date, and shall have and retain any and all rights and defenses the Debtors and/or the Estates had immediately prior to the Effective Date with respect to any Disputed Claims.

9.04    Injunction

(a) In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Debtors. Bankruptcy Code section 1141(c) nevertheless provides, among other things, that except as provided in sections 1141(d)(2) and (d)(3) and except as otherwise provided in the plan or in the order confirming the plan, the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors. Consistent with the preceding sentence, except as otherwise expressly provided in the Plan, the Plan Supplement, related documents, or for obligations issued pursuant to the Plan, all Entities who have held, hold or may hold Claims or Interests that have been released pursuant to the Plan or as to which the Plan provides for classification and treatment or that are subject to the exculpatory provisions herein, are temporarily enjoined from taking any of the following actions from and after the Effective Date: (i) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors (but solely to the extent such action is brought against the Debtor to directly or indirectly recover upon any Assets of the Estate, including, without limitation, any such Assets that vest in the Liquidation Trust, as applicable, upon the Effective Date), or the Liquidating Trust on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the Debtors or the Liquidating Trustee on account of or in connection with or with respect to any such Claims or Interests; and (iii) creating, perfecting or enforcing any encumbrance of any kind against any Debtors or the Liquidating Trust or the property of the Estates or the Liquidating Trust on account of in connection with or with respect to any such Claims or Interests.

(b) Except as otherwise provided in this Plan, or to the extent necessary to enforce the terms and conditions of this Plan, the Confirmation Order or a separate Order of the Bankruptcy Court, all Entities who have held, hold, or may hold Claims against or Interests shall be permanently enjoined from taking any of the following actions against any of the Assets of the Estates or the Liquidating Trust or any other asset or to be distributed under the Plan on account of any such Claims or Interests: (i) commencing or continuing, in any manner or in any place, any action, cause of action, or other proceeding; (ii) enforcing attaching,

17576844/4

collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting or enforcing any lien; (iv) asserting a setoff (except to the extent such setoff was exercised prior to the Petition Date), or the right of subrogation of any kind against any debt, liability, or obligation due to the Debtor; and (v) commencing or continuing, in any manner or in any place, any action, cause of action, or other proceeding against any of the Assets or Liquidating Trust's Assets or any other assets to be distributed under this Plan that does not comply with or is inconsistent with the provisions of this Plan.

(c) Nothing in this section shall prevent the Liquidating Trustee or the Liquidating Trust from prosecuting the Liquidating Trust Assets or commencing any action or other proceeding of any kind against any party other than with respect to conduct after the Petition Date.

(d) Notwithstanding the foregoing clauses, all Entities shall only be enjoined from commencing or continuing in any manner any action or other proceeding of any kind against an Exculpated Party for any matter expressly covered by Section 9.03 herein

### D.    Executory Contracts and Unexpired Leases Not Assumed.

Notwithstanding anything in the Plan to the contrary, unless otherwise, (i) previously assumed and assigned or assumed, assigned and sold; or (ii) for which a motion for approval of the assumption of an Executory Contract or Unexpired Leases has been Filed and served prior to, and remains pending on the Effective Date, all Executory Contracts or Unexpired Leases shall be rejected as of the Effective Date, other than all insurance policies, which pursuant to Section 7.02 of the Plan, which shall be deemed to be Executory Contracts and shall be deemed assumed by the Debtors and/or Liquidating Trust on the Effective Date as set forth therein.

### E.    Bar Dates.

Administrative Bar Date. Unless previously filed or as otherwise governed by an order of the Court or pursuant to the Plan, to requests for payment of Administrative Claims must be filed with the Court by the Administrative Claim Bar Date, which shall be the first Business Day that is thirty (` the Effective Date.  Holders of Administrative Claims that are required to file and serve a request for payment of such Administrative Claims and that do not file and serve such a request by the Administrative Claim Bar Date shall be forever barred from asserting such Administrative Claims against the Debtors, their Estates, the Liquidating Trust, or their respective property. Objections to any requests for payment of Administrative Claims must be asserted by the Claims Objection Deadline.

Professional Compensation. Each Professional shall file an application for allowance of final compensation and reimbursement of expenses in the Chapter 11 Cases, for the period through the Effective Date, no later than forty-five (45) days after the Effective Date. Objections to applications of professionals for compensation or reimbursement of expenses must be filed with the Bankruptcy Court and served on the Liquidating Trustee, the U.S. Trustee, and the professionals to whose application the objections are addressed no later than twenty-one (21) days after the Professional Fee Bar Date, or the Bankruptcy Court may enter an order authorizing the fees without a hearing. Any professional fees and reimbursements or expenses incurred by the

17576844/4

Liquidating Trustee subsequent to the Effective Date may be paid without application to the Bankruptcy Court.

Rejection Damages Bar Date. If the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan or otherwise gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors, their Estates, or the Liquidating Trust, unless a Proof of Claim is filed with the Bankruptcy Court by no later than 30 days after the Effective Date; provided, however, that any counterparty or counterparties to an Executory Contract or Unexpired Lease with a Claim that arises or becomes Allowed on or after the Effective Date as a result of the rejection of such contract or lease. **All proofs of claim arising from the rejection of executory contracts or unexpired leases must be filed by the later of (a) 30 days after entry of any order authorizing the rejection of an executory contract or unexpired lease, including any order confirming the Plan, and (b) the date set forth in an order authorizing rejection of an executory contract or unexpired lease.**

Proofs of Claim arising from the rejection of executory contracts or unexpired leases should be filed so as to be received on or before the applicable Bar Date at the following addresses:

Proofs of Claim may be delivered electronically using the interface available on the Debtors' claims agent's website: https://cases.stretto.com/KTRV.  Alternatively, proofs of claim may be submitted by first class mail, overnight, or hand delivery to the following address:

KTRV, LLC, et al. Claims Processing
c/o Stretto
410 Exchange, Suite 100
Irvine, CA 92602

Proofs of claim submitted by facsimile or e-mail shall not be accepted.

**F.      Retention of Jurisdiction by Bankruptcy Court.**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases to the extent legally permissible, including, without limitation, jurisdiction over the matters set forth in Article XII of the Plan; provided, however, for the avoidance of doubt, nothing in this Confirmation Order, the Plan or the Liquidating Trust Agreement shall prevent the Liquidating Trustee or the Liquidating Trust from commencing and prosecuting litigation that constitute Liquidating Trust Assets in either the Bankruptcy Court, an appropriate state court, or other non-bankruptcy forum, in the Liquidating Trustee's discretion.

**H.      Notice Parties' Service Addresses.**

For purposes of serving requests for payment of Administrative Claims, applications for allowance of Professional Fee Claims, and any other papers required to be served on the notice parties set forth in the Plan, such service should be made, as applicable, on:

(a)     **If to the Debtors:**

      Jeffrey R. Waxman (DE Bar No. 4159)
      Eric J. Monzo (DE Bar No. 5214)
      Christopher M. Donnelly (DE Bar No. 7149)
      Samantha L. Rodriguez (DE Bar No. 7524)
      3205 Avenue North Blvd., Suite 100
      Wilmington, DE 19803
      Telephone: (302) 888-6800
      Facsimile: (302) 571-1750
      E-mail: jwaxman@morrisjames.com
            emonzo@morrisjames.com
            cdonnelly@morrisjames.com
            srodriguez@morrisjames.com

(b)     **If to the Committee:**

      LANDIS RATH & COBB LLP
      Kimberly A. Brown (No. 5138)
      Matthew R. Pierce (No. 5946)
      Elizabeth A. Rogers (No. 7335)
      919 Market Street, Suite 1800
      Wilmington, Delaware 19801
      Telephone: (302) 467-4400
      Facsimile: (302) 467-4450
      Email: brown@lrclaw.com
            pierce@lrclaw.com
            erogers@lrclaw.com

         -and-

      FROST BROWN TODD LLP
      Jordan S. Blask, Esq.
      Ronald E. Gold, Esq.
      Bryan J. K. Sisto, Esq
      Union Trust Building
      501 Grant Street, Suite 800
      Pittsburgh, PA 15219
      Telephone: (412) 513-4300
      Facsimile: (412) 513-4299
      Email: jblask@fbtlaw.com
            rgold@fbtlaw.com
            bsisto@fbtlaw.com

17576844/4

(c)      **If to the U.S. Trustee:**

Office of the U.S. Trustee
Attn: Malcolm Bates, Esquire
844 King St., Suite 2207
Lockbox 35
Wilmington, DE 19801
E-mail: Malcolm.M.Bates@usdoj.gov

**I.      Copies of Confirmation Order.**

Copies of the Plan, the Confirmation Order or any other pleadings filed in the Chapter 11 Cases may be obtained for a fee via PACER at: http://www.deb.uscourts.gov or for free at https://cases.stretto.com/KTRV/court-docket.

Dated: October __, 2025                MORRIS JAMES LLP

                                       /s/_____
                                       Jeffrey R. Waxman (DE Bar No. 4159)
                                       Eric J. Monzo (DE Bar No. 5214)
                                       Christopher M. Donnelly (DE Bar No. 7149)
                                       Samantha L. Rodriguez (DE Bar No. 7524)
                                       3205 Avenue North Blvd., Suite 100
                                       Wilmington, DE  19803
                                       Telephone: (302) 888-6800
                                       Facsimile: (302) 571-1750
                                       E-mail: jwaxman@morrisjames.com
                                            emonzo@morrisjames.com
                                            cdonnelly@morrisjames.com
                                            srodriguez@morrisjames.com

                                       *Counsel for the Debtors and Debtors-in-Possession*

17576844/4

**<u>Exhibit C</u>**

Budget For Use of Cash Collateral

| Heritage Coal & Natural Resources, LLC | 8/1 Actual | 8/8 Actual | 8/15 Actual | 8/22 Actual | 8/29 Actual | 9/5 Actual | 9/12 Actual | 9/19 Actual | 9/26 Actual | 10/3 Actual | 10/10 Actual | 10/17 Budget | CONFIRMATION 10/24 Budget | 10/31 Budget | EFFECTIVE 11/7 Budget | 11/14 Budget | 11/21 Budget | 8/29-11/29 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OPENING CASH BALANCE ($000s) | 3,654.2 | 3,236.9 | 3,227.3 | 3,271.3 | 3,225.8 | 2,812.7 | 2,810.2 | 2,808.0 | 2,778.3 | 2,111.0 | 2,102.1 | 1,575.0 | 1,428.8 | 1,138.5 | 522.6 | 243.4 | 192.0 | 3,225.8 |
| **CASH INFLOWS** | | | | | | | | | | | | | | | | | | |
| Integrity A/R | | | | | | | | | | | | | | | | | | - |
| Alpha | | | | | | | | | | | | | | | | | | - |
| House Coal A/R | | | | | | | | | | | | | | | | | | - |
| Coal Sales - 1st Train (ANR - Tier 2) | | | | | | | | | | | | | | | | | | - |
| Coal Sales - 2nd Train (ANR - Tier 1) | | | | | | | | | | | | | | | | | | - |
| Coal Sales - 3rd Train (INTG - Tier 1) | | | | | | | | | | | | | | | | | | - |
| Coal Sales - 4th Train (ANR - Tier 1) | | | | | | | | | | | | | | | | | | - |
| Coal Sales - 5th Train (Tier 2) | | | | | | | | | | | | | | | | | | - |
| RFI | | | | | | | | | | | | | | | | | | - |
| RAW RS Sale - CR or Carlos | | | 92.2 | | | | 5.7 | | | | | | | | - | - | - | 5.7 |
| Other | | | | | | | 15.2 | | 1.0 | | | | | | - | | | 16.2 |
| **Total Operating Cash Receipts** | - | - | 92.2 | - | - | - | 20.9 | - | 1.0 | - | - | - | - | - | - | - | - | 21.9 |
| **CASH OUTFLOWS** | | | | | | | | | | | | | | | | | | |
| Employee Payroll - Mining | | | | | | | | | | | | | | | | | | - |
| Employee Payroll - Wash Plant | | | | | | | | | | | | | | | | | | - |
| Employee Payroll - Office/Engineer/Other | (21.1) | | (18.7) | | (21.3) | | (21.0) | | (21.4) | | (21.6) | | (22.7) | | (22.7) | | | (130.6) |
| Payroll Taxes | (1.6) | | (1.4) | | (1.6) | | (1.6) | | (1.6) | | (1.6) | | | | | | | (6.4) |
| Employee Benefits | | | | (3.3) | | | | | (7.9) | | | | | | (7.9) | | | (15.8) |
| 720 Excise Tax $.55 | (1.2) | | | | | | | | | | | | | | | | | - |
| Maryland Production Tax $.47 | | | | | | | | | | | | | | | | | | - |
| OSM Tax $.224 | (12.9) | | | | | | | | | | | | | | | | | - |
| Property Tax | | | | | | | | | (1.0) | | | | | | | | | (1.0) |
| Regulatory Authorities - Permits/Fines | | | | (3.4) | | (0.2) | | | | | | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (1.4) |
| Utilities | (1.5) | | (5.8) | (1.4) | | | | (3.0) | (1.3) | | | | (5.0) | | | | | (6.3) |
| Insurance | | | (7.9) | | | | | | (21.3) | (1.0) | | | (10.0) | | | | | (35.3) |
| Bond Premiums | | | (6.3) | | | | | | | | | | | | | | | - |
| Workers Comp | | | (3.8) | | | | (1.6) | | | | | | | | | | | (1.6) |
| Site Security | | | | | | | | | | | | | | | | | | - |
| Trucking | | | | | | | | | | | | | | | | | | - |
| Royalties | | | | | | | | | | | | | | | | | | - |
| Engineering Fees | | | | | | | | (2.3) | | | | | | (15.0) | | | (5.0) | (22.3) |
| Accounting Fees | | | | | | | | | | | | | | (15.0) | | | | (15.0) |
| IT/Accounting Software | | | | | (0.9) | (0.8) | | | | | | | (13.0) | | | | | (14.7) |
| Water Treatment | (9.2) | (7.8) | | (8.3) | (3.7) | | | | (11.0) | (5.7) | | (10.0) | (10.0) | (10.0) | (10.0) | | | (60.4) |
| AMEX | | | | | | | | | | | | | | | | | | - |
| WEX (Gas Cards) Due 1st | | | | | | | | | | | | | | | | | | - |
| R&M | | | (0.3) | | | | | | | | | | (0.5) | | | | | (0.5) |
| Supplies | | | | | | | (0.5) | (0.2) | | | | | | | | | | (0.7) |
| Fuel & Lubricants | (1.0) | | (1.0) | | | | | | (1.0) | (0.5) | (0.3) | (0.4) | | (0.4) | (0.4) | (0.4) | | (3.4) |
| Coal Processing Chemicals | | | | | | | | | | | | | | | | | | - |
| Coal Processing R&M | | | | | | | | | | | | | | | | | | - |
| Coal Analysis & Sampling | | | (0.1) | | | | | | | | | | | | | | | - |
| Travel | | | | | | | | | | | | | (1.0) | | | | | (1.0) |
| Counsel - Normal Course | | | | | | | | | | | | | | | | | | - |
| Financial Advisors | | | | | | | | | | | | | | | | | | - |
| Processing Agent | | | | | | | | | | | | | | | | | | - |
| Vendor | (1.2) | (1.8) | (2.9) | | (2.0) | (1.5) | | | (1.3) | (1.7) | (0.6) | (1.2) | (1.2) | (1.2) | (1.2) | (1.2) | (1.2) | (14.3) |
| Other | | | | | | | | | | | | | | | | | | - |
| **Total Operating Disbursements** | $ (49.7) | $ (9.6) | $ (48.2) | $ (16.4) | $ (29.5) | $ (2.5) | $ (23.1) | $ (7.1) | $ (67.8) | $ (8.9) | $ (24.1) | $ (12.3) | $ (63.5) | $ (41.8) | $ (42.4) | $ (1.4) | $ (6.4) | $ (330.7) |
| **Operating Cash Flow** | $ (49.7) | $ (9.6) | 44.0 | $ (16.4) | $ (29.5) | $ (2.5) | $ (2.2) | $ (7.1) | $ (66.8) | $ (8.9) | $ (24.1) | $ (12.3) | $ (63.5) | $ (41.8) | $ (42.4) | $ (1.4) | $ (6.4) | $ (308.8) |
| **Bankruptcy Disbursements** | | | | | | | | | | | | | | | | | | |
| Professional Fees - (see schedule) | (367.1) | | | (29.1) | (383.6) | | | (22.6) | (600.0) | | (503.0) | (83.9) | (54.9) | (574.1) | (20.0) | - | (85.0) | (2,327.1) |
| Critical Vendor | | | | | | | | | | | | | | | | | | - |
| Cure - Royalties | | | | | | | | | | | | | | | | | | - |
| Fuel / Lube | | | | | | | | | | | | | | | | | | - |
| Shipping Motion | | | | | | | | | | | | | | | | | | - |
| Trucking | | | | | | | | | | | | | | | | | | - |
| KEIP/KERP | | | | | | | | | | | | | | (100.0) | | | | (100.0) |
| Adequate Assurance | | | | | | | | | | | | | | | | | | - |
| 503(b)(9) | | | | | | | | | | | | | | | | | | - |
| Taxes | | | | | | | | | | | | | | | | | | - |
| Cures | | | | | | | | | | | | | | | | | | - |
| UST Fees | (0.5) | | | | | | | (0.5) | | | | | (172.0) | | (16.8) | | | (189.3) |
| Bedrock - Interest and Prof Fees | | | | | - | | | - | | | | (50.0) | | | (50.0) | | | (100.0) |
| Post Sale Distribution/Other - Convenience Class | | | | | | | | | | | | | | (100.0) | | | | (100.0) |
| **Total Bankruptcy Disbursements** | (367.6) | - | - | (29.1) | (383.6) | - | - | (22.6) | (600.0) | - | (503.0) | (133.9) | (226.9) | (574.1) | (236.8) | (50.0) | (85.0) | (2,816.4) |
| **Total Disbursements** | (417.3) | (9.6) | (48.2) | (45.5) | (413.1) | (2.5) | (23.1) | (29.7) | (668.3) | (8.9) | (527.1) | (146.2) | (290.3) | (615.9) | (279.2) | (51.4) | (91.4) | (3,147.1) |
| **Cash Flow after Bankruptcy Disbursements** | (417.3) | (9.6) | 44.0 | (45.5) | (413.1) | (2.5) | (2.2) | (29.7) | (667.3) | (8.9) | (527.1) | (146.2) | (290.3) | (615.9) | (279.2) | (51.4) | (91.4) | (3,125.2) |
| **ENDING CASH BALANCE ($000s)** | $ 3,236.9 | $ 3,227.3 | $ 3,271.3 | $ 3,225.8 | 2,812.7 | $ 2,810.2 | $ 2,808.0 | 2,778.3 | $ 2,111.0 | $ 2,102.1 | $ 1,575.0 | $ 1,428.8 | $ 1,138.5 | $ 522.6 | $ 243.4 | 192.0 | 100.6 | $ 100.6 |